1

**THE HONORABLE SUZANNE R. PARISIEN**
**Noted for Hearing on Shortened Time: May 30, 2023**
**Oral Argument Requested**

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR KING COUNTY**

8

9
10
11

MICHAEL VANDIVERE and KATHRYN
SNOW VANDIVERE, husband and wife and
their marital community, and KATHRYN
SNOW VANDIVERE, as the legal guardian
of W.V., a minor,

No. 19-2-27385-2 SEA

12

Plaintiffs,

13

vs.

**PLAINTIFFS' MOTION FOR
SANCTIONS**

14
15

VERTICAL WORLD, INC., a Washington
State Corporation; C3 MANUFACTURING,
LLC, a Colorado Company,

16

Defendants.

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR SANCTIONS

No. 19-2-27385-2 SEA



909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654
www.pcvalaw.com

EXHIBIT 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## I.     INTRODUCTION

Plaintiffs bring this motion for sanctions against Defendant C3 Manufacturing, LLC ("C3") based on the very recent discovery of two separate acts of egregious misconduct committed by C3 and its former attorneys who inexplicably withdrew from the case a month before trial:

1.   On May 5, 2023, Defendant Vertical World, Inc. ("Vertical World") revealed that C3's former attorney, Chris Furman, opened a gym account at Vertical World and accessed the Vertical World gym—without notice to counsel—**no less than 30 times** beginning in March of this year through May.  It remains unclear the extent of any ex parte contact C3's former attorney had with the majority witnesses in this case.  Plaintiffs have been seeking to depose Mr. Furman, but they have not been successfully in serving him despite numerous attempts, and it appears that he might be evading.

2.   On May 22, 2023, Defendant C3 produced documents revealing that C3's insurer, Houston Casualty Company ("HCC"), rescinded its $4 million insurance policy issued to C3, leaving only $1 million in coverage for a claim that is likely to lead to a verdict in the eight figures.  Defendant C3 knew about this recission since January 26, 2023, several months before trial, and yet failed to inform Plaintiff.  The basis for the recission is that HCC has accused C3 of having committed fraud by misrepresenting a history of defects and product recalls with the subject product line on the application for insurance.

Both of these revelations have prejudiced Plaintiffs on the eve of trial, involve serious ethical concerns, and they demonstrate sanctionable offenses under the civil rules.  Regarding the first act of misconduct, C3's former counsel potentially had extensive *ex parte* communication with most of the witnesses in this case—employees of Vertical World—under the guise of being a normal customer during the time period when he still represented C3 in this litigation.  In opening a gym membership, C3's former counsel entered into a *quid pro quo* business arrangement with

PLAINTIFFS' MOTION FOR SANCTIONS

Page 1  |  No. 19-2-27385-2 SEA

**PFAU COCHRAN**
**VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Vertical World for purposes unknown to Plaintiffs and without advance notice to Plaintiffs. All prior inspections of the Vertical World gym have been done pursuant to CR 34 and with notice and attendance of all counsel, so this conduct was committed outside of the protocol required by the civil rules. Many questions remain unanswered as to this conduct:

- Why did C3's attorney spend excessive amounts of time at Vertical World without prior notice to counsel?
- What conversations did C3's attorney have with witnesses in this case?
- Did C3's attorney conduct surveillance of Vertical World?
- Did C3's attorney take photographs, videos, or statements of Vertical World and/or its employees who are witnesses to this case?

These many questions will remain unanswered as Plaintiffs enter trial. For reasons still unknown to Plaintiffs, Vertical World indicated that it may call Mr. Furman as a witness at trial. To investigate the extent of the misconduct, Plaintiffs' counsel requested supplementation of discovery from Defendants and attempted to serve Mr. Furman with a deposition subpoena, however Mr. Furman is evading service, and his law firm will not accept service for him. Even if Plaintiffs are capable of serving and deposing Mr. Furman mere days before trial, it is unknown what transpired between Mr. Furman and nearly all the witnesses in this case. C3 has yet to explain itself for this conduct. Due to the timing of this disclosure by Vertical World – C3 to this day has never provided any update to discovery requests regarding this conduct despite Plaintiffs' requests that it do so – Plaintiffs have been stymied from investigating the impact that Mr. Furman's conduct has had on the issues at stake in this important trial.

As to the second act of misconduct, where C3 withheld critical information regarding insurance coverage *for months*, Plaintiffs are again put in a position where they are prejudiced in their preparation for trial by having a full and fair picture of C3's insurance coverage that may be available to satisfy all or part of a judgment. This Court will recall that C3's former counsel had very recently requested a continuance based on an "unavoidable conflict." The latest production

PLAINTIFFS' MOTION FOR SANCTIONS

Page 2 | No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

has revealed that the representations made to this Court were very likely made under false pretenses. The cause for the "conflict" was likely because HCC funded prior counsel, but due to the rescission of insurance coverage, C3 had to find counsel paid through other means. None of this was shared in C3's motion to continue because former counsel attempted to garner a trial continuance through concealing the truth from the Court.

The late-breaking discovery revealed that C3's own insurer has now rescinded coverage, completely upturning Plaintiffs' ability to recover on a judgment that may be entered in this case. C3 has two policies which afforded coverage for this case: one policy with Great American for $1 million in coverage and another policy with HCC for $4 million in excess coverage. C3's late disclosure of the rescission of $4 million of insurance coverage has prejudiced Plaintiffs because it is now revealed that C3 is underinsured with only $1 million in coverage. Plaintiffs have no recourse to investigate the decision to rescind C3's insurance coverage due to C3's decision to withhold the information for several months. Defendants like C3 have a duty to produce all documents affecting insurance coverage because the amount of coverage impacts how Plaintiffs proceed in litigation. CR 26(b)(2). Not only did C3's former insurance-funded attorneys hide the fact that there exists little coverage days before trial begins, but this concealment also deprived Plaintiffs from taking CR 30(b)(6) depositions of C3's insurers to investigate available coverage. Because of this concealment, Plaintiffs are faced with a trial with potentially few assets for recovery. There is no doubt that C3's former attorneys committed the acts that they did to pursue the best interests of the party that paid them—HCC—at the detriment of both Plaintiffs and C3.

This withholding of critical insurance discovery was also a willful attempt to deprive Plaintiffs from evidence that is substantive to Plaintiffs' liability claims. Plaintiffs bring claims under the WPLA, including failure to warn. This claim is premised on the fact that C3 misrepresented the risks and issues with its product. The subject product Plaintiff Michael Vandivere used when he was injured was subject to a product recall and discovery has revealed that C3 had a long history of recalling this product line. The concealed evidence goes to the heart

PLAINTIFFS' MOTION FOR SANCTIONS

Page 3 | No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

of Plaintiffs' claim.  C3's former attorneys did not want Plaintiffs to discover that C3 defrauded HCC (prior to the fall incident which injured Plaintiff in 2019) and made misrepresentations as to the defective nature of the subject product for commercial gain – to obtain a multi-million-dollar policy through allegedly fraudulent means.  Plaintiffs were deprived of investigating this alleged fraudulent act.  Plaintiffs do not have any discovery into the misrepresentations C3 made regarding its product.  This evidence would have gone to attack the credibility of C3 as well as established that C3 had a history of making material misrepresentations about the safety of its product. Plaintiffs are deprived of this critical evidence mere days away from trial.

Plaintiffs are left unable to investigate these two acts of misconduct, revealed in the final throes before trial.  Plaintiffs are deprived of their ability to examine the nature of extent of this conduct, how the case is impacted by this conduct, or gather evidence regarding this conduct which would be substantive to Plaintiffs' claims.  The record demonstrates that Defendants' late disclosures were a tactical, willful effort to conceal information from Plaintiffs in order to prevent Plaintiffs from pursuing efforts to regain coverage from HCC, acquire substantive evidence about C3's alleged fraud, or investigate C3's counsel's activities with witnesses in this case.  The conduct at issue in this motion rises to the level of violating CR 11.  Plaintiffs must therefore request relief for the misconduct by C3 and its former attorneys.  There is no other remedy to repair the damage done here except to enter default judgment against C3 on Plaintiffs' failure to warn claim.  The other remedy Plaintiffs seek for this discovery misconduct is to give a jury instruction which allows a jury to make a negative inference from C3's discovery misconduct.

## II.    RELEVANT FACTS

### A.    ON THE EVE OF TRIAL, TWO NEW INSTANCES OF DISCOVERY MISCONDUCT WERE REVEALED

On May 11, 2023, Defendant C3 filed a motion to continue the trial date in this case.  C3's former counsel, J. Scott Wood and Virginia Leeper, represented to this Court that the reason a continuance was needed was due to a "necessary, unanticipated withdrawal of current counsel for



Defendant." Def. Mot. to Continue, at 1. C3's former counsel claimed that attorneys at Mr. Wood's new firm, Gordon Rees, were conflicted out of representing C3 and that counsel at Mr. Wood's former firm, Sinars Slowikowski Tomaska LLP "have had a different conflict in continuing to represent Defendant." Def. Reply to Mot. to Continue, at 2. The two latest revelations shed light as to the issues which C3 did not share with this Court.

1. **C3's Former Attorney Had 38 Visits to the Vertical World Gym a Couple Months Before Trial Without Notice to Counsel**

On April 27, 2023, a little over one month before trial, Christopher Furman withdrew as counsel for C3, requesting that all future pleadings be served on J. Scott Wood, Virginia Leeper, Elizabeth Bain, and Duncan Lemmon.[1] On May 5, 2023, Defendant Vertical World served its Notice of Documents Offered Under ER 904.[2] Contained in Vertical World's submission were several exhibits which showed that Mr. Furman created a membership with Vertical World and visited the Vertical World gym 38 times from February 2023 to May 2023, days before he withdrew and just a few months before the start of trial.[3] On May 8, 2023, Vertical World's attorneys issued a letter indicating that this information just came to their attention and that they may call Mr. Furman as a witness at trial.[4]

On May 11, 2023, Plaintiffs' counsel sent a letter to Defendants, stating in part:

> We have serious concerns about the professional ethics and the potential danger for misconduct involved in this situation. To be clear, Vertical World entered into a contractual business relationship with C3's attorney, Chris Furman, two months prior to trial. The details surrounding this quid pro quo business relationship and potentially ex parte conversations Mr. Furman may have had with witnesses remain unclear. Then, Vertical World's attorneys offered into evidence records of Mr. Furman's membership and usage of the Vertical Worlds facility. This conduct is particularly alarming when considering other backdoor activities between C3 and Vertical World, which include Vertical World and C3 secretly meeting in Colorado soon after Michael Vandivere's catastrophic fall and then the inexplicable exchange of the defective auto belay devices used by Mr. Vandivere and their serial numbers. This conduct by C3's attorney, Chris

---

[1] Cochran Decl., Ex. 1.

[2] Cochran Decl., Ex. 2.

[3] Cochran Decl., Ex. 3.

[4] Cochran Decl., Ex. 4.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 5 | No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Furman, and Vertical World must come under scrutiny, first by my office and almost certainly by the Court.

In light of these serious issues, we request that both Vertical World and C3 review Plaintiffs' prior discovery requests and supplement their responses accordingly. Finally, we request the deposition of Chris Furman and ask that you make him available as soon as possible given that we commence trial in less than a month.[5]

The day after Plaintiffs served this letter, C3's other attorneys, Elizabeth Bain, J. Scott Wood, and Virginia Leeper, filed notices of intent to withdraw from the case. On May 18, 2023, Plaintiffs attempted to effect service of a subpoena and notice of deposition on Christopher Furman.[6] To-date, Plaintiffs have not been successful in serving Mr. Furman. Despite Plaintiffs' request for supplementation of discovery responses based on Mr. Furman's activities, C3 has not supplemented its discovery production.[7]

### 2. C3 Withheld Evidence of Potential Fraud by C3 Which It Had in Its Possession Since January 2023

On May 22, 2023, exactly **three weeks before the start of trial**, C3 supplemented its discovery responses with communications from HCC which C3's attorneys had in their possession for several months.[8] The first communication is a letter from HCC dated January 26, 2023, notifying C3's president, Ronald Naranjo, that HCC is rescinding its insurance policy.[9] In this letter, HCC states the basis for its rescission—alleged fraud—and identifies other communications with C3's lawyers which C3 to this day has continued to conceal from Plaintiffs:

<u>APPLICATION</u>

On August 31, 2018, Mr. Naranjo signed a Veracity Insurance Solutions' Products Liability Insurance Application while attempting to obtain an excess insurance policy. This Application was provided by Veracity to HCC and HCC relied on C3's representations when underwriting the Excess Policy. In Section 9 of the application, Mr. Naranjo warranted that (1) the information provided, after reasonable inquiry, was

---

[5] Cochran Decl., Ex. 5.

[6] Cochran Decl., Ex. 6.

[7] Notably, this withheld information about Mr. Furman's visits was responsive to Plaintiffs' Second Set of Interrogatories and Requests for Production, Interrogatory No. 7. Cochran Decl., Ex. 46.

[8] Cochran Decl., Ex. 7.

[9] *Id.*, at Bates Page 004339.



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

true and complete and (2) was the basis of the policy and deemed incorporated therein. **In the Application, Section 3, Question 11 asked, "Has the Applicant ever recalled or is it considering recalling any product?" C3's response was "No." Section 6, Question 2 to the Application asked, "Is (are) any person(s) or organization(s) proposed for this insurance aware of any fact, incident, circumstance, situation, condition, defect or suspected defect which may result in a Products Liability claim?" C3's response was "No."**

As set forth in the policy language, by accepting the Excess Policy, C3 agreed that the statements in the Declarations were based upon representations C3 made to HCC and that HCC issued the Excess Policy in reliance upon C3's representations. Here, the representations were made in the application process. Further, the Excess Policy provides that it is void in any case of fraud by C3 as it relates to the Excess Policy. See Form HXC1 001 0814, Sec. IV, 13.

INVESTIGATION

Following the July 2022 notice of the Michael Vandivere et al v. Vertical World, Inc., et al., King County, Washington Superior Court, Case No. 19-2-2738502 lawsuit, for the first time, HCC became aware that C3 may have had prior recalls of its product that pre-dated the issuance of the Excess Policy. More specifically, HCC reviewed a deposition summary from retained counsel that indicated Mr. Naranjo had testified about recalls Thereafter, in September 2022, subject to a reservation of rights, HCC submitted a request for information to C3 to provide further information for HCC's consideration regarding whether there had been a material misrepresentation in the Application. **Through its counsel, by letter dated November 2, 2022,** C3 refused to provide the requested information but suggested HCC contact defense counsel to access some of the requested documents HCC complied with that suggestion and acquired copies of Mr. Naranjo's deposition transcripts and exhibits.

HCC has reviewed the transcripts and referenced exhibits. In the February 4, 2022 deposition, Mr. Naranjo testified under oath concerning recalls of C3's product. The first recall occurred on May 9, 2016, and the second occurred on August 15, 2018. When asked to identify Exhibit 1, Mr. Naranjo testified, "So that is a recall notice that we issued on May 18th of 2016." See February 4, 2022 Deposition Transcript, 78:25-79:1. When asked to identify Exhibit 4, Mr. Naranjo stated, "That's a recall notice from August 15, 2018." See id. at 108:13. Exhibit 1 stated, "C3 Manufacturing recently became aware of a material defect which may cause the device to cease to retract the lanyard. Our investigation indicates that defects in the material used to manufacture the retraction spring of the affected device may cause partial or complete fracture of the retraction spring in the affected units causing inadequate or complete loss of retraction." Exhibit 4 had similar language and also stated, "Complete fracture of the retraction spring will result in loss of retraction and the possibility of the lanyard 'paying out', thereby losing tension on the line." Both letters directed consumers to immediately remove affected auto belays from service and return them for repairs. In addition, at the

PLAINTIFFS' MOTION FOR SANCTIONS



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

deposition, Mr. Naranjo agreed that the retraction spring defect could increase the risk of injury to climbers using the product. See February 4, 2022 Deposition, 99:5-9.

In Exhibit 3, Mr. Naranjo's August 13, 2018 email identified his knowledge of 13 failures occurring between July 13 and August 10, 2018. Mr. Naranjo's email to representatives of Lesjdfors Springs America Inc., stated, "I am going to have to recall our devices with springs from the lots that we had talked about previously We have had 15 failures with 13 happening since July 13."

MATERIAL MISREPRESENTATION

From review of the 2022 deposition and its exhibits, **HCC concludes that Mr Naranjo, on behalf of C3, made material misrepresentations in the application process to obtain the Excess Policy.** Had Mr. Naranjo accurately responded to the questions, HCC would not have issued the Excess Policy.

More specifically, in the month prior to signing the Application, Mr. Naranjo knew of 13 failures and the need for a recall, but indicated he was not aware of any defect, which may result in a products liability claim. This was less than 3 weeks before he signed the Application representing otherwise. Further, given he issued a recall approximately two weeks prior to affirming the application, his representation in the application that C3 never had any recalls was also false. When signing the Application, Mr. Naranjo declared that to the best of his knowledge and belief, after reasonable inquiry, the statements in the Application were true and complete. **In fact, the representations were false and concealed information. Further, given the recent communications about recalls and defects, C3 knowingly made the false statement and concealed information. The false statement and concealed information materially affected the acceptance of the risk by HCC because providing excess liability coverage for products that have been subject to recalls and are known to fail inherently creates more risk.** This is especially true when the product is utilized in rock climbing and the failure to retract can lead to bodily injury. Mr. Naranjo agreed at his deposition that the retraction spring defect could increase the risk of injury to climbers using the product. HCC had no knowledge of the true facts at the time the Excess Policy incepted. When issuing the Excess Policy, HCC relied, to its detriment, on the false statements and lack of presented information. All elements of material misrepresentation are satisfied and, under Colorado law, HCC is permitted to rescind the Excess Policy.[10]

On February 27, 2023, C3's Colorado counsel replied to HCC's letter, contesting the rescission.[11]  On March 17, 2023, attorneys from the Gordon Rees law firm—the same law firm that just withdrew from representing C3—sent a letter to C3's Colorado attorneys stating that

---

[10] *Id.*, at Bates Pages 004339-004341.

[11] *Id.*, at Bates Pages 004335-004338.

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Gordon Rees represents HCC and that HCC maintains its decision to rescind the insurance policy.[12]

No explanation has been offered why this discovery was withheld for months until days before trial, even though it was directly responsive to Plaintiffs' discovery related to insurance seeking "any documents related to coverage."[13]

## B.   THE HISTORY OF MISCONDUCT INVOLVING C3

The latest discovery raises many questions about the credibility of C3, which is a central issue in this case.  While the credibility of a party is always at issue in any case, this case presents unique issues such as potential tampering with the product which injured Plaintiff Michael Vandivere.  Due to the late timing of these revelations, Plaintiffs are deprived of conducting a proper investigation into these issues and obtaining evidence which would go to the heart of C3's credibility and misrepresentations about its product.  Plaintiffs provide the Court with the context below to show that the withheld evidence is highly material to Plaintiffs' WPLA claim premised on C3's failure to warn the public about the hazards of its product.

### 1.      The Dubious Origin of C3's "Perfect Descent Auto Belay"

C3 was founded by Ronald Naranjo, who first incorporated his company in the State of Colorado in 2010.[14]  Today, Mr. Naranjo is the president of C3.[15]  Prior to forming C3, Mr. Naranjo worked at Mine Safety Appliances ("MSA") from the 1990's to 2010.[16]  MSA is a maker of safety products for workers exposed to a variety of hazardous conditions in industries such as construction.[17]   During his tenure at MSA, Mr. Naranjo worked as production lead before transitioning to become the production manager.[18]  Both of these roles entailed overseeing the assembly of products made by MSA.[19]  One of the products MSA made was a self-retracting fall

---

[12] *Id.*, at Bates Pages 004333-004334.

[13] The withheld evidence was responsive to many of Plaintiffs' discovery requests.  See Cochran Decl., Ex. 47.

[14] Cochran Decl., Ex. 8.

[15] *Id.*, Ex. 9, at 6:17-21.

[16] *Id.*, at 23:9-20.

[17] *Id.*, at 28:7-14.

[18] *Id.*, at 28:17-20.

[19] *Id.*, at 32:20-33:22.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 9  |  No. 19-2-27385-2 SEA

arrest product called the Redpoint Descender.[20]  On October 15, 2009, MSA issued an immediate stop use notice, announcing that all Redpoint Descenders were to be discontinued, effective immediately following the stop use notice.[21]  The defect with the Redpoint Descenders involved issues with the braking system resulting in climbers sustaining injuries by unexpected rapid descents while using the Redpoint Descenders.[22]  MSA emphasized that "existing devices should not be used."[23]  Its engineers tested the Redpoint Descenders, dismantled and rebuilt them, and tested them repeatedly, but could not replicate the fault in an attempt to find an engineering solution.[24]  MSA could not see an upside to attempting to insure a product for which a potential failure risk was still of unknown origin and so it opted to leave the climbing industry altogether.[25]

    MSA's discontinuation of the Redpoint Descender sent shockwaves in the climbing industry, as MSA was at that point the industry's biggest suppliers of auto-belays.[26]  According to athletic publications at the time, thousands of climbing wall operators were infuriated by MSA's abandonment of the industry.[27]  The void left in MSA's wake presented a terrific financial opportunity for Mr. Naranjo.  During the same timeframe as the discontinuation of the Redpoint Descenders, Mr. Naranjo transitioned from his job with MSA in 2009 to form C3.[28]  C3 did not start out as the original manufacturer of the Perfect Descent auto belay but instead began by only manufacturing a component part used in the Perfect Descent auto belay—a secondary clutch.[29]  The origin of the Perfect Descent auto belay product line began by simply modifying and relabeling



[20] *Id.*, at 30:2-7, 49:5-9.

