# EXHIBIT 2



February 27, 2023

RECEIVED MAR 0 3 2023 By_____

Lauren Kasheta
Tokio Marine HCC
LDG Reinsurance Corporation
401 Edgewater Place, Suite 400
Wakefield, MA 01880

    Re:    Insured:    C3 Manufacturing, LLC
            Policy No.:    H18PX50121-00
            Underwriter:    Houston Casualty Co.

Dear Ms. Kasheta:

Please be advised that Levin Sitcoff Waneka, PC has been retained to represent C3 Manufacturing, LLC ("C3") in connection with actions of LDG Reinsurance Corporation ("LDG") in connection with the insurance policy referenced above (the "Excess Policy") that was issued to provide coverage above the limits in the underlying commercial general liability policy, no. PL1745347-01 (the "Underlying Policy"), issued by Great American E&S Insurance Company and covering the same time period, October 11, 2018 – October 11, 2019.

Thank you for your letter dated January 26, 2023. In it, you state that the Excess Policy has been rescinded and a refund check issued for the premium. While you did not identify it by name, that decision was based on a document titled General & Products Liability Insurance Application (the "Application") that bears the logo for Veracity Insurance Services and which C3 President Ron Naranjo signed on August 31, 2018. In particular, you take issue with the questions:

> 11. Has the Applicant ever recalled or is it considering recalling any product?    ☐ Yes ☒ No

> 2. Is (are) any person(s) or organization(s) proposed for this insurance aware of any fact, incident, circumstance, situation, condition, defect or suspected defect which may result in a Products Liability claim? ☐ Yes ☒ No
> If yes, please provide details.

Both should have been answered "yes," in LDG's view, because C3 had sent out a mailer to its customers in May 2016 and August 2018 in which it requested that they return certain units of certain auto belay models to C3 for early warranty work due to a failing spring. Without analyzing the issue, LDG assumes that such actions were *recalls* for purposes of the Excess Policy and reinforces that assumption by pointing to Mr. Naranjo's generic use of the term "recall" in his email exchange with the spring manufacturer on August 13, 2018, and in his deposition taken a few years later in *Vandivere et al. v. Vertical World, Inc., et al.*, King County, Washington Superior

1512 Larimer Street, Ste. 650
Denver, CO 80202
303-575-9390
kerri@lsw-legal.com
www.lsw-legal.com

Court Case No. 19-2-2738502 (the "Lawsuit"). Because LDG thus concludes that "Mr. Naranjo knew of 13 [spring] failures and the need for a recall" three weeks before signing the Veracity Application, C3 made a material misrepresentation by answering questions 11 and 12 "no." This gave Tokio the ability, according to LDG, to rescind the Excess Policy.

Respectfully, we believe that Colorado law does not allow for rescission of the Excess Policy.

> To rescind an insurance policy on the basis of an alleged misrepresentation by the applicant, the insurer must prove that:
>
> (1) the applicant made a false statement of fact or concealed a fact in his application for insurance; (2) the applicant knowingly made the false statement or knowingly concealed the fact; (3) the false statement of fact or the concealed fact materially affected either the acceptance of the risk or the hazard assumed by the insurer; (4) the insurer was ignorant of the false statement of fact or concealment of fact and is not chargeable with knowledge of the fact; [and] (5) the insurer relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy.

*Silver v. Colorado Cas. Ins. Co.*, 219 P.3d 324, 328 (Colo.App. 2009), quoting *Hollinger v. Mut. Benefit Life Ins. Co.*, 560 P.2d 824, 827 (Colo. 1977).

With respect to 4), an insurer is estopped from rescinding a policy when the insured acted in good faith and gave truthful information to the agent even though the application contains a false statement, and the insured signed it stating the answers were true to the best of his knowledge. *See Silver, supra* at 329-30.

Here, Veracity Insurance Company agent Cameron Allen assisted in the completion of the 2017 version of the Application as Mr. Naranjo approached him about switching insurance carriers. Mr. Allen advised Mr. Naranjo to answer question 11 "no" after hearing the explanation of what happened with the May 2016 spring failures, and that the Consumer Product Safety Commission ("CPSC") said that no action needed to be taken. If it was not a government-mandated official action, said Mr. Allen, then it would not be a "recall." This understanding and belief then formed the basis for Mr. Naranjo answering the same question the same way in the 2018 Application when the same spring issue resurfaced. Because Mr. Allen instructed Mr. Naranjo in how to complete the Application after learning the true facts, Tokio is estopped from rescinding the Excess Policy for the purported reason that the answer to question 11 was a false statement of fact.