[21] *Id.*, Ex. 10.

[22] *Id.*

[23] *Id.*, Ex. 11.

[24] *Id.*, Ex. 12.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*, Ex. 9, at 35:4-11.

[29] *Id.*, at 37:5-11.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 10  |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MSA's discontinued Redpoint Descenders.[30]   Mr. Naranjo testified that a man named Derek Wagner, who used to work for the factory-authorized service center for MSA's discontinued Redpoint Descender, reached out to him to ask him to supply secondary clutches to install into the Redpoint Descenders which were relabeled as the Perfect Descent auto belays.[31]

MSA's reaction was not conciliatory; the company released a statement emphasizing that the Redpoint Descender units were recalled, that the secondary clutch mechanism that Mr. Naranjo developed would not necessarily address the unidentified problem and that such retrofitted models would be used at the risk of the user.[32]  "Furthermore," MSA stated, "such modifications or refurbishment efforts of recalled products violate federal consumer product safety laws and place the refurbishment companies at risk of possible severe civil and criminal monetary sanctions."[33]

Once the service center ran out of the discontinued Repoint Descenders to recycle and relabel as Perfect Descent auto belays, C3 was approached to take over the entire manufacturing process of the Perfect Descent auto belays.[34]  To do this, Mr. Naranjo reverse engineered the Redpoint Descenders to replicate the design of this product.[35]  Mr. Naranjo did this reverse engineering job himself despite having no formal education, no college or technical degrees, nor any specialized training in engineering or metallurgy.[36]  Mr. Naranjo testified that today's Perfect Descent auto belay is based on his 2013 reverse engineered design, which was copied from the discontinued Redpoint Descenders.

It is not surprising that the Perfect Descent auto belay, reverse engineered from the Redpoint Descenders which were discontinued due to safety issues, has been plagued with defects for years.  From as early as 2015, the Perfect Descent auto belays have experienced fracturing of

---

[30] *Id.*, at 52:5-53:10.

[31] *Id.*, at 45:11-19, 49:12-50:9, 51:17-22, 52:5-14.

[32] *Id.*, Ex. 12.

[33] *Id.*

[34] *Id.*, Ex. 9, at 52:15-53:10.

[35] *Id.*, at 54:17-55:9.

[36] *Id.*, at 21:4-5, 22:7-21, 55:1-9.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 11  |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

the retraction springs.[37]   Failure of the retraction spring creates slack in the lanyard as climbers ascend, resulting in increased risk of a free fall to the ground if enough slack is in the lanyard.[38] On May 9, 2016, due to the defective condition of the Perfect Descent retraction springs, C3 began issuing Stop Use and Return for Repair notices for its products.[39]   C3 did not correct the issue for auto belays it manufactured after that date, as C3 again issued a Stop Use and Return for Repair Notice in 2018 for the exact same defect.[40]   In fact, these defects occurred each year in 2015, 2016, 2017, 2018, and 2019.[41]   It is clear that rather than fix the issue prior to sale, C3 would sell defective auto belays and follow up by issuing notices of defect.   By 2018, Mr. Naranjo was in communication with the component supplier of the retraction springs, Lesjöfors, informing them that they've experienced no less than 13 product failures within the timespan of less than a month between July 13, 2018 and August 10, 2018.[42]

On October 3, 2019, after the problem had persisted for more than three years, C3 finally initiated a formal recall process with the USCPSC.[43]   When asked why he waited more than three years to file a report with the USCPSC, Mr. Naranjo could not explain besides saying that he initiated the process with the USCPSC because C3's springs continued to break.[44]   On October 21, 2019, an Urgent Safety Recall Notice was issued.[45]   This recall notice identifies a variety of serial numbers affected by the notice, including the Perfect Descent Model 220 Speed Drive Auto Belays with serial numbers ranging from S-1695 through S-1762.[46]   The notice states that there are defects in the material used to manufacture the retraction spring which can result in partial or complete

---

[37] *Id.*, Ex. 13; Ex. 9, at 79:10-13.

[38] *Id.*, Ex. 14.

[39] *Id.*, Ex. 13.

[40] *Id.*, Ex. 15.

[41] *Id.*, Ex. 13, Ex. 15, Ex. 16.

[42] *Id.*, Ex. 17; Ex. 9, at 80:21-25.

[43] *Id.*, Ex. 18.

[44] *Id.*, Ex. 9, at 117:14-118:11.

[45] *Id.*, Ex. 16.

[46] *Id.*

PLAINTIFFS' MOTION FOR SANCTIONS



PFAU COCHRAN VERTETIS AMALA ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

fracturing of the spring and loss of retraction force, causing the lanyard to stop retracting, possibly "paying out," and leading to possible serious injury or death.[47]

Aside from the recall notice, the Section 15(b) Report, and an email string between Mr. Naranjo and Judith Hayes, Compliance Officer for the Defect Investigations Division of the USCPSC, C3 did not produce a number of documents and communications it exchanged with the USCPSC. This was a blatant violation of Judge Catherine Shaffer's order compelling complete production of such documents by no later than January 31, 2022.[48] Plaintiffs had to acquire the records through subpoenaing the USCPSC directly, and to this day C3 has not supplemented these records in its production.

The unproduced records included a Product Safety Assessment Report prepared by the USCPSC regarding the defective product at issue.[49] Notably, many of the statements Mr. Naranjo made to the USCPSC were not accurate. In his initial Section 15(b) Report to the USCPSC, Mr. Naranjo said he discovered the defect on September 17, 2019 and that there were a total of 10 incidents.[50] When asked in his deposition why he did not report the defects or incidences beginning in 2015, Mr. Naranjo said it was because the problem was "sporadic."[51] Mr. Naranjo conceded that contrary to his representations to the USCPSC, the defect identified in the 2016 Stop Use and Return for Repair Notice was the same as the defect he reported to the USCPSC in 2019.[52] He also conceded that from 2016 to 2019, there were more than ten incidences.[53]

Additionally, the Urgent Safety Recall Notice, dated October 21, 2019, states that "no accidents have been reported."[54] However, on October 18, 2019, three days prior to the Recall

---

[47] *Id*.
[48] Dkt. No. 189.
[49] Cochran Decl., Ex. 14.
[50] *Id*., Ex. 18.
[51] *Id*., Ex. 9, at 120:10-121:23.
[52] *Id*., at 121:24-122:2.
[53] *Id*., at 122:3-8.
[54] *Id*., Ex. 16.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 13 | No. 19-2-27385-2 SEA



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0709 | Fax: (253) 627-0654

1
2
3
4

Notice, Mr. Naranjo received a phone call from Rich Johnston, owner and president of Vertical World, and had a discussion with him about this lawsuit.[55] This was not reported despite the express mandate sent by the USCPSC to Mr. Naranjo on October 9, 2019, which stated: [56]

> Pursuant to 16 C.F.R. § 1115.13(d)(14) and (15), please also provide the following additional information relating to the Subject Products:
>
> 14. For each of the following entities, the full name, address, email address, and telephone number:
>
>    a) Foreign manufacturers
>    b) Importer of record
>
> 15. To the extent not already provided in response to subsection 6, provide:
>
>    a) complaints, warranty, insurance or other claims, including lawsuits related to the reported issue;
>
>    b) all reports of incidents, property damage, and injuries related to the reported issue; and
>
>    c) any other documents or information (in any form) related to the reported issue.
>
>    If any such documents are unavailable, identify them and state the reason they are unavailable.
>
> 16. Please provide information sufficient to describe all deaths involving this product, regardless of whether the death is related to the reported issue.

Mr. Naranjo also failed to comply with the last requirement shown above—to report all deaths involving his product, regardless of whether he personally believes the defect at issue caused the death. Only after Judge Shaffer ordered complete production of responsive records did C3 produce documents regarding multiple fatalities involving Mr. Naranjo's Perfect Descent auto belays. On June 17, 2021, Mr. Naranjo was informed that a climber died in a gym in Colorado while allegedly using a Perfect Descent auto belay.[57] On October 13, 2021, Mr. Naranjo was informed that a climber died in Sydney, Australia, died while allegedly using a Perfect Descent auto belay.[58] Law enforcement in Australia is investigating the incident and have requested Mr.

---

[55] *Id*., Ex. 39; Ex. 9, at 141:24-147:14.

[56] *Id*., Ex. 20 (emphasis added).

[57] *Id*., Ex. 21; Ex. 22.

[58] *Id*., Ex. 23; Ex. 24.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 14 | No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

Naranjo's emails.[59]

2

On June 22, 2021, the USCPSC sent a letter informing Mr. Naranjo that it would cease

3

monitoring but that C3 had the continuing obligation to report injuries to the Commission:[60]

4



U.S. CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814

Judith Hayes                                              Tel: 301-504-7618
Compliance Officer                                        Fax: 301-504-0359
Division of Resources Management and Fast Track           Email: JHayes@cpsc.gov
Office of Compliance and Field Operations

June 22, 2021

Email: ronnaranjo@c3mfg.com

Ron Naranjo
President
C3 Manufacturing LLC
3809 Norwood Drive
Littleton, CO 80125

Re:    CPSC File No. RP200004
       C3 Manufacturing LLC
       Automatic Belay

Dear Mr. Naranjo:

The U.S. Consumer Product Safety Commission (Commission) staff has reviewed C3
Manufacturing LLC (Firm's) progress in carrying out the corrective action plan (CAP) in the
above-referenced matter. The Office of Compliance and Field Operations has determined that no
further monitoring on the part of the staff is warranted. Therefore, acting under delegation from
the Commission, the staff has closed this case with respect to the Firm's CAP. The Commission
staff will reopen this case, however, if it finds that the Firm's corrective actions do not
adequately protect the public from the risk of injury presented by this product.

The Firm has a continuing obligation to inform the Office of Compliance and Field
Operations of defects associated with the Subject Products which could create a substantial
product hazard and of information that reasonably supports the conclusion that the Subject
Products create an unreasonable risk of serious injury or death. If the Firm receives or learns of
any information complaints, claims, incidents, or injuries that the Firm did not report, or other
information affecting the scope, prevalence, or seriousness of the reported problem, issue, or
potential defect or hazard, the Firm must report that information to the Office of Compliance and
Field Operations.

Mr. Naranjo ignored this mandate by a federal commission to report complaints, claims,

incidents, or injuries. Mr. Naranjo testified that he never reported this present lawsuit to the

---

[59] *Id*., Ex. 25.

[60] *Id*., Ex. 26.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 15 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

USCPSC.[61]  Mr. Naranjo has not reported the fatality in Australia to the USCPSC.[62]  Mr. Naranjo testified that he feels that he has no obligation to report these matters to the USCPSC nor does he plan to report the fatalities or this present lawsuit to the USCPSC in the future.[63]  Notably, this is not the only lawsuit C3 is involved in.  C3 is also being sued in a case filed in Pennsylvania in 2021.[64]  Plaintiffs' have also independently discovered that C3 is also being used by its distributor in the U.S. District Court, North Carolina, which C3's attorneys also never disclosed in discovery despite Plaintiffs making such discovery requests to C3.

## 2. Misconduct Surrounding the Handling of the Device Plaintiff Michael Vandivere Used

Documents produced in discovery raise serious questions as to whether the auto belay held out by Defendants as the device Mr. Vandivere used on the date of his fall—an auto belay with the serial number S-1717—is truly the device used during the incident.  The records produced to Plaintiffs, which were created shortly after the fall incident on August 1, 2019, suggest that the auto belay used by Mr. Vandivere during the incident was an auto belay containing the serial number S-1714.

On March 1, 2019, C3 sold Vertical World seven auto belays, including S-1714 and S-1717.[65]  The fall incident in this case occurred on August 1st.[66]  On October 17, 2019, Rich Johnston, Vertical World's owner, was served with a copy of the complaint.[67]  The very next day, on October 18, 2019, Mr. Johnston called Mr. Naranjo to discuss this lawsuit.[68]

On November 12, 2019, Mr. Naranjo emailed Vertical World, asking for the whereabouts of auto belay serial number "S-1417" and why it was not sent back to C3 pursuant to the Urgent

---

[61] *Id.*, Ex. 9, at 171:21-23.
[62] *Id.*, at 179:19-24.
[63] *Id.*, at 179:25-180:13.
[64] *Id.*, at 12:22-25, 18:2-25; Ex. 27.
[65] *Id.*, Ex. 28.
[66] *Id.*, Ex. 29.
[67] *Id.*, Ex. 30.
[68] *Id.*, Ex. 19; Ex. 9, at 141:24-147:14.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 16  |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Product Safety Recall.[69]   Vertical World responded to Mr. Naranjo on the following day, confirming that Perfect Descent auto belay serial number "S-1417" was "'being preserved for evidence' as it was involved in an accident."[70]   During his deposition, Mr. Naranjo clarified that S-1417 was a typo as S-1417 was a device sold to a customer named Geckoking in Asia.[71]   Mr. Naranjo clarified that in his email on November 12, 2019, he was likely referring to serial number S-1714, which was sold to Vertical World on March 1, 2019.[72]   He testified that he likely switched the digit.[73]   Mr. Naranjo confirmed that he did not ask about the whereabouts of S-1717 in November of 2019, and that had he not received S-1717 pursuant to the product recall, he would have asked about that device.[74]

On the eve of Mr. Naranjo's deposition, **after** Judge Shaffer's imposed deadline to complete discovery following her order to compel, C3 produced batches of records which included servicing and repair records for auto belays sold to Vertical World.   One such repair record allegedly pertains to the auto belay with the serial number S-1714.[75]   Most bewildering about this record is that the repair record is dated November 9, 2019, two days before C3 emailed Vertical World asking for the whereabouts of S-1714 and three days before Vertical World indicated that this auto belay was subject to an evidence hold.   Mr. Naranjo agreed during his deposition that it would not make sense that he was emailing Vertical World about where S-1714 was if that device had just been repaired two days earlier.[76]   Notably, in the copy of the repair record produced to Plaintiffs, someone scratched out the original serial number and wrote "S-1714" in a different ink color than the original record:[77]

---

[69] *Id.*, Ex. 31.

[70] *Id.*

[71] *Id.*, Ex. 32; Ex. 9, at 139:25-140:10.

[72] *Id.*, Ex. 9, at 150:17-152:12, 153:20-24.

[73] *Id.*, at 154:3-5.

[74] *Id.*, at 155:12-17.

[75] *Id.*, Ex. 33.

[76] *Id.*, Ex. 9, at 154:6-16.

[77] *Id.*, Ex. 33.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 17  |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

3

4

5

6

7



8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

One explanation posed by Plaintiffs' counsel to Mr. Naranjo during his deposition was that the repair record originally stated S-1717 and that the serial number was crossed out and rewritten to say S-1714. Mr. Naranjo testified that he could not say, one way or another, if this repair record originally pertained to S-1714 or S-1717.[78] All Mr. Naranjo could confirm was that he did not ask about S-1717 in his email to Vertical World sent two days after this service record.[79]

Discovery has revealed other inconsistencies regarding C3's involvement early on in this lawsuit. In his deposition, Vertical World president Rich Johnston testified that in 2020, he and "a couple of friends" were "touring rock climbing gyms throughout the front range" and that they decided to stop by the C3 manufacturing plant to "say hello."[80] Robert Richards, Vertical World's board member, testified that he, Mr. Johnston, and Vertical World employee Brent Bishop visited the C3 manufacturing plant simply because Mr. Johnston was a "distributor" for the Perfect Descent auto belay but that there was no discussion about the lawsuit on that visit.[81] Mr. Naranjo testified that Rich Johnston flew out to C3's facility specifically to discuss this lawsuit.[82] Although he denies that the product at issue in this case was brought to him, Mr. Naranjo could not explain why Mr. Johnston would physically go to the manufacturing plant to discuss the lawsuit when he had already done so just a few weeks prior over the phone.[83] Mr. Naranjo agreed that it would make sense and be prudent as a manufacturer to request to inspect the device which is subject to a recall and which has injured a climber, but that he does not "specifically recall" if he told Mr. Johnston to bring the device which gravely injured Mr. Vandivere to him for inspection.[84]

On March 15, 2020, months after the email communications regarding device No. S-1714, and shortly after Mr. Johnston's trip to visit Mr. Naranjo in his manufacturing plant, Vertical World

---

[78] *Id.*, Ex. 9, at 158:23-159:4.

[79] *Id.*, at 158:18-22.

[80] *Id.*, Ex. 34, at 111:21-112:24.

[81] *Id.*, Ex. 35, at 110:12-25, 115:6-8.

[82] *Id.*, Ex. 9, at 163:13-165:14; Ex. 36.

[83] *Id.*, Ex. 9, at 165:24-166:10.

[84] *Id.*, at 166:11-171:20.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 19 | No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

represented for the first time that Mr. Vandivere used product No. S-1717 during the fall incident.[85]

On February 14, 2022, Plaintiffs issued a CR 34 notice to Defendant, notifying them of the following request:[86]

> We would like to schedule an inspection of the Perfect Descent Auto Belay 220 Speed Drive devices with the serial numbers S-1717 and S-1714. We also request C3 Manufacturing to produce two exemplar devices for testing that meet the following specifications: (1) one 220 Speed Drive device containing the original spring shipped in March of 2019; and (2) one 220 Speed Drive device containing the Power Spring Twin modification with spring separator installed. Please see the enclosed CR 34 Notice reflecting the same. The inspection of these devices will involve destructive testing and so our firm will draft a proposed set of testing protocol for the inspection and send that to you shortly.
>
> We hope to schedule this inspection within the next six weeks. Please provide your availability in the next two weeks so we can schedule a phone conference call to discuss the protocol and dates for the inspection.

On February 17, 2022, counsel for Vertical World reached out to Plaintiffs' counsel to schedule a phone conference to discuss the proposed inspection.[87]  Counsel for Vertical World and Plaintiffs held a conference on that same day, during which it was represented that Vertical World did not oppose the inspection or destructive testing in principle, but wanted to be compensated for the cost of unit No. S-1714.  Counsel for Vertical World represented that S-1714 was not installed in the Vertical World gym in Seattle but instead in a gym located in Lynnwood, and that his client was concerned about removing S-1714 from its current use in the Lynnwood gym.  Vertical World's counsel sent an email memorializing the conversation.[88]  Notably, the email stated that S-1714 is in circulation in the Vertical World – Lynnwood gym and that Vertical World would like Plaintiffs to pay the cost for a new auto belay upfront so Vertical World does not have "to take the

---

[85] *Id.*, Ex. 37.
[86] *Id.*, Ex. 38.
[87] *Id.*, Ex. 39.
[88] Cochran Decl., Ex. 39.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 20  |  No. 19-2-27385-2 SEA



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

unit out of circulation in the meantime and [incur] that delay."[89]  Plaintiffs sent a letter to counsel for Defendants on February 23, 2022, informing Vertical World that Plaintiffs would agree to pay for the replacement of S-1714 and requesting C3 to respond to Plaintiffs' request for two exemplar devices for the inspection.[90]

The parties scheduled a phone conference to discuss Plaintiffs' CR 34 inspection on March 1, 2022.  During the March 1st phone conference, Vertical World's representations about the chain of custody regarding auto belay No. S-1714 dramatically changed.  Contrary to his representations made on February 17th and in his own email on February 18th that S-1714 was in circulation at Vertical World, counsel for Vertical World revealed that S-1714 was actually in the possession of C3.  When Plaintiffs filed a motion to compel a CR 34 inspection, C3 opposed the motion and submitted to this Court a declaration from Ron Naranjo attesting that "C3 does have device S-1714 in its possession. S-1714 was sent from Vertical World's Lynnwood facility for ***routine maintenance***."[91]

On April 1, 2022, counsel for Vertical World sent an email to Plaintiffs' counsel, proving that Mr. Naranjo's statement was false.[92]  Counsel for Vertical World revealed that Vertical World emailed C3 the day after receiving Plaintiffs' CR 34 subpoena on February 14th, reporting that S-1714 was defective and no longer retracting.[93]  Mr. Naranjo would have also known that his statement in his prior declaration was untrue, as his declaration was dated a month after Vertical World's email reporting that S-1714 was defective and because the next scheduled maintenance for S-1714 was in 2023, not 2022, as stated right on the auto belay.[94]  It is highly suspect that Vertical World sent C3 S-1714—the device Plaintiffs believe was the true device Mr. Vandivere

---

[89] *Id*.
[90] *Id*., Ex. 40.
[91] *Id.*, Ex. 41.
[92] *Id.*, Ex. 42.
[93] *Id.*, Ex. 42, Ex. 43.
[94] *Id.*, Ex. 44.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 21  |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0709 | Fax: (253) 627-0654

used on the date of his fall—the day after Plaintiffs issued a subpoena to inspect it.  It is even more suspect that Mr. Naranjo perjured himself to hide the reason why C3 had possession of S-1714.  The anomalies do not end there.  Vertical World supplemented new auto belay inspection records, allegedly showing that Vertical World "discovered" that S-1714 was defective and not retracting **the day after** Plaintiffs served their CR 34 subpoena.[95]  It defies credulity that Vertical World only discovered that this product was defective and then immediately sent it to C3 within a day after Plaintiffs served their subpoena to inspect this same product.

During the March 1st phone conference, Plaintiffs' counsel also inquired as to whether C3 would produce exemplar products per the specifications requested by Plaintiffs in their CR 34 notice.[96]  Mr. Naranjo admits in his declaration that he did not retain other exemplar springs from the recalled auto belays.[97]  Notably, C3 was directed by the USCPSC to anticipate litigation and to preserve all documents and samples of the subject defective auto belays, so if indeed C3 does not possess Plaintiffs' requested exemplars, it would be in violation of this directive:[98]

> In addition, until this matter and any related matters are resolved, there will remain the possibility of further enforcement action, including reasonably anticipated litigation.  Therefore, the Firm must abide by the continuing legal obligation to preserve all information, documents, electronically-stored data, and samples, now in existence or created hereafter, related to the Subject Products.