Question 11 cannot be the basis for rescinding the Excess Policy for the additional reason that it is vague and ambiguous. The Application uses the specific term *recall,* which is a term that can have multiple meanings, one of which does not apply to the circumstances involving the May 2016 and August 2018 Stop Use and Repair requests. That is, *recall* may denote the official process carried out by or in conjunction with the government for the return of an insured's products, such as



through the CPSC or the Food and Drug Administration. *See* 16 CFR § 1115.25; https://www.cpsc.gov/Recalls; https://www.cpsc.gov/About-CPSC; https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions. Conversely, it may be a much more broad, generic term that denotes any action to summon the return of a product. *See e.g.,* https://asq.org/quality-resources/recalls; In the latter, the term would be synonymous with a product *withdrawal*. But, these are two different terms – recall and withdrawal – as evidenced by the fact that the Underlying Policy uses both in the coverage exclusion n. (Recall of Products, Work or Impaired Property), which the Excess Policy incorporates by reference. *Wagner v. Am. Fam. Ins.*, 968 F. Supp. 2d 1100, 1106 (D. Colo. 2013), *aff'd*, 569 F. App'x 574 (10th Cir. 2014); *cf. Weitz Co., LLC v. Mid-Century Ins. Co.*, 181 P.3d 309, 313–14 (Colo. App. 2007) ("The use of different terms in the policy signals that those terms should be afforded different meanings."). Indeed, the conclusion that *recall* is a vague term is reflected in the fact that Mr. Naranjo was unclear and Mr. Allen's interpretation was that it applied to a governmentally-mandated procedure. The Excess Policy certainly does not provide a definition of the term, and neither does the Application.

This ambiguity is of import in two respects. First, ambiguities in an insurance contract are construed in favor of the insured (*e.g.,* the average layperson) and in favor of coverage in Colorado and therefore, the term *recall* in the Application is deemed to be the official process carried out by or in conjunction with the government to obtain the return of the insured's product. *Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)); *Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 388 F. Supp. 3d 1328, 1333 (D. Colo. 2019); *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005). That was not the case with the May 2016 and August 2018 Stop Use and Repair requests. In both instances there were no reports of any injuries or "near misses." In both situations C3 consulted the CPSC which advised that no action needed to be taken with respect to the devices, and specifically instructed C3 – in the event it decided to offer early warranty work on the belays – to not use the term "recall" in its notices. Under this meaning, the answer to question 11 is appropriately answered "no" because C3 had not *recalled* any product and was not then considering doing so.[1]

Secondly, then, Tokio could not establish elements 1) or 2) of an effective rescission. According to the former possible meaning of *recall,* C3's answer to question 11 was not a false statement of fact. Even if according to the latter possible meaning the answer was false, Mr. Naranjo's specific understanding and belief that question 11 was asking about government-involved, official recalls rather than manufacturer-initiated requests that customers return the product early to perform warranty work means that he was not knowingly answering the question in a way that was contrary to Tokio's intent.

Question 2 under Section Six is a similarly infirm basis for rescinding the Excess Policy. That question is afflicted with the same vagueness and ambiguity as question 11. As is relevant here, question 2 called on Mr. Naranjo to state whether he was aware of any defect which "may result

---

[1] Compare the May 2016 and August 2018 notices with the actual recall that took place in 2019. Attachments 1, 2, 3.

in a Products Liability claim?" *Products Liability* is capitalized indicating it is a term with a formal, precise meaning, but no definition is given. Certainly one possible meaning – the meaning a reasonable layperson or the average insured would give it - would be a lawsuit based on a dangerous product or a failed product that caused injury to someone. Thus, question 2 could easily be interpreted as requesting whether C3 knew of any claimed injury arising from a failure of the springs, that could at some point ripen into a lawsuit for damages because of bodily harm. Such was not the case here, though. As of August 31, 2018, there were no injuries reported from any failed belay device and certainly no lawsuits had been filed. Further, the prior request to return and repair / replace the affected units in 2016 was successful. That, coupled with the CPSC's "hands-off" response, meant that C3 had no reason to believe that any auto belays were in imminent danger of causing bodily harm.[2] The answer to question 2 is truthful and even if the intent was to discover more generally whether any product had failed in a way that could result in bodily injury, that was not the wording Tokio used. Consequently, Tokio cannot establish the first two elements of a rescission that would purportedly be premised on the question 2 answer.

For these reasons, we respectfully request that Tokio acknowledge that it will proceed as if the Excess Policy has continuously been in force and effect and send a bill for any premium that may be due (C3 did not cash the refund check). Please send word within the next two (2) weeks and call with any questions.

Thank you for your time and attention to this matter.

Very truly yours,

LEVIN SITCOFF WANEKA PC

Kerri J. Anderson

---

[2] Mr. Naranjo's acknowledgement in his deposition that the spring problem could lead to injury was *made four (4) years* after he signed the Application and was a revelation that was wrought by the Lawsuit. Indeed, prior to that point in time Mr. Naranjo was of the firm belief that the spring problem could *not* lead to bodily harm. This was because it appeared that the spring failures were only happening when being extracted and only when fully extended.