Due to C3's violation of this federal mandate, they have destroyed the springs that would have been used to verify a match with the spring contained within S-1717.

### 3.    Plaintiffs' Experts Detect Signs of Evidence Tampering

Plaintiffs retained a team of engineers at Kent Engineering LLC to inspect S-1714 and S-1717.  The engineers included Michael C. Leach and Randy K. Kent.  Mr. Leach is a registered professional engineer who has managed multiple forensic cases involving construction defects and

---

[95] *Id.*, Ex. 45.

[96] *Id.*, Ex. 38.

[97] *Id.*, Ex. 41.

[98] Cochran Decl., Ex. 20; Ex. 9, at 137:10-23.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 22  |  No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

fall analysis.[99]   Mr. Kent is the owner of Kent Engineering, with 37 years of experience in engineering, metallurgy, and failure analysis.[100]  This engineering team conducted an examination of the subject products in two phases.[101]  The first phase of the inspection included physical testing at the Vertical World gym.[102]  The second phase of the inspection occurred at the Kent Engineering laboratory.[103]

The engineering team had to inspect both S-1714 and S-1717, noting that there are factual issues regarding the identification of the device Mr. Vandivere used when he fell.[104]  Mr. Leach notes irregularities in the records about the device Mr. Vandivere used, such as emails identifying S-1714 as the product.[105]  Other irregularities were found in Vertical World's 2019 inspection logs, which list multiple different auto belays installed on the anchor under which Mr. Vandivere fell.[106]  The inspection log also notes retraction issues with the auto belays installed at the anchor under which Mr. Vandivere fell.[107]  Recertification and repair records for the subject devices were also found to be altered.[108]  Mr. Kent also examined the screws used to seal the auto belays using a Keyence 3D imaging microscope and found etching marks on the screws 0used to seal S-1717, which suggest that this product was opened prior to the inspection.[109]  The engineering team also could not verify if the spring in S-1717 was part of the original 2019 batch due to C3 having destroyed all like springs.[110]  Due to this conflicting information, Messrs. Leach and Kent state that

---

[99] Declaration of Michael C. Leach ("Leach Decl."), filed with the Court on June 6, 2023, Dkt. 234, ¶ 2.
[100] Declaration of Randy K. Kent ("Kent Decl."), filed with the Court on June 6, 2023, Dkt. 233, ¶ 2.
[101] Leach Decl., ¶ 13.
[102] *Id.*
[103] *Id.*, ¶ 14.
[104] *Id.*, ¶ 15.
[105] *Id.*, ¶ 16.
[106] *Id.*, ¶ 15.
[107] *Id.*
[108] *Id.*, ¶ 17.
[109] Kent Decl., ¶ 7.
[110] Leach Decl., ¶ 19.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

S-1714 cannot be ruled out as the device used during the fall.[111]  Nor can product tampering be ruled out based on the etching marks.

Plaintiffs' experts have opined that S-1714 is unquestionably defective.[112]  S-1714 experiences retraction failure, the same failure which C3 Manufacturing identified in its Urgent Safety Recall Notice can "result in serious injury or death."[113]  The retraction failure in S-1714 is due to both a design error and material selection error.[114]  The selection of metal for the spring was a high strength metal, which serves as a poor choice for a retraction spring.[115]  The measured retraction strength of S-1714 was substantially lower than S-1717 and, upon opening the housing, the spring failed to hold much retraction force.[116]  C3 may argue that the condition of S-1714 could have been altered since the date of Mr. Vandivere's incident given the noted recertification date on the exterior housing unit.[117]  However, Mr. Leach states that this does not change the fact that S-1714 is defective consistent with the defect warned about by C3 Manufacturing in the product recall notice, and if anything demonstrates that S-1714 is defective and fails to retract despite efforts made by C3 Manufacturing to fix the device pursuant to the recall process.[118]  Mr. Leach states that it would be improbable that C3 Manufacturing made S-1714 defective in this precise way, or in other words took steps to break S-1714, upon attempting to fix this precise problem pursuant to the product recall.[119]  Given its defective condition, and given that S-1714 fell within the serial batch of products subject to a recall due to a material defect resulting in retraction defects, it is more than likely than not that S-1714 possessed the retraction defect consistent with the product

---

[111] *Id.*, ¶ 18.
[112] *Id.*, ¶ 22.
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

recall on the date of Mr. Vandivere's fall.[120]

Mr. Leach opines that the retraction defect would likewise be a probable cause for the fall incident given that Mr. Vandivere testified that he secured the self-locking carabiner to his harness and inspected the carabiner and harness before ascending.[121] Mr. Leach reviewed the auto-locking carabiner as well as Mr. Vandivere's harness used on the day of the incident, and found that it is highly improbable that the self-locking carabiner would fail to clip to the harness.[122] In contrast, a retraction defect would result in a climber accumulating excess slack upon their ascent resulting in either a free-fall scenario or a fall scenario where the climber lacks sufficient fall clearance to safely fall to the ground.[123] This defect is the more likely cause of the incident.[124]

### III.           EVIDENCE RELIED UPON

This motion relies upon the Declarations of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Declaration of Michael Leach [Dkt. 234], Declaration of Randy Kent [Dkt. 233], as well as the pleadings, exhibits, and documents already on file in this matter.

### IV.   AUTHORITIES AND ARGUMENT

**A.    SANCTIONS SHOULD BE IMPOSED DUE TO C3'S MISCONDUCT.**

Sanctions in this case are mandated under Civil Rule 26(g), the rule that governs sanctions for violation of the discovery rules. *Fisons*, 122 Wn.2d at 339-340. CR 26(g) is specifically designed to reduce "delaying tactics, procedural harassment and mounting legal costs." *Fisons*, 122 Wn.2d at 341. These practices "tend to impose unjustified burdens on other parties, frustrate those who seek to vindicate their rights in the courts, obstruct the judicial process, and bring the civil justice system into disrepute." *Fisons*, 122 Wn.2d at 341. The rule provides that counsel's signature on a discovery response constitutes a certification that the response is warranted by

---

[120] *Id.*

[121] *Id.*, ¶ 25.

[122] *Id.*

[123] *Id.*

[124] *Id.*

PLAINTIFFS' MOTION FOR SANCTIONS

Page 25 | No. 19-2-27385-2 SEA



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

existing law and not interposed for an improper purpose.  CR 26(g).  If certification is made in violation of the rule, the trial court must impose "upon the person who made the certification, the party on whose behalf the request response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee." CR 26(g); *Fisons*, 122 Wn.2d at 355 (noting that rule authorizes imposition of sanctions against either attorney, client, or both).  "In determining what sanctions are appropriate, the trial court is given wide latitude." *Fisons*, 122 Wn.2d at 355; *see Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494 (1997) ("a trial court has broad discretion as to the choice of sanctions for violation of a discovery order.").  "[T]he least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed. The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong." *Fisons*, 122 Wn.2d at 355–56.

In *Fisons*, a child suffered severe and permanent brain damage after taking a drug manufactured and distributed by the Fisons Corporation. *Fisons*, 122 Wn.2d at 307.  The child sued the physician who prescribed the drug for medical malpractice, and the physician filed a crossclaim against Fisons for failure to warn him of the risks associated with the drug. *Fisons*, 122 Wn.2d at 306-307.  More than one year after the child settled with the physician, a letter was produced from an anonymous source that showed Fisons was aware of the drug's potential danger. *Fisons*, 122 Wn.2d at 307-308, 337.  The physician moved for sanctions, but the motion was denied in lieu of an order compelling the production of other documents related to the drug's danger. *Fisons*, 122 Wn.2d at 308, 337.  The following day after this order, Fisons produced approximately 10,000 documents to the physician, including an internal memo acknowledging that the recommended dosage was a significant "mistake" or "poor clinical judgment" promoted by a physician with a financial interest in Fisons. *Fisons*, 122 Wn.2d at 308, 337.  Our Supreme Court held that denying sanctions was error because the trial court used a subjective standard to find that the violation was not intended. *Fisons*, 122 Wn.2d at 345.  "Whether an attorney has made a

**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

reasonable inquiry is to be judged by an objective standard," and if a violation is found, then sanctions "are mandated." *Fisons*, 122 Wn.2d at 343, 346, 355. "In applying the rules to the facts of the present case, the trial court should [ask] whether the attorneys' certifications to the responses to the interrogatories and requests for production were made after reasonable inquiry and (1) were consistent with the rules, (2) were not interposed for any improper purpose and (3) were not unreasonable or unduly burdensome or expensive." *Fisons*, 122 Wn.2d at 344.

Here, like in *Fisons*, sanctions are required because there can be no dispute that a clear CR 26(g) discovery violation occurred. First, counsel for C3 potentially had undisclosed and extensive contact with many of the witnesses in this case. Despite Plaintiffs' request for C3 to supplement its discovery responses based on this conduct, C3 has never produced any supplement. Plaintiffs' Second Set of Interrogatories and Requests for Production served in 2022 explicitly requested C3 to identify "all dates and locations in which employees, agents, attorneys, directors, and officers of Vertical World met with employees, agents, attorneys, directors, and officers of Vertical World met with employees, agents, attorneys, directors, and officers of C3."[125]  Plaintiffs attempted to investigate the nature of this conduct, however the process servicing company retained by Plaintiffs to serve a deposition subpoena has been unsuccessful in effecting service on Mr. Furman.[126]

Second, C3's attorneys willfully concealed evidence regarding C3's alleged fraud of HCC in which C3 made "material misrepresentations" as to the issues and defect history of the subject product to HCC. This withholding was willful as this has been in the possession of C3's attorneys since at least January of 2023, although the correspondence references communications dating back to 2022 which C3 has, to this day, failed to produce. These communications go to the heart of Plaintiffs' case—C3's failure to warn the public about the hazards of its product. C3 has a track record of deceiving the public and in this very case has, through its attorneys, engaged in an effort to conceal evidence which is material to Plaintiffs' WPLA claims. Evidence that C3 purportedly

---

[125] Cochran Decl., Ex. 46.
[126] Cochran Decl., Ex. 48.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 27  |  No. 19-2-27385-2 SEA



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

defrauded HCC by misrepresenting the defect and recall history of the subject product—which is the product that injured Plaintiff Michael Vandivere—is as material as it gets. Plaintiffs have now been deprived of investigating what other documents or other evidence exists relating to C3's misrepresentations about its product. Notably, the HCC policy was procured prior to the date of the incident in this case so the material misrepresentation which occurred happened before Plaintiff Michael Vandivere was injured, making this evidence all the more relevant.

Moreover, CR 37(b) provides the Court with authority to impose sanctions for failing to comply with a court order. "'A party's disregard of a court order without reasonable excuse or justification is deemed willful.'" *Magana v. Hyundai Motor America*, 167 Wn.2d 570, 584 (2009) (quoting *Rivers v. Wash. State Conference of Mason Contractors,* 145 Wn.2d 674, 686-87 (2002)); *Anderson v. Mohundro*, 24 Wn. App. 569, 574 (1979) ("any violation of an explicit court order without reasonable excuse or justification must be deemed a willful act."). This case involves a decision to not only withhold critical documents until the very eve of trial, but also to subsequently violate Judge Catherine Shaffer's January 31, 2022 order to compel by failing to produce the disputed evidence.

There is no way to avoid the fact that C3 acted in bad faith. The egregiousness of the conduct here cannot be understated: C3's attorneys knew that Plaintiffs requested disclosure of any contact C3's attorneys had with Vertical World's employees and agents. C3 knew it concealed evidence that establishes that C3 arguably defrauded HCC by misrepresenting the defect history of its product—the very product which is the subject of this litigation.[127] Despite Plaintiffs having brought a motion to compel, C3 and its attorneys purposefully chose to disregard the rules of discovery and the commandments of this Court by concealing material evidence. This is an egregious example of a massive discovery violation.

---

[127] This evidence was responsive to many of Plaintiffs' discovery requests as set forth in Exhibit 47 to the Declaration of Darrell L. Cochran.

PLAINTIFFS' MOTION FOR SANCTIONS

Page 28  |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

**B.    The Court Should Impose Sanctions Under Its Inherent Equitable Power to Discourage Bad Faith Litigation.**

Where litigation misconduct does not fit within the provisions of any court rule, the court has the inherent authority to impose sanctions against a party who attempts in any way to obstruct the orderly administration of justice. *State v. S.H.*, 102 Wn. App. 468, 8 P.3d 1058 (2000). "Every court of justice has power . . . [t]o enforce order in the proceedings before it… [and] [t]o provide for the orderly conduct of proceedings before it[.]" RCW 2.28.010(2)-(3). Where sanctions are not expressly authorized, "the trial court is not powerless to fashion and impose appropriate sanctions under its inherent authority to control litigation." *In re Firestorm 1991*, 129 Wn.2d 130, 130 (1996) (applying the principles embodied in CR 11, CR 26(g), and CR 37 to CR 26(b) violations). "[D]ecisions either denying or granting sanctions… are generally reviewed for abuse of discretion." *Fisons.,*122 Wn.2d at 338. Division One has considered a trial court's authority to sanction in detail. *State v. S.H.*, 102 Wn. App. 468, 474 (2000). The *S.H.* Court ultimately held that the trial court's inherent authority to sanction is properly invoked upon a finding of bad faith, which can be demonstrated by conduct that delays or disrupts the litigation process, or by other "inappropriate and improper" conduct. *S.H.*, 102 Wn. App. at 475.

Even if sanctions were not warranted under CR 26(g) and CR 37(b), or under CR 11, which would be appropriate here, the Court should nonetheless impose sanctions under its inherent authority to curb C3's bad faith litigation misconduct. Withholding these documents was highly prejudicial to Plaintiffs. C3/s decision to withhold these documents prevented Plaintiffs from investigating the circumstances surrounding this new discovery and identify other information and documents C3 failed to produce. Plaintiffs therefore request the Court to enter an order imposing sanctions against C3 and C3's former counsel for withholding evidence.

**C.    Entry of Default Against C3 and a Negative Inference Jury Instruction Are Warranted**

Trial courts have powers both as an independent branch of government responsible for executing its duties and functions in judicial proceedings but also as a court of justice invested with



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

specific powers granted by the legislative branch of government, namely Chapter 2.28 RCW. Superior court judges have power in any part of the state to "exercise any power" and perform any duty conferred or imposed upon them by statute.  RCW 2.28.080.  Every judicial officer has power to compel obedience to his or her lawful orders as provided by law.  RCW 2.28.060.  "Judicial power is never exercised for the purpose of giving effect to the will of the courts, but always for the purpose of giving effect to the will and intent of the legislature; or, in other words, to the will of the law."  *Buffelen Lumber & Mfg. Co. v. State*, 32 Wn.2d 40, 42, 200 P.2d 509, 511 (1948). The legislature's will and intent is made clear through the enactment of RCW 2.28.010: every court of justice has power to enforce order in the proceedings before it and to provide for the orderly conduct of proceedings before it or its officers.  RCW 2.28.010.  Nowhere in Chapter 2.28 RCW does the legislature derogate from its principal interest in judicial officers maintaining order in the courts of justice by exercising its enforcement powers.

Where sanctions are not expressly authorized, "the trial court is not powerless to fashion and impose appropriate sanctions under its inherent authority to control litigation."  *State v. S.H.*, 102 Wn. App. 468, 473, 8 P.3d 1058, 1060 (2000); *In re Firestorm 1991*, 129 Wn.2d 130, 139, 916 P.2d 411 (1996) (applying the principles embodied in CR 11, CR 26(g), and CR 37 to CR 26(b) violations).

In Washington, when faced with discovery misconduct, courts adhere to the premise "'that the adversary's conduct may be considered generally as tending to corroborate the proponent's case and to discredit that of the adversary.'"  *Henderson v. Tyrrell*, 80 Wash. App. 592, 605, 910 P.2d 522 (1996), *as amended on denial of reconsideration* (Mar. 14, 1996) (quoting 2 John W. Strong, McCormick on Evidence § 265, at 192 (4th ed. 1992).  The Washington Supreme Court, in *Pier 67, Inc. v. King County*, 89 Wn.2d 379, 573 P.2d 2 (1977), held that "where relevant evidence which would properly be a part of a case is within the control of a party whose interests it would naturally be to produce it and he fails to do so, without satisfactory explanation, the only inference which the finder of fact may draw is that such evidence would be unfavorable to him."

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Id.* at 385–86 (emphasis added).

To remedy discovery misconduct, the Court may use its discretion to craft an appropriate sanction. Sanctions may include an adverse inference jury instruction, a rebuttable presumption applied to the evidence, summary judgment, or other sanctions. *Henderson*, 80 Wn. App. at 605 and fn. 3 at 606. Washington courts weigh two general factors in crafting a sanction based on discovery misconduct: "(1) the potential importance or relevance of the missing evidence; and (2) the culpability or fault of the adverse party." *Marshall v. Rally's Pacwest, Inc.,* 94 Wn. App. 372, 381-82, 972 P.2d 475 (1999). "[I]n determining the adverse party's culpability, the trial court can consider the party's bad faith, whether that party had a duty to preserve the evidence, and whether the party knew that the evidence was important to the pending litigation." *Homeworks Constr., Inc. v. Well*, 133 Wn. App. 892, 900, 138 P.3d 654 (2006). "[A] party may be responsible for spoliation without a finding of bad faith." *Id.*

With respect to the first factor, the "potential importance or relevance of the missing evidence" in this case is high. *Henderson*, 80 Wn. App. at 607. Plaintiffs are deprived of understanding what C3's former counsel did during his 38 visits to the Vertical World gym, which witnesses he spoke to, and whether he conducted additional research or surveillance for C3. Additionally, Plaintiffs are deprived of evidence regarding C3's material misrepresentations about the hazards of its product. Additional documentation exists regarding this issue, yet Plaintiffs are deprived of its discovery due to C3's concealment until the eve of trial. Additionally, C3's primary insurer has now rescinded coverage and Plaintiffs are deprived of the opportunity to investigate the decision to rescind C3's policy due to C3's concealment of this information for months. C3's misconduct has entirely devastated Plaintiffs' ability to prepare their experts, evidence, and strategy going into trial in just a few days.

With respect to the second factor, the "culpability or fault of the adverse party" is likewise high. *Id.* C3's former counsel knew that all parties had conducted a CR 34 inspection of the Vertical World gym with all counsel present and on notice of such conduct. C3's former counsel

PLAINTIFFS' MOTION FOR SANCTIONS

Page 31  |  No. 19-2-27385-2 SEA

**PFAU COCHRAN**
**VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

surely knew about the rules regarding having ex parte contact with represented individuals—Vertical World's employees. Despite this, C3's counsel had extensive contact with little ability for Plaintiffs' attorneys to investigate. Likewise, C3 willfully concealed evidence of C3's alleged fraud of HCC until days before trial. There is no explanation for this conduct other than to prejudice Plaintiffs.

Just as our political system can break down when people feel they can break the rules without consequences, so too can our legal system. The justice system depends on advocates doing their best to follow the law and abide by a court's orders—even if those advocates believe the Court is mistaken. Moreover, it is well-recognized that certain types of rule-breaking can create insurmountable prejudice to a party.

This conduct will result in severe prejudice to Plaintiffs. The only remedy in this instance is to enter an order of default against C3 on Plaintiffs' failure to warn claim which is a remedy permitted under *Henderson*. 80 Wn. App. at 605 and fn. 3 at 606. In addition to this remedy, consistent with Washington case law, Plaintiffs request that the Court grant them leave to present a jury instruction to the jury to draw a negative inference against C3 Manufacturing, LLC for its concealment of evidence of its material misrepresentation about its product. *Pier 67, Inc.*, 89 Wn.2d at 385-86.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court exercise its inherent authority to enter sanctions against a party, here C3 Manufacturing, for this egregious and concealed discovery misconduct.

//

//

//

//

//

PLAINTIFFS' MOTION FOR SANCTIONS

Page 32  |  No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1      RESPECTFULLY SUBMITTED this 24th day of May, 2023.

2

3                         **PFAU COCHRAN VERTETIS AMALA PLLC**

4                         *I certify that this memorandum contains 10,255 words.*

5                         *Plaintiffs have filed a motion for leave to file this brief*
                        *overlength.*

6

7                         By /s/ Darrell L. Cochran
                        Darrell L. Cochran, WSBA No. 22851

8                         Thomas B. Vertetis, WSBA No. 29805
                        Andrew S. Ulmer, WSBA No. 51227

9                         Alexander G. Dietz, WSBA No. 54842

10                        909 A Street, Suite 700
                       Tacoma, WA 98402

11                        Main: (253) 777-0799
                       Fax: (253) 627-0654

12                        E-mail: darrell@pcvalaw.com

13                                 tom@pcvalaw.com
                                aulmer@pcvalaw.co

14                                 adietz@pcvalaw.com

15

16

17

18

19

20

21

22

23

24

25

26



**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

## CERTIFICATE OF SERVICE

I, **Sarah Awes**, hereby declare under penalty of perjury under the laws of the State of Washington that that I am employed at Pfau Cochran Vertetis Amala PLLC.  I served the foregoing via **Email**, indicated below, by directing delivery to the following individuals:

**Attorneys for Defendant Vertical World, Inc.:**

Ann E. Trivett
Robert L. Christie
Christie Law Group PLLC
21600 Westlake Ave N, Suite 206
Seattle, WA 98109

Mark A. Clausen
Clausen Law Firm PLLC
701 5th Ave. Suite 4400
Seattle, WA 98104

**Attorneys for Defendant C3 Manufacturing, LLC:**

J. Scott Wood
Virginia Leeper
Zackary Paal
Gordon Rees Scully Mansukhani, LLP
701 Fifth Avenue, Suite 2100
Seattle, WA 98104

Rachel Tallon Reynolds
Erin M. Thenell
Lucy Boateng-Agyei
Lewis Brisbois Bisgaard & Smith LLP
1111 Third Avenue, Suite 2700
Seattle, WA 98101

SIGNED this 24th day of May, 2023.

/s/ Sarah Awes
Sarah Awes
Legal Assistant

PLAINTIFFS' MOTION FOR SANCTIONS

No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

The Honorable Suzanne R. Parisien
Noted for Hearing: June 7, 2023, 11:00 a.m.
With Oral Argument
Opposition Papers

1

2

3

4

5

6

7

8

9

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

10

11

12

13

14

15

16

17

MICHAEL VANDIVERE and KATHRYN SNOW VANDIVERE, husband and wife and their marital community, and KATHRYN SNOW VANDIVERE, as the legal guardian of W.V., a minor,

                          Plaintiffs,

v.

VERTICAL WORLD, INC., a Washington State Corporation; C3 MANUFACTURING, LLC, a Colorado Company,

                        Defendants.

No. 19-2-27385-2 SEA

**SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS**

## I.     **INTRODUCTION**

18

19

20

21

22

23

24

25

26

    Attorney Christopher Furman ("Mr. Furman") was not investigating the claims or interviewing witnesses when he visited Vertical World's facilities on multiple occasions. He was a patron.  But even if he had been investigating the claims in some way, his doing so would have been permissible. Washington law is very clear:  An adverse attorney may even go so far as conducting ex parte interviews with employees who are not speaking or managing agents. *Wright by Wright v. Grp. Health Hosp.*, 103 Wn.2d 192, 202-03, 691 P.2d 564 (1984) ("*Wright*").

    Washington Rule of Professional Conduct ("RPC") 4.2 states:

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS - 1

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

RPC 4.2.

In interpreting how RPC 4.2 applies to corporations involved in litigation, *Wright* held that its prohibition was limited to employees or representatives of a corporation who had legal authority to "bind" the corporation in a legal evidentiary sense. *Wright*, at 200. Indeed, no distinction is made between employees who are fact witnesses or those whose acts or omissions caused the event leading to the litigation. If the employees/witnesses are not "speaking agents," an attorney is free to communicate and deal with them—including about the issues in the case. But even that did not happen here.  Mr. Furman did not communicate with any Vertical World witness or any Vertical World employee about this case. But the point is, even if he had, there is no ethical or other rule that prevents him from doing so. As the Supreme court stated in *Wright*, "it is not the purpose of the rule to protect a corporate party from the revelation of prejudicial facts." *Id.* (citing *Accord, Coburn v. Seda*, 101 Wn.2d 270, 276-77, 677 P.2d 173 (1984)).

Another rule, RPC 4.3, prohibits a lawyer, acting on behalf of a client, from conveying a misleading impression that he/she is disinterested when dealing with an unrepresented party regarding a legal matter.  Mr. Furman's visits to Vertical World were to use the climbing facilities—he dealt with low-level staff as a patron, not as an attorney for his client. He did not speak to anyone regarding the litigation during his visits, and he did not interview anyone—let alone anyone who had the power to bind Vertical World in an evidentiary sense.

In sum, Mr. Furman's use of Vertical World's climbing facilities while representing C3 Manufacturing ("C3") did not run afoul of any RPCs; it did not violate any court order or civil rule; and it cannot be (and should not be) a basis for imposing any sanctions.

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS - 2

## II.     FACTUAL BACKGROUND

Mr. Furman joined the Sinars Slowikowski Tomaska LLC law firm (the "Sinars Firm") as an associate in late February of 2022. At that time, he had been practicing law for two years. Furman Decl.[1] ¶ 2. Soon after joining the firm, he was asked to assist with its representation of C3, and he worked under the supervision of two firm partners, Scott Wood and Duncan Lemon. Furman Decl. ¶ 5; Hicks Decl.[2] ¶ 3.

Shortly after beginning working on the matter, Mr. Furman attended as an observer an x-ray examination of a C3, auto-belay device at a third-party facility.  That examination occurred on April 1, 2022. Furman Decl. ¶ 6.  It was done by Delphi Precision Imaging and was observed by Plaintiffs' expert. *Id.*  The facility at which the examination occurred was close to Vertical World's since closed Redmond location. After the examination, he went to Vertical World's Redmond gym and paid the fee required to use their climbing facilities. *Id.*  Mr. Furman had been an avid rock climber for years. *Id.* ¶ 3.  He was living on Bainbridge Island at the time, and he wanted to go to a climbing gym he had not previously been to that was close by. *Id.* ¶ 6. While working out at Vertical World's Redmond location on April 1, 2022, he only used the bouldering facilities. He did not use or examine or even approach any auto-belay equipment. That equipment was in a different portion of the gym. *Id.* Nor did he examine any auto-belay devices during this visit. *Id.*; Keller Decl.[3], Ex. A ("Furman Dep.") at 30:3-9. Mr. Furman did not advise Vertical World's legal counsel in advance that he was going to visit the Redmond location that day. Furman Dep. at 12:18-13:5. He did tell one of his supervising partners that he had rock-climbed at the Redmond facility on April 1, 2022. Furman Dep. at 38:5-19.

---

[1] Decl. of Christopher Furman in Supp. of Sinars Firm and Mr. Furman's Opp'n to Mot. for Sanctions ("Furman Decl."), filed herewith.
[2] Decl. of James D. Hicks in Supp. of Sinars Firm and Mr. Furman's Opp'n to Mot. for Sanctions ("Hicks Decl."), filed herewith.
[3] Decl. of Bradley S. Keller in Supp. of Sinars Firm and Mr. Furman's Opp'n to Mot. for Sanctions ("Keller Decl."), filed herewith.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    Mr. Furman did not visit Vertical World again until almost a year later, in February of

2    2023, after he had moved from Bainbridge Island to Seattle. Furman Decl. ¶ 7. Because he was

3    now living closer to Vertical World's gyms, he decided to purchase a monthly membership so he

4    could regularly rock climb there. *Id.* When he purchased the membership he also knew that his

5    supervising attorney, Scott Wood, would be leaving the firm shortly, and that Mr. Wood would

6    be taking the defense of C3 with him and that both the Sinars Firm's and Mr. Furman's

7    representation of C3 would be ending. *Id.*

8    During the week of April 24, 2023, Scott Wood confirmed that he, along with his

9    matters, would be moving to a new firm within days. Hicks Decl. ¶ 4. Most of Scott Wood's

10   matters were going with him to his new law firm. *Id.* Neither the Sinars Firm nor Mr. Furman

11   were going to be representing C3 or Mr. Wood's other clients after his departure. *Id.* To reflect

12   this, notices of withdrawal needed to be filed. *Id.* So, on April 27, 2023, Mr. Furman filed five

13   notices of withdrawal, one in each of five cases Scott Wood was taking with him. *Id.* and Ex. A.

14   This case was one of five cases for which Mr. Furman filed notices of withdrawal on April 27,

15   2023. *Id.* ¶ 5 and Ex. A at 14-16. Scott Wood's last day at the Sinars Firm was the same day the

16   notices of withdrawal in those cases were filed, April 27, 2023. *Id.* ¶ 6.

17   Indoor climbing gyms offer two types of climbing experiences: "bouldering" and "sport

18   climbing." Furman Decl. ¶ 4. Bouldering involves a climber climbing over mats on the ground

19   without protective gear or equipment. When bouldering, a climber is normally limited to a 10-20

20   foot vertical route. *Id.* In contrast, "sport climbing" involves using protective gear and other

21   assistive gear including ropes and auto-belays that allow solo climbing of routes of 40 vertical

22   feet or greater. *Id.* In order to use auto-belays at Vertical World in 2023, Mr. Furman was

23   required to participate in a training session. *Id.* ¶ 9. The training consisted of receiving

24   instruction on using auto-belay devices, and Mr. Furman demonstrating his ability to do so. *Id.*

25   The training was approximately 45 minutes and was taught by a gym employee. When Mr.

26   Furman participated in the training session, four other gym patrons also participated in it. *Id.*

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION
TO MOTION FOR SANCTIONS - 4

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

While rock climbing at Vertical World, Mr. Furman's interactions with staff and other patrons consisted of friendly conversations and greetings. *Id.* ¶ 10. This included his interactions with the employee that provided the auto-belay training. *Id.*  His conversations and interactions were no different than those any other gym member would have had. *Id.*

Mr. Furman's visits to Vertical World were solely for the purpose of rock climbing. They were not done on behalf of his client, and he did not interact with employees on behalf of his client.  *Id.* ¶ 11. Because his visits were as a patron to work out, and not on behalf of C3, at Mr. Furman's recent deposition the work-product privilege was <u>not</u> asserted regarding anything he observed or did during those visits. Furman Dep. at 27:14-20, 53:7-16. Mr. Furman never discussed the facts of the litigation or anything about the litigation with any employees or other patrons. Furman Decl. ¶ 11. During his visits to the gym to rock climb, Mr. Furman never talked to or interacted with any employee who had been deposed in the litigation, or anyone whom he understood or believed was a manager or supervisor at Vertical World. *Id.* ¶¶ 12-13. At no point did Mr. Furman make any video recordings, take pictures, notes, or any other type of recording during his use of the climbing facilities. *Id.* ¶ 14.

Mr. Furman told Vertical World's counsel, John Barry, on April 26, 2023, that he had been rock climbing at Virtual World's gyms. Furman Dep. 51:7-14. Mr. Furman has not gone to any Vertical World gyms since his last visit on May 6, 2023. Furman Dep. 43:16-19.

## III.   <u>ARGUMENT</u>

### A.   <u>RPC 4.2 Was Not Violated</u>

Whether and how lawyers may communicate with employees of an adverse party is governed by *Wright.* RPC 4.2, Cmt. 10. Under RPC 4.2, an attorney may conduct ex parte interviews of an employee who is not a speaking or managing agent. *Wright,* at 202-03. For the purposes of RPC 4.2, a managing-speaking agent is one that has the *authority* to bind a corporation. *Id.* at 202.  They "are ultimately responsible for managing the entity's operations . . . . [t]hese officials are the multi-person entity's alter ego—they can speak and act for the

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS - 5

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

entity and can settle controversies on its behalf." *Id.* (citing Note, *DR 7-104 of the Code of Professional Responsibility Applied to the Government "Party"*, 61 Minn. L. Rev. 1007, 1010 (1977)) (The purpose of the disciplinary rule is to protect the corporation so its agents who have the authority to prejudice the entity's interests are not unethically influenced by adverse counsel.) The comments to RPC 4.2, which are official pronouncements adopted by the Washington Supreme Court, state

> In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter.

RPC 4.2, Cmt. 7. [4]

RPC 4.2 does not apply to an adverse attorney's interaction with lower-level employees as part of the general public. In *Apple Corps Ltd. v. International Collectors Society*, 15 F. Supp. 2d 456 (D.N.J. 1998), the court was considering whether an attorney violated RPC 4.2 when she investigated the adverse party's compliance with a consent order by telephoning a toll-free phone number to purchase commemorative stamps in a manner that would violate the consent order. *Id.* at 462. During the calls there was no evidence that the attorney or anyone working at her direction asked the sales representatives questions about instructions they had received, questions about the company's policies with regards to the stamps, or any other substantive question besides whether they could buy stamps. *Id.* at 474. The court found that the phone calls did not violate RPC 4.2 because "RPC 4.2 cannot apply where lawyers and/or their investigators, seeking to learn about current corporate misconduct, act as members of the general public to engage in ordinary business transactions with low-level employees of a represented corporation." *Id.* at 474-75.

---

[4] Additionally, since former employees cannot speak for the corporation, they are not considered speaking agents for purposes of RPC 4.2. *Wright,* at 201.

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

In an advisory opinion, the Washington State Bar Association addressed communications with low-level employees who are not speaking agents in the context of government employees. The WSBA advisory opinion states:

> [i]f the low-level government employees do not supervise, direct or regularly consult with the government lawyer concerning the matter, do not have the authority to obligate the government with respect to the matter, and are not individually represented by the government lawyer, the opposing lawyer may contact those employees directly.

WSBA Advisory Op. 201803 (2018).

Where an attorney uses an adverse corporate party's facilities for leisure, one trial court held that the argument that doing so somehow prejudices the corporate party was "unavailing."[5] Another Delaware trial court was more blunt—characterizing a corporate party's policy to bar adverse attorneys from its venues as "the stupidest thing"[6] the court had seen.

Mr. Furman's actions are not even within the sphere of the types of actions the *Wright* court was focused on—where an attorney seeks to investigate an adverse corporate party by interviewing to their employees. Instead, Mr. Furman was as a patron using the climbing facilities. He visited Vertical World for the first time on April 1, 2022 due to his proximity to the gym that day, and he later purchased a monthly membership in 2023 when he knew, because the case was leaving the Sinars Firm, he would no longer be working it. Furman Decl. ¶¶ 6-7. Mr. Furman filed his notice of withdrawal on April 27, 2023, because the matter was moving to a new firm in a matter of days. Hicks Decl. ¶¶ 4-5.

---

[5] *Hutcher v. Madison Square Garden Ent. Corp.*, No. 653793/2022, 2022 WL 16924087 (N.Y. Sup. Ct. Nov. 14, 2022) (preliminary injunction granted; subsequently vacated by *Hutcher v. Madison Square Garden Ent. Corp.*, 21 A.D.3d 573, 186 N.Y.3d 26 (N.Y. App. Div. 2023) because, by statute, plaintiffs were limited to a monetary remedy).
[6] *In Re Madison Square Entertainment Corp. Stockholders Litigation*, Consol. C.A. No. 2021-0468 (Del. Ch. Nov. 3, 2022), Hearing Tr. at 7:15-16 (a copy of an excerpt of the hearing transcript is attached to the Keller Declaration as Exhibit B).

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS - 7

1    Mr. Furman's interactions and communications with Vertical World personnel were

2    the same as those that any visitor or club member would have when rock climbing at Vertical

3    World. There is no suggestion that any personnel he interacted with were "speaking agents."

4    Furman Decl. ¶ 13. He was using the climbing facilities for recreational purposes. Nothing

5    about Mr. Furman's communications or dealings with VW regarding his gym visits ran afoul

6    of RPC 4.2. Fucile Decl.[7] ¶ 10.  Strait Decl.[8] ¶¶ 6, 10.

7    There is also no requirement under RPC 4.2, or any other ethical rule, for Mr. Furman

8    to inform Vertical World's counsel that he was using Vertical World's facilities. Fucile Decl.

9    ¶ 10.  When he did tell Vertical World's counsel on April 26, 2023 that he had been going the

10   facilities to rock climb, he did so because he sensed some staff awkwardness and he wanted to

11   be able to continue climbing there. Furman Dep., 48:9-19:12.

12   The theory Plaintiffs posit—that Mr. Furman was not allowed to visit Vertical World

13   because he was an adverse attorney is mistaken. Attorneys adverse to a corporation in

14   litigation do not violate any ethical or other rule when they visit the adverse corporate party's

15   establishment as a patron to use their facilities. RPC 4.2 was not violated here.

16   **B.    RPC 4.3 Also Was Not Violated**

17   RPC 4.3 addresses when an attorney, acting on behalf of a client, is dealing with an

18   unrepresented person.  It provides:

19
20           In dealing on behalf of a client with a person who is not
             represented by a lawyer, a lawyer shall not state or imply that
21           the lawyer is disinterested. When the lawyer knows or
             reasonably should know that the unrepresented person
22           misunderstands the lawyer's role in the matter, the lawyer shall
             make reasonable efforts to correct the misunderstanding. The
23           lawyer shall not give legal advice to an unrepresented person,
             other than the advice to secure the services of another legal
24

_____

25   [7] Decl. of Mark J. Fucile in Supp. of Sinars Firm and Mr. Furman's Opp'n to Mot. for
     Sanctions ("Fucile Decl."), filed herewith.

26   [8] Decl. of John Strait in Supp. of Sinars Firm and Mr. Furman's Opp'n to Mot. for Sanctions
     ("Striat Decl."), filed herewith.

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION
TO MOTION FOR SANCTIONS - 8

1
2
> practitioner, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

3    As a preliminary matter, RPC 4.3 has no application where, as here, an attorney interacts

4    with an unrepresented party (VW staff) as a patron rather than on behalf of a client. "It is clear

5    from the language of RPC 4.3 that it is limited to circumstances where an attorney is acting in

6    his capacity as a lawyer—'dealing on behalf of a client.'" *Apple Corps Ltd.,* 15 F. Supp. 2d at

7    476 (citing RPC 4.3).[9] "Therefore, its prohibitions on allowing the unrepresented person to

8    misunderstand that the lawyer is disinterested only apply to a lawyer who is acting as a lawyer."

9    *Apple Corps Ltd.,* 15 F. Supp. 2d at 476 (finding RPC 4.3 did not apply to counsel's testing

10   compliance of a consent order by calling a toll-free number and talking to adverse party's lower-

11   level employees).

12   RPC 4.3 addresses two potential things.  The first is to prevent exploitation of an

13   unrepresented person who could be misled and assume that an attorney is disinterested

14   regarding a legal matter when the attorney, who is acting on behalf of a client, is in fact not

15   disinterested. *See* RPC 4.3, Cmt. 1.[10]  Besides not acting on behalf of C3, because any dealings

16
17
18
19
20
21

---

[9] The New Jersey RPC 4.3 examined by the court in *Apple Corps Ltd.* which begins "[i]n dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding," mirrors Washington RPC 4.3 which reads "[i]n dealing on behalf of a client with a person who is not represented by a lawyer, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

22
[10] Comment 1 states:

23
24
25
26
> [1] **[Washington revision]** An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client. In order to avoid a misunderstanding, a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person. For misunderstandings that sometimes arise when a lawyer for an organization deals

---

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION
TO MOTION FOR SANCTIONS - 9

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Mr. Furman had were with low-level staff, there is no danger of exploitation. Those individuals are neither parties, nor are they "speaking agents" of Virtual World.  The concern of exploitation or misleading an unrepresented person does not apply where the person is not a party to any litigation, will not later be a party, and has no ability to speak or act on behalf of a party.  In this respect, RPC 4.3 dovetails with RPC 4.2 and *Wright*.  As *Wright* specifically holds, and even though it is not what was happening here, attorneys are free to interview precipitant fact witnesses employed by a party so long as they are not "speaking agents."

The second concern RPC 4.3 addresses is to prevent an attorney whose client's interests are adverse to an unrepresented person from providing legal advice to the unrepresented person. *See* RPC 4.3, Cmt. 2.  That is not at issue here.

Here Mr. Furman (i) learned nothing from being a Vertical World patron that any person walking in off the street and becoming a member would not learn, (ii) the low-level staff he dealt with were not adverse parties and they were not speaking agents of Vertical World, and (iii)  there is no suggestion that he provided any legal advice to any staff. RPC 4.3 is not implicated even if you assume he visited on behalf of a client—which he did not. Fucile Decl. ¶ 11; Strait Decl. ¶¶ 6, 10.

**C.** **Sanctions Based on C3's Response to Interrogatory No. 7 Is Not Warranted**

It is a stretch too far to characterize Mr. Furman's post-litigation Vertical World rock climbing workouts as a meeting between C3 and Vertical World. He did not make arrangements with any individual Vertical World employee to meet, interview, or have conversations with them. And he did not have any conversations or dealing with anyone about this case. He was there working out. He was not there on behalf of C3. One does not "meet with" a Starbucks employee at the cash-register when they buy their morning cup of coffee.

---

with an unrepresented constituent, see Rule 1.13(f).  For the definition of "unrepresented person" under this Rule, see Washington Comment [5].

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION TO MOTION FOR SANCTIONS - 10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    Regardless, any failure to refer to Mr. Furman's Vertical World visits did not

2    prejudice Plaintiffs.

3    In fact, it had no impact at all. Plaintiffs (and the Court) now have a detailed 90

4    minute deposition regarding what Mr. Furman did (and, more importantly, didn't do) during

5    those visits. What would have been different in terms of Plaintiffs preparing this case for trial,

6    if, several months ago, Interrogatory No. 7 had been answered by identifying Mr. Furman's

7    rock climbing workouts at Vertical World? Nothing. And Plaintiffs certainly haven't

8    identified anything. Motions for sanctions should be denied where there exists no prejudice,

9    even if a discovery violation is deemed to have occurred. *State v. Barry*, 184 Wn. App. 790,

10    339 P.3d 200 (2014) (State's late disclosure of witnesses' criminal convictions was not

11    prejudicial where Defendant's counsel could not show how he would have prepared for trial

12    differently). Plaintiffs suggest he would have "launched an investigation." But Plaintiffs got

13    their investigation. They took Mr. Furman's deposition, and they now know that Mr. Furman

14    began working out regularly at Vertical World earlier this year. That had zero impact on the

15    issue to be tried regarding Plaintiffs' product liability claims against C3. There has been (and

16    cannot be) any showing of prejudice regarding C3's response to Interrogatory No. 7.

17    **D.    Plaintiffs Lack Standing to Request Sanctions Based on Mr. Furman's VW Visits**

18    Plaintiffs lack standing to seek sanctions against C3 regarding Mr. Furman's rock

19    climbing activities at Vertical World. "Standing refers to a party's right to make a legal claim

20    or seek judicial enforcement of a right." *Forbes v. Pierce Cnty.*, 5 Wn. App. 2d 423, 433, 427

21    P.3d 675 (2018). "A litigant cannot assert the legal rights of another person and must have a

22    real interest before bringing a cause of action." *Id.* RPC 4.2 protects speaking/managerial

23    employees from being contacted by an adverse attorney in litigation, and it protects their

24    employers. *Wright*, 103 Wn.2d at 202-\03.

25    Plaintiffs' (mistaken) argument of ethical lapses concerns ethics rules designed to

26    protect Vertical World and certain Vertical World employees. Those rules do not protect

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION
TO MOTION FOR SANCTIONS - 11

Plaintiffs. Therefore, Plaintiffs lack standing to seek sanctions based on the RPC issues presented here.

### IV.   CONCLUSION

Attorneys are not required to notify an adverse corporate party when they visit the corporations' facilities as a patron. Nor are they required to seek permission when interviewing their non-speaking/managerial employees. Chris Furman did not visit Vertical World on behalf of his client nor did he interview any employees, let alone those that had any speaking authority for Vertical World. He visited because he was a rock-climber and wanted to enjoy his hobby. His doing so did not violate any ethical or other civil rule.

DATED this 6th day of June, 2023.

BYRNES KELLER CROMWELL LLP

By  /s/ Bradley S. Keller
    Bradley S. Keller, WSBA #10665
    Joan M. Pradhan, WSBA #58134
    1000 Second Avenue, 38th Floor
    Seattle, Washington 98104
    Phone: (206) 622-2000
    Fax: (206) 622-2522
    bkeller@byrneskeller.com
    jpradhan@byrneskeller.com
    ***Attorneys for Christopher Furman and Sinars Slowikowski Tomaska LLC***

**CERTIFICATION:**  The above signature also certifies that this memorandum contains 3,947 words, in compliance with the Local Civil Rules.

1

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 6th day of June, 2023, a true copy of the foregoing was served on each and every attorney of record herein via King County E-Service and email:

| | |
|---|---|
| Darrell L. Cochran | Rachel Tallon Reynolds |
| Thomas B. Vertetis | Erin M. Thenell |
| Kevin M. Hastings | Lucy Boateng-Agyei |
| Andrew S. Ulmer | Lewis Brisbois Bisgaard & Smith LLP |
| Pfau Cochran Vertetis Amala, PLLC | 1111 Third Avenue, Suite 2700 |
| 911 Pacific Avenue, Suite 200 | Seattle, WA 98101 |
| Tacoma, WA 98402 | Rachel.reynolds@lewisbrisbois.com |
| darrell@pcvalaw.com | Erin.thenell@lewisbrisbois.com |
| tom@pcvalaw.com | Lucy.Boateng-Agyei@lewisbrisbois.com |
| kevin@pcvalaw.com | ***Attorneys for Defendant C3 Manufacturing*** |
| aulmer@pcvalaw.com | |
| ***Attorneys for Plaintiffs*** | |
| Robert Christie | Mark Clausen |
| Ann E. Trivett | Clausen Law Firm, PLLC |
| Christie Law Group, PLLC | 9655 SE 36th Street, Suite 100 |
| 2100 Westlake Ave N Ste 206 | Mercer Island, WA 98040 |
| Seattle, WA 98109-5802 | mclausen@clausenlawfirm.com |
| bob@christielawgroup.com | ***Attorney for Defendant Vertical World*** |
| ann@christielawgroup.com | |
| ***Attorneys for Defendant Vertical World*** | |

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED in Seattle, Washington, this 6th day of June, 2023.

/s/ Bradley S. Keller
Bradley S. Keller
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522

SINARS FIRM AND CHRISTOPHER FURMAN'S OPPOSITION
TO MOTION FOR SANCTIONS - 13

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

JUDGE SUZANNE R. PARISIEN
TRIAL DATE: JUNE 12, 2023
HEARING DATE: June 7, 2023
HEARING TIME: 11:00 a.m.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

| | |
|---|---|
| MICHAEL VANDIVERE and KATHRYN SNOW VANDIVERE, husband and wife and their marital community, and KATHRYN SNOW VANDIVERE, as the legal guardian of W.V., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>VERTICAL WORLD, INC., a Washington State Corporation; C3 MANUFACTURING, LLC, a Colorado Company,<br><br>Defendants. | Case No. 19-2-27385-2 SEA<br><br>**DEFENDANT C3 MANUFACTURING, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION FOR SANCTIONS RELATING TO PRIOR COUNSEL** |

## I.    RELIEF REQUESTED

Per this Court's instructions, Defendant C3 Manufacturing, LLC ("C3") offers this response in opposition to Plaintiffs' request for sanctions on the discrete issue of C3's prior counsel's conduct.[1]  It is undisputed that prior counsel never informed C3 of his visits to Vertical World.  C3 cannot be sanctioned for conduct of its counsel that it only learned of weeks ago.  Accordingly,

---

[1] Rather than relitigating the issue of excess coverage recission, C3 incorporates by reference its prior briefing and argument on that issue.

DEFENDANT C3 MANUFACTURING, LLC'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION
FOR SANCTIONS RELATING TO PRIOR COUNSEL  - 1

LEWIS BRISBOIS BISGAARD & SMITH LLP
1111 Third Avenue, Suite 2700
Seattle, Washington 98101
206.436.2020

125021898.1

1 | C3 asks the Court to deny Plaintiffs' request for sanctions.

2 | ## II. COUNTER STATEMENT OF FACTS

3 | C3's prior counsel was deposed pursuant to Court order on June 2, 2023.[2] Mr. Furman

4 | testified about his rock-climbing activities at Vertical World, and specifically stated that he did

5 | not inform C3 of his activities:

6 | > Q: Understood. So did you ever talk to C3, your client, about the fact that you'd
     > been going to Vertical World in 2023?
7 | > ….
8 | > A: No.[3]

9 | This concession warrants denial of Plaintiffs' request for sanctions against C3.

10 | ## III. STATEMENT OF ISSUES

11 | Where Plaintiffs have not submitted any evidence of the violation of a Court Order and

12 | have failed to produce any evidence of willful misconduct on the part of C3 should Plaintiffs'

13 | emergency Motion for Sanctions, including the request for a default judgment and/or an adverse

14 | inference instruction be summarily denied?

15 | ## IV. MATERIALS RELIED UPON

16 | C3 relies upon all pleadings, discovery requests and responses, expert reports, depositions

17 | and exhibits submitted or procured in this case and the materials included with the attached

18 | Declaration of Rachel Tallon Reynolds.

19 | ## V. ARGUMENT AND AUTHORITY

20 | **A. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE C3 DID NOT ENGAGE IN ANY SANCTIONABLE CONDUCT.**

21 |

22 | The Court should deny Plaintiffs' motion first and foremost because C3 itself did not

23 | engage in sanctionable conduct. To the extent there is any concern about C3's prior counsel's

24 | rock-climbing at Vertical World, those concerns are not imputable to the defendant itself.

25 |

26 | [2] Deposition of Christopher Furman, attached as Exhibit A to Reynolds Decl.

27 | [3] Exhibit A, at 55:4-16.

DEFENDANT C3 MANUFACTURING, LLC'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION
FOR SANCTIONS RELATING TO PRIOR COUNSEL  - 2

125021898.1

LEWIS BRISBOIS BISGAARD & SMITH LLP
1111 Third Avenue, Suite 2700
Seattle, Washington 98101
206.436.2020

1   Plaintiffs' counsel cites to no authority to support the imposition of sanctions against C3 because

2   of concerns they have about prior counsel's conduct.[4]

3        Even assuming that C3 violated some Court Order by way of its prior counsel's visits to

4   Vertical World (which it did not), the sanctions requested by Plaintiffs would be entirely

5   inappropriate as to C3.  Plaintiffs bear the burden of proving that **C3** – not its prior counsel –

6   willfully violated a rule or discovery order.  Christopher Furman's testimony establishes that C3

7   was not informed of his visits to Vertical World until it came to light from Vertical World's counsel

8   weeks ago.  There are no facts to support a finding of impropriety on the part of C3 relative to its

9   prior counsel's conduct.

10                          **VI.    <u>CONCLUSION</u>**

11        For the foregoing reasons, C3 respectfully requests that the Court deny Plaintiffs' Motion

12   for Sanctions and request for fees.

13

14

15   DATED June 6, 2023                    LEWIS BRISBOIS BISGAARD & SMITH LLP

16

17                                  By:        */s/ Rachel Tallon Reynolds*
                                         Rachel Tallon Reynolds, WSBA #38750
18                                       Erin M. Thenell, WSBA #51449
                                         Lucy Boateng-Agyei, WSBA #58141
19                                       1111 Third Avenue, Suite 2700
                                         Seattle, Washington 98101
20                                       (206) 436-2020
21                                       Rachel.Reynolds@lewisbrisbois.com
                                         Erin.Thenell@lewisbrisbois.com
22                                       Lucy.Boateng-Agyei@lewisbrisbois.com
23                                       ***Defendant C3 Manufacturing, LLC***

24        I certify that this brief contains no more than 4,200 words in compliance with local

25   rules.

26   ---
     [4] Prior Counsel has retained counsel that has made a limited appearance for the purpose of responding to
     the request for sanctions; C3 defers to that counsel to respond to the substantive issues raised in Plaintiffs'
27   motion.

DEFENDANT C3 MANUFACTURING, LLC'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION
FOR SANCTIONS RELATING TO PRIOR COUNSEL  - 3

125021898.1

LEWIS BRISBOIS BISGAARD & SMITH LLP
1111 Third Avenue, Suite 2700
Seattle, Washington 98101
206.436.2020

1

## CERTIFICATE OF SERVICE

2    I declare under penalty of perjury under the laws of the State of Washington that on June

3    6, 2023, I served a true and correct copy of the foregoing document on the following persons by

4    E-service via e-mail, or in another manner as indicated below:

5    ***Counsel for Plaintiffs***               ***Counsel for Defendant Vertical World,***
     Darrell L. Cochran, WSBA No. 22851          ***Inc.***
6    Thomas B. Vertetis, WSBA No. 29805          Robert L. Christie, WSBA No. 10895
     Kevin M. Hastings, WSBA No. 42316           Ann E. Trivett, WSBA No. 39228
7    Andrew S. Ulmer, WSBA No. 51227             John Barry
8    PFAU COCHRAN VERTETIS AMALA                 CHRISTIE LAW GROUP, PLLC
     909 A. Street, Suite 700                    2100 Westlake Avenue N., Suite 206
9    Tacoma, WA  98402                           Seattle, WA  98109
     Telephone: (253) 777-0799                   Telephone: (206) 957-9669
10   darrell@pcvalaw.com                         bob@christielawgroup.com
11   tom@pcvalaw.com                             ann@christielawgroup.com
     kevin@pcvalaw.com                           john@christielawgroup.com
12   aulmer@pcvalaw.com                          stefanie@christielawgroup.com
     jgott@pcvalaw.com
13   sawes@pcvalaw.com
     laura@pcvalaw.com
14

15   ***Counsel for Defendant Vertical World, Inc.***
     Mark A. Clausen, WSBA No. 15693
16   CLAUSEN LAW FIRM, PLLC
     701 Fifth Avenue, Suite 4400
17   Seattle, WA  98104
     Telephone: (206) 223-0335
18   mclausen@clausenlawfirm.com

19

20    Executed on June 6, 2023, at Seattle, Washington.

21

22                                              */s/ Elizabeth Pina*
                                                Elizabeth Pina, Legal Assistant
23                                              Elizabeth.Pina@lewisbrisbois.com

24

25

26

27

DEFENDANT C3 MANUFACTURING, LLC'S RESPONSE IN          LEWIS BRISBOIS BISGAARD & SMITH LLP
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION                   1111 Third Avenue, Suite 2700
FOR SANCTIONS RELATING TO PRIOR COUNSEL  - 4                      Seattle, Washington 98101
                                                                        206.436.2020
125021898.1

# King County Superior Court Clerk's Office EFiling Confirmation Receipt

| | |
|---|---|
| Case Number: | 19-2-27385-2 SEA |
| Case Title: | VANDIVERE ET AL VS VERTICAL WORLD INC |
| Submitted By: | Rachel Reynolds |
| Bar Number: | 38750 |
| User ID: | Rtreynolds |
| Submitted Date/Time: | 6/6/2023 10:14:25 AM |
| Received Date/Time: | 6/6/2023 10:14:25 AM |
| Total Cost: | $0.00 |

## DOCUMENTS

| | |
|---|---|
| Document Type: | OBJECTION/OPPOSITION |
| File Name: | Vandivere - C3's Opposition to Plaintiffs' Motion for Sanctions on Prior Counsel Conduct.pdf |
| Cost: | $0.00 |

| | |
|---|---|
| Document Type: | DECLARATION OF RACHEL TALLON REYNOLDS RE OPPOSITION TO PLTFS MOTION |
| File Name: | Vandivere - Decl of R Reynolds with Exhibit.pdf |
| Cost: | $0.00 |

| | |
|---|---|
| Printed On: | 6/6/2023 10:14:53 AM |

THE HONORABLE SUZANNE R. PARISIEN

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY**

8   | MICHAEL VANDIVERE and KATHRYN

9   | SNOW VANDIVERE, husband and wife and
    | their marital community, and KATHRYN

10  | SNOW VANDIVERE, as the legal guardian
    | of W.V., a minor,

No. 19-2-27385-2 SEA

11                                    Plaintiffs,

12         vs.

**REPLY IN SUPPORT OF PLAINTIFFS'
PLAINTIFFS' MOTION FOR
SANCTIONS**

13  | VERTICAL WORLD, INC., a Washington

14  | State Corporation; C3 MANUFACTURING,
    | LLC, a Colorado Company,

15                                    Defendants.

16

17

18

19

20

21

22

23

24

25

26

REPLY IN SUPPORT OF PLAINTIFFS'
PLAINTIFFS' MOTION FOR SANCTIONS

Page 1 |  No. 19-2-27385-2 SEA



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# I.   REPLY

In its three-page response, Defendant C3 Manufacturing, LLC ("C3") argues that C3 itself should not be sanctioned because C3 (the corporation) was not aware that its former attorney—under the approval of his law partners—made at least 29 ex parte visits to Vertical World. Impliedly, C3 suggests that its former attorneys and/or the Sinars Slowikowski Tomaska LLC law firm (the "Sinars Firm") should bear responsibility for the sanction to be imposed.

Anticipating a sanction for this misconduct, C3's former counsel, Christopher Furman, and the Sinars Firm now make an appearance.  The response from former counsel urges the Court to excuse its discovery misconduct not based on any assertions that the Sinars Firm and Mr. Furman complied with the discovery rules—they do not even deny that they submitted ***patently false*** discovery responses in this case and withheld evidence for months—but, rather, on the assertion that Furman's conduct does not violate the Rules of Professional Conduct ("RPCs").  But Plaintiffs bring a motion for sanctions for discovery misconduct, not an ethics complaint before the Washington State Bar Association.

This proceeding is not one which requires a determination of compliance with the RPCs but with the rules of discovery.  Clearly the memorandum and supporting ethics expert declarations submitted by the Sinars Firm are primarily focused on staving off a potential future malpractice lawsuit between C3 and the Sinars Firm, however any potential claims between C3 and its former attorneys are immaterial to the issues presented before the Court.  With respect to the concealment of documents pertaining to the alleged fraud of Houston Casualty Company ("HCC"), the Sinars Firm notably fails to offer any response to this issue despite the fact that the concealment was carried out by the Sinars attorneys.  The Sinars Firm accordingly waives any response to that issue.

The materials submitted in response to Plaintiffs' motion for sanctions are in large part unresponsive to the discovery misconduct at the heart of this request.  The Court should accordingly enter an award of sanctions both to balance the prejudice to Plaintiffs as well as to serve as a deterrence for the willful discovery violations and patently false statements made by C3's attorneys

REPLY IN SUPPORT OF PLAINTIFFS'
PLAINTIFFS' MOTION FOR SANCTIONS

Page 2  |  No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

throughout discovery.

**A.    Both C3 and the Sinars Firm Fail to Justify Their False Discovery Responses**

Neither C3 nor the Sinars Firm offer any legal authorities to excuse the ***false*** discovery responses they provided regarding Mr. Furman's visits to the Vertical World facility.  These false discovery responses require the imposition of sanctions under Washington's discovery rules.

On July 26, 2022, Plaintiffs served their Second Set of Interrogatories and Requests for Production.  Interrogatory No. 7 requested C3 to "identify all dates and locations in which employees… of Vertical World met with… agents, attorneys… of C3."[1]  C3, through the Sinars Firm, responded on August 25, 2022, with a false answer, stating:

> In January of 2020, Vertical World's Richard Johnston asked to tour C3's facility, and C3 obliged. In April of 2022, representatives from C3, Vertical World, and Plaintiffs all met at Vertical World Seattle to test two Perfect Descent Auto Belays. ***C3 does not recall meeting with Vertical World on any other occasion***.[2]

The attorneys at the Sinars Firm who drafted these responses knew this was false.  By August 25, 2022, both Mr. Furman and his pro hac partner, Duncan Lemmon, were aware that Mr. Furman made his first ex parte visit to Vertical World on April 1, 2022, the same day as the product examination and three days before the CR 34 inspection of Vertical World.  C3's answer to this interrogatory continued to be untruthful throughout the course of 2023 when Mr. Furman, with the approval of multiple partners at the Sinars Firm, made 28 additional ex parte visits to Vertical World.

Sanctions in this case are mandated under Civil Rule 26(g), the rule that governs sanctions for violation of the discovery rules.  *Fisons*, 122 Wn.2d at 339-340.  CR 26(g) is specifically designed to reduce "delaying tactics, procedural harassment and mounting legal costs." *Fisons*, 122 Wn.2d at 341.  These practices "tend to impose unjustified burdens on other parties, frustrate those who seek to vindicate their rights in the courts, obstruct the judicial process, and bring the

---

[1] Cochran Supp. Decl., Ex. 2.

[2] *Id*.

REPLY IN SUPPORT OF PLAINTIFFS'
PLAINTIFFS' MOTION FOR SANCTIONS

Page 3  |  No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

civil justice system into disrepute." *Fisons*, 122 Wn.2d at 341.  The rule provides that counsel's signature on a discovery response constitutes a certification that the response is warranted by existing law and not interposed for an improper purpose.  CR 26(g).  If certification is made in violation of the rule, the trial court must impose "upon the person who made the certification, the party on whose behalf the request response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee." CR 26(g); *Fisons*, 122 Wn.2d at 355 (noting that rule authorizes imposition of sanctions against either attorney, client, or both).  "In determining what sanctions are appropriate, the trial court is given wide latitude." *Fisons*, 122 Wn.2d at 355; *see Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494 (1997) ("a trial court has broad discretion as to the choice of sanctions for violation of a discovery order.").  "[T]he least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed. The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong." *Fisons*, 122 Wn.2d at 355–56.

Sanctions for this false statement are likewise warranted pursuant to CR 11.  CR 11 requires attorneys to date and sign all pleadings, motions and legal memoranda. Such signature constitutes the attorney's certification that:

> to the best of the ... attorney's knowledge, information, and belief, formed after reasonable inquiry it [the pleading, motion or memoranda] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

CR 11.  If it appears that CR 11 has been violated, the court, upon motion or upon its own initiative, may impose upon the person an appropriate sanction which may include reasonable attorney fees and expenses. *Biggs v. Vail*, 124 Wn.2d 193, 197, 876 P.2d 448, 451 (1994).

Pursuant to CR 26(g) and CR 11, sanctions should be imposed.  The Sinars Firm argues in a mere passing statement that Plaintiffs are not prejudiced by their false discovery response or Mr. Furman's ex parte conduct because Plaintiffs were able to depose Mr. Furman who self-servingly



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

testified that he went to Vertical World simply to exercise.  The Sinars Firm ignores the entire thrust of the issue.  Obviously, an attorney who was caught engaging in ex parte conduct would claim that they were not engaged in ex parte conduct for an improper purpose.  However, it defies credulity to believe that of all the climbing gyms Mr. Furman could have exercised in, he just so happened to select the gym which C3 blames for not complying with C3's product instructions as its chief affirmative defense in this case.  It also defines believability that Mr. Furman coincidentally opened his Vertical World gym account on the same day as the date C3's product was being examined.

The reality is that C3's chief affirmative defense which it raised on summary judgment in this case is that Vertical World is an alleged "learned intermediary" which C3 plans to blame in this case for noncompliance with its product instructions.  C3 had an interest in bolstering its affirmative defense by surveilling Vertical World as Vertical World's gym practices are the core of C3's legal defense.  The issue presented here is that the false discovery statements from the Sinars Firm and C3 deprived Plaintiffs the ability to conduct a thorough investigation to verify if Mr. Furman is truthful, determine the identity of the individuals he did have contact with, and confirm what precisely Mr. Furman did when he entered the gym without notice to counsel.  C3's former attorneys waited until Plaintiffs were starting trial to disclose this misconduct in an effort to prevent scrutiny of Mr. Furman's conduct.  The Sinars Firm's references to Mr. Furman being an innocent patron of a public business are entirely inapplicable here where Vertical World's facility and its practices are a live issue in this case and a chief legal defense of C3.  This misconduct was not innocent or conducted outside of the scope of Mr. Furman's agency as C3's defense attorney.  Further, there is no legal justification for providing a false response to Plaintiffs' interrogatory which sought information regarding this precise conduct.

Division I in *J.K. by Wolf v. Bellevue Sch. Dist. No. 405*, 20 Wn. App. 2d 291, 313, 500 P.3d 138, 151 (2021), held that where a plaintiff is placed at an investigative disadvantage due to the discovery misconduct of a defendant, default is warranted.  The Court should impose such a

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

sanction here as it should not be Plaintiffs who should bear the prejudice stemming from the false statements of C3 and its former attorneys.

**B.** **The Sinars Firm Failed to Address the Concealment of Discovery Relating to the Alleged Fraud of HCC**

The concealment of discovery relating to HCC occurred while the Sinars Firm represented C3. The Sinars Firm offers no explanation for this discovery misconduct. The Court should interpret the silence from the Sinars Firm as a concession that there was no justification for this concealment, and strike any argument the Sinars Firm may attempt to raise regarding its concealment of this discovery for the first time at oral argument.

**C.** **The Court's Sanction Should Hold C3, its Former Attorneys, and the Sinars Firm Jointly and Severally Responsible for the Sanction**

Based on the curiously brief response from C3 wherein it impliedly blames its former counsel for any sanctions in this case, it is clear that Great American—which insures C3—is attempting to shift payment for any sanctions award to the Sinars Firm and/or its malpractice insurance carrier. However, C3's former attorneys at the Sinars Firm were selected by Great American and acted in accordance with the direction of Great American. Additionally, C3's former attorneys at the Sinars Firm carried out this discovery misconduct within the scope as C3's attorneys and agents.

C3's former attorneys were agents of C3. A principal may be held accountable for the actions of its agent. *Thornell v. Seattle Serv. Bureau, Inc.*, 184 Wn.2d 793, 803, 363 P.3d 587 (2015); *Kosovan v. Omni Ins. Co.*, 19 Wn. App. 2d 668, 687, 496 P.3d 347, 360 (2021). Moreover, it is not uncommon that corporate defenses are subject to sanctions based on the conduct of its defense attorneys in a case, including for discovery misconduct. Accordingly, any sanctions award in this case should be entered jointly and severally against C3, its former attorneys, and the Sinars Firm.

//

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

## II.    CONCLUSION

The Court should grant Plaintiffs' motion for sanctions and enter a default against C3, award Plaintiffs 1.5 times their fees and litigation costs, and provide a negative inference jury instruction.

RESPECTFULLY SUBMITTED this 7th day of June, 2023.


**PFAU COCHRAN VERTETIS AMALA PLLC**

*I certify that this memorandum contains 1,873 words in compliance with the local rules.*

By /s/ Darrell L. Cochran
Darrell L. Cochran, WSBA No. 22851
Thomas B. Vertetis, WSBA No. 29805
Andrew S. Ulmer, WSBA No. 51227
Alexander G. Dietz, WSBA No. 54842

909 A Street, Suite 700
Tacoma, WA 98402
Main: (253) 777-0799
Fax: (253) 627-0654
E-mail: darrell@pcvalaw.com
        tom@pcvalaw.com
        aulmer@pcvalaw.co
        adietz@pcvalaw.com



**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

## CERTIFICATE OF SERVICE

2          I, **Sarah Awes**, hereby declare under penalty of perjury under the laws of the State of

3

4     Washington that that I am employed at Pfau Cochran Vertetis Amala PLLC.  I served the

5     foregoing via **Email**, indicated below, by directing delivery to the following individuals:

6          **Attorneys for Defendant Vertical World, Inc.:**

7     Ann E. Trivett
      Robert L. Christie
8     Christie Law Group PLLC
      21600 Westlake Ave N, Suite 206
9     Seattle, WA 98109

10    Mark A. Clausen
      Clausen Law Firm PLLC
11    701 5th Ave. Suite 4400
      Seattle, WA 98104
12

13         **Attorneys for Defendant C3 Manufacturing, LLC:**

14    J. Scott Wood
      Virginia Leeper
15    Zackary Paal
      Gordon Rees Scully Mansukhani, LLP
16    701 Fifth Avenue, Suite 2100
      Seattle, WA 98104
17

18    Rachel Tallon Reynolds
      Erin M. Thenell
19    Lucy Boateng-Agyei
      Lewis Brisbois Bisgaard & Smith LLP
20    1111 Third Avenue, Suite 2700
      Seattle, WA 98101
21

22

23         SIGNED this 7th day of June, 2023.

24                                                          /s/ Sarah Awes
                                                            Sarah Awes
25                                                          Legal Assistant

26

REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR SANCTIONS REGARDING INSURANCE

No. 19-2-27385-2 SEA



**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

3

4

5

6

7                    **SUPERIOR COURT OF THE STATE OF WASHINGTON**
                                **FOR KING COUNTY**

8      MICHAEL VANDIVERE and KATHRYN
       SNOW VANDIVERE, husband and wife
9      and their marital community, and
       KATHRYN SNOW VANDIVERE, as the
10     legal guardian of W.V., a minor,

11                              Plaintiffs,        NO. 19-2-27385-2 SEA

12            vs.                                  **ORDER GRANTING IN PART**
                                                   **PLAINTIFFS' MOTION FOR**
13                                                 **SANCTIONS**
       VERTICAL WORLD, INC., a Washington
14     State Corporation; C3 MANUFACTURING,
       LLC, a Colorado Company,
15

16                              Defendant.

17

18

19

20

21

22

23

24

25

26



**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

## I.     INTRODUCTION

This matter came before the Court on Plaintiffs' Motion for Sanctions [Dkt. 396] ("**Motion**").  Having reviewed the evidence presented and heard the parties' oral arguments at multiple hearings on the issue of sanctions, the Court incorporates by reference the oral ruling made during the June 14, 2023 hearing.  Additionally, the Court makes the following Findings of Fact and Conclusions of Law, and enters a ruling on Plaintiffs' Motion to the extent described below.

## II.     DOCUMENTS CONSIDERED

The Court has considered the pleadings and documents filed by the parties in this case, and in particular the following items, including their attachments:

1.      Plaintiffs' Motion for Sanctions [Dkt. 396];

2.      Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions [Dkt. 400];

3.      Defendant Vertical World, Inc.'s Response to Plaintiffs' Motion for Sanctions [Dkt. 408];

4.      Defendant Vertical World, Inc.'s Supplemental Response to Plaintiffs' Motion for Sanctions and Request for Fees and Costs [Dkt. 410];

5.      Defendant C3 Manufacturing, LLC's Response in Opposition to Plaintiffs' Motion for Sanctions Relating to Disclosure of Insurance Coverage Issues [Dkt. 412];

6.      Declaration of Rachel Tallon Reynolds in Support of 4.      Defendant C3 Manufacturing, LLC's Response in Opposition to Plaintiffs' Motion for Sanctions Relating to Disclosure of Insurance Coverage Issues [Dkt. 413];

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 2 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

7.    Plaintiffs' Reply in Support of Plaintiffs' Motion for Sanctions Regarding Insurance [Dkt. 421];

8.    Defendant Vertical World, Inc.'s Reply Re Motion for Sanctions [Dkt. 423];

9.    Supplemental Memorandum Regarding Plaintiffs' Motion for Sanctions [Dkt. 438];

10.    Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions [Dkt. 439];

11.    Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions [Dkt. 443];

12.    Defendant C3 Manufacturing, LLC's Response in Opposition to Plaintiffs' Supplemental Motion for Sanctions Relating to Prior Counsel [Dkt. 441];

13.    Declaration of Rachel Tallon Reynolds in Support of Defendant C3 Manufacturing, LLC's Response in Opposition to Plaintiffs' Supplemental Motion for Sanctions Relating to Prior Counsel [Dkt. 442];                    — SPP

14.    Sinars Firm and Christopher Furman's Opposition to Motion for Sanctions [Dkt. 445];

15.    Declaration of Chris Furman in Support of the Sinars Firm and Mr. Furman's Opposition to Plaintiffs' Motion for Sanction [Dkt. 446];

16.    Declaration of James Hicks in Support of The Sinars Firm and Mr. Furman's Opposition to Plaintiffs' Motion for Sanction [Dkt. 447];

17.    Declaration of Mark J. Fucile in Support of The Sinars Firm and Mr. Furman's Opposition to Plaintiffs' Motion for Sanction [Dkt. 448];                    — SPP

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 3 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

18.     Declaration of John Strait in Support of The Sinars Firm and Mr. Furman's

Opposition to Plaintiffs' Motion for Sanction [Dkt. 449];     — SRP

19.     Declaration of Bradley S. Keller in Support of The Sinars Firm and Mr. Furman's

Opposition to Plaintiffs' Motion for Sanction [Dkt. 450];     — SRP

20.     Plaintiffs' Reply in Support of Plaintiffs' Motion for Sanctions [Dkt. 451];

21.     Sinars Slowikowski Tomaska LLC's and Christopher Furman's Joinder and

Supplemental Filing [Dkt. 457];

22.     Plaintiffs' Supplemental Memorandum Regarding Plaintiffs' Motion for

Sanctions [Dkt. 459];

23.     Third Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs'

Motion for Sanctions [Dkt. 460];

24.     Declaration of James H. Moss in Support of Defendant C3's Opposition to

Plaintiffs' Motion for Sanctions [Dkt. 462];     — SRP

25.     Defendant C3 Manufacturing, LLC's Response to Vertical World, Inc.'s

Proposed Order of Findings of Fact, and Conclusions of Law;

26.     The existing records and files in this case.

### III.     FINDINGS OF FACT

The Court makes the following findings of fact.  To the extent that any findings of fact

may be deemed to be a conclusion of law, it should be considered to be such.

### A.     PROCEDURAL HISTORY OF CLAIMS AND DEFENSES

1.      Plaintiffs filed the original Complaint for Damages on October 16, 2019 [Dkt.

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

2.      On May 21, 2021, Plaintiffs filed their Second Amended Complaint for Damages ("**SAC**"), wherein they allege that C3 Manufacturing, LLC ("**C3**") manufactured the Perfect Descent auto-belay device that Mr. Vandivere used on the incident date of August 1, 2019, that C3 sold the Perfect Descent auto-belay to Vertical World, Inc. ("**Vertical World**"), and that Mr. Vandivere's injuries were proximately caused by C3's defective product, including its failure to provide adequate warnings and instructions.  SAC at ¶ 1.2 [Dkt. 132].

3.      Based on the facts and the specific causes of action alleged in the SAC, the Plaintiffs have alleged against C3 claims under the Washington Product Liability Act ("**WPLA**"), codified at RCW 7.72.  SAC at ¶¶ 7.1-7.8 [Dkt. 132].

4.      On August 27, 2021, C3 filed its Answer to Plaintiffs' SAC, admitting that "it manufactured the Perfect Descent auto-belay device that Mr. Vandivere may have used on the incident date" and that C3 "sold the Perfect Descent auto-belay to Vertical World."  Answer at pg. 1 [Dkt. 149].

5.      In its Answer, C3 asserted certain affirmative defenses, such as asserting that "Plaintiffs' damages, if any, were proximately caused in whole or in part by the negligent or intentional acts or omissions of third parties over whom C3 had no control or right of control and for whom C3 has no legal responsibility including but not limited to Vertical World. As a result, C3 has no liability to Plaintiffs, or C3's' liability should be reduced by an amount to be demonstrated at trial."  Answer at pgs. 4-5 [Dkt. 149].

6.      In its Answer, C3 asserted certain affirmative defenses, such as asserting that "[i]n the event that C3 is found to be at fault herein, it is entitled to have its respective fault duly apportioned with the fault of all other persons or entities that proximately caused or contributed

PFAU  COCHRAN
VERTETIS  AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

to any loss, damage, or injury claimed, including the fault of Plaintiffs, Vertical World, and any other persons or entities." Answer at pg. 5 [Dkt. 149].

7.     In its Answer, C3 asserted certain affirmative defenses, such as asserting that "[a]ny duty to warn was discharged by Vertical World and its intervening duty to give required warnings as a learned intermediary. Any breach of that duty was a superseding cause of Plaintiffs' damages." Answer at pg. 5 [Dkt. 149].

8.     On May 20, 2022, C3 filed a Motion for Summary Judgment, arguing in part that Plaintiffs' failure to warn claim under RCW 7.72.030(1)(b) should be dismissed under the "sophisticated purchaser" doctrine because Vertical World is a "learned intermediary" or "sophisticated purchaser" whom "C3 relied on to warn new and inexperienced users of the dangers associated with climbing generally and dangers specific to Perfect Descent devices, including the importance of clipping into its auto belays properly and of not climbing with slack in the line." Defendant C3 Manufacturing, LLC's Motion for Summary Judgment, pgs. 14-17 [Dkt. 221].

### B.     HISTORY OF THE SUBJECT PRODUCT

9.     C3 was founded by Ronald Naranjo, who first incorporated his company in the State of Colorado in 2010.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 8 [Dkt. 400].  Today, Mr. Naranjo is the president of C3.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 6:17-21 [Dkt. 400].

10.     Prior to forming C3, Mr. Naranjo worked at Mine Safety Appliances ("MSA") from the 1990's to 2010.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 23:9-20 [Dkt. 400].  MSA is a maker of safety products for workers exposed to a variety of hazardous conditions in industries such as construction.  Declaration of

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 28:7-14 [Dkt. 400]. During his tenure at MSA, Mr. Naranjo worked as production lead before transitioning to become the production manager. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 28:17-20 [Dkt. 400]. Both of these roles entailed overseeing the assembly of products made by MSA. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 32:20-33:22 [Dkt. 400].

11.     One of the products MSA made was a self-retracting fall arrest product called the Redpoint Descender. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 30:2-7, 49:5-9 [Dkt. 400].     On October 15, 2009, MSA issued an immediate stop use notice, announcing that all Redpoint Descenders were to be discontinued, effective immediately following the stop use notice. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 10 [Dkt. 400]. The defect with the Redpoint Descenders involved issues with the braking system resulting in climbers sustaining injuries by unexpected rapid descents while using the Redpoint Descenders. *Id.* MSA stated that "existing devices should not be used." Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 11 [Dkt. 400].

12.     During the same timeframe as the discontinuation of the Redpoint Descenders, Mr. Naranjo transitioned from his job with MSA in 2009 to form C3. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 35:4-11 [Dkt. 400]. C3 did not start out as the original manufacturer of the Perfect Descent auto belay but instead began by only manufacturing a component part used in the Perfect Descent auto belay—a secondary clutch. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 37:5-11 [Dkt. 400]. The origin of the Perfect Descent auto belay product line began by

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

modifying and relabeling MSA's discontinued Redpoint Descenders.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 52:5-53:10 [Dkt. 400].   Mr. Naranjo testified that a man named Derek Wagner, who used to work for the factory-authorized service center for MSA's discontinued Redpoint Descender, reached out to him to ask him to supply secondary clutches to install into the Redpoint Descenders which were relabeled as the Perfect Descent auto belays.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 45:11-19, 49:12-50:9, 51:17-22, 52:5-14 [Dkt. 400].

13.     Once the service center ran out of the discontinued Repoint Descenders to resell as Perfect Descent auto belays, C3 was approached to take over the entire manufacturing process of the Perfect Descent auto belays.   Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 52:15-53:10 [Dkt. 400].  To do this, Mr. Naranjo reverse engineered the Redpoint Descenders to replicate the design of this product.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 54:17-55:9 [Dkt. 400]. Mr. Naranjo did this reverse engineering job himself despite having no formal education, no college or technical degrees, nor any specialized training in engineering or metallurgy. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 9 at 21:4-5, 22:7-21, 55:1-9 [Dkt. 400].

14.     From as early as 2015, the Perfect Descent auto belays have experienced fracturing of the retraction springs.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 13; Ex. 9, at 79:10-13 [Dkt. 400].  Failure of the retraction spring creates slack in the lanyard as climbers ascend, resulting in increased risk of a free fall to the ground if enough slack is in the lanyard.   Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 14 [Dkt. 400].  On May 9, 2016, C3 began issuing Stop

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Use and Return for Repair notices for its products.    Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 13 [Dkt. 400].  C3 again issued a Stop Use and Return for Repair Notice in 2018 for the same defect.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 15 [Dkt. 400].   These defects occurred each year in 2015, 2016, 2017, 2018, and 2019.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Exs. 13, 15, 16 [Dkt. 400].  By 2018, Mr. Naranjo was in communication with the component supplier of the retraction springs, Lesjöfors, informing them that they've experienced no less than 13 product failures within the timespan of less than a month between July 13, 2018 and August 10, 2018.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 17; Ex. 9, at 80:21-25 [Dkt. 400].

15.    On October 3, 2019, C3 initiated a formal recall process with the USCPSC.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 18 [Dkt. 400].  On October 21, 2019, an Urgent Safety Recall Notice was issued.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 16 [Dkt. 400].  This recall notice identifies a variety of serial numbers affected by the notice, including the Perfect Descent Model 220 Speed Drive Auto Belays with serial numbers ranging from S-1695 through S-1762. *Id.*  The product used by Mr. Vandivere on the incident date fell within this range of serial numbers subject to the product recall.  The notice states that there are defects in the material used to manufacture the retraction spring which can result in partial or complete fracturing of the spring and loss of retraction force, causing the lanyard to stop retracting, possibly "paying out," and leading to possible serious injury or death. *Id.*  This is the defect and effect alleged by Plaintiffs to have caused the fall that injured Plaintiff Michael Vandivere.

C.    **C3'S PRIOR ATTORNEY ACCESSES VERTICAL WORLD OVER ~~20~~ 38 times ~~TIMES~~ WITHOUT NOTIFYING COUNSEL**

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

16.     On April 27, 2023, a little over one month before trial, Christopher Furman withdrew as counsel for C3, requesting that all future pleadings be served on J. Scott Wood, Virginia Leeper, Elizabeth Bain, and Duncan Lemmon.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 1 [Dkt. 400].

17.     On May 5, 2023, Defendant Vertical World served its Notice of Documents Offered Under ER 904.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 2 [Dkt. 400].

18.     Contained in Vertical World's submission were several exhibits which showed that Mr. Furman, a lawyer representing C3, created a membership with Vertical World and visited the Vertical World gym ↑ *approximately* 38 times from ~~February 2023~~ *April 1, 2022* to May 2023, within *days* of his *✱ See page 38.* ←SPP withdrawal as counsel for C3 and just a few weeks before the start of trial.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 3 [Dkt. 400].   The exhibits revealed that Mr. Furman had tested the use of C3's auto-belays in Vertical World, an issue which sits at the center of the product defect causes of action.

19.     On May 8, 2023, Vertical World's attorneys issued a letter indicating that this information just came to their attention and that they may call Mr. Furman as a witness at trial. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 4 [Dkt. 400].

20.     On May 11, 2023, Plaintiffs' counsel sent a letter to Defendants, stating in part:

We have serious concerns about the professional ethics and the potential danger for misconduct involved in this situation. To be clear, Vertical World entered into a contractual business relationship with C3's attorney, Chris Furman, two months prior to trial. The details surrounding this quid pro quo business relationship and potentially ex parte conversations Mr. Furman may have had with witnesses remain unclear. Then, Vertical World's attorneys offered into evidence records of Mr. Furman's membership and usage of the Vertical Worlds facility. This conduct is particularly alarming when considering other backdoor

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1
2
3
4

activities between C3 and Vertical World, which include Vertical World and C3 secretly meeting in Colorado soon after Michael Vandivere's catastrophic fall and then the inexplicable exchange of the defective auto belay devices used by Mr. Vandivere and their serial numbers. This conduct by C3's attorney, Chris Furman, and Vertical World must come under scrutiny, first by my office and almost certainly by the Court.

5
6
7

In light of these serious issues, we request that both Vertical World and C3 review Plaintiffs' prior discovery requests and supplement their responses accordingly. Finally, we request the deposition of Chris Furman and ask that you make him available as soon as possible given that we commence trial in less than a month.

8
9
10

Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 5 [Dkt. 400].

11
12

21.     The day after Plaintiffs served this letter, C3's other attorneys, Elizabeth Bain, J. Scott Wood, and Virginia Leeper, filed notices of intent to withdraw from the case.

13
14
15
16

22.     On June 2, 2023, C3's former attorney, Christopher Furman, appeared for a deposition. For this deposition, he was represented by Bradley S. Keller of Brynes Keller Cromwell, LLP. *The deposition was ordered by the Court because the Sinars firm refused to accept service on his behalf*

17
18
19
20

23.     Mr. Furman graduated from law school in 2019 and is currently an associate *on May 18th and 19, 2023, -SRP* attorney at Sinars Slowikowski Tomaska LLC. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 5:5-11 [Dkt. 443]. He appeared in this case on March 22, 2022, as counsel of record for C3. This was three weeks after he started working at Sinars Slowikowski. Second Supplemental Declaration of Darrell

21
22
23
24
25
26

L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 7:13-19 [Dkt. 443]. In this case, Mr. Furman reported to partners Scott Wood and Duncan Lemmon, who was a pro hac attorney based in California. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 6:24-7:2 [Dkt. 443]. Duncan Lemmon and Scott Wood were the supervising attorneys on this case, with Mr. Lemmon being Mr.

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 11 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Furman's direct report for the day-to-day issues in the case.  Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 8:3-10 [Dkt. 443]. On April 27, 2023, Mr. Furman withdrew from the case.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 1 [Dkt. 400].  He testified that he withdrew from the case "[b]ecause Scott Wood was leaving [Sinars Slowikowski]."  Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 8:6:8-10 [Dkt. 443].

24.    Mr. Furman testified that he did not recall whether he familiarized himself with the Answer filed by C3 or the fact that C3 was seeking contribution for any judgment against Co-Defendant Vertical World.    Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 9:4-14 [Dkt. 443].   He testified that he familiarized himself with the depositions taken in this case, including those with Vertical World's employees and owners.   Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 9:15-10:12 [Dkt. 443].

25.    Mr. Furman revealed that his first time visiting Vertical World was actually on April 1, 2022.  Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 11:25-12:4 [Dkt. 443].   This was the same exact day as the X-ray inspection of the subject auto belay,  and three days prior to the CR 34 inspection held at the Vertical World gym involving all counsel present.   Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 42 [Dkt. 400].  April 1, 2022, was also the date in which it was alerted that C3 had in its possession auto belay S-1714, which possessed the retraction spring defect.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 42 [Dkt. 400].

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 12 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

26.     Mr. Furman testified that at no point before or after his April 1, 2022 visit to the Vertical World gym did he seek permission or even advise counsel for Vertical World or Plaintiffs that he would be accessing the Vertical World facility or be in potential contact with witnesses in this case. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 33:24-34:4 [Dkt. 443]. ~~Mr. Furman claimed in his testimony that he had been to most climbing facilities in the Seattle region and that, out of the blue, he decided to go exercise at Vertical World on the same day that the subject product was~~ *SRP* ~~being examined. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 34:5-35:5 [Dkt. 443]. This visit was not purely~~ *advised* Mr. Furman's ~~own doing, as he~~ testified that he ~~received permission from~~ pro hac attorney Duncan *of his intention to                    and was told by Lemmon that it was a* Lemmon ↑ access Vertical World's facility. Second Supplemental Declaration of Darrell L. *"non-event."* Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 38:5-39:1 [Dkt. 443]. Then, *- SRP* after opening an account at Vertical World on April 1, 2022, Mr. Furman never visited this gym until a year later in February of 2023. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 3 [Dkt. 400]. Mr. Furman claimed in testimony that he did not notify anyone either at Vertical World or their legal team that he was going to a facility owned by a co-defendant. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 12:18-21 [Dkt. 443]. He testified that he saw no reason to do that. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 12:22-24 [Dkt. 443].

27.     Mr. Furman again received permission from pro hac attorney Duncan Lemmon to access Vertical World's facilities in February 2023. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 41:9-21 [Dkt. 443].

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Although Mr. Furman repeatedly testified that he did not think his accessing Vertical World's facilities was an issue, he nevertheless sought and received authorization from a second partner at Sinars Slowikowski to visit Vertical World – firm partner, Jim Hicks – who "volunteered he agreed there was no issue with it." Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 45:19-47:10 [Dkt. 443]. With the consult of his partners, Mr. Furman continued to access Vertical World's facilities and also accessed a climbing course at Vertical World on February 17, 2023. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 44:7-14 [Dkt. 443].

28.    The first time Mr. Furman disclosed his activities to Vertical World's counsel was on April 26, 2023. Second Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. A at 48:9- [Dkt. 443]. Mr. Furman explained why he finally reported his activities to Vertical World's attorneys:

> Q. Tell us about that conversation.
>
> A. Sure. So the last, I don't know, **handful of times that I'd gone to Vertical World, I felt like I was kind of getting some side-eye or kind of being observed by people in the gym.** And while I knew Scott was leaving and I wanted -- you know, I wanted to keep climbing there. So I just, you know, thought I would make -- emphasize that this was just me personally climbing. It had nothing to do with the case.
>
> Q. And tell us about the side-eye. What are you meaning when you are saying you got the side-eye from people at Vertical World?
>
> A. I felt like people were watching me.
>
> Q. Anyone in particular?
>
> A. No. But it was -- it was consistent enough that I thought, well, **sounds like somebody was, you know, at least uncomfortable with this, so I should just tell them, look, this is personal.** Has nothing do with the case. Because wanted to keep climbing there.

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2      Q. What employees were those?

3      A. I don't know.

4      Q. Men? Women? Young? Old?

5      A. I don't even know if they were employees but they were adults.

6      Q. What did they look like?

7      A. I don't know. I was there to climb. I just noticed people kind of staring
8      at me and it made me uncomfortable. And I just, like I said, wanted to
       keep climbing there and wanted them to know that it didn't have anything
9      to do with the case.

10     Q. We're all interpreting your testimony as being -- as indicating that
       there were people at Vertical World who understood that you were a
11     lawyer for co-defendant C3 and that might be raising concerns with
       them. So much so that it prompted you to call John Barry, who
12     represented Vertical World. So I'm trying to understand who were these
       people, and if you are telling me you don't know, I'd like a description of
13     who they were or what their gender was, what their ages were, that type
       of information.
14

15     A. I -- I don't recall. I just can recall there were people. Like I would get
       off a climb and feel people staring at me and I'd turn around and sure
16     enough there would be.

17
       Q. I want the record to be clear. I'm not asking about something that
18     happened in 2012. I'm asking what happened roughly 37 days ago.

19
       A. What happened in 2012? Why is that relevant? I don't understand.
20
       Q. Exactly. You are indicating -- you are telling us under oath that you
21     don't have any recollection of any identifying characteristics, including
       gender or age about who was giving you the, quote/unquote, side-eye.
22     And I'm saying, I'm asking you about something that happened a little
       over a month ago, not something that happened over a decade ago. So
23     why can't you give us some identifying information?

24
       A. Because I was not there to -- I wasn't there to try and recall these faces
25     for you today. I was there to climb. I can tell you that some of them
       appeared to be female and some of them appeared to be male, but that's
26     about all I could say.

ORDER GRANTING IN PART PLAINTIFFS'                    **PFAU COCHRAN**
MOTION FOR SANCTIONS                                  **VERTETIS AMALA**
                                                      ATTORNEYS AT LAW

Page 15 of 39 | No. 19-2-27385-2 SEA                  909 A Street, Suite 700
                                                      Tacoma, WA 98402
                                                      (253) 777-0799 | Fax: (253) 627-0654

Q. So what did you tell John Barry about who they might have been?

A. I don't even know if I told him that. I just said, "Listen, **I think you guys already know that I'm climbing here** and I just want you to know that it has nothing to do with the case and I'd like to keep climbing here," and that Scott is leaving and I'll be not on this case. So that was it.

Q. Why didn't you tell John Barry, "As I think you already know, I'm climbing there"?

A. Because like I said, I felt like people were giving me side-eye.

Q. And what was John Barry's response?

A. **He said that they didn't know** and that was it.

Cochran Supp. Decl., Ex. 1, at 48:17-51:20.

29.    C3 failed to disclose any of this conduct in response to Plaintiffs' discovery requests which expressly requested this information in Interrogatory No. 7 to Plaintiffs' Second Set of Interrogatories and Requests for Production to C3 Manufacturing, LLC. Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 2 [Dkt. 439].

30.    C3 and its attorneys from the Sinars law firm failed to disclose this information in responding to Plaintiffs' Second Set of Interrogatories and Requests for Production.

31.    Mr. Furman's repeated acts of accessing the Vertical World facilities was conduct responsive to Plaintiffs' discovery requests.

32.    Due to the late timing of this disclosure regarding Mr. Furman's conduct, Plaintiffs and Defendant Vertical World, Inc. were deprived of their ability to further investigate the nature and extent of Mr. Furman's conduct or determine which Vertical World employees, who are witnesses in this case, he may have engaged with - SRP within orientations, supervision, trainings, or other potential interactions that could create its trial advantage.

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 16 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

**D.    C3'S CONCEALMENT OF RECORDS PERTAINING TO THE ALLEGED RESCISION OF COVERAGE BY HCC**

33.    On May 22, 2023, exactly three weeks before the start of trial, C3 supplemented its discovery responses with communications from HCC which C3's attorneys had in their possession for several months. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 7 [Dkt. 400]. The first communication is a letter from HCC dated January 26, 2023, notifying C3's president, Ronald Naranjo, that HCC is rescinding its insurance policy. Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 7 at bates page number 004339 [Dkt. 400].

34.    In this letter, HCC states the basis for its rescission—alleged fraud—and identifies other communications with C3's lawyers which C3 to this day has continued to conceal from Plaintiffs:

APPLICATION

On August 31, 2018, Mr. Naranjo signed a Veracity Insurance Solutions' Products Liability Insurance Application while attempting to obtain an excess insurance policy. This Application was provided by Veracity to HCC and HCC relied on C3's representations when underwriting the Excess Policy. In Section 9 of the application, Mr. Naranjo warranted that (1) the information provided, after reasonable inquiry, was true and complete and (2) was the basis of the policy and deemed incorporated therein.

**In the Application, Section 3, Question 11 asked, "Has the Applicant ever recalled or is it considering recalling any product?" C3's response was "No." Section 6, Question 2 to the Application asked, "Is (are) any person(s) or organization(s) proposed for this insurance aware of any fact, incident, circumstance, situation, condition, defect or suspected defect which may result in a Products Liability claim?" C3's response was "No."**

As set forth in the policy language, by accepting the Excess Policy, C3 agreed that the statements in the Declarations were based upon representations C3 made to HCC and that HCC issued the Excess Policy in reliance upon C3's representations. Here, the representations were

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

made in the application process. Further, the Excess Policy provides that it is void in any case of fraud by C3 as it relates to the Excess Policy. See Form HXC1 001 0814, Sec. IV, 13.

## INVESTIGATION

Following the July 2022 notice of the Michael Vandivere et al v. Vertical World, Inc., et al., King County, Washington Superior Court, Case No. 19-2-2738502 lawsuit, for the first time, HCC became aware that C3 may have had prior recalls of its product that pre-dated the issuance of the Excess Policy. More specifically, HCC reviewed a deposition summary from retained counsel that indicated Mr. Naranjo had testified about recalls Thereafter, in September 2022, subject to a reservation of rights, HCC submitted a request for information to C3 to provide further information for HCC's consideration regarding whether there had been a material misrepresentation in the Application. **Through its counsel, by letter dated November 2, 2022,** C3 refused to provide the requested information but suggested HCC contact defense counsel to access some of the requested documents HCC complied with that suggestion and acquired copies of Mr. Naranjo's deposition transcripts and exhibits.

HCC has reviewed the transcripts and referenced exhibits. In the February 4, 2022 deposition, Mr. Naranjo testified under oath concerning recalls of C3's product. The first recall occurred on May 9, 2016, and the second occurred on August 15, 2018. When asked to identify Exhibit 1, Mr. Naranjo testified, "So that is a recall notice that we issued on May 18th of 2016." See February 4, 2022 Deposition Transcript, 78:25-79:1. When asked to identify Exhibit 4, Mr. Naranjo stated, "That's a recall notice from August 15, 2018." See id. at 108:13. Exhibit 1 stated, "C3 Manufacturing recently became aware of a material defect which may cause the device to cease to retract the lanyard. Our investigation indicates that defects in the material used to manufacture the retraction spring of the affected device may cause partial or complete fracture of the retraction spring in the affected units causing inadequate or complete loss of retraction." Exhibit 4 had similar language and also stated, "Complete fracture of the retraction spring will result in loss of retraction and the possibility of the lanyard 'paying out', thereby losing tension on the line." Both letters directed consumers to immediately remove affected auto belays from service and return them for repairs. In addition, at the deposition, Mr. Naranjo agreed that the retraction spring defect could increase the risk of injury to climbers using the product. See February 4, 2022 Deposition, 99:5-9.

In Exhibit 3, Mr. Naranjo's August 13, 2018 email identified his knowledge of 13 failures occurring between July 13 and August 10, 2018. Mr. Naranjo's email to representatives of Lesjdfors Springs



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1

2

America Inc., stated, "I am going to have to recall our devices with springs from the lots that we had talked about previously We have had 15 failures with 13 happening since July 13."

3

4

MATERIAL MISREPRESENTATION

5

6

7

From review of the 2022 deposition and its exhibits, **HCC concludes that Mr Naranjo, on behalf of C3, made material misrepresentations in the application process to obtain the Excess Policy.** Had Mr. Naranjo accurately responded to the questions, HCC would not have issued the Excess Policy.

8

9

10

11

12

13

14

15

16

17

18

19

20

More specifically, in the month prior to signing the Application, Mr. Naranjo knew of 13 failures and the need for a recall, but indicated he was not aware of any defect, which may result in a products liability claim. This was less than 3 weeks before he signed the Application representing otherwise. Further, given he issued a recall approximately two weeks prior to affirming the application, his representation in the application that C3 never had any recalls was also false. When signing the Application, Mr. Naranjo declared that to the best of his knowledge and belief, after reasonable inquiry, the statements in the Application were true and complete. **In fact, the representations were false and concealed information. Further, given the recent communications about recalls and defects, C3 knowingly made the false statement and concealed information. The false statement and concealed information materially affected the acceptance of the risk by HCC because providing excess liability coverage for products that have been subject to recalls and are known to fail inherently creates more risk.** This is especially true when the product is utilized in rock climbing and the failure to retract can lead to bodily injury. Mr. Naranjo agreed at his deposition that the retraction spring defect could increase the risk of injury to climbers using the product. HCC had no knowledge of the true facts at the time the Excess Policy incepted. When issuing the Excess Policy, HCC relied, to its detriment, on the false statements and lack of presented information. All elements of material misrepresentation are satisfied and, under Colorado law, HCC is permitted to rescind the Excess Policy.

21

22

Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 7 at bates page number 004339-004341 [Dkt. 400].

23

24

25

26

35.     On February 27, 2023, C3's Colorado counsel replied to HCC's letter, contesting the rescission.   Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 7 at bates page number 004335-004338 [Dkt. 400].   On March 17, 2023, attorneys from the Gordon Rees law firm—the same law firm that C3 attorney Scott Wood

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

decided to move to prior to withdrawing from representing C3 just weeks before the start of trial—sent a letter to C3's Colorado attorneys stating that Gordon Rees represents HCC and that HCC maintains its decision to rescind the insurance policy.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 7 at bates page number 004333-004334 [Dkt. 400].

36.    The content discussed in the HCC rescission letter regarding the alleged "material misrepresentation" by C3 of the subject product in this case may have provided substantive evidence in support of Plaintiffs' WPLA claims according to Plaintiffs, not the least of which would be further evidence of a pattern of misrepresentation and deceipt about the auto-belay product defect.

37.    Due to the late timing of C3's disclosure of the HCC rescission letter, Plaintiffs have been prevented from engaging in meaningful discovery concerning this issue.

38.    The HCC letters were responsive to Plaintiffs' First Set of Interrogatories and Requests for Production first served on May 21, 2021.  Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 47 [Dkt. 400].

39.    Plaintiffs and Vertical World settled claims against each other immediately after discovering that HCC rescinded its policy.  Plaintiffs and Vertical World incurred substantial fees and costs in preparing to go to trial against one another which could have otherwise been avoided entirely had the HCC rescission letter been produced upon receipt by C3 and its attorneys.

## IV.    CONCLUSIONS OF LAW

The Court makes the following conclusions of law.  To the extent that any conclusion may be deemed to be a finding of fact, it should be considered to be such.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

**A.    DISCOVERY VIOLATIONS**

1.    C3 represents to this Court that Plaintiffs "never requested" the discovery at issue on this Motion.  C3 also argues that the statements it made in an application for a multi-million-dollar insurance policy relating to the subject product are not discoverable.  The Court finds that these arguments are not accurate.

2.    The following interrogatories and requests for production sought identification of C3's insurance coverage as well as any documents identified in answering Plaintiffs' interrogatories:

> INTERROGATORY NO. 3: List all insurance policies including, but not limited to, liability, homeowners, automobile, or business policies providing coverage to YOU that were in effect at the time of the INCIDENT.

> INTERROGATORY NO. 4: List all excess or umbrella insurance policies of any kind providing coverage to YOU that were in effect at the time of the INCIDENT.

> REQUEST FOR PRODUCTION NO. 1: Please produce a certified copy of any policy of insurance including, but not limited to, liability, homeowners, automobile or business, which was in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by Plaintiffs.

> REQUEST FOR PRODUCTION NO. 2: Please produce certified copies of any and all excess/umbrella insurance policies that were in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by plaintiffs.

> REQUEST FOR PRODUCTION NO. 3: Please produce a certified copy of the declarations page of any policy of insurance that was in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by Plaintiffs.

> REQUEST FOR PRODUCTION NO. 4: Please produce a certified copy of the declarations page of any excess/umbrella insurance policies that were in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by Plaintiffs.

PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

REQUEST FOR PRODUCTION NO. 31: Please produce true and correct copies of all DOCUMENTS identified in YOUR responses to plaintiff's Interrogatories.[1]

Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 47 [Dkt. 400].

      3.     Additionally, the following interrogatories and requests for production sought the production of all documents C3 received which allege that C3's product could be defective, unsafe, or cause injuries:

**INTERROGATORY NO. 11: IDENTIFY any and all complaints YOU received that the Perfect Descent Auto-Belay caused injuries or was otherwise unsafe.**

REQUEST FOR PRODUCTION NO. 28: Please produce ALL DOCUMENTS regarding any complaints YOU received that any Perfect Descent Auto-Belay caused injuries.

**REQUEST FOR PRODUCTION NO. 29: Please produce ALL DOCUMENTS regarding any complaints YOU received that any Perfect Descent Auto-Belay was defective.**

REQUEST FOR PRODUCTION NO. 30: Please produce ALL DOCUMENTS regarding any complaints in your possession that any Perfect Descent Auto-Belay cause physical injuries.

REQUEST FOR PRODUCTION NO. 31: Please produce true and correct copies of all DOCUMENTS identified in YOUR responses to plaintiff's Interrogatories.

Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 47 [Dkt. 400].[2]

---

[1] Cochran Decl., Ex. 47.

[2] The discovery requests in bold text were those which this Court previously ordered C3 to complete by January 31, 2022. C3's withholding of this discovery therefore violates the discovery order of this Court to produce all discovery responsive to those requests.

ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SANCTIONS

Page 22 of 39 | No. 19-2-27385-2 SEA

4.     The concealed HCC documents are responsive to these requests as the documents pertain to C3 allegedly misrepresenting the defect and safety history of its product to HCC.  A fair reading of Plaintiffs' requests demonstrates that the withheld records were responsive to this interrogatory and requests for production.

5.     Finally, the following discovery requests explicitly encompassed requests for documents concerning this litigation, which include the concealed records:

> REQUEST FOR PRODUCTION NO. 5: Please produce all statements made by YOU to anyone, including but not limited to any recorded statement provided by YOU, concerning the INCIDENT.

> REQUEST FOR PRODUCTION NO. 36: Please produce all documents relating to Vertical World, Inc.

Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 47 [Dkt. 400].

6.     C3 cannot in good faith claim that the withheld records were not responsive to these requests.  The communications between HCC and C3 repeatedly refer to this litigation and refer to Vertical World, Inc.  To the extent C3 believed these requests were overbroad, it should have, but never did, seek a protective order from the Court.  To the extent C3 believed it never had to supplement its prior discovery responses, CR 26(e)(2)(B) requires C3 to do so.

7.     Additionally, the numerous undisclosed visits by C3's former attorney, Mr. Furman, to Vertical World were subject to disclosure in response to Plaintiffs' Interrogatory No. 7 in Plaintiffs' Second Set of Interrogatories and Requests for Production:

> INTERROGATORY NO. 7: **Please identify all dates and locations in which employees,** agents, attorneys, directors, and officers **of Vertical World met with** employees, agents, **attorneys**, directors, and officers **of C3.**

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 23 of 39 | No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for

Sanctions, Ex. 2 (emphasis added) [Dkt. 439].

On August 25, 2022, in response to Interrogatory No. 7, C3 answered with what can

only be perceived as an untrue statement:

> See C3's Preliminary Statement and General Objections. C3 objects because this Interrogatory seeks information protected by the work-product doctrine, attorney-client privilege, and/or the joint-defense privilege. C3 also objects because this request seeks irrelevant evidence and/or is not reasonably calculated to produce admissible evidence. It is also unduly burdensome. It's not reasonably tailored in terms of time or scope.

> Subject to and without waiving any objection, C3 responds as follows:

> In January of 2020, Vertical World's Richard Johnston asked to tour C3's facility, and C3 obliged. In April of 2022, representatives from C3, Vertical World, and Plaintiffs all met at Vertical World Seattle to test two Perfect Descent Auto Belays. C3 does not recall meeting with Vertical World on any other occasion.

Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for

Sanctions, Ex. 2 [Dkt. 439].

This answer to Interrogatory No. 7 was not truthful as it did not mention Christopher

Furman's visit to Vertical World on April 1, 2022, nor did C3 ever supplement their answer to

this interrogatory during Mr. Furman's ~~six~~ approximately 38 - SPP additional visits to Vertical World.

8.    Accordingly, the withheld discovery was requested by Plaintiffs.  Some of the

requests which C3 ignored were subject to this Court's January 31, 2022 order compelling

production.  C3 abdicated its obligations to comply with the rules of discovery and this Court's

discovery order.

**B.    SANCTIONS UNDER CR 11, CR 26(g), and CR 37(d)**

9.    The four purposes of discovery sanctions are deterrence, punishment,

compensation, and education. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 584, 220 P.3d

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 24 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

191 (2009) (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 356, 858 P.2d 1054 (1993)).

10.     Like CR 11, CR 26(g) is aimed at reducing delaying tactics, procedural harassment and mounting legal costs. *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 341, 858 P.2d 1054, 1076 (1993).  On its face, Rule 26(g) requires an attorney signing a discovery response to certify that the attorney has read the response and that after a reasonable inquiry believes it is (1) consistent with the discovery rules and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; (2) not interposed for any improper purpose such as to harass or cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had, the amount in controversy, and the importance of the issues at stake in the litigation. *Fisons*, 122 Wn.2d at 343.  The responses must be consistent with the letter, spirit and purpose of the rules. *Id.* at 344.  In applying the rules to the facts of the present case, the trial court determines whether the attorneys' certifications to the responses to the interrogatories and requests for production were made after reasonable inquiry and (1) were consistent with the rules, (2) were not interposed for any improper purpose and (3) were not unreasonable or unduly burdensome or expensive. *Id.*

11.     CR 37 sets forth applicable rules regarding sanctions when a party fails to make discovery.  "CR 37(d) authorizes a court to impose the sanctions in CR 37(b)(2), which range from exclusion of evidence to granting default judgment when a party fails to respond to interrogatories and requests for production." *Magaña v. Hyundai Motor Am.*, 167 Wn.2d at

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 25 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

583-84, 220 P.3d 191 (citing *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 324, 54 P.3d 665 (2002)).

12.    A trial court may impose one of the "harsher remedies" under CR 37(b) upon a showing that (1) the discovery violation was willful or deliberate, (2) the violation substantially prejudiced the opponent's ability to prepare for trial, and (3) the court explicitly considered less severe sanctions. *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 496–97, 933 P.2d 1036 (1997); *Teter v. Deck*, 174 Wn.2d 207, 216-217, 274 P.3d 336 (2012); *Magaña v. Hyundai Motor Am.*, 167 Wn.2d at 584, 220 P.3d 191. These sometimes are referred to as the *Burnet* factors. Each factor will be considered below.

**1.    Willful Violation**

13.    A party's disregard of a court order, without reasonable excuse or justification, is deemed to be "willful." *Magaña v. Hyundai Motor America*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009), citing *Rivers v. Wash. State Conf. of Mason Contractors*, 145 Wn.2d 674, 686-87, 41 P.3d 1175 (2002). But willfulness cannot automatically be presumed:

> [I]f willfulness follows necessarily from the violation of a discovery order, then the on-the-record finding of willfulness that *Burnet* requires is meaningless.

*Blair v. TA-Seattle East No. 176*, 171 Wn.2d 342, 350, fn. 3, 245 P.3d 797 (2011). The trial court therefore must consider and explicitly evaluate and reject on the record any reasons given for a party's violation of a discovery order.

14.    In order for a discovery violation to be "willful," it need not be the result of deliberate misconduct. *Carlson v. Lake Chelan Cmty. Hosp.*, 116 Wn. App. 718, 739, 75 P.3d 533 (2003) ("A showing of intentional conduct is not required as even an inadvertent failure to disclose is enough if there is a violation of the rule without a reasonable excuse."); *Smith v. Behr*, 113 Wn. App 306, 327, 54 P.3d 665 (2002); *Allied Fin. Servs. v. Mangum*, 72 Wn. App.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

164, 168, 864 P.2d 1 (1993) (noting a failure to comply with discovery obligations without adequate excuse is a "willful" violation under the rules); *Carlson*, 116 Wn. App. at 741 (finding testimony properly excluded following discovery violations).

15.     This Court has held multiple hearings in which it has heard from the attorneys from each party, including from C3's former attorneys, asked questions of the attorneys, posed questions to be answered by the parties themselves, invited input from the attorneys, invited further briefing and explanation, and followed up with additional hearings.  It has become apparent that C3 and its former counsel, the Sinars Firm, continue to withhold information from the Court about why certain events and conduct have transpired as it appears to have transpired.

16.     Viewing all the facts and circumstances described above, including the Defendant's delay in disclosing the alleged fraud by Defendant C3 in its application to HCC, its prior attorneys' conduct at Vertical World, its continuing pattern of violations of the civil discovery rules, its violation of the court's discovery orders, and its consistent lack of any adequate explanation for its conduct, which repeatedly blocked the Plaintiffs' efforts to prepare for trial, the court finds and concludes that the Defendant C3's above-described CR 37(b) violations were "willful" for purposes of the first *Burnet* factor.

~~17.     Sanctions are also warranted under CR 11 for C3's inaccurate answers to Plaintiffs' discovery requests.  CR 11 requires attorneys to date and sign all pleadings, motions, and legal memoranda. Such signature constitutes the attorney's certification that:~~ 

> ~~to the best of the ... attorney's knowledge, information, and belief, formed after reasonable inquiry it [the pleading, motion or memoranda] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.~~

~~CR 11~~

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

If it appears that CR 11 has been violated, the court, upon motion or upon its own initiative, may impose upon the person an appropriate sanction which may include reasonable attorney fees and expenses. *Biggs v. Vail*, 124 Wn.2d 193, 197, 876 P.2d 448, 451 (1994).

A fair reading of C3's answer to Interrogatory No. 7 in Plaintiffs' Second Set of Interrogatories and Requests of Production leads to the conclusion that the answer was not truthful. Supplemental Declaration of Darrell L. Cochran in Support of Plaintiffs' Motion for Sanctions, Ex. 2 [Dkt. 439]. This answer to Interrogatory No. 7 did not mention Christopher Furman's visit to Vertical World on April 1, 2022, nor did C3 ever supplement their answer to this interrogatory during Mr. Furman's 28 additional visits to Vertical World. The initial answer to this interrogatory occurred while Mr. Furman represented C3. Mr. Furman and the Sinars Firm have not offered any adequate explanation for why C3 provided this inaccurate answer to Interrogatory No. 7. The only conclusion the Court can draw, therefore, is that C3's prior attorneys at the Sinars Firm provided an untruthful answer to Interrogatory No. 7 so that neither Plaintiffs nor Vertical World, Inc. would learn about C3's counsel's access of the Vertical World gym and potential contact with Vertical World's employees, who are witnesses in this case.

2.    **Prejudice**

The court finds that C3's conduct has placed the Plaintiffs at a serious investigative disadvantage in conducting discovery, and that this has caused substantial prejudice to the Plaintiffs. Due to the concealment of the HCC records, Plaintiffs were deprived of engaging in further discovery regarding the alleged "material misrepresentation" by C3 regarding the allegedly defective nature of the subject product. Such evidence would most

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 28 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

1  certainly have been probative to Plaintiffs' WPLA claims and C3's history of representations

2  regarding the safety of its products.

3  18.    Due to the withholding of this evidence, Plaintiffs were also deprived of taking

4  any steps to address the rescission of $4 million dollars of coverage in this case which represents

5  a majority of the coverage for C3. As Plaintiffs learned about the rescission days before trial

6  started, Plaintiffs were not afforded sufficient time to depose insurance carriers and other

7  witnesses to either take steps to re-establish coverage or reform case strategies based on the loss

8  of coverage. This concealment also caused Plaintiffs and Vertical World to incur unnecessary

9  fees and costs in preparing a trial against each other which would have otherwise been avoided

10  had C3 complied with their obligation to produce this discovery.

11  19.

12  20.    C3's concealment of its prior attorney's extensive visits to Vertical World also

13  deprived Plaintiffs the ability to investigate the nature and extent of his contact he had with

14  Vertical World and its employees. The Vertical World gym, its gym practices, its recreational

15  equipment, and the practices of its employees are all central issues in this case. Plaintiffs made

16  express discovery requests to learn about any contact between C3's attorneys and Vertical

17  World's employees and C3 willfully provided false answers to those discovery requests. The

18  Court can only construe these inaccurate discovery answers as an effort by C3 and its attorneys

19  to conceal its conduct from Plaintiffs and Vertical World. Because of the late revelation of this

20  conduct and Mr. Furman's alleged lack of memory about the employees he did have some level

21  of contact with, Plaintiffs are deprived from investigating the extent of C3's attorney's conduct,

22  determine which witnesses may have been impacted, or understand what information C3

23  acquired during these over 28 visits.  — RP

24  38

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 29 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

20. C3's intentional concealment of evidence until the very eve of trial severely undermined Plaintiffs' ability to prepare for a trial and in turn undermined the fact finder's ability to render a verdict based on the evidence, has disrupted the evidentiary balance essential to the accuracy of the fact-finding process, and has threatened the "orderly administration of justice." *Omnigen Research v. Wang*, 321 F.R.D. 367, 369-70 (D. Or. 2017) (citing *Leon v. IDX Systems Corp.*, 464 F.2d 951, 958 (9th Cir. 2006)); *In re Napster, Inc.*, 462 Fed.Supp.2d 1060, 1074 (N.D. Cal. 2006); *Peschel v. City of Missoula*, 664 F.Supp.2d 1137, 1146 (D. Mont. 2009).

21. To the extent that C3 argues or implies that there is little or no prejudice to the Plaintiffs, the Court disagrees. Such an argument must be rejected because it is C3's misconduct that has prevented Plaintiffs from knowing what additional evidence exists regarding alleged "material misrepresentations" about the subject product or about the extent of C3's prior attorney's conduct. See *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987) (holding that where "the relevance and resulting prejudice from destruction of documents cannot be clearly ascertained because the documents no longer exist ... the culpable party can hardly assert any presumption of irrelevance as to the destroyed documents" (internal quotations omitted). While this is not a case involving destruction of records, the late disclosure prevents Plaintiffs from engaging in any meaningful ability to further investigate and determine what other probative information exists).

## 3. **Appropriate Remedies**

22. The Supreme Court explained the purposes of remedies for sanctions in *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 858 P.2d 1054 (1993): [T]he least severe sanction that will be adequate to serve the purpose of the particular sanction

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

should be imposed. ... **The sanction should insure that the wrongdoer does not profit from the wrong**... The purposes of sanctions orders are to deter, to punish, to compensate and to educate. *Fisons*, 122 Wn.2d at 355-356, 858 Pl.2d 1054 (Emphasis added).

24. A trial court must make clear on the record whether lesser sanctions would be effective and why it is imposing the sanction it has chosen. *Snedigar v. Hoddersen*, 114 Wn.2d 153, 170, 786 P.3d 781 (1990); *Rivers v. ate Conf. of Mason Contractors*, 145 Wn.2d 674, 697, 41 P.3d 1175 (2002); *In re Dep. of M.P.*, 185 Wn. App. 108, 118, 340 P.3d 908 (2014).

25. The court has considered possible sanctions that may be appropriate.

26. An existing court order had been entered in this case confirming that this case had been delayed long enough and that no further continuances would be permitted for any reason. Continuing the trial to allow further discovery would not be productive under the circumstances, given the fact that this case is four years old and any continuance would be a substantial detriment to Plaintiff who has sought resolution of this personal injury case for bodily harms. Additionally, given the history of concealment, lack of cooperation in discovery, and what appears now to be a complicated sequencing of withdrawals of law firms and attorneys, overlapping fiduciary duties and ethical concerns, it is unlikely that Plaintiffs would be able to meaningfully investigate the extent of these issues. Additionally, any additional continuance of the trial date would only cause the memories of witnesses to grow fainter. *Smith v. Behr*, 113 Wn. App. at 329, 54 P.3d 665.

27. A monetary fine will certainly be an appropriate remedy here for part of the misconduct with respect to the incurred fees and costs in Plaintiffs and Vertical World (*possibly* - SRP) preparing for trial against each other, but a monetary fine on its own would be an unsatisfactory remedy for Plaintiffs because it is difficult to know what dollar amount would be suitable for an insured

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 31 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

manufacturer like C3.  Nor would a monetary sanction address the substantial prejudice caused to the Plaintiffs and the judicial system caused by C3's willful discovery violations.  *See Magaña*, 167 Wn.2d at 592, 220 P.3d 191.  As the trial court stated in *Smith v. Behr*, a monetary sanction does not "rectify a wrong; it just sets a price on it. It punishes the defendant to some extent, but it doesn't determine the plaintiffs' damages. It doesn't do anything to resolve the reason the plaintiffs came to court in the first place." *Smith v. Behr*, 113 Wn. App. at 329, 54 P.3d 665 (quoting the trial court's ruling).

28.      Striking C3's affirmative defenses alone also would be an insufficient sanction because the Plaintiffs would still need to prove liability against the unknown evidence accumulated by C3's attorneys towards establishing a "causation" defense, but without the benefit of any discovery concerning the alleged fraud conducted by C3 as to HCC.  Plaintiffs would also not have the benefit of an investigation of the extent of C3's prior counsel's conduct and what impact it may have on witnesses in this case, Plaintiffs would be in a disadvantaged position in proving liability in that situation.  Notably, C3's chief affirmative defense is to assign fault and blame to Vertical World as a "learned intermediary" and C3's surreptitious conduct at Vertical World may be interpreted as an effort by C3 to, outside the knowledge of Plaintiffs or Vertical World, acquire information in support of its affirmative defenses intended to defeat Plaintiffs' claims.

29.      When a party engages in violations of discovery rules and orders, more severe sanctions are warranted. *J.K. by Wolf v. Bellevue Sch. Dist. No. 405*, 20 Wn. App. 2d 291, 313, 500 P.3d 138, 151 (2021).  CR 37(d) also authorizes the imposition of sanctions when a party violates a discovery order. *Magana*, 167 Wn.2d at 583–84, 220 P.3d 191.  Division I's 2021

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 32 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

*J.K.* decision offers further guidance on the Court's authority to enter more severe sanctions where a party's discovery misconduct impacted a plaintiff's ability to prepare their case:

> In addressing prejudice, **the trial court emphasized its prior findings that [the defendant's] conduct placed [the plaintiff] at a serious investigative disadvantage in conducting discovery and concluded that it caused [the plaintiff] substantial prejudice**. It concluded that [the defendant's misconduct] undermined the fact finder's ability to render a verdict based on the evidence, **disrupted the evidentiary balance necessary for the accuracy of the fact-finding process**, and **threatened the "orderly administration of justice."**

*J.K.*, 20 Wn. App. 2d 291, 318–21.

Division I also took specific consideration into the defendant's evasive and untimely discovery responses when affirming the trial court's entry of more severe sanctions:

> Compounding the effects of the spoliation, [the defendant's] untimely, evasive, incomplete, and misleading discovery responses affected [the plaintiff's] ability to prepare for trial. For instance, because [the defendant] did not produce the e-mail exchange between Lesco and Roberts about video software until August 2019, [the plaintiff] seemingly did not know to question Lesco about whether he reviewed footage during his deposition in January 2019. The trial court acted within its discretion in concluding that [the defendant's] conduct substantially prejudiced [the plaintiff].

*J.K.*, 20 Wn. App. 2d 291, 318–21.

Additionally, Division I emphasized that the Court must not permit a wrongdoer from profiting from its misconduct by going with the least severe sanction for discovery misconduct:

> The discovery sanction should be proportional to the discovery violation and the circumstances of the case." *Magana*, 167 Wash.2d at 590, 220 P.3d 191. Before ordering a default judgment, a trial court must "'clearly indicate on the record that it has considered less harsh sanctions.'" *Id.* (quoting *Rivers*, 145 Wash.2d at 696, 41 P.3d 1175). A trial court should impose the "'least severe sanction that will be adequate to serve the purpose of the particular sanction.'" *Id.* (quoting *Fisons*, 122 Wash.2d at 355–56, 858 P.2d 1054). **But a sanction "'must not be so minimal, however, that it undermines the purpose of discovery'."** *Id.* (quoting *Fisons*, 122 Wash.2d at 355–56, 858 P.2d 1054). **"'The sanction should insure [sic] that the wrongdoer does not profit from the wrong.'"** *Id.* (quoting *Fisons*, 122 Wash.2d at 355–56, 858 P.2d 1054).

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

29.

~~30.~~ 30.    At this time, the Court declines to enter an order of default against C3 as requested by Plaintiffs in their Motion.  However, the weight of Washington jurisprudence supports the alternative relief requested by Plaintiffs, which is to grant Plaintiffs leave to draft jury instructions from which the jury may draw an adverse-inference against C3.  Accordingly, the Court grants Plaintiffs' motion for instructions to be read to the jury regarding C3's discovery misconduct.

~~31.~~ 30.    This Court finds that the compounding effect of C3's concealment of alleged material misrepresentations about the subject product to HCC, along with the undisclosed conduct of C3's former attorney at the Vertical World gym, has substantially prejudiced Plaintiffs and therefore warrants the imposition of sanctions in the form of adverse-inference jury instructions.  To that end, Plaintiffs are to submit to the Court proposed instructions regarding the discovery misconduct.

~~32.~~ 31.    The Court finds that this is the least harsh sanction which adequately addresses the prejudice to Plaintiffs.  Plaintiffs are mere days away from trial and entirely prevented from taking any further discovery to investigate HCC's rescission, the nature and extent of C3's alleged material misrepresentation, or take depositions of HCC, C3 or C3's former legal counsel regarding this issue.  Plaintiffs could have developed this evidence through discovery to serve as much more substantive evidence supporting Plaintiffs' failure to warn claim but for C3's misconduct.  C3's actions were also willful given that this evidence was responsive to Plaintiffs discovery requests and subject to this Court's prior order to compel.  This was not evidence that was inadvertently withheld from Plaintiffs.  There is no other evidence more important to produce than evidence that insurance coverage was rescinded due to C3's alleged fraud regarding the subject product.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Additionally, the deposition of Mr. Furman demonstrates that his extensive visits to Vertical World were not innocuous. Mr. Furman testified that he disclosed his visits to the gym only after individuals at Vertical World, seemingly employees, were uncomfortable with his visits to the gym. His deposition left more questions than it offered answers, as Mr. Furman alleges that he cannot recall the name or identifiers for the employees he would interact with when checking into the gym, the employee who administered his test, or the identifiers for the employees who were uncomfortable with his presence in the gym. Plaintiffs are deprived of any leads to further investigate this conduct due to counsel's alleged lack of memory regarding basic information about the gym employees he would interact with. This Court finds that Plaintiffs are deprived of their ability to investigate potential misconduct days before trial is prejudicial.

32.
33. As Division I recently noted, severe sanctions are warranted where a defendant's discovery misconduct puts a plaintiff in a "serious investigative disadvantage." *J.K.*, 20 Wn. App. 2d 291, 318–21. Plaintiffs have been placed in a position of being foreclosed from investigating both the HCC issue and potential attorney misconduct. The deprivation of Plaintiffs' ability to investigate is entirely caused by C3's own willful conduct.

33.
34. The Court concludes that the measures described above will be a sufficient remedy for the Plaintiffs, and that they also will serve the proper purposes of discovery sanctions. *Fisons*, 122 Wn.2d at 355-356, 858 P.2d 1054.

34.
35. The court also concludes that any sanctions less than the measures described above "would not fully address the 'goals of deterrence, punishment, compensation, and education.'" *Smith v. Behr*, 113 Wn. App. at 329, 54 P.3d 665.

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 35 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

35.

36.     Separate and apart from the remedies needed to address the prejudice dealt to Plaintiffs which impaired their ability to prepare for the upcoming trial with C3, the Court also finds that sanctions are needed to address the needless and avoidable costs and fees incurred by Plaintiffs and Vertical World, Inc. in preparing a trial against each other. CR 37(b)(2) provides for a spectrum of remedies for discovery violations, including a mandate that "the court shall require the party failing to obey the order . . . to pay the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."

36.

37.     The Court finds that C3's failure to comply with the court's discovery orders and the rules of discovery was not substantially justified for purposes of CR 37(b). C3 was not justified in concealing the rescission of $4 million dollars in insurance coverage. The disclosure of this evidence immediately changed the landscape of this case. Plaintiffs and Vertical World reevaluated the risks of going to trial against each other with the loss of the coverage by HCC and immediately settled their claims with each other. Specifically, Vertical World explained to the Court that it only intended to go to trial with the prospect of the $4 million dollar policy available to cover a verdict that C3 and Vertical World may potentially be subject to. Both Plaintiffs and Vertical World relied on C3's representations of available coverage to their detriment. The alleged rescission of that policy immediately changed Vertical World's exposure and resulted in Plaintiffs and Vertical World reaching a settlement. Had C3 timely produced this evidence, resolution would have occurred months ago, avoiding the needless expense.

37.

38.     The Court finds that C3 should have timely supplemented its discovery responses within a week of receiving HCC's rescission letter. Thus, Plaintiffs are entitled to

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 36 of 39 | No. 19-2-27385-2 SEA

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

recover their reasonable costs, including their reasonable attorneys' fees and litigation costs, incurred after the date of the rescission letter of January 26, 2023 to the date of this Order.

39.    The Court reserves ruling on the issue of whether to award Vertical World its fees and costs at this time.  The Court instructs the parties to submit additional briefing on the issue of whether Vertical World may rely on the discovery requests Plaintiffs made regarding insurance coverage.

## V.    ORDER

The Court incorporates all oral rulings, findings of fact, and conclusions of law made during the hearing held on June 14, 2023.  Based on the foregoing Findings of Fact and Conclusions of Law, and for the reasons stated above and during the June 14 hearing, the Court orders as follows:

1.    The Court grants the Plaintiffs' Motion for Sanctions [Dkt. 396] in part, to the foregoing extent.

2.    At the commencement of the trial, the jurors shall be given adverse-inference jury instructions, to be drafted by Plaintiffs at a later date.

3.    Plaintiffs shall be awarded their reasonable attorney's fees and litigation costs incurred from January 26, 2023 to June 14, 2023, paid by C3 Manufacturing, LLC and/or its prior attorneys at the Sinars Firm.[3]

4.    The Court reserves ruling on the issue of the award of reasonable fees and costs incurred by Vertical World, subject to further briefing by the parties as previously stated.

DONE IN OPEN COURT this 21ˢᵗ day of June, 2023.

---

[3] The Sinars Firm has argued that its attorneys cannot be held jointly and severally liable for any monetary sanction, however CR 26(g) provides that sanctions may be imposed upon the signing attorney, the party on whose behalf the response is made, or both. *Fisons*, 122 Wn.2d at 355.

ORDER GRANTING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS

Page 37 of 39 | No. 19-2-27385-2 SEA

**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

THE HONORABLE SUZANNE PARISIEN

*

18. Mr. Furman first accessed Vertical World on April 1, 2022, the very same day he attended an examination of the auto-belay device in question. It is unclear when Mr. Furman ⎤ Vertical World.

actually
became
a member of

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654