**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01705-RMR-NRN

Houston Casualty Company,

      Plaintiff,

v.

C3 Manufacturing LLC and Great American E & S Insurance Company, as assignee of C3 Manufacturing LLC,

      Defendants.

---

**GREAT AMERICAN E & S INSURANCE COMPANY'S
APPENDIX IN SUPPORT OF ITS MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT UNDER ABSTENTION
PRINCIPLES AND FOR LACK OF PERSONAL JURISDICTION**

---

I declare that the following exhibits to the attached appendix (the "Appendix") are true and correct copies.

1.     Attached as Exhibit 1 to the Appendix is the *Vandivere* plaintiffs' demand letter of July 21, 2022. ("Demand Ltr.").

2.     Attached as Exhibit 2 to the Appendix is the email notice sent by Great American to HCC on July 22, 2022. ("Notice").

3.     Attached as Exhibit 3 to the Appendix is the Declaration of J. Scott Wood, filed May 11, 2023, without exhibits. ("Wood Decl.").

4.     Attached as Exhibit 4 to the Appendix is the *Vandivere* court's May 15, 2023 order denying C3's request for a continuance on the basis of its counsel's conflict and withdrawal. ("5/15 Order").

5.      Attached as Exhibit 5 to the Appendix is the transcript of the *Vandivere* court's June 7, 2023 motion hearing.  ("6/7 Order").

6.      Attached as Exhibit 6 to the Appendix is the transcript of the *Vandivere* court's June 14, 2023 pretrial hearing.  ("6/14 Order").

7.      Attached as Exhibit 7 to the Appendix is the June 17, 2023 letter sent by Great American's counsel to HCC seeking contribution and reserving rights to seek action against HCC.  ("6/17 Ltr.").

8.      Attached as Exhibit 8 to the Appendix is a transcript of the June 22, 2023 deposition of J. Scott Wood.  ("Wood Dep.").

9.      Attached as Exhibit 9 to the Appendix is a copy of the June 26, 2023 assignment and agreement to settle negotiated between Great American and C3.  ("Assignment").

10.     Attached as Exhibit 10 to the Appendix is the June 26, 2023 settlement confirmation between representatives for C3 and the *Vandivere* plaintiffs' counsel.  ("Settlement Conf.")

11.     Attached as Exhibit 11 to the Appendix is Great American's complaint filed in Washington state court on September 5, 2023.  ("GAESIC Compl.").

12.     Attached as Exhibit 12 to the Appendix is HCC's amended answer to Great American's complaint, filed in the Western District of Washington on December 28, 2023.  ("HCC Am. Ans.").

13.     Attached as Exhibit 13 to the Appendix is the Western District of Washington's order of remand of Great American's complaint.  ("Remand Order").

14.    Attached as Exhibit 14 to the Appendix is a copy of the *Vandivere* docket,

taken on January 16, 2024, indicating the multiple filings and the cessation of trial

proceedings after June 26, 2023.  ("Vandivere Dkt.").

Dated:  January 18, 2024                    Respectfully submitted,

                                            *s/ Cedric D. Logan*
                                            _____
                                            Cedric D. Logan
                                            Wheeler Trigg O'Donnell LLP
                                            370 Seventeenth Street, Suite 4500
                                            Denver, CO 80202
                                            Telephone: 303.244.1800
                                            Facsimile:  303.244.1879
                                            Email:  logan@wtotrial.com

                                            *Attorneys for Defendant Great American
                                            E & S Insurance Company*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on January 18, 2024, I electronically filed the foregoing **GREAT AMERICAN E & S INSURANCE COMPANY'S APPENDIX IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT UNDER ABSTENTION PRINCIPLES AND FOR LACK OF PERSONAL JURISDICTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Kerri J. Anderson**
  kerri@lsw-legal.com, nicole@lsw-legal.com, karen@lsw-legal.com

- **Jennifer Arnett**
  jennifer@arnettlawyers.com, christine@arnettlawyers.com,
  cgiaquinto@sanitaslaw.com

- **Bradley Aaron Levin**
  brad@lsw-legal.com, nicole@lsw-legal.com, karen@lsw-legal.com, nelson@lsw-legal.com

*s/ Cedric D. Logan*

# EXHIBIT 1



**PFAU COCHRAN
VERTETIS AMALA**
ATTORNEYS AT LAW

**TACOMA**
909 A STREET
SUITE 700
TACOMA, WA 98402
(253) 777-0799

**July 21, 2022**

J. Scott Wood                          Ann E. Trivett
Duncan S. Lemmon                       Robert L. Christie
Christopher Furman                     John Barry
Sinars Slowikowski Tomaska LLC         Christie Law Group PLLC
1000 Second Ave. Suite 1950            2100 Westlake Avenue N., Suite 206
Seattle, WA 98104                      Seattle, WA 98109

Mark Clausen
Clausen Law Firm PLLC
701 Fifth Ave, Ste. 4400
Seattle, WA 98104

**PARTNERS**
MICHAEL T. PFAU
DARRELL L. COCHRAN[2]
THOMAS B. VERTETIS[2,4]
JASON P. AMALA
MALLORY C. ALLEN[1]
ELIZABETH P. CALORA
ANELGA DOUMANIAN[1,6]
COLLEEN DURKIN PETERSON
KEVIN M. HASTINGS
CHRISTOPHER E. LOVE
VINCENT T. NAPPO[1]
STEVEN T. REICH[8]

**ASSOCIATES**
YEMI AJAYI[3]
PATRICK A. BROWN
JESSICA E. BURRUS[1]
SYDNEY E. CODD
ALEXANDER G. DIETZ
BRIDGET T. GROTZ
WILLIAM T. MCCLURE
MICHAEL D. MCNEIL
LESLEY O'NEILL[7]
ANDREW S. ULMER
BENJAMIN B. WATSON

ALL ATTORNEYS
LICENSED IN WA

1 LICENSED IN NY
2 LICENSED IN OR
3 LICENSED IN CA
4 LICENSED IN NJ
5 LICENSED IN KY
6 LICENSED IN MO
7 LICENSED IN GA
8 LICENSED IN ID

*Re: Michael Vandivere, et al. v. Vertical World, Inc., et al.*

Dear Counsel:

As you know from years of litigation, we represent Michael and Kathryn Vandivere, and their young daughter W.V., in a case brought against your clients, Vertical World, Incorporated, and C3 Manufacturing, LLC. Mr. Vandivere suffered catastrophic injuries when the auto belay device installed at Vertical World, manufactured by C3, suddenly failed as he reached the apex of the wall and began to descend. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Vandivere received extensive treatment. To rehabilitate from his injuries, Mr. Vandivere took a lengthy leave of absence from his long-time employ as a project manager with Amazon, where he led a team that built customer programs within various businesses to digest customer feedback.

The force of Mr. Vandivere crashing to the floor from near the top of a climbing wall caused ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**SEATTLE:** 403 COLUMBIA STREET, SUITE 500 • SEATTLE, WA 98104 • (206) 462-4334
**NEW YORK:** 31 HUDSON YARDS, 11TH FLOOR • NEW YORK, NY 10001 • (212) 300-2444

**WWW.PCVA.LAW**

GAESIC000001



July 21, 2022

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

Several experts have evaluated the fall and have concluded that Vertical World and C3 are responsible for the damages the Vandivere's suffered because the auto belay device intended to protect him during his climb failed to prevent the catastrophic fall. The primary defense to this has been to allege, without any evidence, that Mr. Vandivere failed to clip into the auto-belay device. This defense has never made sense and will fail at trial for a variety of reasons. As explained during a recent court hearing, Mr. Vandivere's tether to the auto-belay device was seen by a by standing witness retracting along with Mr. Vandivere's ascent as he reached the top, a point that could only be explained by the fact that he was attached. When he reached the top and released, Mr. Vandivere put his trust in Vertical World and C3, but the auto belay device they held out as being safe failed in a catastrophic way, causing him to plummet into a free fall to the ground.

Mr. Vandivere's catastrophic fall was preventable with the exercise of ordinary care, yet the actions taken by the Defendants demonstrate a willful indifference to the safety of the public. From inception, C3's auto belay device was reverse engineered from the failed product line abandoned by MSA. This reverse engineering process was performed by someone with no formal education. The subject product line has been plagued with defects for virtually the entire history of this product line, as established by C3's Stop Use and Return for Repair Notices which were sent to customers on an annual basis. In defiance of federal law, C3 misrepresented the extent of the problems plaguing this product line, as well as failed to report the deaths associated with this product line, to the U. S. Consumer Product Safety Commission, a fact which will prove devastating at the time of trial. As a Colorado corporation, C3 is subject to an award of exemplary damages under § 13-21-102, C.R.S. by operation of Washington's choice-of-law principles. Under this statute, a jury may award exemplary damages in an amount equal to Plaintiffs' actual damages. Additionally, the court may increase any award of exemplary damages to a sum not to exceed three times the amount of actual damages upon a showing that C3 continued its willful and wanton behavior during the pendency of the case, which is established by C3's continued sale of this product line and the testimony of C3's president indicating that C3 has no plans to be forthcoming in its disclosures to the USCPSC. This presents extraordinary exposure to Defendants, especially C3, particularly in light of several very recent jury verdicts in King County establishing that jurors in this county have no reservations against penalizing manufacturers who are reckless with punitive damages where the acts of the manufacturer are willful and wanton. *See Erickson v. Pharmacia LLC*, King County Cause No. 18-2-11915-4 ($185M verdict, $135M of which was an award of punitive damages); *Bard v. Pharmacia LLC,* King County Cause No. 18-2-00001-7 ($62M verdict, with each plaintiff being awarded $5M in punitive damages); *Beutler, et al. v. Pharmacia LLC*, King County Case No. 21-2-14302-1 ($21.37M verdict, with $15.69M in punitive damages).

GAESIC000002



July 21, 2022

For protection against judgments for negligently and grossly negligently harming others, Vertical World purchased a stunningly small $1 million policy from Allied World Insurance. For product defects, C3 purchased a $1 million policy from the Great American insurance corporation, and a $4 million excess policy from the Tokio Marine insurance corporation. In exchange for the premiums, these insurance companies contractually promised to protect Vertical World and C3 for judgments up to $6 million total in cases exactly like this where tortious and/or statutory misconduct proximately caused harm to another. Allied World, Great American, and Tokio have long had our expert opinions that demonstrate the severity of Mr. Vandivere's physical and emotional harms. With trial set for November 14, 2022, these insurance corporations have had ample time to assess medical records, review depositions, complete mock trials, and assess the risk of forcing Vertical World and C3 into trial in a case with catastrophic injuries.

The insurance corporations required to protect Vertical World and C3 against judgements have also paid you, as insurance defense counsel, to seek an outright dismissal based on various legal theories. As you know, the Court denied both Vertical World's and C3's separate requests to dismiss the lawsuit brought to recover damages for Mr. and Mrs. Vandivere. Based on the nature and extent of their damages, which is supported by medical evidence, your clients will be exposed to an excess judgment situation. In addition to being responsible for any verdict amount exceeding the $6 million policy limits, a judgment would affect many aspects of Vertical World's and C3's business, including reputation and ability to obtain financing. These disastrous consequences are precisely why Washington law is clear that Allied World, Great American, and Tokio must not place their financial interests ahead of Vertical World's and C3's interests in evaluating this claim.

You are well-versed in Washington law that "[i]nsurers have a statutory and common law duty to act in good faith toward an insured." *Griffin v. Allstate*, 108 Wn. App. 133, 143(2001) (citing RCW 48.01.030 and *Tank v. State Farm Fire & Cas. Co.,* 105 Wn.2d 381, 386 (1986)); RCW 48.01.030 ("The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters."); WPI 320.02. In Washington, an insurer acts in bad faith when it does not give equal consideration to its insured's interests. *Coventry Assocs. v. Am. State Ins. Co.*, 136 Wn.2d 269, 281, 961 P.2d 933 (1998); *Tyler v. Grange Ins. Ass'n*, 3 Wn. App. 167, 173 (1970); WPI 320.02 ("An insurer who does not deal fairly with its insured, or who does not give equal consideration to its insured's interests, fails to act in good faith."). An insurer's duty of good faith applies to "all insurance matters", including handling of a claim, initiation of any investigation of a claim, conduct during an investigation of a claim, and payment of or denial of a claim. RCW 48.01.030; WAC 284-30-330; WAC 284-30-370; WAC 284-30-395. "Failure to conduct a reasonable investigation constitutes bad faith." *Griffin*, 108 Wn. App. at 146-47.

GAESIC000003



July 21, 2022

Here, Vertical World and C3 bound their fates together from the beginning, quickly and covertly meeting about the failed auto belay device despite contrary, discredited testimony. Experts have closely evaluated the facts and concluded that they are responsible, and medical experts have examined and concluded that Mr. Vandivere's damages are significant. Vertical World and C3 are jointly and severally liable, and no evidence supports the theory that Mr. Vandivere failed to clip in or somehow did it improperly. The nature and extent of the total damages in this case exceeds the $6 million in policy limits. To collect money to satisfy a multimillion verdict directly from Allied World, Great American, and Tokio, Washington law requires that we must first make a demand within the policy limits, and then hope that these insurance corporations reject the demand, thereby exposing Vertical World and C3 to a verdict exceeding the available insurance coverage. That is why we now write to demand the total $6 million insurance policy limits in exchange for a full release. We will keep this offer open until August 1, 2022, at 5:00 PST.

Sincerely,

Darrell L. Cochran

DLC:jg

GAESIC000004

# EXHIBIT 2

**Subject:** [External] FW: EXCESS NOTICE REQUEST - GAI Claim A00365827 - Insured: C3 Manufacturing LLC - Policy: PL 1745347-01 - DOL:8/1/19 - Michael Vandivere v. C3 Manufacturing LLC, et al

Hi Porche,

This claim has been assigned to me for handling which was just reported yesterday. LDG Reinsurance is a wholly owned subsidiary of Houston Casualty Company. HCC was the issuing carrier of the excess policy.

Who wrote and when did they write the mediation evaluation attached? When is mediation scheduled for?

Can you please provide a copy of the primary Great American policy as well as a copy of your claim file?

Weâ€™re having some technical issues today, but Iâ€™ll provide our claim number shortly.

Thanks!
Lauren

**Lauren Kasheta**
Claims Director
LDG Reinsurance Corporation
lauren_kasheta@ldgre.com
Tel: 781-716-5115
tmhcc.com

---

**From:** Recka, Peter <peter_recka@ldgre.com>
**Sent:** Thursday, July 28, 2022 12:42 PM
**To:** Kasheta, Lauren <lauren_kasheta@ldgre.com>
**Subject:** Fwd: EXCESS NOTICE REQUEST - GAI Claim A00365827 - Insured: C3 Manufacturing LLC - Policy: PL 1745347-01 - DOL:8/1/19 - Michael Vandivere v. C3 Manufacturing LLC, et al


**Peter A. Recka, CPCU**
President
LDG Reinsurance Corporation
Tokio Marine HCC
peter_recka@ldgre.com
Tel. 781-716-4988
tmhcc.com

---

**From:** Claims <claims@veracityins.com>
**Sent:** Wednesday, July 27, 2022 8:46 AM
**To:** Product Claims <productclaims@tmhcc.com>
**Cc:** Cameron Allen <cam@veracityins.com>
**Subject:** FW: EXCESS NOTICE REQUEST - GAI Claim A00365827 - Insured: C3 Manufacturing LLC - Policy: PL 1745347-01 - DOL:8/1/19 - Michael Vandivere v. C3 Manufacturing LLC, et al

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Attached is a new claim. Please send us acknowledgement, including claim number and adjuster contact information for our records.

GAESIC000005



**Adam Demke**
**Claims Adjuster**
**Veracity Insurance Solutions, LLC**
260 South 2500 West, Suite 303
Pleasant Grove, UT 84062
866-395-1308 (Toll Free)
801-763-1374 (Fax)

www.veracityinsurance.com

**Follow us online:** 

*CONFIDENTIALITY NOTICE: This e-mail and the transmitted documents contain private, privileged and confidential information belonging to the sender. The information therein is solely for the use of the addressee. If your receipt of this transmission has occurred as the result of an error, please immediately notify us so we can arrange for the return of the documents. In such circumstances, you are advised that you may not disclose, copy, distribute or take any other action in reliance on the information transmitted.*

*Veracity Insurance Solutions LLC is a licensed P&C, Life & Health, and Surplus Lines Broker in all 50 states. For more detailed information about Veracity Insurance Solutions LLC, please refer to the following link: http://veracityinsurance.com*

*State of California Insurance License Number: 0H52950*

**From:** Cameron Allen <cam@veracityins.com>
**Sent:** Tuesday, July 26, 2022 4:36 PM
**To:** Claims <claims@veracityins.com>
**Subject:** RE: EXCESS NOTICE REQUEST - GAI Claim A00365827 - Insured: C3 Manufacturing LLC - Policy: PL 1745347-01 - DOL:8/1/19 - Michael Vandivere v. C3 Manufacturing LLC, et al

UM Policy:

Policy #: H18PX50121-00
Policy Period: 10/11/2018 â€" 10/11/2019
Carrier: HCC Casuaty
Policy (attached)

Thanks,



**Cameron S. Allen**
*Brokerage Division Sales Manager*
**Veracity Insurance Solutions, LLC**
260 South 2500 West, Suite 303
Pleasant Grove, UT 84062
866-395-1308 (Toll Free)
801-216-8253 (Direct)
801-815-0738 (Cell)
801-763-1374 (Fax)
www.veracityinsurance.com
cam@veracityins.com

**At this time, we are kindly asking that payments be made electronically. Our payment portal is https://pay.veracityinsurance.com/  We are transitioning from accepting hard/physical checks effective 12/01/2020.  I can provide our bank information for payments to be processed via wire if that is needed.**

 

Quote Cyber Here â€" Agent Cyber Quote Portal

*Everyone on my team is here to help.  If you need something right away, please reach out to:*
*Tawni Andersen: tawni@veracityins.com*
*Megan Thompson: megan@veracityins.com*

*CONFIDENTIALITY NOTICE: This e-mail and the transmitted documents contain private, privileged and confidential information belonging to the sender. The information therein is solely for the use of the addressee. If your receipt of this transmission has occurred as the result of an error, please immediately notify us so we can arrange for the return of the documents. In such circumstances, you are advised that you may not disclose, copy, distribute or take any other action in reliance on the information transmitted.*

*Veracity Insurance Solutions LLC is a licensed P&C, Life & Health, and Surplus Lines Broker in all 50 states. For more detailed information about Veracity Insurance Solutions LLC, please refer to the following link: http://veracityinsurance.com*

*State of California Insurance License Number:  0H52950*

---

**From:** Claims <claims@veracityins.com>
**Sent:** Tuesday, July 26, 2022 12:08 PM
**To:** Cameron Allen <cam@veracityins.com>
**Subject:** FW: EXCESS NOTICE REQUEST - GAI Claim A00365827 - Insured: C3 Manufacturing LLC - Policy: PL 1745347-01 - DOL:8/1/19 - Michael Vandivere v. C3 Manufacturing LLC, et al
**Importance:** High

Cam,

I donâ€™t see that we have the excess policy with Tokio, unless Iâ€™m just blindâ€¦ is there anything we need to do on this?

Thanks,



**Jen Stafford**
**Claims Manager**
**Veracity Insurance Solutions, LLC**
260 South 2500 West, Suite 303
Pleasant Grove, UT 84062
801-642-2402 (Direct)
844-670-1077 (Toll Free)
801-763-1374 (Fax)
www.veracityinsurance.com

**Follow us online:** 

*CONFIDENTIALITY NOTICE: This e-mail and the transmitted documents contain private, privileged and confidential information belonging to the sender. The information therein is solely for the use of the addressee. If your receipt of this transmission has occurred as the result of an error, please immediately notify us so we can arrange for the return of the documents. In such circumstances, you are advised that you may not disclose, copy, distribute or take any other action in reliance on the information transmitted.*

*Veracity Insurance Solutions LLC is a licensed P&C, Life & Health, and Surplus Lines Broker in all 50 states. For more detailed information about Veracity Insurance Solutions LLC, please refer to the following link: http://veracityinsurance.com*

*State of California Insurance License Number:  0H52950*

GAESIC000007

**From:** Wood, Porche <pwood4@GAIG.COM>
**Sent:** Friday, July 22, 2022 6:08 PM
**To:** Claims <claims@veracityins.com>; Cameron Allen <cam@veracityins.com>
**Subject:** EXCESS NOTICE REQUEST - GAI Claim A00365827 - Insured: C3 Manufacturing LLC - Policy: PL 1745347-01 - DOL:8/1/19 - Michael Vandivere v. C3 Manufacturing LLC, et al
**Importance:** High

**[External Email]**

Good evening,

Today we received the attached policy limit demand for the above matter which includes the excess policy limits with excess carrier Tokio. Although we have not evaluated the case to be as such, I wanted to make sure the excess carrier was aware and had a file open. Iâ€™ve included defense counselâ€™s pre-mediation report and the original loss notice and suit as well. Please provide the excess adjuster contact information once confirmed. Please let me know if you have any questions or need anything additional from me. Thank you!

Porche

**Porche Wood, CPCU, AIC, AINS** Claim Specialist | Tel 513-265-8866 | Fax 513-412-8435 | Email pwood4@gaig.com



GAIG.com |
Great American Insurance Group Tower
301 E. Fourth St. 20th Floor N, Cincinnati, OH 45202

This email transmission, including any attachments, is intended solely for the addressee named above, and may contain confidential or privileged information. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender immediately by reply email and destroy the message and its attachments.

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. Tokio Marine HCCâ€™s products are underwritten by American Contractors Indemnity Company, HCC International Insurance Company PLC, HCC Life Insurance Company, HCC Specialty Insurance Company, Houston Casualty Company, Lloydâ€™s Syndicate 4141, United States Surety Company and U.S. Specialty Insurance Company. For more information about Tokio Marine HCC, please visit www.tmhcc.com.

This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

This email transmission, including any attachments, is intended solely for the addressee named above, and may contain confidential or privileged information. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender immediately by reply email and destroy the message and its attachments.

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. Tokio Marine HCCâ€™s products are underwritten by American Contractors Indemnity Company, HCC International Insurance Company PLC, HCC Life Insurance Company, HCC Specialty Insurance Company, Houston Casualty Company, Lloydâ€™s Syndicate 4141, United States Surety Company and U.S. Specialty Insurance Company. For more information about Tokio Marine HCC, please visit www.tmhcc.com.

This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use,

GAESIC000008

disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

---

This email transmission, including any attachments, is intended solely for the addressee named above, and may contain confidential or privileged information. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender immediately by reply email and destroy the message and its attachments.

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. Tokio Marine HCC's products are underwritten by American Contractors Indemnity Company, HCC International Insurance Company PLC, HCC Life Insurance Company, HCC Specialty Insurance Company, Houston Casualty Company, Lloyd's Syndicate 4141, United States Surety Company and U.S. Specialty Insurance Company. For more information about Tokio Marine HCC, please visit www.tmhcc.com.

This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

---

This email transmission, including any attachments, is intended solely for the addressee named above, and may contain confidential or privileged information. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender immediately by reply email and destroy the message and its attachments.

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. Tokio Marine HCC's products are underwritten by American Contractors Indemnity Company, HCC International Insurance Company PLC, HCC Life Insurance Company, HCC Specialty Insurance Company, Houston Casualty Company, Lloyd's Syndicate 4141, United States Surety Company and U.S. Specialty Insurance Company. For more information about Tokio Marine HCC, please visit www.tmhcc.com.

This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

GAESIC000009

# EXHIBIT 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FILED

2023 MAY 11 03:26 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 19-2-27385-2 SEA

HONORABLE JUDGE SUZANNE PARISIAN
Trial Date: June 5, 2023
Hearing Date: May 15, 2023
Hearing Time: 12:00 p.m.

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING**

MICHAEL VANDIVERE and KATHRYN
SNOW VANDIVERE, husband and wife and
their marital community, and KATHYRYN
SNOW VANDIVERE, as the legal guardian of
W.V., a minor,

          Plaintiffs,

v.

VERTICAL WORLD, INC., a Washington State
Corporation; C3 MANUFACTURING, LLC, a
Colorado Company,

          Defendants.

No. 19-2-27385-2 SEA

DECLARATION OF J. SCOTT WOOD IN
SUPPORT OF DEFENDANT C3
MANUFACTURING, LLC'S MOTION
TO CONTINUE THE TRIAL DATE

I, J. Scott Wood, declare as follows:

    1.    I am an attorney at the firm of Gordon Rees Scully Mansukhani, LLP, attorneys

of record for Defendant C3 Manufacturing, LLC, in the above-entitled action.

    2.    The statements contained in my declaration are within my personal knowledge of

DECLARATION OF J. SCOTT WOOD

Page 1

**GORDON REES SCULLY
MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

GAESIC000010

1    this matter or upon information and belief, and I am competent to testify thereto.

2    3.    Attached hereto as **Exhibit A** is a true and accurate copy of C3 Manufacturing,

3    LLP's Motion to Strike Plaintiff's Expert Witnesses, or in the Alternative,

4    Continue the Trial Date.

5    4.    Two weeks ago I changed law firms and joined Gordon Rees Scully Mansukhani,

6    LLP.  I just learned that as an attorney at Gordon Rees Mansukhani, LLP, I now

7    have a conflict in representing C3 Manufacturing, LLC that cannot be waived.  I,

8    and any other attorney at Gordon Rees Manuskhani, LLC, must immediately

9    withdraw as counsel for C3 Manufacturing, LLC.

10    I declare under the penalty of perjury under the laws of the State of Washington, that the

11    foregoing is true and correct to the best of my knowledge.

12    EXECUTED in Seattle, Washington on this 11th day of May, 2023.

13

14

15    _s/J. Scott Wood_____
       J. Scott Wood, WSBA #41342

16

17

18

19

20

21

22

23

24

25

DECLARATION OF J. SCOTT WOOD                    Page 2        **GORDON REES SCULLY
                                                              MANSUKHANI, LLP**
                                                              701 Fifth Avenue, Suite 2100
                                                              Seattle, WA  98104
                                                              Telephone: (206) 695-5100
                                                              Facsimile: (206) 689-2822

GAESIC000011

**CERTIFICATE OF SERVICE**

I, Leslie Boulanger, declare that I am an attorney with the law firm of GORDON REES SCULLY MANSUKHANI, LLP, 701 Fifth Avenue, Suite 2100, Seattle, King County, Washington; that I am over 18 years of age and not a party to this action.

[ X ]   **(By E-Service)**   I hereby certify that on this date I electronically filed the foregoing document with the King County Superior Court using the CM/ECF system, and electronically served all parties in accordance with King County Local General Rule 30(b)(4)(B). In accordance with King County's E-Service feature, the Clerk of Court will send e-mail notifications of such filing to the following attorneys:

[ X ]   **(By E-mail)**   I caused the foregoing document(s) to be delivered via e-mail to firms and persons whose email addresses are listed next to the name of the party represented as listed below:

| *Counsel for Plaintiffs* | *Counsel for Defendant Vertical World, Inc.* |
|---|---|
| Darrell L. Cochran, WSBA No. 22851<br>Thomas B. Vertetis, WSBA No. 29805<br>Kevin M. Hastings, WSBA No. 42316<br>Andrew S. Ulmer, WSBA No. 51227<br>PFAU COCHRAN VERTETIS AMALA<br>909 A. Street, Suite 700<br>Tacoma, WA 98402<br>Telephone: (253) 777-0799<br>darrell@pcvalaw.com<br>tom@pcvalaw.com<br>kevin@pcvalaw.com<br>aulmer@pcvalaw.com<br>jgott@pcvalaw.com<br>sawes@pcvalaw.com<br>laura@pcvalaw.com | Robert L. Christie, WSBA No. 10895<br>Ann E. Trivett, WSBA No. 39228<br>John Barry<br>CHRISTIE LAW GROUP, PLLC<br>2100 Westlake Avenue N., Suite 206<br>Seattle, WA 98109<br>Telephone: (206) 957-9669<br>bob@christielawgroup.com<br>ann@christielawgroup.com<br>john@christielawgroup.com<br>stefanie@christielawgroup.com<br><br>(include all email addresses above) |
| *Counsel for Defendant Vertical World, Inc.*<br>Mark A. Clausen, WSBA No. 15693<br>CLAUSEN LAW FIRM, PLLC<br>701 Fifth Avenue, Suite 4400<br>Seattle, WA 98104<br>Telephone: (206) 223-0335<br>mclausen@clausenlawfirm.com<br>lisav@clausenlawfirm.com | |

DECLARATION OF J. SCOTT WOOD

Page 3

GORDON REES SCULLY MANSUKHANI, LLP
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

GAESIC000012

1        I declare under penalty of perjury under the laws of the State of Washington that the

2   foregoing is true and correct.

3        Executed on the 11th day of May, 2023 at Seattle, Washington.

4

5                                 s/ Leslie Boulanger

                                  Leslie Boulanger, Legal Secretary

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF J. SCOTT WOOD            Page 4        **GORDON REES SCULLY
MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA  98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

GAESIC000013

# EXHIBIT 4

1                                  HONORABLE SUZANNE R. PARISIEN
                                          Department 42

2                       Hearing Date: May 15, 2023 at 12:00 PM

3

4

5

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

6

| | |
|---|---|
| MICHAEL VANDIVERE and KATHRYN SNOW VANDIVERE, husband and wife and their marital community, and KATHRYN SNOW VANDIVERE, as the legal guardian of W.V., a minor, | NO. 19-2-27385-2 SEA |
|             Plaintiffs, | ORDER DENYING DEFENDANT C3 MANUFACTURING, LLC'S MOTION TO CONTINUE TRIAL DATE |
|    v. | |
| VERTICAL WORLD, INC, a Washington State Corporation; C3 MANUFACTURING, LLC, a Colorado Company, | |
|            Defendants. | |

THIS MATTER having come on regularly before this Court on Defendant C3 Manufacturing, LLC's Motion to Continue the Trial Date, the parties appearing by and through counsel, the Court having reviewed the pleadings and files in this matter, specifically including the following:

    1. Defendant C3 Manufacturing, LLC's Motion to Continue the Trial Date;

    2. Declaration of J. Scott Wood in Support of Defendant C3 Manufacturing, LLC's Motion to Continue the Trial Date with attachments thereto;

    3. Defendant Vertical World, Inc.'s Response to Defendant C3 Manufacturing, LLC's

[PROPOSED] ORDER DENYING C3
MANUFACTURING, LLC'S MOTION TO
CONTINUE TRIAL DATE - 1
(Case No. 19-2-27385-2 SEA)

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

GAESIC000014

1    Motion to Continue the Trial Date and;

2    4. Plaintiff's oral representation (and email response) in opposition to the continuance
     communicated at the Pre-Trial Conference on May 11, 2023.

3    Having read the argument of counsel; and being otherwise fully advised in this matter;

4    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant C3

5    Manufacturing, LLC's Motion to Continue the Trial Date is DENIED.

6    The Court notes that this matter has been continued no fewer than 6 times. The parties

7    have waited four and half years for their day in court. The Court is troubled by what can only be

8    described as C3's dizzying array of attorney withdrawals/substitutions and law firm changes by

9    counsel. With an Order signed by Judge Shaffer on October 12, 2022 indicating there would be

10   no further continuances **for any reason** and an **agreed** trial date of June 5, 2023 entered on October

11   18, 2022, requesting a continuance two weeks away from trial is unacceptable and prejudices all

12   parties and counsel. Counsel for C3 was fully aware of the October 12th and 18th Orders and yet

13   chose to change firms within a month of a hard set trial *without first ascertaining that there was*

14   *no conflict with the new firm.*

15   Pre-Trial Motions and Juror Hardships will be heard on June 7th and/or June 8, 2023. Voir

16   Dire will commence at 9 am on Monday June 12, 2023 with trial to begin on the next day following

17   the conclusion of jury selection. A revised case schedule order incorporating these dates and others

18   will be entered following the pre-trial conference at 12 pm on Monday, May 15, 2023.

19   DONE IN CHAMBERS this ___12th___ day of May, 2023.

20

21   _____
     HONORABLE SUZANNE R. PARISIEN

22

[PROPOSED] ORDER DENYING C3
MANUFACTURING, LLC'S MOTION TO
CONTINUE TRIAL DATE - 2
(Case No. 19-2-27385-2 SEA)

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

GAESIC000015

# EXHIBIT 5

Motion Hearing - 6/7/2023

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

---

MICHAEL VANDIVERE and KATHRYN   )
SNOW VANDIVERE, husband and wife  )
and their marital community, and   )
KATHRYN SNOW VANDIVERE, as the   ) No. 19-2-27385-2 SEA
legal guardian of W.V., a   )
minor,   )
   )
    Plaintiffs,   )
   )
   v.   )
   )
VERTICAL WORLD, INC., a   )
Washington State Corporation;   )
C3 MANUFACTURING, LLC, a   )
Colorado Company,   )
   )
    Defendants.   )

---

MOTION HEARING

(Via Zoom)

The Honorable Suzanne Parisien Presiding

June 7, 2023

---

Transcribed by: Bonnie Reed, CET

Motion Hearing - 6/7/2023

```
 1                  A P P E A R A N C E S

 2

 3      On Behalf of Plaintiffs:
        DARRELL L. COCHRAN
 4      ANDREW S. ULMER
        Pfau Cochran Vertetis Amala PLLC
 5      909 A Street, Suite 700
        Tacoma, Washington  98402-4413
 6

 7      On Behalf of Defendant Vertical World, Inc.:
        ROBERT L. CHRISTIE
 8      JOHN WELLINGTON TSUJI BARRY
        ANN ELIZABETH TRIVETT
 9      Christie Law Group, PLLC
        2100 Westlake Avenue North, Suite 206
10      Seattle, Washington  98109-5802

11

12      On Behalf of Defendant C3 Manufacturing, LLC:
        RACHEL TALLON REYNOLDS
13      Lewis Brisbois Bisgaard & Smith, LLP
        1111 Third Avenue, Suite 2700
14      Seattle, Washington  98101-3224

15

16      On Behalf of Sinars Slowikowski Tomaska, LLC, and Christopher
        Furman:
        BRADLEY S. KELLER
17      JOAN MAYA PRADHAN
        Byrnes Keller Cromwell LLP
18      1000 Second Avenue, Suite 3800
        Seattle, Washington  98104-1062
19

20

21

22

23

24

25
```

Motion Hearing - 6/7/2023

Page 3

1                    I N D E X  O F  P R O C E E D I N G S

2

3                                    PAGE

4    June 7, 2023 Motion Hearing Proceedings Commence..........   4

5    Argument by Mr. Cochran...................................   10

6    Argument by Mr. Christie..................................   18

7    Argument by Ms. Reynolds..................................   21

8    Argument by Mr. Keller....................................   33

9    Rebuttal Argument by Mr. Cochran..........................   55

10   Rebuttal Argument by Mr. Christie.........................   72

11   Rebuttal Argument by Mr. Keller...........................   83

12   Surreply by Mr. Cochran...................................   86

13   Conclusion of Proceedings of June 7, 2023.................   88

14

15

16

17

18

19

20

21

22

23

24

25

Motion Hearing - 6/7/2023

Page 4

1                        -o0o-

2                   June 7, 2023

3

4        THE COURT:  All right, good morning, everyone.  You folks

5    hear me okay?

6        MR. COCHRAN:  Yes, we can.

7        THE COURT:  All right.  We are here this morning, this is

8    Vandivere v. Vertical World, Cause No. 19-2-27385-2 SEA, and

9    we're here kind of a Part 2 on a Motion for Sanctions filed

10   by Plaintiff.

11       We did, of course, address the rescission of insurance

12   piece last week, and this is a continuation of the Motion

13   for Sanctions, this time focusing on discovery violations

14   related and also -- discovery and other potential violations

15   related to the presence of a C3 former attorney, Mr. Furman,

16   as a patron of Vertical World.  And I wanted to give counsel

17   time to supplement the record with -- following the

18   deposition of Mr. Furman, which occurred last week.  So

19   that's kind of how we are -- why we are here today.

20       I'll have counsel now please identify themselves for the

21   record.

22       MR. COCHRAN:  Darrell Cochran, here for the plaintiffs,

23   and I'm joined by Andrew Ulmer as well.

24       THE COURT:  Good morning.

25       MR. CHRISTIE:  Good morning, Your Honor.  Bob Christie,

Motion Hearing - 6/7/2023

Page 5

1      I'm here for Vertical World, along with my colleagues, Ann

2      Trivett and with John Barry.

3          THE COURT:  All right.  Good morning to you folks.

4          MS. REYNOLDS:  And, good morning, Your Honor.  Rachel

5      Reynolds, here on behalf of defendant, C3 Manufacturing,

6      LLC.

7          THE COURT:  All right.  Good morning to you, Ms. Reynolds.

8          MR. KELLER:  Good --

9          THE COURT:  Mr. Keller, I see you.

10         MR. KELLER:  Good morning, Your Honor.  I'm Brad Keller

11     for Byrnes Keller and we're here by a special appearance on

12     behalf of the Sinars firm and Mr. Furman, and with me also

13     is Ms. Joan Pradhan.

14         THE COURT:  All right.  Nice to see you again,

15     Ms. Pradhan.

16         Okay.  I assume you folks have filed some form of an Entry

17     of Appearance in this matter?

18         MR. KELLER:  We did, Your Honor.  We filed a Notice of

19     Special Appearance.

20         THE COURT:  Great.

21         MR. KELLER:  I want to say --

22         THE COURT:  I don't --

23         MR. KELLER:  -- last --

24         THE COURT:  -- need to know the exact date as long as its

25     filed.  That's all I care about, that it's filed before you

Motion Hearing - 6/7/2023

Page 6

1        are here for this hearing, that's all.  It doesn't matter

2        when.  I'm glad it was done.  Thank you.

3          All right.  And, Mr. Keller or Ms. Pradhan, are you

4        wanting to present argument on this?  If there was something

5        that was filed by you, I didn't see it.

6          MR. KELLER:  Was that addressed to me, Your Honor?

7          THE COURT:  Yes, it was.

8          MR. KELLER:  Well, okay.  We have a problem then, because

9        we did file an extensive opposition --

10         THE COURT:  Ah, okay.

11         MR. KELLER:  -- but last night -- not evening, but during

12       the court day following the schedule that I --

13         THE COURT:  Sure.

14         MR. KELLER:  -- understood laid out earlier, and we did

15       provide copies of it by email --

16         THE COURT:  Okay.

17         MR. KELLER:  -- to the clerk at 4:30, and it was rather

18       robust.

19         THE COURT:  Okay.

20         MR. KELLER:  It included a brief.  It included a

21       declaration from Mr. Fucile; a declaration from John Strait;

22       a declaration from Mr. Furman; and a declaration from

23       Mr. Hicks, who is a partner at the Sinars firm.

24          So I apologize --

25         THE COURT:  Sure.

Motion Hearing - 6/7/2023

1          MR. KELLER:  -- if the Court hasn't seen it, we must have

2      done something wrong.

3          THE COURT:  No.  I'm sure you didn't.  There's just a lot

4      a materials filed.

5          And I just wanted to tell everyone that this, certainly,

6      is a significant matter and I'm not going to be ruling from

7      the bench this morning.  And I can further assure everyone

8      here that every single word that has been filed with this

9      Court on this issue will be read by me and reviewed

10     thoroughly before any ruling comes out.

11         I want to say that up front, but I also want to -- with

12     that, I want to let you folks know that having spent some

13     hours reviewing, clearly not everything but a lot of the

14     materials in this, it is clear to me that we are not

15     ready -- or not -- ready isn't the right word.  We are not

16     able to start a trial on Monday.

17         There's no way that we would be able to address motions in

18     limine tomorrow because the motions in limine will, I

19     believe, be changing dramatically based upon my ruling.  I

20     haven't determined my ruling yet, but even looking at the

21     various options that there are and the fact that Vertical

22     World is no longer a party, the motions in limine are going

23     to be changed significantly.  And so there may need to be

24     new ones.  I'm sure there will be some new ones, perhaps.

25     And they'll be, perhaps, more significantly, you know, a

Motion Hearing - 6/7/2023

1    reduction of the ones that were already filed.

2        Either way, there's no possible way that we're going to

3    have our arms wrapped around the motions in limine before we

4    get a ruling on the pending motion right now, the Motion for

5    Sanctions.  And all of this would have to be done in time to

6    do voir dire on Monday.  Not -- it's just not possible.

7        And the reality is that no matter what this Court rules

8    with regard to the pending Motion for Sanctions, the scope

9    of this trial is shorter.  And so a few-day delay in

10   starting isn't going to, in any way, affect the window that

11   we have for this trial or whatever, however -- whatever --

12   whatever is still going to trial will be able to be

13   conducted well within the window of availability we have.

14   So we're not losing our trial date.  It's not going to start

15   Monday but this case and whatever is left of it is going to

16   go out, you know, probably later next week.

17       Again, it really depends upon my ability to get all the

18   information, gather it all, process it all, make a ruling,

19   and then move on to motions in limine, and then we will do a

20   voir dire.  So I am at the end of our hearing this morning

21   going to instruct Ms. Salle to excuse the current jurors,

22   which I always hate doing because we can't reuse them, that

23   is the one thing that is really a disadvantage.  The only

24   disadvantage to Zoom voir dire is that unlike old school,

25   we'll call it, when folks were here, we could send them back

Motion Hearing - 6/7/2023

1    down to the jury room and they get sent out to another

2    trial.  We can't do that.  So we've lost these folks.

3    That's okay.  We're not going to rush through a trial when

4    there are huge substantial issues that have to be addressed.

5     So I just want to let you folks know what my thinking is

6    and that we are going to have a delay, but it's not going to

7    be dramatically -- it's not going to be a lengthy one and

8    it's not going to impact our ability to get this case to

9    resolution.

10     Anybody want to comment on that before we move to the

11    Motion for Sanctions?

12     MR. COCHRAN:  I'll address it, like, kind of -- just kind

13    of generally.

14     THE COURT:  Okay.  Anyone else want to --

15     MR. KELLER:  I, obviously, don't have any comment on your

16    trial schedule, Your Honor --

17     THE COURT:  Yeah.

18     MR. KELLER:  -- because it doesn't --

19     THE COURT:  Didn't think -- didn't --

20     MR. KELLER:  -- involve me, but I do want to just -- you

21    know, because the Court has indicated that it did not see

22    our papers in opposition, I leave it up to the Court's

23    discretion whether the best use of its time is to have

24    argument and then read that or whether you want to put us

25    over for a day or two until you have had an opportunity?

Motion Hearing - 6/7/2023

1       THE COURT:  No.  You know what?  I know Mr. Fucile.  I

2       know who he is.  He was just in court in front of me.  I

3       know who Mr. Strait is.  I know -- I can imagine what your

4       arguments will be.  And I'm certainly familiar with the RPCs

5       around this.  I'd like to go forward today, but as is often

6       the case, the Court takes the matter under advisement.  And

7       I will then read with a fine-tooth comb everything else

8       that's been submitted to me, all the declarations.  So we're

9       going to proceed this morning.

10       I just wanted anyone else, if they wanted to take the

11      opportunity to just discuss the trial scheduling issue,

12      let's do that first because it's such a housekeeping issue

13      before we go the meat of the matter.

14       Mr. Christie, anything that you'd like to address on this?

15      MR. CHRISTIE:  No, Your Honor.  Thank you.

16      THE COURT:  All right, Ms. Reynolds?

17      MS. REYNOLDS:  Nothing from C3, Your Honor.  Thank you.

18      THE COURT:  All right, great.  Thank you.

19       Okay.  Whenever you're ready, Mr. Cochran?

20      MR. COCHRAN:  Thank you, Your Honor.  And I think oral

21      argument at this point will help the Court.  If nothing

22      else, we can kind of emphasize the various briefs and

23      materials that we all think are the most important thing to

24      give the highest priority.  And --

25      THE COURT:  And I want to be --

Motion Hearing - 6/7/2023

Page 11

1          MR. COCHRAN:  And --

2          THE COURT:  -- clear, I have read all of your materials,

3      your supplemental declaration, as well as C3's.  I just

4      didn't -- because it must have come in late in the day

5      yesterday, didn't have it uploaded.  It's not a problem, so

6      continue.

7          MR. COCHRAN:  Right.  And I appreciate Mr. Keller's

8      position and I'm voicing support that he will be able to

9      emphasize for you what's most important, even if we haven't

10     had a chance to study it at depth.

11         I reluctantly laid in the same spot that the Court does

12     that we -- this, obviously, deserves the Court's attention

13     and all of our attention before we get going, so I

14     appreciate that on the start of the trial.

15         So as you will see when you get to the materials that the

16     Sinars law firm has filed, they've really focused on the RPC

17     violations, which may or may not exist.  And as Mr. Ulmer

18     wonderfully briefed overnight in our reply, that's not what

19     we're doing here.

20         We're here about our civil trial which was supposed to

21     have started within hours, literally, and the discovery

22     violations that we find have been committed by C3 itself and

23     by its attorneys, and maybe even its insurance companies.

24     The time for bar disciplinary proc- -- matters, if that

25     happens, is somewhere else.  The issue of whether there's a

Motion Hearing - 6/7/2023

Page 12

1        malpractice case, also not before us.  What we're here

2        talking about are the discovery violations which we know

3        come in multiform.  This isn't just one event of misconduct.

4        This is a series of misconduct that really started even

5        before our addition of C3 as a defendant in the case and has

6        proceeded throughout and it's in multiple forms.  We've

7        addressed, to some extent anyway, the insurance issues.

8          What crystallized after we took Christopher Furman's

9        deposition on Friday was how integrally related, not only

10       his ex parte contacts at Vertical World is, but how that --

11       how then that relates and exacerbates their position as to

12       why they didn't produce the insurance information and the

13       product defect information and misrepresentations that

14       underlie the rescission by Tokio Marine.

15         So in short, what we found out from Mr. Furman is that at

16       the inception of their involvement when we have -- the

17       Plaintiffs have asked for an inspection of the auto belay

18       devices that he -- and "surreptitiously" is the correct word

19       because he never notified Vertical World or its attorneys or

20       even the attorney who is his former roommate in law school,

21       John Barry, who is representing Vertical World -- he

22       notified no one that in April of 2022 he was going to check

23       out Vertical World three days prior to a point at which we

24       had formally scheduled a CR 34 inspection of the premises.

25          He got permission from his managing -- his supervising

Motion Hearing - 6/7/2023

1     partner, Duncan Lemmon, which I find to be extraordinary.

2     It wasn't just him.  He ran this by his partner and he said,

3     "I'm going to go and check this place out," never notifying

4     Vertical World.  And as you will see, never admitting that

5     in discovery responses to the Plaintiffs, who asked very

6     specifically, "Tell us about every time C3, its agents, its

7     employees, its owner, its attorneys have met with employees

8     of Vertical World."  And he didn't -- he not only didn't

9     disclose that in discovery responses in April or August of

10    2022, he never responded at all in February, March, April,

11    or May in the lead-up to this trial.

12      So the RPC violations is something down the road.  What

13    we're talking about are discovery violations.  And so

14    Mr. Furman essentially said in the deposition and his --

15    Mr. Keller is saying in his response now, "Golly, gee.  We

16    just wanted to climb in gyms and we didn't, you know, we

17    didn't take any photographs and any of that."

18      It's bizarre, because he not only went and surreptitiously

19    accessed Vertical World's premises in April of 2022, but

20    then in February of 2023 he begins a stretch of 30 visits to

21    Vertical World.  By the way, not just one close to his

22    house, but ones in Seattle.  He did one in Redmond and he

23    did one in Lynnwood, none of which can be explained by,

24    "Gosh, I'm just a climber and I love climbing."  None of it

25    can.

Motion Hearing - 6/7/2023

1            And what's what's fascinating, of course, is that some of

2       the core issues for liability -- and this is -- Mr. Christie

3       will probably address this, but with Vertical World and also

4       with C3 was -- is the question of the check-in process.  Was

5       there -- you know, was there an effort to supervise the

6       clip-in?  You know, what happened in terms of the auto belay

7       device and its maintenance?  How does a -- how does the auto

8       belay device work?  All of which, whether he says he's just

9       climbing because he loves climbing or not, he has chosen to

10      do it in Vertical World, chosen to be gathering and

11      assessing information that could used in trial and then, lo

12      and behold, he's listed as a trial witness.

13          So fascinatingly, of course, C3 got itself involved in

14      this trial as a defendant because its owner, Ron Naranjo,

15      officiously intermeddled in our suit with Vertical World.

16      So we had filed the case against Vertical World.  Vertical

17      World had filed a summary judgment motion.

18          And then in comes a declaration from C3's president

19      saying, "Oh, all of those warnings in our sales materials,

20      ignore those.  We never really intended those to be in -- to

21      be warnings and, you know, we just put them in our

22      materials."  So we focused on C3 and said, "What are you

23      talking about?"  A manu- -- why would a manufacturer

24      disclaim warnings that it's got in its sales materials?  And

25      then, of course, we learned that the auto belay device at

Motion Hearing - 6/7/2023

1    the center of our injury fall was a defective product, so

2    then we brought in C3.

3      From the very beginning, we learned that C3 was not

4    disclosing information about what happened.  We feel that

5    they misrepresented throughout the entire time what its

6    involvement has been because what we found out was C3,

7    probably literally as Mike Vandivere is still receiving care

8    from either Harborview or immediately after he was

9    discharged from Harborview, that C3 hosts Vertical World

10   people and then there's a mysterious switch in serial

11   numbers for the devices that may or may not have been used

12   in Mike Vandivere's climb when he fell.

13     So we've been concerned about what they're doing

14   throughout the entire time.  And then we come to find out in

15   mid to late May of this year, just weeks before the trial

16   happens, all this information that its attorney, Chris

17   Furman, with approval by his immediately supervising

18   attorney, Duncan Lemmon, had been accessing Vertical World

19   without authorization, not only without authorization but

20   without even advising the lawyers who are representing the

21   codefendant that they were doing it, and also then we find

22   out about the rescission.

23     What's interesting about the rescission, which kind of

24   crystallized with Chris Furman's deposition, is that Ron

25   Naranjo, the president of C3, gets the rescission letter

Motion Hearing - 6/7/2023

Page 16

1    from Tokio Marine on January 26th, so C3 itself has received

2    notice that its policy is being rescinded.  And what's the

3    basis?  Material misrepresentation about the very product

4    which is at the center of our lawsuit.  Material

5    representation is fraud about concealing that information.

6     So C3 is the one who has that information in January.

7    Never produced to us.  I'm assuming that the lawyers, Sinars

8    Law Firm, received blind copies or even advance

9    notification, but we don't have that information at this

10   point.  But what we do know is that on February 27th, a

11   month later, C3 has independent counsel who is sending

12   letters to Tokio Marine saying, "We don't" -- "We think that

13   it's too vague and you should keep your policy in place."

14    Again, Sinars has that information in all likelihood and I

15   invite them to dispute that or deny it.  In fact, I've asked

16   Ms. Reynolds to provide that information for the Court this

17   morning, but what we do know is that C3 certainly did.  And

18   it's wildly unlikely that the Sinars firm didn't, yet

19   there's no production of that information.

20    And then in March -- so this is really interesting and

21   this crystallized the other day with the dep.  So in March,

22   you'll know -- you'll recognize the name, Scott Wood.  Scott

23   Wood is the lead attorney or has been the lead attorney for

24   C3 throughout the entirety of the litigation until he

25   switches firms.  And he switches firms to the law firm that

Motion Hearing - 6/7/2023

1        is writing to C3 and its independent counsel in March,

2        saying:  "No, we maintain our rescission and our rescission,

3        again, is based on your material misrepresentations of the

4        fact that there was a product defect, a product recall, and

5        injuries related to that product defect."

6          So what you'll see when you get a chance to read

7        Mr. Keller's materials that he submitted on behalf of Sinars

8        is factually inaccurate.  And I'm curious about why, because

9        he claims that Chris Furman, the lawyer, knew that the

10       case -- that the C3 case was going with Scott Wood to the

11       new firm in February or March and that's why he joined the

12       gym.  False; he couldn't have.  Scott Wood couldn't have

13       taken the case because the firm he was going to was the one

14       representing Tokio Marine, which had rescinded the contract

15       of C3 based on material representations.

16         So it is implausible that Scott Wood was going to take it.

17       It is implausible and unbelievable that the reason Chris

18       Furman joined the gym was because he knew it was going with

19       Scott Wood.  Absolute falsehood which, of course, compounds

20       all of our concerns about the discovery violations and

21       supports the fact that a very serious discovery sanction has

22       to ensue both to level the playing field here in this trial

23       and because we, as a judicial system, have a responsibility

24       to deter this misconduct.

25         Now this is going to sound a little ironic, but I can't

Motion Hearing - 6/7/2023

Page 18

1    stand bringing discovery motions.  I can't stand bringing

2    sanctions motions.  And it's a little ironic because I just

3    happen to have been a part of some of the biggest ones

4    throughout about 30 years of a span of time, including the

5    Oso $1-1/2 million dollar sanction by Judge Rogoff, and the

6    O.K. Boys Ranch $700,000 sanction, and another one against

7    Subaru.  So -- but even though I've been a part of these, I

8    don't like to.  I enjoy counsel on the other side.  Brad

9    Keller, I consider him to be a wonderful attorney and a

10   friend; Bob Christie, consider to be a wonderful attorney

11   and a friend.

12     So I don't like them.  I understand everyone's obligation

13   to represent their clients with zeal, but there's a line.

14   And when there is a cross of the line like we see in this

15   case and like we see in the Oso case, for example, it's

16   incumbent on us, as the judicial system, to take action, so

17   that's what we've asked.

18     THE COURT:  Thank you, Mr. Cochran.

19     Ms. Reynolds?

20     All right, Mr. Christie, do you want to go first and then

21   we'll have Ms. Reynolds?

22     MR. CHRISTIE:  That probably makes sense, Your --

23     THE COURT:  Yeah.

24     MR. CHRISTIE:  -- Honor.  And I'll be brief.  Thank you.

25     A couple things to point out that are significant since

Motion Hearing - 6/7/2023

Page 19

1       the last hearing.  We have reached a settlement agreement

2       with Plaintiffs.  I've ordered the check.  I think a

3       stipulated order is going to be filed to appoint a guardian

4       ad litem to do a review of the --

5        THE COURT:  I have it --

6        MR. CHRISTIE:  -- minor component of the settlement.

7        THE COURT:  -- on my desk and I'm going to sign it today.

8        MR. CHRISTIE:  The point is that that happened rapidly

9    once we knew about this policy rescission.  It was

10   highlighted a little bit by Mr. Ulmer the other day because

11   we anticipated we would conclude an agreement.  And we have,

12   for the very obvious reason that this C change and the

13   potential exposure to my client made it obvious, immediately

14   obvious, that we needed to do everything that we could as

15   counsel for Vertical World to resolve this case for what is

16   really the defined amount of money available and that is

17   this policy.

18     So the point made kind of preliminarily at the last

19   hearing was that but for the timing of this disclosure, we

20   could have settled this case March 1st.  That's

21   crystallized.  That is crystallized.  And so we have been

22   actively litigating against Mr. Cochran, Mr. Ulmer, and

23   their firm in the six figures of expenses and fees incurred

24   that are a complete waste, a complete waste.

25     What I'll say briefly about Mr. Furman, as officers of the

Motion Hearing - 6/7/2023

Page 20

1        court, we owe a fundamental duty of candor to the tribunal

2        and honesty and fairness with our opposing counsel.  And

3        from a discovery standpoint, if Mr. Furman had

4        hypothetically called us up and said, "Hey, I want to go

5        climb at your gym.  Is that all right?"

6         "No, that's not all right for a variety of reasons.

7        You're going to have to go through an onboarding process.

8        You're going to have to go through the iPad program that's a

9        central issue in the dispute that our client has with the

10       Plaintiff.  You're going to have to go through a belay test

11       before you can use the auto belay.  And you're going to see

12       firsthand whether or not Vertical World personnel supervised

13       that process," all issues of critical factual dispute and

14       that would probably be the subject of depositions and

15       on-scene inspections that involve all counsel.

16        So the naivete of that process is stunning to me, but here

17       it's a discovery issue.  Now we didn't know that, so that's

18       not a roadblock in the sanction that we're seeking, which

19       was preventing us from settling this case.  It's certainly

20       improper.  And I support Mr. Cochran's view of that.  And

21       when you start looking at the timeline of events, it's just

22       not right.  It's just fundamentally not right.

23        So I'm going to leave it with this:  We've settled.  And

24       we settled rapidly because of the withholding of

25       information, which C3 has not contested, is discoverable and

Motion Hearing - 6/7/2023

Page 21

1           should have been timely supplemented.  There can't be a good

2           faith argument to the contrary about what prior counsel did

3           and C3 did, casting no aspersions to C3's current counsel,

4           who I so deeply respect.

5             So that's where we are.  We're prepared to submit a -- an

6           order that is along the lines of what Mr. Cochran submitted

7           in terms of findings of fact that focus on the timing of the

8           disclosure of the policy rescission and the requested relief

9           that we see, there really being no dispute, but that had

10          that been disclosed last March, we would have been long gone

11          from this case.  Our clients would have saved hundreds of

12          thousands of dollars and so would Mr. Cochran's firm because

13          we've been actively in battle.  We're not anymore.

14            Thank you, Your Honor.

15            THE COURT:  Thank you, Mr. Christie.

16            Ms. Reynolds?

17            MS. REYNOLDS:  Thank you, Your Honor.  I apologize for the

18          delay.

19            THE COURT:  No problem.

20            MS. REYNOLDS:  First, I'd like to take a step back and

21          think about what this case is and importantly what this case

22          is not.  This is a case now about whether my client

23          manufactured, sold, distributed a defective product; whether

24          that defective product caused Mr. Vandivere's fall, and if

25          so, what are the damages of that?

Motion Hearing - 6/7/2023

1        Coverage is not an issue in this case.  It's not an issue

2    in an underlying case.  My obligation here is, as the

3    defense counsel for C3 relative to product liability claims.

4    I'm not coverage counsel.  In fact, I'm not ethically

5    allowed to opine about issues of coverage, nor am I counsel

6    for the Sinars firm or any of its attorneys.

7        So with that background, C3 is prepared to defend on the

8    merits of the case.  There is a very real dispute about the

9    propriety of the product liability claims in this case, and

10    there's a dispute about whether there was a defect and

11    whether that defect was causative in this case.  That's what

12    we intend to discuss at trial.

13        The issue about how much insurance, first off, we

14    discussed it.  I implored the Court to have a single

15    hearing.  And opposing counsel said, "No, we can resolve the

16    hearing" -- or "the issue of rescission" last week.  So I

17    was surprised to see kind of a deluge of briefing on the

18    insurance issue again.  And I'm happy to address it, but our

19    position remains the same.  And I submit that it is good

20    faith, that questions asked both with regard to Mr. Furman's

21    alleged visits to Vertical World and with regard to

22    rescission were -- there's no information that has been

23    withheld by anyone with regard to that.

24        The Verti- -- or C3 has produced information responsive to

25    the questions that were asked.  No one asked us for, "Have

Motion Hearing - 6/7/2023

Page 23

1    you gotten any correspondence from your insurer?"  "Have you

2    had a dispute with your insurer?"  "Is there any reservation

3    of rights?"  They asked for a policy or the policies that

4    apply.  We produced that.

5      And I'm happy to address anything else on the insurance

6    issue separately, but looking at the discrete issue which we

7    were here to discuss about Mr. Furman's (inaudible) Furman

8    and his former -- or -- and his firm's counsel in terms of

9    the propriety of that conduct and simply state that there's

10   no evidence that going to a public place as a patron is

11   inappropriate or sanctionable conduct, but what is

12   indisputable is there's no evidence that my client, C3, knew

13   about Mr. Furman's visits.

14     So irrespective of what this Court concludes about what

15   Mr. Furman did or did not do, C3 was not in a position to

16   supplement it's insur- -- or its discovery responses about

17   visits to Vertical World because no one told them.  And so

18   that is not a sanctionable activity as to my client, C3.

19     With regard to the analysis on the insurance issue, again,

20   we submit it's not -- the information about the ongoing back

21   and forth between the Tokio Marine excess coverage and

22   personal counsel for C3 and then Tokio Marine again -- and

23   that's an ongoing dispute, and the right questions weren't

24   asked.  And I am not trying to sit on a technicality, but

25   the simplest explanation for why these things weren't

Motion Hearing - 6/7/2023

Page 24

1    produced is because they weren't responsive.

2     I tend to take an extremely broad view of discovery and

3    that doesn't mean that prior counsel took an incorrect view

4    of discovery to the extent we know what they knew when.  I

5    don't know the answers to that as we sit here today.  But

6    even if (inaudible) -- we (inaudible) --

7     THE COURT:  Ms. Reynolds, you're --

8     MS. REYNOLDS:  -- (inaudible) --

9     THE COURT:  -- cutting out.  Ms. Reynolds?  I'm not sure

10   what's happening with your Wi-Fi, but you're definitely

11   cutting out.  And so now you appear to be completely frozen.

12    So let's take a couple-minute recess.  Ms. Salle is going

13   to send an email to Ms. Reynolds and ask her to re-sign on.

14   Everyone else, stay where you are, but we will dismiss --

15   you can knock her out of the call right now, Ms. Salle,

16   right?  And then send her an email and ask her to re-log in?

17   That's what we'll do.  We'll see everyone back in about five

18   minutes, everyone.  Thank you for your patience.

19                    (Recess)

20    THE COURT:  Ms. Reynolds, one of the things you said

21   that -- if you could, perhaps, go back to, can you speak to

22   me about the point that you've made that no one at C3 knew

23   about Mr. Furman's visits.  And if you could speak to that

24   in terms of agency and what kind of knowledge would be

25   imputed, that's an interesting thought that I've had while

Motion Hearing - 6/7/2023

Page 25

1      you -- when you mentioned that no one at C3 knew.

2       MS. REYNOLDS:  Yes, Your Honor.  In terms of that issue,

3      there would be -- there's no authority cited, first off, by

4      Plaintiffs or Mr. Christie's office on this topic that you

5      would impute the act of an attorney onto their client.  The

6      obligation is for the attorney to be representing that

7      client.

8       And so to the extent that there's any authority submitted

9      by Mr. Keller, how would C3 know to supplement its

10     materials?  And how -- there's no authority that's been in

11     this case that says that there's an agency relationship,

12     meaning that C3, the client that is being represented by an

13     attorney, would be independently sanctioned for failing to

14     submit discovery that it has no factual basis to do anything

15     with.

16      There's -- at its core, C3 would need to know that there

17     is something going on in order to know that there's some

18     obligation to respond to discovery.  And (inaudible) there's

19     a very solid argument that going as a patron to a public

20     place is not a visit that is described (inaudible) as an

21     attorney for responsiveness to this particular discovery

22     request.

23      And, again, I'd like to just take a step back.  This

24     started off with, you know, one issue.  And then we are

25     facing a moving target.  (Inaudible) first time we've heard

Motion Hearing - 6/7/2023

1    that there's this reciveness (phonetic) issue is really this

2    morning on the issue of Mr. Furman.  And so we are faced

3    with trying to respond to an ever-changing target, but at

4    its core, there's no facts that my client knew anything was

5    going on at Vertical World (inaudible) and there's no

6    authority that has been cited to date that says (inaudible)

7    obligation to investigate their own counsel, to check

8    whether that's -- the discovery remains actually accurate as

9    to activities outside of the responding party.  And with

10    that, I would submit on that issue.

11      THE COURT:  So nothing further, Ms. Reynolds?

12      MS. REYNOLDS:  Just back to the issue of rescission since

13    it's brought in -- brought up again.  Your Honor,

14    (inaudible) in terms of the supplementation, this

15    information was supplemented in terms of discovery.  There's

16    (inaudible) the civil rule does not (inaudible) not say

17    immediate --

18      THE COURT:  Ms. Reynolds, I'm --

19      MS. REYNOLDS:  -- supplementation.

20      THE COURT:  Ms. Reynolds?

21      MS. REYNOLDS:  The civil rule --

22      THE COURT:  Ms. Reynolds?

23      MS. REYNOLDS:  -- says seasonably.

24      THE COURT:  Ms. Reynolds?  I'm going to stop you because

25    every other word is cutting out.  We have got to make a

Motion Hearing - 6/7/2023

Page 27

1    record of this. No matter what ends up happening, we're

2    going to have to have a really nice record. And I can't do

3    that because of your Wi-Fi.

4    I appreciate that you are probably working

5    around-the-clock, but I have to tell you, it is somewhat

6    inexplicable to me that for a hearing this important you

7    would find yourself with no Wi-Fi. And even without the

8    video on, I can't hear you. We are making a record here on

9    a very important matter. And so I don't know where you are.

10   I don't know how remote it is, but this hearing needs to

11   continue and I assume you'd like to be heard?

12   MS. REYNOLDS: Yes, Your Honor.

13   THE COURT: Sorry. I'm sorry, my -- hang on. My bailiff

14   may have a suggestion for us just to use your phone.

15   THE BAILIFF: If you use your phone to call in, the

16   connection may be better.

17   THE COURT: All right, thanks.

18   So, Ms. Reynolds, next suggestion is that you exit the

19   Zoom link and just use your phone to call in.

20   And what number would that be, Ms. Salle? The same --

21   would it be the same Zoom number?

22   THE BAILIFF: The telephone number, depending on your

23   location, is listed -- it's listed in your -- if you can

24   access your email, it's listed as part of the email sent

25   this morning. I can rattle it off right now. And then you

Motion Hearing - 6/7/2023

Page 28

1    would put the meeting ID in.  But if you have a pen, it's

2    (253) 205-0468.  And then you would insert meeting ID

3    87849444936.

4        THE COURT:  Okay.  So is it probably better that she also

5    close the other one or is it okay to have both, Ms. Salle?

6        THE BAILIFF:  I'd suggest close the other so there's no

7    echo.

8        THE COURT:  Okay.  So, Ms. Reynolds, can you hear me?

9        MS. REYNOLDS:  Yes, I can hear you, Your Honor.

10    THE COURT:  But --

11        THE BAILIFF:  The phone is muted and your computer is

12    still on.  You can unmute your phone and I will...

13        THE COURT:  All right, it looks like you're unmuted now,

14    Ms. Reynolds.  Can you hear me okay?

15        MS. REYNOLDS:  Yes, Your Honor.  My sincere apologies.

16        THE COURT:  Okay, great.  So why don't you continue?

17        MS. REYNOLDS:  Okay.  I will try to be brief, Your Honor.

18    I was speaking to the seasonability of supplementation.

19    Seasonability depends on the circumstances that are

20    underlying what needs to be supplemented to the extent there

21    is a supplementation required.

22        And here, we have an ongoing dispute, as we've discussed

23    previously, about the propriety of Tokio Marine's decision

24    to attempt to rescind coverage.  And so there was a

25    supplementation.  There has been outrage that it wasn't

Motion Hearing - 6/7/2023

Page 29

1    provided to all counsel timely, but there's no authority

2    that says that this, in fact, was untimely, and that's

3    second.

4       Third, the harm -- there is a specter of wrongdoing

5    because C3's excess carrier has made a decision inexplicably

6    to rescind coverage.  The decision was made based upon the

7    evidence that was cultivated and discovered in this case.

8    In other words, we'd previously talked about whether there's

9    this universe of information about some wrongdoing or

10   withheld information about prior recalls.  That's

11   inaccurate.  The letters demonstrate that Tokio Marine's

12   decision is based upon the information in this case.

13      So in other words, we're all on the same playing field.

14   We all are literally on the same page and there's nothing

15   substantive outside of the coverage issue, which has not

16   been litigated, that would bear on the merits of this case,

17   meaning the claims or defenses of the product liability

18   claim.

19      Next, there's been no evidence.  There's been argument

20   about what Vertical World and Plaintiffs would have done in

21   this case absent information about another party's coverage

22   decision.  That -- there's also no authority that that's an

23   appropriate determining factor for the imposition of

24   sanctions because the issue is trial preparation, meaning

25   trial preparation on the merits of the case, claims and

Motion Hearing - 6/7/2023

Page 30

1    defenses.

2        The evidence in this case demonstrates that there was a

3    resolution, but it also demonstrates that there's a very

4    legitimate defense for both Vertical World and for C3 about

5    whether or not there was any wrongdoing on either defendant

6    or prior defendant's fault because there's strong evidence

7    that Mr. Vandivere was contributorily negligent.  Even if

8    he's found one percent contributorily negligent, there's not

9    going to be joint and several liability, nor has Vertical

10   World's conduct in defending itself in this case been

11   suggestive of some concern that there wasn't going to be

12   either a wholesale allocation of fault to the Plaintiff or

13   at least a one percent allocation of fault.

14       So it's curious that the evidence is now, "We would have

15   done something different.  We have no evidence to support

16   that.  We're just saying that."  There's really no proof to

17   the claim that there's been hundreds of thousands of dollars

18   expended as a result of the failure to disclose information

19   that we submit was never requested.

20       Finally, the -- going back to the Furman issue, Your

21   Honor, and I'll end with this.  It's intellectually

22   inconsistent to say that there was some impropriety on the

23   part of Furman, he's furtively going or surreptitiously

24   visiting the gym at the detriment of Vertical World, while

25   at the same time -- we heard this earlier in this particular

Motion Hearing - 6/7/2023

Page 31

1    argument, there's some alleged conspiracy between C3 and

2    Vertical World that apparently is evidenced by their very

3    quick meetings following Mr. Vandivere's accident.  So

4    either C3 and Vertical World are conspiring or they're not.

5      But, certainly, Mr. Furman's visits to Vertical World as a

6    patron were not something known to my client; therefore,

7    even if the Court determines that that's a meeting that

8    would have been responsive to an outstanding discovery

9    request, C3 itself is not any position to be answerable for

10   failing to supplement a response that it did not know about.

11     And with that, I would answer any of the Court's questions

12   and appreciate the Court's willingness to work with my

13   technological issues.

14     THE COURT:  All right.  Thank you, Ms. Reynolds.

15     Mr. Keller?

16     MR. KELLER:  Thank you, Your Honor.  I think the thing

17   that makes me most nervous about this hearing is that if my

18   internet bandwidth lets me down and I lose connection after

19   observing what happened.

20     THE COURT:  Well, you've got a --

21     MR. KELLER:  But --

22     THE COURT:  -- I see you've got a telescope behind you, so

23   I suppose you could zoom in that way and keep an eye on

24   what's happening, but don't be nervous.

25     MR. KELLER:  Okay, Your Honor.  First thing, I'm going to

Motion Hearing - 6/7/2023

Page  32

1      spend my time on only one or two factual issues and only

2      because I know Your Honor hasn't had a chance to review.

3      You will see very extensive declarations about the visits

4      and what occurred, what didn't occur.

5        THE COURT:  So --

6        MR. KELLER:  No. 1 --

7        THE COURT:  -- let me -- and I am sorry, to cut you off.

8      I want to make my own disclosure at this point, which I

9      think is important, which is that Mr. Strait prepared a

10     declaration in a personal matter that I had, I want to say

11     six or seven years ago.  I don't know if it's -- I don't

12     think -- I think it's in that time frame.  I don't have a

13     personal relationship with him.  I have had zero contact

14     with him since that.  That matter is long, long resolved.

15     And I do not believe that it will have any impact on

16     anything that I am going to be deciding here.  I just want

17     to let you know that.

18       And, you know, to the extent that there is overlap between

19     Mr. Fucile and Mr. Strait, I would imagine there would be,

20     that I would certainly be relying on Mr. Fucile's

21     declaration.

22       But I would also point out that, as has been pointed out

23     by Mr. Cochran, which is that this -- you know, the RPC

24     violations, potential, alleged, whatever they may be, really

25     aren't the -- at the forefront of my approach to this.  This

Motion Hearing - 6/7/2023

1          is really discovery violations and discovery conduct that

2          happened during the course of discovery.  And so that's

3          really where my focus is, just so you know, but I did want

4          to disclose that Mr. Strait and I have had a prior dealing,

5          and again I believe about seven years ago, and I have had no

6          contact with him since.

7            MR. COCHRAN:  No objection from Plaintiffs, Your Honor.

8            THE COURT:  Thank you.

9            Mr. Christie, anything you'd want to add on to --

10           MR. CHRISTIE:  No.  No objection, Your Honor.  Sorry, I

11         was just searching for my mute button.

12           THE COURT:  Yeah, no problem.

13           MR. CHRISTIE:  No objection.

14           THE COURT:  Mr. Keller?

15           MR. KELLER:  No.  Again, Your Honor, you'll have a lot of

16         factual information in --

17           THE COURT:  Sure.

18           MR. KELLER:  -- the declarations.  And it's extremely

19         important, but I want to emphasize two things.

20           THE COURT:  Sure.

21           MR. KELLER:  One, Mr. Cochran talked about Mr. Furman's

22         first visit to a Vertical World gym on April 1 of 2022, and

23         I think is trying to say -- is saying, "Oh, it's awfully

24         suspicious timing-wise.  You know, it happened the same day

25           as there was an x-ray examination going on at a completely

Motion Hearing - 6/7/2023

Page 34

1        different facility and four days later was a CR 34

2        inspection."

3         I want to emphasize two things about that.  One, he went

4        to a completely different Vertical World facility than the

5        one where Mr. Vandivere was injured.  He went to the Redmond

6        facility that day.  Mr. Vandivere was injured at another

7        one.  But more important, he did not engage in any auto

8        belay activity.  He was in a completely different part of

9        the gym.

10        When you see these declarations, you'll learn that there's

11       something called "sport climbing" and there's something

12       called "bouldering."  And one involves use of auto belays,

13       the other has nothing to do with it.  It's even different.

14       He was there to do bouldering that day as a workout.  That's

15       what he did as a paying patron.

16        And that's the third thing, is that when he goes in as a

17       paying patron and uses the gym, what he learns is what any

18       other person who paid to go would learn.  There's no

19       information that he's learning that's different -- well, I'm

20       too old to do things like rock climbing, but if I wasn't,

21       nothing different that he learns.

22        The second important thing factually is when he becomes a

23       member -- now I switched to 2023 --

24       THE COURT:  Mm-hmm.

25       MR. KELLER:  -- and when he becomes a member, I think it's

Motion Hearing - 6/7/2023

1        in the March time frame, but he actually goes on the first

2        occasion, I believe, in February of 2023, and he goes over

3        20 times between February of 2023 and early May.

4          Respectfully to Mr. Cochran, he's just plain wrong about

5        what Mr. Wood was doing.  He -- it was well known both to

6        Mr. Furman and within the firm that Mr. Wood was leaving the

7        firm and taking the cases with him.  What was not known at

8        that time was where he was going.  He did later join the

9        Gordon Rees firm which then could not act as counsel because

10       Mr. Cochran is correct, they were coverage counsel for the

11       excess insurer.  So when in February and March of 2023, when

12       Mr. Furman does become a member and go to the gym, the

13       important thing is, he knew that case was leaving the office

14       and he was not going to be involved anymore.  That's No. 1.

15         No. 2, there was a reason for it.  He had moved over to

16       Seattle and it was closer.

17         And three, again, as a patron there, he does not learn

18       anything that you or I, if we were rock climbers, joined

19       would learn.  That's all I'm going to talk about factually.

20         For sanctions to be imposed based on anything having to do

21       with Mr. Furman's visits, one of three things have to be

22       shown:  A violation of a court order; a violation of the

23       rules of ethics or the rules of professional conduct; or,

24       three, a willful violation of the discovery rules that

25       importantly prejudices a party.

Motion Hearing - 6/7/2023

Page 36

1        THE COURT:  So what about --

2        MR. KELLER:  We're not dealing with --

3        THE COURT:  -- Interrogatory No. 7, Mr. Keller?  That

4    seemed like really a spot-on, very broad request:  "Tell us

5    any time there was, you know, meetings between lawyers,

6    parties, employees."

7        MR. KELLER:  Okay.  So that's the third prong.  Turn to

8    the third bra- -- potential basis for imposing sanctions.

9    Has there been a willful violation of the discovery rules

10   with respect to the response that was given regarding

11   Interrogatory No. 7?

12       There's an interesting procedural history to this

13   argument.  When this sanctions motion was filed, which was

14   two weeks ago, contrary to this morning and contrary to what

15   got filed at seven o'clock this morning, the focus of the

16   motion was a claimed RPC violation by alleged improper ex

17   parte communications with a represented party.  The focus on

18   Monday evening shifted to Interrogatory No. 7, after the

19   Plaintiffs retreated from any claim that what had been done

20   was improper.

21       So the question you're asking me now and the question

22   that's posed is:  Is it willful and deliberate discovery --

23   a willful and discovery violation that caused prejudice that

24   would warrant sanctions here?

25       Mr. Cochran, who I respect tremendously and consider him a

Motion Hearing - 6/7/2023

Page 37

1    friend also, and I -- we could have a spirited debate

2    regarding whether what occurred here can fairly be deemed a

3    meeting between C3 on the one hand and Vertical World on the

4    other when he's there interacting with the staff as any

5    patron would have.  But the fact that we're even having a

6    debate about that shows that it's not a simple clear black

7    and white issue.

8      And I agree with Your Honor, it's broad.  It's broad, but

9    it's asking about meetings between parties that are

10   involved -- codefendants in litigation.  And there's a real

11   question here:  Is that really intended to deal with a guy

12   going there to work out at the gym and learning only the

13   things that anybody would?  But we don't have to have that,

14   but the fact that there is even a -- it's debatable, goes to

15   whether you have a willful and deliberate violation.

16     But there's something that's even more important, that

17   transcends the semantics debate that you could have about

18   whether or not that's a meeting that would be responsive.

19   If Mr. Furman's gym visits should have been referred to in

20   the response to Interrogatory No. 7, the central -- or one

21   of the central issues for you today is:  How has the

22   Plaintiff been prejudiced by not learning about that until

23   the first week of May of this year?

24     The only thing that the Plaintiff has come forward with

25   is, they say, "Well, we would have been able to investigate

Motion Hearing - 6/7/2023

1    regarding those visits earlier."  That is not prejudice and

2    it is certainly not the kind of prejudice that warrants

3    sanctions under the facts that you have here.  You now

4    have and you will be able to review the results of a

5    90-minute deposition about what occurred, and equally

6    important, what did not occur during any of his visits.

7       You also now know that there is no -- there was no work

8    product objection that was asserted regarding anything about

9    any of those visits.  And that's consistent with

10    Mr. Furman's and our position that he wasn't there as an

11    attorney for C3 that day.  He was there as a patron working

12    out.

13       THE COURT:  Mr. Keller --

14       MR. KELLER:  Now to empha-

15       THE COURT:  -- I -- I'm troubled by Mr. Furman's lack of

16    detail on anything.  This happened 37 days ago at the time

17    of the deposition as was inquired to and not 2012, and yet

18    he just had no information.  He couldn't even tell whether

19    it was a female or a male, the people who were giving him

20    the side-eyed glances.  And he felt so compelled by this

21    distrust of him that he called Mr. Barry to let him know,

22    "Gosh, just so you know, FYI," -- you already knew this.

23    And that he couldn't identify --

24       MR. KELLER:  Okay.

25       THE COURT:  -- anyone by name, couldn't physically

Motion Hearing - 6/7/2023

Page 39

1    describe them, male, female.  I mean, how is it then --

2     MR. KELLER:  Well --

3     THE COURT:  -- that counsel, who may have wanted to

4    investigate what transpired between these adverse parties,

5    how could they possibly investigate it when Mr. Furman

6    doesn't know anyone?  He can't even give old, young, male,

7    female.

8     MR. KELLER:  Two responses, Your Honor.

9     THE COURT:  Sure.

10     MR. KELLER:  One, I'd urge you to go read his testimony

11    about --

12     THE COURT:  I will.

13     MR. KELLER:  -- every other visit that he was there and

14    let you decide whether that was forgetful or whether he was

15    very open and detailed and honest about what he did and did

16    not do.

17     Second, with respect to this one incident at the end where

18    he felt like he was getting some awkwardness on the part of

19    staff, all I can do is point out to Your Honor, we're

20    dealing with low-level staff and a GM.  And other than

21    knowing that he felt some awkwardness, what difference does

22    it make whether that person was a man or a woman or who they

23    are?

24     That's -- and, three, if counsel wants to know who those

25    people are, everybody knows what day it was because

Motion Hearing - 6/7/2023

Page 40

1    Mr. Christie produced all of the records regarding every

2    visit he had at the gym each and every day.  They have the

3    ability to determine who was on staff that day.

4        THE COURT:  So --

5        MR. KELLER:  I --

6        THE COURT:  -- it's incumbent on them to do some huge

7    investigation to time when Mr. Furman was there, who was

8    working at that time at that location, all the people?  Then

9    interview all of them and say with a picture of Mr. Furman,

10   "Do you remember him?  Did you -- what did you talk to him

11   about?  What did he do?"

12       MR. KELLER:  Yeah.

13       THE COURT:  "What kind of instructions did you give him?

14   What" -- I mean that's what they should have to do?

15       MR. KELLER:  It's not incumbent on them, but if they want

16   to go chase rabbits down the hole, they can.  What

17   significance is it in terms of the merits of whether there

18   was a product defect here, regarding who the people were on

19   staff that day that he felt -- sensed a little awkwardness

20   driving him to make a -- what is the potential relevance of

21   that to:  Is this product defective, causation, comparative

22   fault?

23       It's got to be more than just something happened and I

24   don't like it.  It's got to have some connection to the case

25   and the merits of the dispute in order for there to be

Motion Hearing - 6/7/2023

Page 41

1     (inaudible) -- and I'd like to give you an example of a

2     case.  And it's the example that the Plaintiffs cited in the

3     brief that they filed this morn- -- motion about what it

4     takes to show the kinds of prejudice we're talking about

5     from the loss of some kind of an opportunity --

6        THE COURT:  Are you referring --

7        MR. KELLER:  -- to investigating --

8        THE COURT:  Are you referring to the -- I have it written

9     down here, the --

10       MR. KELLER:  J --

11       THE COURT:  -- J.K. by Wolf case?

12       MR. KELLER:  Yes.

13       THE COURT:  You know --

14       MR. KELLER:  It's --

15       THE COURT:  -- there's another case that no one cited that

16    I would encourage everyone to look at.  And I -- I didn't

17    have time to pull it up myself, but it was Judge Ruhl and it

18    was also a school district case and it came down last year.

19    And it was about surveillance video --

20       MR. COCHRAN:  The Jer- --

21       THE COURT:  -- I believe in buses --

22       MR. COCHRAN:  The Jerry Moberg case, yeah.

23       THE COURT:  Yeah.

24       MR. COCHRAN:  Jerry Moberg's case, yeah.

25       THE COURT:  Right.  And that case -- that default was

Motion Hearing - 6/7/2023

Page 42

1      affirmed on appeal.  And I would say, because I -- this is

2      way before I had this case -- thank you, Judge Shaffer for

3      your retirement and -- just kidding.  I had occasion to look

4      at the other case.

5        Mr. Cochran, what was the name of it again that you --

6        MR. COCHRAN:  I --

7        THE COURT:  Mo- --

8        MR. COCHRAN:  I'll be able to pull it up here in a second.

9        THE COURT:  It's all right.  I've read it twice, but more

10     importantly, I was so curious about it.  A year ago I had

11     another case somewhat similar and I pulled out Judge Ruhl's

12     findings and there was about, I don't know, about 37 pages

13     of findings, but I would say that -- to your point,

14     Mr. Keller, I know you were going to say, "Gosh, the

15     discovery -- the, you know, what happened in the J.K. by

16     Wolf case was far more egregious than here in terms of the

17     concreteness of the harm," but I would urge you once -- if

18     Mr. Cochran can't pull it up, I'll pull it up -- to look at

19     that case where truthfully the harm there was similarly

20     unknown and unknowable.

21       And so I just want to make sure that -- I'm sure you're

22     maybe aware of that case too, but don't rely too heavily on

23     J.K. because there's another case that, in my mind, has a

24     way more attenuated discovery violation to actual harm and

25     that was affirmed by the Court of Appeals.

Motion Hearing - 6/7/2023

Page 43

1        MR. KELLER:  Okay.  I'm not familiar with the other case

2    so I can't --

3        THE COURT:  No problem.

4        MR. KELLER:  -- deal with it in the abstract.

5        THE COURT:  I will send it --

6        MR. KELLER:  But I think --

7        THE COURT:  I will send it to you.

8        MR. KELLER:  I think you know where I'm coming from --

9        THE COURT:  I do.

10       MR. KELLER:  -- on the J.K. case.  I mean, because (a)

11   it's a spoliation case --

12       THE COURT:  Understood.

13       MR. KELLER:  -- you know, and it's spoliation of a video

14   regarding the students going on the bus where -- excuse me,

15   the entry to the bathroom where the alleged sexual abuse --

16   there were 14 instances of willful misconduct.  There were

17   violations of the discovery rules and two court orders.

18     So it's not what we're dealing with here, but what we are

19   dealing with here, potentially, is a single interrogatory

20   response, that had it been answered, would have disclosed

21   that Mr. Furman has attended the gym as a patron for some

22   odd-number of times during 2023 and on a single occasion.

23     And so I don't see, given what we now know about all the

24   details of what occurred during those visits and what didn't

25   occur and that there's no assertion of work product, he's

Motion Hearing - 6/7/2023

Page 44

1    not there, at least in his mind wearing his hat as an

2    attorney, how there could be any theoretical potential

3    prejudice to the other side. And I think the proof of it is

4    really by what we know now.

5      So again, Your Honor, one, we're dealing with

6    interrogatory response and interrogatory is very, very

7    broad, I agree with you, but I think given the context of

8    the case and what the claims were, the notion of meetings

9    between C3 and Vertical World, while you may think, "Oh,

10   well, it's -- yeah, but it doesn't have anything to do with

11   the case really but it's responsive" -- you know, whether it

12   was or wasn't is not a bright line clear and that goes to

13   Wolf on this and deliberateness; two, even if it had been

14   disclosed, how was the Plaintiff prejudiced in any way from

15   that? And we have no showing here regarding that.

16     THE COURT: Okay.

17     MR. KELLER: So --

18     THE COURT: So go ahead. Ah, I --

19     MR. KELLER: The last thing I want to say -- the last

20   thing I do is, as I -- you know, we haven't previously

21   weighed in on this issue about the debate over whether the

22   excess policy was rescinded or not. You have -- the sum

23   total of the evidence that you have in front of you is three

24   letters and a supplemental interrogatory response.

25      And what is so clear about those letters is one is from

Motion Hearing - 6/7/2023

Page 45

```
1        the excess carrier to C3, nothing to do with the Sinars firm
2        on it.  The second is from an -- a coverage lawyer at a
3        Denver law firm, completely different law firm, with the
4        excess carrier.  Nothing to do with Sinars firm.  And the
5        third is the excess carrier's lawyers response addressed to
6        that coverage lawyer.  And then you have the supplemental
7        interrogatory response that was filed sometime in early May.
8          None of that implicates or shows when or if the Sinars
9        firm or any of its lawyers had any knowledge whatsoever that
10       that was occurring with respect to the excess policy.
11         And I can only speak to Your Honor on behalf of, you know,
12       the lawyers that are still there.  And I know Mr. Furman
13       knew absolutely nothing about any of these issues, but
14       Mr. Wood and Mr. Lemmon, they're no longer with the firm so
15       I cannot make any representation to Your Honor.  But I know
16       that the evidence you have in front of you at this time does
17       not shed anything that would suggest that the firm knew
18       about it at any time before.
19         And, you know, that's not surprising.  The firm is
20       retained -- defense counsel retained by the primary insurer.
21       And it doesn't get involved in the coverage issues.  In
22       fact, under Tank v. State Farm, it would be wholly
23       inappropriate for retained defense counsel, the Sinars firm,
24       to be injecting itself into the coverage issues, so it's not
25       surprising.
```

Motion Hearing - 6/7/2023

Page 46

1          But my point to you is, the only thing you have in front

2      of you today are three letters between people that have --

3      that are -- none of whom are lawyers from the Sinars firm,

4      and that's not the basis for extending anything about that

5      excess coverage issue as a basis for sanctions to the firm.

6          The last issue is this request at the end of what got

7      filed at seven o'clock this morning that any monetary

8      sanction award be jointly and several against the Sinars

9      firm.  That surfaced for the first time at seven o'clock

10     this morning.

11         THE COURT:  So I'm going to stop you, Mr. Keller, because

12     this is important, but I want to talk about timing here.

13     It's ten after twelve.  I certainly have to let my lower

14     bench go for their lunch break.  We are not done with your

15     argument nor has Mr. Cochran had an opportunity to have a

16     reply.  And perhaps most importantly, I'm going to need to

17     go have everyone deliberately go through the Burnet factors,

18     which is required if -- for any consideration of a motion

19     for default for discovery violations.

20         And so I want to give folks some time to prepare.  You

21     know, it's been done in the -- by implication that the

22     legal -- the briefings on this does address the three

23     prongs, but I want it to be clear and I want it to be on the

24     record that we are doing that.  And so all of these things

25     need to occur.  And I don't know scheduling-wise, I want to

Motion Hearing - 6/7/2023

Page 47

1    give my lower bench their hour break.

2        Ms. Salle, what do I have going on?

3        Nothing.

4        Okay, great.

5        So are you folks available to come back at 1:15 to finish

6    this up?  Will that work for everyone?

7        MR. COCHRAN:  Yes.

8        THE COURT:  Great.  Thank you, everyone.

9        MS. REYNOLDS:  Yes, Your Honor.

10       THE COURT:  I have to give my bench their break.  And

11   we'll see you all at 1:15.  Have a good lunch.

12       Mr. Keller, when we return, we'll be returning to you

13   directly to finish your third argument.

14       Thank you --

15       MR. KELLER:  Thank you.

16       THE COURT:  -- everyone for your hard work so far.

17       MR. KELLER:  Thank you.

18              (Lunch recess)

19       THE BAILIFF:  The courtroom is live.

20       THE COURT:  All right, welcome back, everyone.

21       Okay.  Before I turn it over to Mr. Keller -- of course,

22   we're back on the record.  This is Vandivere v. Vertical

23   World, Cause No. 19-2-27385-2 SEA.

24       Before I turn it back over to Mr. Keller, I just wanted

25   to -- in case anyone was going nuts trying to find that

Motion Hearing - 6/7/2023

Page 48

1        case, I figured out that John Ru- -- Judge Ruhl, the

2        order -- the case I was thinking of was the same case.  It

3        was J.K. v. Bellevue School District, but it happened to

4        have been Judge Keenan was the trial judge, so the opinion

5        had his -- him as the judge, but Judge Ruhl must have worked

6        on the case before since he was the one that did the order

7        granting the Motion for Sanctions and did the 38-page

8        findings.  So in case you were confused about that, it is

9        the same case.  All right.

10        All right, folks.  Mr. Keller, you were on your -- I think

11       your third point you were wanting to make?

12        MR. KELLER:  I just want to apologize to Ms. Pradhan.  The

13       Judge gave you a head fake there and that's why you couldn't

14       find the case.  She was searching on the internet by Judge

15       Ruhl.

16        THE COURT:  Yeah, so sorry.  I was, like, I know I'm -- I

17       just remembered it was Judge Ruhl and he did the order.  So

18       I must have -- just like this case, he did all the workup

19       and then it got transferred to a trial judge.  And Judge

20       Keenan, of course, was the counsel -- I'm sorry, the judge

21       that presided over the trial.

22        Sorry, Ms. Pradhan.  Another rabbit hole for you.

23        Okay.

24        MR. KELLER:  Judge, returning to my last point here, which

25       was that literally at seven o'clock this morning is the

Motion Hearing - 6/7/2023

Page 49

1       first time that any request was made for any kind of a

2       sanction against the Sinars firm or Mr. Furman.  I'll call

3       them the attorneys.

4          THE COURT:  Sure.

5          MR. KELLER:  And it was not in the opening motion that was

6       filed two weeks ago.  There was a extensive supplemental

7       filing that was made on Monday at the end of the day.  It

8       was not in there.  It literally came up at seven o'clock

9       this morning.

10         And, you know, one, that's just not fair.  Two --

11         THE COURT:  Well, let me just say, if you want more time

12      to respond on this issue -- it's an important one and I'm

13      certainly going to give it to you, but I am going to

14      consider it just because I think I have to given the facts

15      here.  So if you want -- if you feel that because it wasn't

16      in the opening brief that you want more time to address

17      specifically the issue with regard to the firm and Mr. --

18      you said it was for joint and several with Mr. Furman and

19      the Sinars firm; is that right?

20         MR. KELLER:  I think that the request that's being made is

21      that any sanction that is imposed against C3 --

22         THE COURT:  Right.

23         MR. KELLER:  -- that the Sinars firm be made jointly and

24      severally liable for it.

25         THE COURT:  Got it.

Motion Hearing - 6/7/2023

Page 50

1        MR. KELLER:  And if Your Honor is going to consider that

2    being rai- -- even though it's been raised at this late

3    time, I am going to want an opportunity and I want to

4    explain why because --

5        THE COURT:  You don't have to explain --

6        MR. KELLER:  -- a very --

7        THE COURT:  -- why.  It's an important issue.  And I'm

8    just going to give you the time, but I am here to tell you

9    that it is -- just the fact that it's late isn't going to

10   make me, you know, strike it or not consider it.  Everything

11   that's been happening in the past ten days in this case,

12   frankly, is happening in real time quickly -- depositions,

13   orders.  And so the tardiness of it, as you perceive it,

14   isn't going to, you know, negate my consideration.

15       And so you -- I'm going to ask you, you know, how much

16   time do you think you need?

17       MR. KELLER:  Yeah.  I would like a week, Your Honor,

18   because -- and I want to explain why.

19       THE COURT:  Sure.

20       MR. KELLER:  It's not an idle (inaudible).  When a claim

21   is actually being made against the attorney, a different set

22   of rules apply regarding the extent to which the attorney is

23   or is not obligated to follow the former client's directive

24   regarding the privilege.  An attorney has a right under the

25   Rules of Professional Conduct, if it's necessary for them to

Motion Hearing - 6/7/2023

Page 51

1    do so, to make certain disclosures.

2      And so I'm going to be -- I'm going to need to be able to

3    run that to the ground, especially since the -- there's some

4    effort to bring the attorneys into this issue of the late

5    disclosure of the excess policy rescission issue.  You know,

6    if you're going to consider that, even though there's no

7    evidence in front of you about if or when the attorneys were

8    aware of it, the Sinars firm attorneys, then I have to

9    really give serious thought to what disclosures we need to

10   make to you to address that situation and the privilege

11   issues vis-à-vis their former client.

12     So that's my thinking on it and so I don't want you to

13   think I'm just dog paddling here --

14   THE COURT:  No.

15   MR. KELLER:  -- to get another --

16   THE COURT:  No, I don't think you're dog paddling.  These

17   are important issues and they need to be thoroughly briefed.

18     Alrighty, so I just want --

19   MR. KELLER:  So I want --

20   THE COURT:  -- to make sure that --

21   MR. KELLER:  So I want --

22   THE COURT:  -- I understand.  So your -- the potential

23   issue may be that even though there is correspondence, I

24   think in January -- January 23rd or January 26th from the

25   insurance carrier to C3, your issue is that it may be

Motion Hearing - 6/7/2023

Page 52

1      privileged?

2        MR. KELLER:  No, no.  The question is, if you're thinking

3      about imposing a sanction for which --

4        THE COURT:  Right.

5        MR. KELLER:  -- the Sinars firm would be jointly and

6      severally liable --

7        THE COURT:  Right.

8        MR. KELLER:  -- related to the late disclosure --

9        THE COURT:  Right.

10       MR. KELLER:  -- of the excess coverage issue --

11       THE COURT:  Right.

12       MR. KELLER:  -- that brings into focus the question of

13     what did the Sinars attorneys know and when did they know

14     it, that there were issues that had happened with respect to

15     the excess insur- -- because on the evidence in front of you

16     right now, there's nothing to suggest that they were aware

17     of that.

18       THE COURT:  I understand.  I understand.

19       MR. KELLER:  Because -- and the point I tried to make

20     before is:  And that's not surprising because as retained

21     defense counsel, they can't ethically get involved in the

22     coverage issues.

23       THE COURT:  Right.

24       MR. KELLER:  Okay.

25       THE COURT:  Okay.

Motion Hearing - 6/7/2023

Page 53

1     MR. KELLER:  So --

2     THE COURT:  Understood.

3     MR. KELLER:  All right.  So in light of some of the

4     comments that Your Honor has made and since this is my last

5     opportunity to talk, I do want to address Burnet --

6     THE COURT:  Sure.

7     MR. KELLER:  -- a little bit.  And when it comes -- you

8     know, again, when it comes to the insurance disclosure

9     issue, our position is that no sanction is warranted against

10     the Sinar firm or any of its attorneys because you have

11     nothing in front of you that would warrant it that tells you

12     what, if anything, they knew about that whole issue and

13     when, okay?

14     So when it comes to this issue of Interrogatory No. 7,

15     that interrogatory asks for the dates and locations of

16     meetings.  The dates and locations of each of Mr. Furman's

17     visits came out as a result of two things:  One, in early

18     May when codefendant, Vertical World, served its ER 904

19     documents and it produced that internal ledger that shows

20     every date he was there.  And then the only other missing

21     item there was the fact that he had been on a visit on

22     April 1 to the Redmond facility to do some bouldering and

23     that came out at his deposition.

24     So we would submit that if any -- if the Court is inclined

25     to impose any sanction, and we submit it's not, because the

Motion Hearing - 6/7/2023

Page 54

1    issue really of his visits is quite tangential to the

2    central issues in this case.

3        And, you know, in Burnet, we -- you were dealing with the

4    meat of the coconut in that case.  The issue was the late

5    disclosure of experts that had to deal with corporate

6    negligence.  And most of the Burnet progeny are dealing with

7    late discovery disclosures or discovery violations that go

8    to the heart of the issues that are involved in the case.

9        And here, if there was a shortcoming, if Your Honor

10   concludes that it should have been disclosed in response to

11   Interrogatory No. 7, what was not disclosed is at best, we

12   submit, tangentially related to what -- the core issues in

13   the case.

14       And this is the point I was trying to make before the

15   break is that the fact that he's there working out, learning

16   what any member of the public who is working out there as a

17   patron would learn, shed no light on the merits of the

18   product liability issues in the case.  So because of that,

19   you're really dealing with a disclosure that had no

20   meaningful impact on the merits of any of the issues that

21   are involved.  So we submit that no sanction is warranted,

22   but if you're going to do anything, it should be limited to

23   what fees were incurred obtaining the information requested

24   by Interrogatory No. 7, which are the dates and locations.

25       And really, the Plaintiffs didn't incur any fees because

Motion Hearing - 6/7/2023

Page 55

1    Mr. Christie produced that document in early May that had

2    it, although I have to be fair, that document did not have a

3    reference, I believe, to the April 2022 visit, which they

4    learned about as a result of taking a 90-minute deposition.

5     So the least factor, if Your Honor is inclined to grant

6    sanctions, which we're arguing against, would be an award of

7    fees for 90 minutes of a deposition and, I guess, the court

8    reporter fees.

9     THE COURT:  Okay.

10    MR. KELLER:  Thank you.  I'm sorry if I took more than my

11    allotted --

12    THE COURT:  No --

13    MR. KELLER:  -- time.

14    THE COURT:  -- no problem.  Thank you.

15     Okay.  I'm just taking some notes here.

16     Okay.  Mr. Cochran?

17    MR. COCHRAN:  Thank you, Your Honor.  One of the things

18    that I admire about my friend, Brad Keller, is that he's

19    forged his skills and his passion in the criminal defense

20    world.  And as Your Honor well knows, that as a criminal

21    defense lawyer sometimes your passion, it supercedes the

22    facts.  And in this case, it's excusable I think with

23    Mr. Keller because he's had so little exposure to the actual

24    litigation.

25     So when he proposes, for example, that there was no

Motion Hearing - 6/7/2023

1    prejudice to the parties by what Mr. Furman and the Sinars

2    firm do -- did, he probably just misapprehends what was at

3    stake because, of course, when the revelation comes forward

4    in late April-early May that Mr. Furman has accessed

5    Vertical World over 30-some-odd times, the situation was

6    that the Plaintiffs were facing off against Vertical World

7    and C3, both of these defendants.

8      One of the primary affirmative defenses by C3

9    Manufacturing was that Vertical World was a learned

10   intermediary who knew better and should have done "this."

11   In fact, C3 Manufacturing had submitted a summary judgment

12   motion saying, "We should get out because Vertical World is

13   completely at fault."

14     One of the things, of course, that we were dealing with as

15   the Plaintiffs was, well, how do we -- how are we combating

16   that?  We've got Vertical World saying "this" and we've got

17   C3 saying "this," and then along comes this bombshell of a

18   revelation, as Mr. Christie has even referenced it, and we

19   as the Plaintiffs are saying, "What?  What on earth?"

20   because C3 has accused Vertical World of being this learned

21   intermediary and responsible.

22     We have been taking the position, "Hey, you guys are in

23   cahoots, right?"  From the very beginning, C3 and Vertical

24   World have been conspiring to change out the auto belay

25   devices, have been -- C3 came in and disclaimed all of its

Motion Hearing - 6/7/2023

1    product warnings, all this stuff.  So as we're looking at

2    it, we think to ourselves, "Well, this is bizarre that Chris

3    Furman would be identified as a trial witness."  We don't

4    understand what are we missing.  Is -- are they going to use

5    Chris Furman to come in and now make -- you know, try to

6    exculpate Vertical World?  Are they going to try to

7    implicate Vertical World with Chris Furman's evidence?  We

8    don't know.

9        We see that Vertical World initially lists Mr. Furman as a

10    witness.  Perhaps they thought to themselves, "Well, weaken,

11    gut C3's defense by putting up Mr. Furman and Mr. Furman

12    will say all of the product warnings in C3's sales materials

13    were nonsense and you knew that, Mr. Naranjo, president of

14    C3."  Perhaps they were going to try to get together and get

15    them both selves out.  We didn't know, but what we did know

16    is that it was bizarre.

17        And when I talked to Mr. Christie afterwards, after this

18    revelation came forward, I said, "This absolutely supports

19    our notion that there was a conspiracy between you, and now

20    you're both going to use Mr. Furman, the long-time attorney

21    for C3, as a witness?"  I don't know whether that resonated

22    or not, but what I do know is that quickly there were

23    settlement discussions by Vertical World.  And we've heard

24    Mr. Christie describe the reasons.

25        One of them was -- one of which was they'd always been

Motion Hearing - 6/7/2023

1       concerned about joint and several liability.  They felt

2       somewhat comfortable by the fact that there was $5 million

3       total in coverage that C3 had always told all of us existed,

4       and that after we all learned that C3 and its attorneys had

5       never supplemented, that 4 million of that 5 million no

6       longer existed because of the rescission, that he was in all

7       sorts of a bind and had to begin negotiations.

8         So when the question is posed:  Well, what's the

9       prejudice?  The prejudice is multiple.  They -- as of May

10      1st or whatever it was when we first get the information,

11      which is roughly 30 days before trial, we're trying to

12      figure out:  What on earth is going on?  Who's -- who

13      sanctioned him going in and accessing Vertical World?  What

14      would he testify if he testified?  Does this -- is this good

15      for us?  Is this bad for us?  And away we go in litigation

16      without -- with very little information.

17        We're not the only one who is prejudiced as we prepared

18      for trial.  Vertical World was prejudiced because they were

19      in the same bizarre bind.  Is this good for us?  Is this

20      horrible for us?  Is this awful for us what we do know?  Is

21      it if we're joint and several, we're going to be in trouble

22      because we are just now all learning that $4 million of the

23      coverage everyone thought was available, no longer exists?

24      C3 certainly knew for months that it had been rescinded but

25      didn't tell us.

Motion Hearing - 6/7/2023

Page 59

1          And, oh by the way, as we're talking about how we're

2          prejudiced and the inability to investigate and the

3          relevance to this product liability case, what we find in

4          the rescission documents is Tokio Marine, the insurer for

5          C3, saying, "You materially misrepresented the fact that

6          there was this product, defective; that there was this

7          product in the trial recall; and that it was this product in

8          the trial that caused over a dozen injury events."

9        So when C3 this morning says, "Your Honor, there's nothing

10         withheld and it's irrelevant.  This case is about a product

11         defect and we have serious issues about whether there was a

12         product defect," Your Honor, everything about the

13         documents -- by the way, which we still don't have, these

14         rescission documents, everything about it is evidence in

15         this case where this product is the defective product

16         central to the case.

17        Why?  Because it was conc- -- because C3 concealed it from

18         its own insurance company in making an application for it.

19         It is a pattern of concealment that we see over and over

20         again by C3.  It is the product that caused this injury.

21        And yet, as Your Honor has pointed out, in here we had

22         Request for Production 29, 30, 31 and in the second set 5

23         and 36, all of which are asking about documents that reflect

24         whether there was a defect.  These clearly did.  They were

25         never disclosed.  They were never put out a privilege on.

Motion Hearing - 6/7/2023

Page 60

1      Nothing.  And yet, it's all evidence that we should still --

2      you know, if we have to, that are -- would be relevant

3      evidence compelling evidence in a trial on liability.  And

4      all of it has been withheld, so those are some of those

5      issues.

6        I want to touch on a couple of misstatements by Mr. Keller

7      for us to keep in mind, particularly with Mr. Furman and the

8      Sinars firm.  While he tries to claim that the first time

9      anyone ever thought about the fact that Sinars and

10     Mr. Furman might be liable for sanctions was this morning,

11     it's incorrect.  This proceeding has been out there since

12     May 24th and the entire time C3, Vertical World, and the

13     Plaintiffs have all discussed the fact that Mr. Furman and

14     Sinars' conduct was at the center of a very serious

15     discovery concern, and that was accessing Vertical World.

16       So Mr. Keller's appearance is not just happenstance.  He's

17     probably been hired by the E&O carrier for Sinars to come in

18     and defend.  But most importantly, even by June 5, which is

19     at least a couple days ago, in our concluding reply, we're

20     saying the questions presently before the Court are:  What

21     relief can the Court fashion which will help deter similar

22     conduct by C3 and its former attorneys in the future?

23       That's just one of the times, but C3 from the beginning

24     was saying, "Many of these issues are not all our fault.

25     It's the attorneys.  And we didn't even know that the

Motion Hearing - 6/7/2023

Page 61

1    attorneys were accessing Vertical World."

2    Not only that, there was a representation made by the --

3    by Mr. Keller that there was just this one time that there

4    was a side-eyed glance that caused Mr. Furman to disclose

5    this.  That's not the evidence.  If we look at page 48 of

6    Mr. Furman's deposition, he testifies that there were a

7    handful of times where he understood that he was being

8    side-eyed or observed by people at Vertical World.  It was a

9    handful of times, not just one time.

10    And by the way, in the testimony of Mr. Furman, he notes

11    that he has run this by, the fact that he's accessing

12    Vertical World, with not one partner but two, Mr. Lemmon and

13    Mr. Hicks.  The Sinars law firm knew about it.  It strains

14    credulity that this was anything other than an effort to

15    make observations about the patterns and practices within

16    Vertical World.

17    There's this notion that there's no work product.  Well,

18    it doesn't take photographs or videotapes or anything else

19    to be work product.  Every observation that Mr. Furman made

20    while he's there over 30 times in the several months leading

21    up to trial are all part of a strategic advantage to C3 and

22    a disadvantage to both Vertical World and to Plaintiffs.

23    The only reason this came to light is because Mr. Furman

24    felt that he'd been caught on a handful of times.  And it

25    was then and only then that he made the disclosure.  And if

Motion Hearing - 6/7/2023

Page 62

1       he didn't truly feel that he hadn't been doing anything

2       wrong, then why did he feel like he was caught by people

3       making observations?  The only answer is that he knew that

4       he was doing something wrong.  Mr. Hicks knew that they were

5       doing something wrong.  Mr. Lemmon knew they were doing

6       something wrong.

7          And as lawyers we're all trained that if you're going to

8       do anything, you err on the side of caution.  And if there

9       was even the slightest question about whether it made sense,

10      whether it was unethical, whether it was an unfair advantage

11      or disadvantage, then C3 and its attorneys -- C3's

12      attorneys, Sinars firm -- all of them, should have notified

13      their codefendant's counsel, Mr. Christie and Ms. Trivett.

14      There's no explanation for why they didn't notify them if

15      they felt like they'd done nothing wrong.  Because if you

16      truly feel that you didn't do anything wrong, you would let

17      them know out of an abundance of caution, but they didn't.

18      They were trying to get away with something.  They got

19      caught.  And only after he felt that he got caught, did he

20      make the revelation.  That's the only reason that we know

21      this information.

22          And I want to go back on timing because Mr. Keller

23      suggests that, gosh, from the beginning, you know,

24      Mr. Furman felt that it was okay to be a member because the

25      case was going to go out with Scott Wood.  That's not the

Motion Hearing - 6/7/2023

Page 63

1        evidence.  In fact, if we look at the declaration that

2        Mr. Hicks, Jim Hicks, has submitted, he states that Scott

3        Wood was take -- Scott Wood, who was the lead attorney on

4        the C3 case, was taking steps to leave the firm, but Scott

5        Wood, I submit to you, never told anybody at the Sinars firm

6        that he was leaving in February or March.  That's not how it

7        works when partners are leaving their law firms.

8          The only thing that Mr. Hicks testifies about under oath,

9        that it was late April that Mr. Wood disclosed that he was

10       leaving and that he was taking clients.  But what we know in

11       late April is that he could not have said, "I'm taking C3."

12       Why?  Because he knew then that he was going to Gordon Rees

13       and Gordon Rees is the law firm that was representing Tokio

14       Marine rescinding the $4 million policy on the basis that C3

15       had made material misrepresentations.

16          So to the extent that there's a representation that

17       Mr. Furman was relying on Scott Wood taking the case out and

18       that he would take C3 out, that is a falsehood.  And it

19       doesn't take much but a close look at Mr. Hicks' declaration

20       and Mr. Furman's testimony to disprove that fact.

21          So the Court is asked about -- I mean, there's been plenty

22       of discussion about what are the specific discovery

23       requests.  The Court has noted that Interrogatory No. 7 and

24       the sec- -- in the second set which we issued in July of

25       2022 about the dates and locations of which the attorneys

Motion Hearing - 6/7/2023

1     from C3 and agents of C3 have made contact with Vertical

2     World, that was never responded to.  It was misrepresented

3     when they responded in August of 2022, and it was never

4     supplemented despite Mr. Lemmon knowing, Mr. Hicks knowing,

5     and certainly Mr. Furman having access to Vertical World

6     without identifying the information.

7        Then we've got the insurance information.  We have

8     Interrogatories 3 and 4 plus Requests for Production 1, 2,

9     3, 4, and 31.  We asked the question:  What insurance

10    policies were operative?  They told us about the $1 million

11    Great American.  They told everyone about the $4 million

12    Tokio Marine, and what they never did, despite months of

13    knowing, was that Tokio Marine had rescinded that policy.

14    That's the information that Mr. Christie very diligently

15    walked through as of importance to his client in making a

16    determination about whether they were going to invest

17    hundreds of thousands in defending their client over the

18    last four or five months.  When we talk about prejudice,

19    that's certainly a huge aspect of this.

20       And again, as we talk about -- as we hear C3 this morning

21    say the central issue is the product defect, this Perfect

22    Descent auto belay device, it, of course, underscores the

23    fact that these documents, which we have now seen in

24    briefing but have not received -- none of us have received

25    them -- show that C3 and its president has materially

Motion Hearing - 6/7/2023

Page 65

1    misrepresented the existence of a product defect.  I submit

2    to you, similar to what they're doing in this courtroom by

3    saying there's no defect, and if there was a defect, it

4    didn't cause anything.  Well, that's exactly why Tokio

5    Marine rescinded this policy.  We've asked for those

6    materials in Requests for Production 29, 30, 31, and then in

7    the second set Requests for Production 5 and 36.

8      THE COURT:  Mr. Cochran, on the --

9      MR. COCHRAN:  So the --

10     THE COURT:  I'm sorry, let me just stop you.  I want to

11   make sure I -- so going backwards to the discovery, you --

12   Interrogatory No. 7, that was in the second set, Plaintiff's

13   second set?

14     MR. COCHRAN:  Yes.  Yes.

15     THE COURT:  And then --

16     MR. COCHRAN:  July 26 of 2022.

17     THE COURT:  July 2022.  And then the next category,

18   Interrogatory 3, 4, and RFP 1, 2, 3, 4, and 31, is that also

19   in Plaintiff's and is also the second set?

20     MR. COCHRAN:  That's the first set.

21     THE COURT:  First set.

22     MR. COCHRAN:  And Mr. Ulmer will correct me if I'm wrong,

23   but I believe that that's the very first set.

24     THE COURT:  Yeah, Mr. Ulmer?  Yeah?

25     MR. ULMER:  Yeah, I'm sorry.  Which ones were those, Your

Motion Hearing - 6/7/2023

Page 66

1      Honor?

2       THE COURT:  Interrogatory 3, 4 --

3       MR. COCHRAN:  The insurance questions.

4       THE COURT:  -- and this is all the insurance, and RFP 1,

5      2, 3, 4, and 31?

6       MR. ULMER:  Yeah, that's the insurance-related requests,

7      requests regarding complaints of the product.  Those stem

8      from our first set.

9       THE COURT:  And that was -- let's see.  The second set was

10     July 2021.  The first set was?

11      MR. COCHRAN:  Second set was July of 2022.

12      THE COURT:  Oh, 2022.  Sorry.

13      The first set was?

14      MR. ULMER:  I'm pulling that for Your Honor --

15      THE COURT:  Okay.

16      MR. ULMER:  -- right now.

17      THE COURT:  You can just let me know when we get to a

18     break.  No problem.

19      And then now, Mr. --

20      MR. ULMER:  (Inaudible) 2021.

21      THE COURT:  That was October 2021?

22      MR. ULMER:  No, I believe --

23      THE COURT:  Oh, okay.

24      MR. ULMER:  -- those were served May of 2021.

25      THE COURT:  Okay.

Motion Hearing - 6/7/2023

Page 67

1        MR. ULMER:  I --

2        MR. COCHRAN:  The first set.

3        THE COURT:  That's the first set, okay.  And then you were

4    going on to a new series, Mr. Cochran.  You started out with

5    RFP and then that's when I stopped to ask the question

6    about --

7        MR. COCHRAN:  Sure.

8        THE COURT:  -- timeliness.

9        MR. ULMER:  Right.

10        MR. COCHRAN:  So as to the defect itself, the product

11    defect, the communications about the product defect, we have

12    Requests for Production 29, 30, 31 in the first set to C3.

13    And then in the second set, Requests for Production 5 and

14    36.

15        THE COURT:  Okay, thank you.

16        MR. COCHRAN:  Again -- yes.  So there was a little bit

17    about the issue that I just want to address quickly on the

18    authority to bind attorneys and their clients.  First of

19    all, I want to make sure that I make clear that C3 is

20    clearly on its own responsible, at least in part, for not

21    having produced the insurance information, not having

22    supplemented the insurance information, and not having

23    produced the documents that show it was accused by Tokio

24    Marine of having materially misrepresented the product

25    defect, its injury events, all of that.  They clearly knew

Motion Hearing - 6/7/2023

Page 68

1      that information, clearly did not provide it, and so did its

2      attorneys who had this information.

3       So as to the authority to bind, of course, that's replete

4      through the law, right?  For example, RCW 2.44.010, I think,

5      is the authority for attorneys to bind on a CR 2A agreement.

6      You're just -- or whatever the attorney says, it binds you.

7      We know that there's an entire body of case law about

8      opening statements where if your lawyer makes a statement in

9      opening -- an opening statement, that you are bound by it.

10     It has even been held to have resulted in a directed verdict

11     immediately after opening statements.

12      We can go and -- you know, when Mr. Keller provides some

13     more information in a week or so or whenever he wants, we'll

14     supplement with all the cases that show a joint and several

15     component to sanctions when both parties' actions are

16     implicated.  So we'll be happy to do that, but that's not a

17     question on this one.

18      So as to the Burnet factors -- and, Your Honor, you

19     probably have seen the order that Judge Ruhl painstakingly

20     crafted, which is a wonderful --

21     THE COURT:  Right here.

22     MR. COCHRAN:  -- road map for us, right?  But, of course,

23     as he says on page 29 of his order that "CR 37 sets forth

24     applicable rules regarding sanctions when a party fails to

25     make discovery," and, importantly, says, "CR 37(b)

Motion Hearing - 6/7/2023

Page 69

1       authorizes a court to impose sanctions which range from

2       exclusion of evidence to granting default judgment when a

3       party fails to respond to interrogatories and requests for

4       production" which, of course, we have.

5         And most compellingly, I think in this case, is that we

6       fought and fought and fought to get our trial date.  Judge

7       Shaffer, who granted several trial continuances, said, "This

8       is it.  This June 8th, 2023, day is it.  Nobody is going to

9       make, you know, any argument to get out of this, that it's

10      got to go and, in part, it's got to go because the

11      Plaintiffs need to resolve this case, the parties need to

12      resolve this case."  And yet here we have -- and by any

13      objective person's perspective, revelations that are, if not

14      shocking, monumental and momentous in terms of trial

15      preparation.  So that's the significance of that under the

16      Burnet factors.

17        And, of course, we're considering what's the right remedy

18      on this thing.  And if we show that the discovery violation

19      was willful or deliberate, that the violations substantially

20      prejudice the opponent's ability to prepare for trial, that

21      we have our basis then for the range -- the full range of

22      sanctions including default judgment.

23        In this case, for example, if we were to look at, is there

24      a curative instruction or a -- or something?  There's not.

25      There's not on a number of these issues.  And again, we're

Motion Hearing - 6/7/2023

Page  70

1       not just talking about one isolated issue.  We're talking

2       about a number of issues that all seem to combine to cause

3       such a problem.  So that's -- that again is supportive of

4       the most severe sanction; in this case, the default

5       sanction.

6         By the way, when I'm talking about default, I'm talking

7       about still preserving C3's right to contest what the

8       damages are that were caused but striking the other defenses

9       as to the product defect and whether it was causative in the

10      fall.  And those are, as C3 says this morning, those are the

11      central part of the defense and they were also the central

12      part of why Tokio Marine rescinded the contract based on

13      fraud.

14        So was it a willful violation?  Under the law, Magana, for

15      example, not to mention the J.K. case, parties -- it doesn't

16      have to be -- hang on.  So in order for a discovery

17      violation to be willful, it need not be the result of

18      deliberate misconduct, it can be manifest misconduct.

19        So even if we were to view everything that Mr. Furman

20      tries to frame this in as some innocent thing, it certainly

21      wasn't to the parties and it landed hard on Vertical World

22      and the Plaintiffs.  So viewing all the facts on C3's and

23      Sinars' conduct, for that matter, in the continuing pattern

24      of violations that we have tried to set forth for the Court

25      from the beginning or even before C3 was a defendant, it

Motion Hearing - 6/7/2023

Page 71

1    blocked the efforts of the Plaintiffs to prep for trial.

2    They've caused irreparable damage to Vertical World in terms

3    of its preparations, as Mr. Christie will no doubt follow up

4    on.

5        And so we have willful ex parte contact.  Mr. Furman, it

6    wasn't just an innocent thing.  He ran it up the flagpole

7    with Mr. Lemmon and Mr. Hicks.  For whatever reason, they

8    all sanctioned what he was doing.  They have not told the

9    truth about the interrogatory answers, for example,

10    Interrogatory No. 7 about their attorney visiting Vertical

11    World, and there's still no production of the underlying

12    documents which prompted Tokio Marine to rescind the

13    contract, all of which can be used by Plaintiffs as evidence

14    of fraud, fraudulent concealment, lack of truthfulness by

15    C3, and that goes to the product defect and the causative

16    nature of the defect itself.

17        So the question frequently is:  Are we at an investigative

18    disadvantage?  Mr. Keller tries to paint this as just being

19    simply a deposition away from understanding things, and that

20    completely misunderstands the overall impact not only to the

21    Plaintiffs but to Vertical World.  We were all mystified or

22    these two parties and their counsel were mystified as this

23    was revealed in late April.

24        Mr. Furman, by the way, was an attorney representing C3

25    and C3's interests in February, March, and April, so he was

Motion Hearing - 6/7/2023

Page 72

1    gathering evidence, whether he had photographed or not.  He

2    was gathering evidence which could be used against Vertical

3    World and the Plaintiffs.

4        So with that, I will stop there and yield to Mr. Christie

5    to follow up.

6        THE COURT:  Mr. Christie, do you have anything to add?

7        MR. CHRISTIE:  Briefly, Your Honor.  And I want to really

8    reply to Ms. Reynolds' comments, respectfully, and make it

9    really clear to the Court why the withholding of the

10   insurance information and the basis for the rescission

11   changed the landscape so dramatically for my client.

12       So the rescission was based on information that Vertical

13   World, first of all, never had.  That is that Mr. Naranjo

14   had misrepresented to the insurer a history of this product

15   failing and that is intermittent failures where there were

16   unexpected and unanticipated failures on this part of this

17   device to arrest a fall.

18       In other words, a person is trusting this to lean back

19   against this device, have a controlled descent, and the

20   defect was that there would suddenly be moments where the

21   brake would release and the line would run quickly and the

22   person would have an uncontrolled descent.  That is the

23   fundamental basis for the rescission, is that Mr. Naranjo

24   misrepresented that information.

25       And here's where it's key in the framework of the case on

Motion Hearing - 6/7/2023

Page 73

1       one particular theory by Plaintiffs, the one for which they

2       want an order of default.  One of the claims is that the

3       product was defective by reason of an -- it being

4       unreasonably safe and a failure to warn that it could

5       experience these unanticipated rapid failures to arrest,

6       okay?

7         It turns out -- and this was the evidence in our case,

8       that our client, Rich Johnston, not his company, he was a

9       dealer of this product.  So part of Plaintiff's theory was

10      that Vertical World is a product seller and, therefore, has

11      the liability of a product manufacturer on the failure to

12      warn theory that this product is unreasonably dangerous

13      because you didn't warn the end user that it could

14      experience a sudden failure to brake, okay?

15        And so that all became -- that theory had been out there,

16      but when this information was revealed, both the underlying

17      grounds for the rescission, the misrepresentation by the

18      part of Mr. Naranjo, and our potential exposure to that

19      theory, there is no comparative fault on the part of this

20      Plaintiff or any member if a device that they're affixed to

21      suddenly fails because we have no reason to tell them, "Oh,

22      by the way, the device you're hooking up to might

23      spontaneously fail and drop you to the ground."  If we knew

24      that, we would never put that device in service.

25        So we don't have this information that is being disclosed,

Motion Hearing - 6/7/2023

Page 74

1    but now it's out on the table.  And it's a muddy mess.  Are

2    we going to be implicated by what Mr. Naranjo failed to

3    reveal about his product suffering these unanticipated

4    failures to brake?  The exposure to us on that theory, which

5    has no viable defense of comparative fault and, therefore,

6    all the exposure of joint and several liability is combined

7    with the loss of 4 million of the total of 6 million

8    possible coverage:  One by us, 1 million; and 5 million on

9    the part of C3.

10       So does that change the landscape of this case in a way

11    that causes us to immediately approach counsel and

12    immediately aggressively work to settle this case?

13    Absolutely.  If we had known that information in February,

14    this case would have settled exactly the way it did now for

15    the exact same reasons that I just outlined.

16       And then I'll add this last piece with respect to

17    Mr. Furman.  Here and simply, Mr. Furman had no business in

18    our facility given his role in this case.  What hasn't been

19    discussed is that Bret Johnston, one of our principal

20    clients and speaking agent for the company, he's the son of

21    the owner, he owns it as well, he's a manager of a facility

22    that Mr. Furman was in.  It's completely possible that

23    Mr. Furman interacted with him, not just some low-level

24    employee.

25       And what did Mr. Furman get to learn that was critical to

Motion Hearing - 6/7/2023

Page 75

1    this case?  A critical issue in this case for Vertical World

2    was:  What do we do to onboard new members that want to

3    climb?  What is the elements of the belay test?  What

4    warnings are given in the iPad that a new onboarded member

5    has to work through?  And then critically, do we actively

6    supervise someone who is using an auto belay?

7        Our defense is that we do not.  Why?  Because we require

8    everyone that ever uses an auto belay to go through a full

9    belay check.  And so we don't actively hook up a member to

10   an auto belay and make sure their carabiner is closed.

11       The Plaintiffs, of course, are arguing, supported by

12   Mr. Naranjo, in part.  He says two things, but on one

13   version of his truth is he says in an owner manual that

14   owners of the device need to supervise anyone using the auto

15   belay.  And, of course, he testifies in deposition that's

16   our job -- that's our job.

17       Now this has nothing to do with the product spontaneously

18   failing, but this is all part of Plaintiffs' theories

19   against us that are now going to trial.  And we've just had

20   someone in an unauthorized ex parte fashion go in; go

21   through the onboarding process; learn the belay test;

22   actually use the device multiple, multiple times.  How would

23   he use that information at trial?  I don't know how he would

24   use it, but how his partners might use it when it's related

25   to them, I don't know, but that's part of the prejudice

Motion Hearing - 6/7/2023

Page 76

1    here.

2      And then this final element to this, so we identify

3    Mr. Furman as a potential witness because I could

4    cross-examine him and get him to acknowledge that as the

5    attorney for C3, he went into our facility, he used the auto

6    belay, he wasn't supervised personally on that, and it's

7    directly contrary to what his own client is telling him and

8    that he did it safely.

9      Well, I'm on a knife's edge because if I reveal that, the

10   first thing skilled counsel on the other side is going to

11   say is, "Wait a minute, what kind of conspiracy is going on

12   here?  Now you've got someone from C3 going in and getting

13   insider knowledge."  I mean, I just don't know how that is

14   all going to play out at trial.

15     But I do know one thing, as an experienced trial lawyer,

16   if you're representing a client in front of a jury and you

17   have an innocent victim that is going to claim that a

18   product suddenly failed and drop him to the ground and

19   there's evidence on one party's part, the manufacturer, that

20   he misrepresented that publically, including to the

21   insurance company, and we happen to be linked with selling

22   those products, that is a bad scenario for a defendant to be

23   in.

24     You combine all those and that's why, frankly to our

25   client's good fortune, we were able to negotiate and close

Motion Hearing - 6/7/2023

Page 77

1       out this case.  We could have done that in February.

2        So I'm not in a position of asking for an order of

3       default.  I'm asking for a lesser sanction.  I want what is

4       fundamentally fair.  And that is, I want our client to be

5       reimbursed, and I haven't put forward figures.  We propose

6       an order that there would be a followup hearing on that for

7       the -- all the litigation expenses associated with having

8       litigated this case aggressively since this information

9       should properly have been disclosed.

10       And with that, I'll close out, Your Honor.  Thank you very

11       much.

12       THE COURT:  Okay.  Thank you, Mr. Christie.  Thank you,

13       everyone.

14       Mr. Keller, I don't -- you said you wanted a week to

15       address the issues that you previously discussed, and so

16       that's fine.  Today is the 7th.  And so a week from today,

17       of course, will be the 14th, so close of business by the

18       14th.

19       And, Mr. Cochran -- and I don't know, Mr. Christie, if

20       whether you'd be leaving this or not -- but what do you

21       think you need to respond by?

22       MR. COCHRAN:  Probably not a whole -- much more time, but

23       what's interesting is Mr. Keller has proposed that he's

24       going to produce information to the Court about when the

25       Sinars lawyers knew on the insurance issue about whether

Motion Hearing - 6/7/2023

Page 78

1    there had been a rescission.  The Court, Mr. Christie, and I

2    are all in the position of relying on whatever the Sinars

3    firm is going to say to be whatever it is.

4      I feel horribly uncomfortable about that, as I would have

5    if they would have said, "Oh, just rely on us to tell --

6    let's have Mr. Furman tell the Court what he did or didn't

7    do."  So I'm a little bit at a disadvantage because I'm not

8    exactly sure what Mr. Keller is proposing he's going to

9    produce.

10      MR. KELLER:  And just so I can be clear, Your Honor.  I

11   wasn't saying that I was, in fact, going to do that.  What I

12   was saying was I need to fundamentally reevaluate the

13   calculus because -- and then this really only has to do with

14   the insurance interrog- -- discovery response issue because

15   a request is being made that a sanction be imposed against

16   the Sinars firm regarding that issue, but the current state

17   of the evidence that Your Honor has is there is no evidence

18   that's been put before you as to when or if anyone at Sinars

19   ever even knew that any of that, had it occurred, with

20   respect to the excess coverage issue.

21      And the reason why I asked for more time is because now

22   that a claim is going to be allowed directly against the

23   Sinars firm, it is a different lens that I have to advise my

24   clients about their obligations regarding the privilege.

25   They have much more latitude to make disclosures about that

Motion Hearing - 6/7/2023

Page 79

1    if they are so inclined.  So I'm really asking for that week

2    more so I can run that whole issue to ground and find out

3    because I know that Mr. Furman didn't know anything about

4    this issue, but I haven't gone and looked to see if -- I --

5    anything -- what the status is of that as regarding others

6    at the firm.

7        THE COURT:  I can --

8        MR. KELLER:  And --

9        THE COURT:  -- just tell you from my experience.  Take it

10   for what it's worth, 20 years -- 22 years practicing before

11   I became a judge and then 10 on the bench, that it would

12   be -- I can't really wrap my head around a situation where

13   the law firm wouldn't know if there had been a rescission of

14   excess coverage.  I just -- I mean, I suppose anything is

15   possible and I'm not prejudging anything, but that would be

16   really counter to my experience, both as a lawyer --

17       MR. KELLER:  Yeah.

18       THE COURT:  -- and as a judge, but I understand what

19   you're --

20       MR. KELLER:  I --

21       THE COURT:  -- saying and I --

22       MR. KELLER:  I --

23       THE COURT:  -- understand the importance of it, so -- but

24   I also understand Mr. Cochran's concern about well, I

25   don't -- you know, like, what are we going to get?  We're

Motion Hearing - 6/7/2023

Page 80

1      going to get a declaration from Mr. Wood, "You know, hey, I

2      didn't know anything."  I mean, that's not really going to

3      help.

4       Why don't we wait until we hear -- where we get

5      Mr. Keller's briefing and then it may be that discovery is

6      warranted on this issue about notice.  I don't know how it's

7      going to shake out, but I think that we're kind of past the

8      point of just taking the word of anyone on this really

9      important issue.  And so let's just wait and see what your

10      briefing looks like, Mr. Keller, and then we can figure out

11      a solution.  I'll -- we'll send out an email.  I don't know.

12      We'll figure it out.

13       We're going to be in touch long before next Wednesday,

14      anyway, on other matters, but will that work?

15      MR. KELLER:  And I --

16      THE COURT:  I'm not sure what else to do right now.

17      MR. KELLER:  I appreciate your sharing with me Your

18      Honor's, you know, reaction and impression from 22 years of

19      private practice, but we know here that we had completely

20      separate independent law firms dealing with the coverage --

21      THE COURT:  I --

22      MR. KELLER:  -- issues.

23      THE COURT:  -- understand that there was a Denver --

24      MR. KELLER:  And --

25      THE COURT:  -- counsel.  I just --

Motion Hearing - 6/7/2023

Page 81

1      MR. KELLER:  And it --

2      THE COURT:  -- yeah.

3      MR. KELLER:  And what the Sinars firm knew or didn't know

4   is entirely a function of what their coverage counsel or

5   their client chose to tell them because clearly they're not

6   on those communications.

7      THE COURT:  Right.  I understand that.  I understand that.

8   It's just typical that the first thing a client does is, if

9   they hear something quite unfortunate like that, is try to

10   get all their lawyers to put their heads together.

11      Anyway, I'm not prejudging anything, Mr. Keller.  I was

12   just -- my reaction was just -- you know, there's just --

13   there's a lot of history here of different lawyers switching

14   in and out and this is things that you may not know because

15   you came in here very late in the day for a very small

16   pur- -- very, you know, important but small piece, but

17   there's really quite the history that I just learned when I

18   got this case -- whatever two, three week -- I don't even

19   remember how long ago it was, about just the history of

20   various lawyers for C3 entering and exiting and withdrawing

21   and new lawyers and continua- -- and there's just a lot of

22   history here.  And so, you know, who knew what when is

23   certainly relevant but also will need to be not taken at

24   anyone's face value.  That's what I'm saying.

25      All right, everyone.  So I am going to have Ms. Salle

Motion Hearing - 6/7/2023

Page 82

1    excuse our present venire panel.  And I will be -- I have --

2    will be getting back to you on this issue.

3     So, obviously, I can't make a ruling until we have all of

4    the briefing on the issue that you want more time on,

5    Mr. Keller, which I understand.  And so we're not going to

6    be able to quickly re-impanel another venire because I don't

7    know exactly what the -- you know, we need -- we're going to

8    need a time frame for getting a decision on this once I get

9    the additional briefing.

10    And then depending on what that decision is, I'm sure it

11    will change the landscape of pretrial motions and so we'll

12    have to go through those.  And then we'll have a better

13    idea, of course, once I make my ruling on the sanctions

14    issue as to how long the trial will be.  You know,

15    conceivably, the trial might be a lot shorter.  It may not

16    be, but it might be.  And so these are all things that we --

17    I just can't predict quite yet.

18    And so as soon as I get your briefing, Mr. Keller, on

19    Wednesday afternoon, I'll be in touch.  We'll probably end

20    up once you get your briefing, we'll set a teleph- --

21    another hearing like this to discuss what kind of time

22    Plaintiff and/or codefendant need to respond.  And if there

23    are some issues that might require discrete discovery, I

24    don't know.  We'll have to wait and see.

25    Anyone want to add anything else?  I know that we've been

Motion Hearing - 6/7/2023

Page 83

1    on the record for a while and there's been a lot of things

2    discussed.  I just want to make sure that there's nothing

3    that folks want to address right now before we part ways.

4        MR. COCHRAN:  Not from Plaintiffs.

5        MR. CHRISTIE:  Not from Vertical World, Your Honor.  Thank

6    you.

7        THE COURT:  Mr. Keller?

8        MR. KELLER:  Well, Your Honor, I'd like to just comment a

9    little bit on some of the things that were said in the

10   reply, but I'll be very, very brief.

11       I listened really, really carefully when Mr. Cochran tried

12   to articulate what prejudice there was to the Plaintiff as a

13   result of Mr. Furman's visits to the gym and the issues

14   involving the response to Interrogatory No. 7.  And the only

15   thing that I heard was "We thought they were in cahoots,

16   these two defendants.  And when we saw him listed as a

17   witness, not by C3 but by Vertical World, that seemed to

18   confirm in our mind that they were in cahoots."  But then

19   you heard Mr. Christie say, "We didn't even know that

20   Mr. Furman was visiting our gym.  We don't even want him

21   there."  And that had nothing to do with anything involving

22   cooperation.

23       So I come back to:  How would the shape of the table be

24   different today if Interrogatory No. 7 had been answered

25   with the dates and times of his visits to the gym as a

Motion Hearing - 6/7/2023

Page 84

1    patron regarding the Plaintiffs?  And there is nothing.

2     And then with regard to Mr. Christie, he says, "He has no

3    business being there in our facility."  He may --

4    Mr. Christie is entitled to feel that way, his clients are

5    entitled to feel that way, but when you read our opposition,

6    you will see how some other trial courts have dealt with

7    corporate defendants' efforts to exclude adverse lawyers

8    from their premises just because they're adverse lawyers,

9    and including the comments of one very prominent Delaware

10   trial judge who called it the stupidest thing she had every

11   heard of.  You don't have -- under Wright --

12     THE COURT:  Well, if you're talking about not -- you know,

13   I -- and I will read everything.  I haven't yet.  But if

14   you're talking about cases where -- and I've read articles

15   about this where lawyers representing a client and they get

16   mad with a promotion -- with a promoter and they won't let

17   him go to concerts there or they won't let them, you know,

18   shop in their store because they -- you know, in retaliation

19   for who they represent, that --

20     MR. KELLER:  You're --

21     THE COURT:  -- would appear to me to be different than a

22   situation where the product at issue is something that the

23   person, the attorney, is actually going to be using,

24   touching, and having firsthand information about.  It's not

25   just, you know, recalcitrance, "We don't like your client.

Motion Hearing - 6/7/2023

Page 85

1   He sued us.  And so guess what, lawyer?  You don't get to

2   come to our" whatever -- big rock concert or whatever it is.

3   That's how I've seen that --

4    MR. KELLER:  Clearly --

5    THE COURT:  -- play out.

6    MR. KELLER:  Clearly, it is different.  The question is:

7   Is it different in a way that is significant regarding the

8   sanctions issue?  And this gets you back to Wright v. Group

9   Health.

10   THE COURT:  Sure.

11    MR. KELLER:  This is not the evidence, but he, under

12   Wright v. Group Health, had the absolute right and ability

13   to go there wearing an attorney hat and doing an

14   investigation and talking to non-managing agents and

15   speaking agents.  He has the ability to do that.  So that's

16   not what he was doing there, but clearly his doing so does

17   not violate any rules of ethics regarding a represented

18   party.

19    So then the question becomes:  Okay, if you're not running

20   afoul of that, what is the issue?  And that gets us back to

21   Interrogatory No. 7 --

22    MR. CHRISTIE:  Ugh.

23    MR. KELLER:  -- okay?  And --

24    MR. COCHRAN:  But we're not going to have a run -- we're

25   not going to have --

Motion Hearing - 6/7/2023

Page 86

1        MR. KELLER:  -- the only other thing --

2        MR. COCHRAN:  -- (inaudible) runoff --

3        THE COURT:  Hang on, hang on.

4        MR. KELLER:  -- that Mr. Christie --

5        MR. COCHRAN:  -- right?

6        THE COURT:  Mr. Keller --

7        MR. KELLER:  Mr. Christie says --

8        THE COURT: -- one more minute.

9        MR. KELLER:  -- that this guy --

10       THE COURT:  Mr. -- finish what you were going to say and

11       then Mr. Cochran respond.  Go ahead.

12       MR. KELLER:  Mr. Christie says that this guy Johnston is a

13       manager and he might have been there at the facility.  I

14       don't know whether he was or wasn't, but we know that there

15       was no communications about the substance of the issues in

16       the case, because had there been, presumably Mr. Christie

17       would have put in a declaration from this individual.  And

18       when you -- and you see the deposition of Mr. Furman, you'll

19       see all his dealings was with the staff.

20        So I come back to -- because it goes as to whether it's

21       sanctionable, and if so, what the sanction ought to be.

22       Is -- what is it that was done wrong here?  And if it's the

23       response to Interrogatory No. 7, what would be different?

24        MR. COCHRAN:  Yeah, and so I'll surreply on this one.

25       It's the combination of all three things being launched at

Motion Hearing - 6/7/2023

Page 87

1        us four weeks before trial.  They violated the discovery

2        responsibility to, one, provide a truthful answer back in

3        August of 2022 to Interrogatory No. 7 and then to supplement

4        the fact that they were engaged in accessing their

5        codefendant against whom they have got a dispositive

6        affirmative defense more than 30 times in the lead-up to

7        trial.  They didn't do that.

8          Now take that in conjunction with the fact that there was

9        a rescission of insurance, which I dare anyone from the

10       Sinars firm to say they didn't know about.  We're going to

11       find out and we'll cross the Rubicon about whether we need

12       more discovery on this, but I submit that they did know it

13       and in combination these things change the landscape, as

14       Mr. Christie says, and caused us all kinds of extra costs

15       and problems.

16         We still, by the way, are subject to the C3 affirmative

17       defense that it's all Vertical World's fault.  So we are

18       still under prejudice.  We still don't have the documents.

19       We still don't have evidence that we would love to have to

20       show the jury that there was willful concealment by C3 of

21       the information about the rescission.

22         And again, this is information that I look forward to

23       someone from the Sinars firm testifying under oath that they

24       did not know in January, February, March, and April of 2023,

25       if not earlier.

Motion Hearing - 6/7/2023

Page 88

1        THE COURT:  All right, folks.  We'll be in touch.  I will

2    wait to hear from -- or wait to see briefing from you,

3    Mr. Keller, close of business on the 13th -- I'm so sorry,

4    the 14th.  Today is the 7th -- the 14th, thank you.

5        And we'll be -- I'm sure we'll end up scheduling something

6    on the 15th.  So I don't know how long your briefing will

7    take me to read, so let's -- we'll schedule time to all

8    discuss the next steps, but I need to first see what the

9    body of the briefing is as to know -- and to be able to

10   review the whole thing and then we'll set a time.  It will

11   be that week, I promise you, to figure out next steps going

12   forward.

13       Thank you for all of the excellent briefing on this

14   complicated issue and we'll get it resolved.

15       Thank you, everyone.

16       MR. COCHRAN:  Thank you, Your Honor.

17       MR. KELLER:  Thank you.

18       MR. CHRISTIE:  Thank you, Your Honor.

19                (Conclusion of hearing)

20

21

22

23

24

25

Motion Hearing - 6/7/2023

Page 89

1                    C E R T I F I C A T E

2

3      STATE OF WASHINGTON        )

4                          )

5      COUNTY OF KING           )

6           I, the undersigned, do hereby certify under penalty

7      of perjury that the foregoing court proceedings or legal

8      recordings were transcribed under my direction as a certified

9      transcriptionist; and that the transcript is true and accurate to

10     the best of my knowledge and ability, including changes, if any,

11     made by the trial judge reviewing the transcript; that I received

12     the electronic recording in the proprietary court format; that I

13     am not a relative or employee of any attorney or counsel employed

14     by the parties hereto, nor financially interested in its outcome.

15

16          IN WITNESS WHEREOF, I have hereunto set my hand this 22nd

17     day of June, 2022.

18

19

20     _____

21     s/ Bonnie Reed, CET

22

# EXHIBIT 6

Page 1

THE IN SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

MICHAEL VANDIVERE and KATHRYN   )
SNOW VANDIVERE, husband wife    )
and their martial community,    )
and KATHRYN SNOW VANDIVERE, as  )  No. 19-2-27385-2 SEA
the legal guardian of W.V., a   )
minor,                          )
                                )
            Plaintiffs,         )
                                )
    v.                          )
                                )
VERTICAL WORLD, INC., a         )
Washington State Corporation;   )
C3 MANUFACTURING, LLC, a        )
Colorado Company,               )
            Defendants.         )
                                )

PRETRIAL HEARING

(Via Zoom)

The Honorable Suzanne Parisien Presiding

June 14, 2023

Transcribed by:    Jennifer A.P. Albino, CET

Pretrial Hearing - 6/14/2023

1                    A P P E A R A N C E S

2                (All Parties Appeared Via Zoom)

3

4        On Behalf of Plaintiffs:

5        DARRELL L. COCHRAN
         ANDREW STEPHEN ULMER
6        Pfau Cochran Vertetis Amala PLLC
         909 A Street, Suite 700
7        Tacoma, Washington 98402-4413

8

9        On Behalf of Defendant Vertical World, Inc.:
         ROBERT L. CHRISTIE
10       JOHN WELLINGTON TSUJI BARRY
         Christie Law Group, PLLC
11       2100 Westlake Avenue North, Suite 206
         Seattle, Washington 98109-5802
12

13

         On Behalf of Defendant C3 Manufacturing, LLC:
14       LUCY BOATENG-AGYEI
         RACHEL TALLON REYNOLDS
15       MAXWELL ANTHONY WESEMANN
         Lewis Brisbois Bisgaard & Smith LLP
16       1111 Third Avenue, Suite 2700
         Seattle, Washington 98101-3224
17

18

19       On Behalf of Sinars Slowikowski Tomaska LLC and Christopher
         Furman:
20       BRADLEY S. KELLER
         JOAN MAYA PRADHAN
21       Byrnes Keller Cromwell, LLP
         1000 Second Avenue, Suite 3800
22       Seattle, Washington 98104-1062

23

24

25

Pretrial Hearing - 6/14/2023

Page 3

1            I N D E X   O F   P R O C E E D I N G S

2

3                              PAGE

June 14, 2023 Proceedings Commence......................  4

4

Ruling by the Court.......................................  10

5

Ruling by the Court (Resumed)..............................  23

6

Conclusion of Proceedings of June 14, 2023.................  43

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pretrial Hearing - 6/14/2023

Page 4

```
1                         -o0o-

2                    June 14, 2023

3

4        THE COURT:  All right.  Good afternoon, everyone.  Can you

5    folks hear me okay?

6        MR. CHRISTIE:  We can, Your Honor.

7        MR. COCHRAN:  Yes, Your Honor.

8        THE COURT:  Yeah?  All right.  Terrific.  Are we missing

9    anyone before we begin?  I'm looking at -- it looks like

10   everyone that I would expect to be here is, if I may -- if

11   anyone thinks that there is someone missing that needs to be

12   here, let me know.

13       No?  Okay.

14       MR. COCHRAN:  Great.

15       THE COURT:  All right.

16       MR. COCHRAN:  I think everybody is here.

17       THE COURT:  All right.  Terrific.

18       We are here this afternoon on -- for -- for the Court's

19   ruling on the Plaintiffs' motion for sanctions and to go

20   over a couple of housekeeping matters in anticipation of our

21   new trial date is, which is going to be starting on

22   June 26th.  We are in the matter of Vandivere v. Vertical

23   World et al., Cause No. 19-2-27385-2, Seattle designation.

24       May I please have counsel identify themselves for the

25   record.
```

Pretrial Hearing - 6/14/2023

Page 5

1          MR. COCHRAN:  Darrell Cochran here for the Plaintiffs, and

2     I'm joined by my partner Andrew Ulmer.

3          THE COURT:  All right.  Good morn- --

4          MR. CHRISTIE:  -- Bob Christie.

5          THE COURT:  -- good afternoon.

6          MR. CHRISTIE:  Bob Christie, Your Honor, here on behalf of

7     Vertical World, and I'm with my colleague John Barry.

8          THE COURT:  Okay.  We kind of had an echo.  I don't know

9     if it's -- I'm not sure what's causing that, it -- it may

10    not be a problem because I don't expect that you will

11    probably be -- have to -- to speak much, but I don't know if

12    it's because you're both sitting close to each other.  I

13    don't know how these things work, but definitely an echo.

14    Let's see what's happens going forward.

15         MR. CHRISTIE:  Thank you.

16         MS. REYNOLDS:  Good afternoon, Your Honor.  Rachel

17    Reynolds on behalf of Defendant C3 Manufacturing, LLC.  And

18    my colleagues Maxwell Wesemann and Lucy Boateng-Agyei are

19    also joying me on different feeds.

20         THE COURT:  All right.  Good -- good afternoon to

21    everyone.

22         MR. KELLER:  And, Your Honor, it's Brad Keller on behalf

23    of the Sinars firm and Mr. Furman, and with me also is my

24    associate Ms. Joan Pradhan.

25         THE COURT:  All right.  Good afternoon, everyone.

Pretrial Hearing - 6/14/2023

Page 6

1            All right.  I just want to say a couple things before we

2        start about, you know, my desire to have everyone present,

3        you know, visually.  You know, we, now, are very accustomed

4        to doing, you know, everything remote.  But the difference

5        between folks being visually present and just on a phone is

6        great to this Court's mind, and that is why I require for

7        everything, if we're doing anything remotely, that folks

8        have to be here on video and -- and -- and present.

9          I, you know, I -- I want to talk just for one minute.  I

10        want to be really good about our time because I have another

11        matter at 4:00, so I want to be good on time.  But I do want

12        to talk for a moment about some things that you folks may

13        not know because it's kind of how the sausage is made.  But

14        I want to roll that out for you so you understand, you know,

15        this Court and perhaps other departments as well, their

16        feelings about continuances and delays like this and why

17        they matter so much.

18          So, you know, we're trial courts.  I'm supposed to be in

19        trial -- and I am in trial -- literally every day, Monday

20        through Thursday with the exception of Fridays when I have

21        summary judgments, other hearings and sentencings.  Not just

22        me, by the way, the whole bench took on civil rotation.  So

23        when -- when we have a case like this, which is now -- since

24        I've gotten it from Judge Shaffer it's been con- -- had to

25        be continued because of, frankly, misconduct.  We have -- I

Pretrial Hearing - 6/14/2023

1       gave out a week-long continuance last week because these are

2       important matters here and Mr. Keller, I understand, came

3       into this very late representing the Sinars law firm and

4       wanting to do his due diligence, but requesting to do some

5       briefing, which I granted.

6         And the -- the reason why all of this matters -- it's not

7       just to the Vandiveres and Vertical World and C3 and the law

8       firms and -- and the lawyer, you guys, who have, you know,

9       very busy schedules, it -- it -- it matters greatly to all

10      of you and your clients who deserve their day in court, but

11      it really matters to all the other litigants because how it

12      works around here is on the Wednesday -- on every Wednesday

13      all the chiefs meet.  And I'm not a chief.  I'm just a --

14      you know, I'm a working bee.  But all the chiefs of the

15      departments meet, and they figure out what's -- what's going

16      to happen for the following week in trial.  Like, who's

17      going to be in trial on what case.  And there's all these

18      things that have to be triaged, right?

19        There's cases that have priority over civil cases, so --

20      and we have to re-update our availability literally every

21      time it changes.  We do the six-week reports.  We -- then we

22      have to change them the second anything changes.  So

23      everyone thinks I'm in trial -- that I was supposed to be

24      starting a trial on Monday, and then, of course, I wasn't

25      because I gave that week out when we had a huge matter that

Pretrial Hearing - 6/14/2023

Page  8

1       had to be addressed.  And so then I give new -- new

2       availability.

3        And every single time that I am not in trial someone's --

4       and by "I" I don't mean me; I mean any judge that's supposed

5       to be in trial, which is most of us except for judges who

6       are on calendars -- every time that we're not on trial

7       when we -- when -- when everyone thinks that we should be or

8       that we -- our calendar says that we are, like mine did,

9       other people who are on standby or -- not even just civil

10      standby, but I'm talking about all kinds of other matters

11      that people are literally waiting to get a judge -- it's

12      wasted because I'm -- I'm -- I'm sitting in chambers.  Of

13      course, I have a lot of work to do, but I could be in trial,

14      and I should be in trial.

15       And so I really -- I -- it -- this idea that we can just

16      wait for a week and, oh, maybe a another week.  And I'm just

17      waiting, you know, to see what's going to happen in this

18      case.  My six-week availability as a court -- I can't tell

19      them when I'm going to be in trial an this case because I

20      don't know what the briefing is going to look like from

21      Mr. Keller who said, "These are really big issues.  I need

22      an extra week."  And then I ruled, hey, depending on the

23      complexity of those issues, I'm may have to give Mr. Cochran

24      more time.  So this just throws off everything.

25       And it -- it -- it really -- we are dealing with a backlog

Pretrial Hearing - 6/14/2023

1        and demands that are so intense you wouldn't possibly

2        believe it.  And so that is why I take these matters really

3        seriously because I have to report every day that I'm not in

4        trial.  And I should be in trial every day.  And so I have

5        not done that because of these things.  And that is why I

6        took that extra week off, so to speak, waiting for briefing

7        that I was told, "Guess it wasn't going to come," is such a

8        serious matter because other folks need trials.  So I wanted

9        to explain that to you folks just so you don't -- you

10       understand kind of how the sausage gets made around here.

11        So having said that, when -- since the filing of the

12       materials that this Court reviewed on the last weeks'

13       hearing, which was on the 7th, of course, I reviewed a lot

14       more materials.  As I indicated at our last hearing, I had

15       not had an opportunity to read all the materials supplied by

16       Mr. Keller.  I want to be -- to assure everyone that I has

17       now -- have now read every single word that has been written

18       in this case on this motion for sanctions, including the

19       things that were presented to this Court yesterday late in

20       the day.

21        What I have not reviewed -- because I simply did not have

22       time this morning -- was a -- a supplemental -- a new

23       proposed order from Plaintiffs.  I will review that, but I

24       did not have an opportunity to review it.  Nor did I have an

25       opportunity to review Ms. Reynolds's opposition to the

Pretrial Hearing - 6/14/2023

Page 10

1    proposed findings that are in the order from Mr. Cochran.

2    So I do want you folks to know that I haven't reviewed that.

3    Everything else including all of the materials in opposition

4    that were filed by Mr. Keller have been carefully reviewed

5    by me.  And so I just start from that.

6      What I want to do here is I'm going to give you my -- on

7    my ruling on this matter, I'm going to have to have a new

8    or- -- or proposed order.  My -- I'm assuming that many

9    parts of what needs to be in my new proposed order that I

10   will be referencing may already be in the 38-page order that

11   I haven't had a chance to look at.  And so whoever has the

12   task on behalf of Plaintiff to get a proposed order can

13   probably just look at what you've already done and perhaps

14   there's quite a bit of overlap.  Obviously, I'll be

15   reviewing any new proposed order based on my rulings here

16   today with careful eye to make sure we get a very clear and

17   concise and comprehensive order because that's what's

18   required here.

19     All right.  And on the new order, I want to be very clear

20   that I am incorporating my oral findings at today's hearing

21   into that order.  I'm incorporating it fully as am I

22   incorporating, fully, my findings and -- to the extent I

23   made orders, from my last hearing on June 7th.  Both of

24   these oral hearings and my comments made during those

25   hearings, today and last week's, are to be incorporated by

Pretrial Hearing - 6/14/2023

Page 11

1    reference, of course, in the order.

2     All right.  In terms of some findings that the Court has

3    made, having reviewed all that has been supplied to me, the

4    Court specifically finds that on May 5th, 2023, Vertical

5    World Defendant revealed that C3's former attorney,

6    Mr. Furman, opened a gym account at Vertical World and

7    accessed the Vertical World gym without notice to counsel

8    approximately 38 times.  I have seen this number reported as

9    30, no fewer than 30.  I counted it myself, based on the

10    discovery that was provided in the exhibits, and I had

11    38 visits beginning in March of this year through May of

12    this year, 2023.  Mr. Furman testified that he also accessed

13    the Vertical World facility on April 1st, 2022, which was

14    the same day that the Perfect Descent auto belay involved in

15    this lawsuit was being inspected, and three days before the

16    scheduled CR 34 inspection of the Vertical World gym.

17     I would note that he also visited -- Mr. Furman testified

18    that he visited Vertical World, several locations,

19    throughout his representation of C3.  Mr. Furman did not

20    notify counsel for Plaintiffs or Vertical World prior to his

21    approximate 38 visits to the Vertical World gym.  Furman did

22    not tell Plaintiff counsel or Vertical World about his

23    contacts with Vertical World until April 26, 2023, when he

24    telephoned his friend and also a lawyer a Vertical World,

25    Mr. Barry.

Pretrial Hearing - 6/14/2023

Page 12

1          C3 attorneys -- C3, LLC, and it's attorneys from the

2      Sinars firm did not disclose this information in responding

3      to Plaintiffs' second set of interrogatories and request for

4      production.  Mr. Furman's visitation to Vertical World was

5      conduct which was clearly responsive to Plaintiffs'

6      discovery request, specifically to Plaintiffs' second set of

7      interrogatories and RFPs dated July 2022, and specifically

8      to that, Interrogatory No. 7.

9          Due to the late timing of this disclosure regarding

10     Mr. Furman's conduct, Plaintiffs were deprived of their

11     ability to further investigate the nature and extent of

12     Mr. Furman's conduct or determine which Vertical World

13     employees might have had conversations or any type of

14     engagement with Mr. Furman.  Mr. Furman had to be compelled

15     to attend his deposition by an order that this Court issued

16     after two separate attempts to serve him, one on May 18th

17     and again on May 19th, which were unsuccessful.

18         I would add here that in this court it is a finding of

19     this Court that to the extent that the Sinars firm would not

20     accept service on behalf of Mr. Furman, which appears to

21     have been the case on Febu- -- on -- sorry -- on the May

22     18th effort, that that is really unacceptable, given that

23     the entire reason that there was a need for this deposition

24     arose directly from the law firm's actions in representing

25     C3.

Pretrial Hearing - 6/14/2023

Page 13

1        On May 22nd, 2023, Defendant C3 produced documents

2    revealing that C3's -- 3 -- C3's insurer, Houston Casualty

3    Company, HCC, stated that it had rescinded its $4 million

4    insurance policy issued to C3.  Defendant C3 knew about this

5    rescission as early at July 26, 2023, possibly earlier.  C3

6    did not produce the documents regarding the HCC rescission

7    until May 23rd, 2023, a few weeks prior to the scheduled

8    start date of this trial.

9      As referenced in the declaration of James Moss, which this

10   Court received yesterday, June 13th, Mr. Wood and the Sinars

11   knew of rescission on the very same day that the HCC

12   rescission letter was sent on January 26, 2023.  The content

13   discussed in the HCC rescission letter regarding the alleged

14   material misrepresentation by C3 of the subject product in

15   this case would have provided substantive evidence to

16   support -- in support of Plaintiffs' WPLA claims,

17   specifically the failure to warn claim.

18    I would add here that certainly it's quite possible that

19   many -- that much of whatever would have come out of

20   discovery related to the statements in the rescission

21   letter, some of that, of course, and perhaps much of it may

22   not have been per se admissible as it relates to insurance.

23   But that isn't the issue before the Court.  Certainly, the

24   discovery of those issues would clearly have been relevant

25   and potentially highly relevant to the product liability

Pretrial Hearing - 6/14/2023

Page 14

1     claims here that Plaintiff is presenting.

2     Due the to late timing of C3's disclosure of the HCC

3     rescission letter, Plaintiffs were prevented from engaging

4     in discovery concerning this issue.  Specifically, the HCC

5     rescission letter would have clearly led to discovery

6     concerning the defective -- the defective product

7     allegations, which is information specifically requested in

8     Plaintiffs' first set of discovery RFP 29, 30, and 31, and

9     the second set of discovery RPF 5 and 36.

10     The HCC's letters were responsive to Plaintiffs' first set

11     of interrogatories and request for production, specifically

12     the information pertained to Interrogatories 3, 4 and RFP 1,

13     2, 3, 4 and 31.  And these were in the discovery of

14     May 2021.  Based on these findings, the Court orders that

15     Plaintiffs' motion for sanction is granted.  The Court finds

16     that Defendants' concealment of the information referenced

17     in these findings was willful, in violation of the rules of

18     discovery and -- and violated Judge Shaffer's order

19     compelling discovery filed in 2022 and that this concealment

20     was carried out in a manner designed to benefit C3 and its

21     former attorneys at the detriment of Plaintiffs and

22     Codefendant Vertical World.

23     The Court declines to grant a default judgment for reasons

24     that I will discuss in a moment but will grant the following

25     relief.

Pretrial Hearing - 6/14/2023

Page 15

1         First, the Court awards Plaintiff reasonable amount of

2     their fees and litigation costs expended from July --

3     January 26, 2023, to the present day.  With regard to the

4     request for a multiplier of 1.5, the Court is going to

5     reserve on that until I receive declaration from Plaintiff

6     counsel and any attachments thereto outlining the costs and

7     fees.  And I have some timelines on this because these are

8     important.  So I -- I would like to receive a declaration of

9     Plaintiff counsel and any attachments in support of their

10    reasonable requests for fees by close of business on Monday

11    June 19th.  I will issue an order by June of 20th.  Here's

12    the important part.  50 percent of this sanction amount will

13    be due by close of business on June 23rd, and the remaining

14    50 percent will be due 12 days later on July 5th.

15        I want to be clear here that because it is very clear to

16    this Court that the Sinars firm knew of this rescission on

17    January 26, 2023 -- again I reference that by the

18    declaration that I received yesterday from Mr. Foss [sic] --

19    based on that, their lability for these costs and fees of

20    Plaintiffs' shall be joint and several between C3 and the

21    Sinars law firm.

22        I want to address Vertical World's request for attorneys'

23    fees.  The Court is reserving on this for the simple issue

24    that I need some additional briefing from the Vertical World

25    on the issue of whether or not the Court can grant the

Pretrial Hearing - 6/14/2023

Page 16

1    requested sanctions, given that there were no per se

2    discovery violations specific to Vertical World, at least

3    not that has been brought to the Court's attention.  So the

4    question before the Court is whether or not Vertical World

5    is entitled to rely on Plaintiffs' discovery request to

6    support a sanction award to a codefendant.

7     I would like this briefing by June 23rd because I want to

8    get -- I want to get the orders out on what is due and

9    payable because a portion of it is due, of course, before

10   trial begins.  And so I want to get that out.  It may very

11   well be that the -- the portion for Vertical World may not

12   become due on -- on the same schedule as Plaintiffs, only

13   because I want to give them time to look at that, any fee

14   requests, declaration, exhibits, et cetera, that I receive

15   from Vertical World.  And because I have to get briefing

16   first, the schedule won't allow them to have ample time.

17   But I wanted to address their request for sanctions.

18     I note that there is a slight difference.  I believe that,

19   Mr. Christie, you asked for sanctions from February 2023.  I

20   think it was end of February where as Mr. Cochran asked for

21   them on the date of the rescission, which was

22   January 26, 2023.  To the extent that you want to edit your

23   request you may do so, but I wanted to point out that the

24   orders -- that your request is slightly different from

25   Plaintiffs'.

Pretrial Hearing - 6/14/2023

Page 17

1        MR. CHRISTIE:  Your Honor, if I may briefly.  Now that we

2    know the precise date of the disclosure, we will edit our

3    request accordingly and will provide the briefing you

4    request by June 23rd.

5        THE COURT:  Thank you very much.

6        All right.

7        MR. CHRISTIE:  Thank you.

8        THE COURT:  The Court grant's Plaintiffs' request to

9    provide a jury instruction which allows a jury to make a

10    negative inference from C3's discovery misconduct.

11        Excuse me.  I've got a bunch of sticky notes here that I

12    have to read from.  Okay.

13        Specifically, as to the failure to warn claim, under the

14    Washington Product Liability Act, the Court declines to

15    enter an order of default given the harshness of this remedy

16    and the fact that a substantial amount of the evidence

17    giving rise to the rescission by HCC did in fact come from

18    Mr. Naranjo's deposition testimony, so it is unclear what

19    additional evidence could have come to light from discovery

20    into the basis of HCC's rescission.  By saying this, I want

21    to be very clear that I am not -- in no way, minimizing the

22    egregiousness of this massive breach of the rules of

23    discovery by C3 and its attorneys.

24        In addition, to remedy possible prejudice caused by

25    Mr. Furman's misconduct in visiting Vertical World on

Pretrial Hearing - 6/14/2023

Page 18

1       38 occasions and entering into a contractual business

2       relationship with Vertical World completely unbeknownst to

3       Plaintiffs or Vertical World, the Court will also issue a

4       more generalized negative inference instruction.  Plaintiff

5       will submit a proposed instruction, which may account for

6       anything -- proposed instruction that -- that may account

7       for anything that they discover in -- in conducting any

8       additional discovery if they want it.  I do not know if that

9       has been requested.  I haven't seen a request for additional

10      discovery.  But to the extent that that is desired, I'm

11      going to grant it, and I'll let you revisit the issue of

12      what kind of instruction you might want.

13        It will be more tailored to what information you now found

14      this late in the day.  I'm not requiring it by any means,

15      but I want to give that option, otherwise we'll craft,

16      perhaps, an instruction that is perhaps less specifically

17      targeted but still covers the blatant misconduct here.  And

18      so that's how I'm -- I'm dealing with the two different

19      issues.

20        The instruction on the failure to warn is intended to be

21      way more detailed because it's targeted right to that claim,

22      whereas -- because we don't know -- we -- pardon me --

23      not -- not me -- because Plaintiffs aren't -- don't know --

24      and, frankly, may never know -- what information was gleaned

25      by Mr. Furman's conduct, it may be that that instruction

Pretrial Hearing - 6/14/2023

Page 19

1    simply can't be -- is not capable of being as closely

2    tailored.

3     So, Mr. Cochran, I'm going to give you an opportunity in a

4    minute if you want -- just take it now.

5     MR. COCHRAN:  Okay.  And I was going to suggest whenever

6    it was appropriate because we -- we got a document late last

7    night that Lewis Brisbois served on us that -- that's going

8    to touch on a number of the points that the Court has just

9    talked about and some of the timing for when sanctionable

10   conduct is very clear and on this precise issue, Your Honor,

11   about what we don't know we know and -- and now from this

12   document that we saw last night, which the Court hasn't seen

13   and don't feel that anyone has drawn attention to it yet --

14   what we know that we don't know.  So with your permission,

15   Mr. Ulmer is going to share a November 2nd, 2022, letter

16   that James Moss sent to -- so I'm going to -- I'm going to

17   repeat the date; November 2, 2022 -- that he sent to Tokio

18   Marine/Houston Casualty and copied -- courtesy copied Scott

19   Wood -- in fact gave him -- gave him a top billing as being

20   the C3 attorney on this.

21    And -- and this is what alarms us about -- so much about

22   not only what is chronically evident about the misconduct

23   but what is still being withheld and is still of interest

24   to -- both to us and to the Court.  So if Mr. Ulmer is able

25   to and we can -- we can show the November 2, 2022, letter

Pretrial Hearing - 6/14/2023

Page 20

1      from James Moss.

2        One thing that we'll know, Your Honor, is that you'll know

3      that Mr. Moss was not fully forthcoming with this Court

4      about not only what he knew but about what the Sinars firm

5      and Scott Wood knew, which again is -- you know, as we look

6      at the Ficens (phonetic) decision down there in Issue 9 late

7      in that massive compendium of a -- of a court decision,

8      we're -- you know, one of its -- one of its signature points

9      is that there is a duty of candor which -- which might be

10     above all the most important things that we think when we

11     think about sanctions.

12       So thank you, Mr. Ulmer.

13       And I'll make sure that I distribute this and formally

14     enter it with the Court.  But here it is, November 2, 2022,

15     James Moss, who was -- who describes himself as corporate

16     counsel for C3 -- protesting against Tokio Marine and

17     Houston Casualty's inquiry about whether there was

18     fraudulent misrepresentations regarding the Perfect Descent

19     belay defect and the application made for insurance.  So we

20     have seen the first page.

21       But what I want to take a look at is down at the bottom of

22     page 2, a particularly alarming paragraph that Mr. Ulmer has

23     highlighted for us.  And I'll read it into the record in

24     case people can't see it.  He says, "Because this case is in

25     litigation, C3 and Mr. Naranjo will not be supplying any

Pretrial Hearing - 6/14/2023

Page 21

1       documents to you or anyone else.  An insurance company under

2       Colorado law has no privilege with its policyholders.  As

3       such, any documentation provided would be available to the

4       Plaintiff in this case."

5        Ergo, he's not going to provide any information to Tokio

6       Marine because he's worried that the Plaintiffs will get

7       that documentation.  And what is he talking about?  He's

8       talking about all of the information that Tokio Marine has

9       requested about the defect, about the injuries, about the

10      Perfect Descent auto belay failures, all of that, and C3's

11      corporate attorney says, "We're not going to give it to you

12      because we don't want the Plaintiffs to get it."

13       And as you'll see, that very next paragraph he says, "if

14      you wish to access documents" -- meaning a declaration and

15      a -- and a deposition that Mr. Naranjo gave -- "please

16      contact defense counsel Scott Wood of the Sinars firm."  And

17      you'll see on the third page when Mr. Ulmer -- Ulmer scrolls

18      down that Scott Wood is cc'd.

19       Now, of course, this is alarming because we went back and

20      looked and said, well, did -- did C3 give us documents in

21      between November of 2022 and -- and when we got these recent

22      document dumps?  And the answer, of course, is categorically

23      no.  But what we know from Mr. Moss, C3's corporate counsel,

24      is that they were not going to provide documents to Tokio

25      Marine because they didn't want the Plaintiffs to get it.

Pretrial Hearing - 6/14/2023

Page 22

1      We feel confident from this -- and I -- and it is

2   appropriate for the Court to make the inference that they

3   are -- continue to withhold documents.  I'll note, by the

4   way, that Mr. Moss omitted this information in his

5   declaration.  That Mr. Hicks and Mr. Moss both failed in

6   their duty of candor about when Scott Wood in the Sinars

7   firm knew about this rescission issue and knew about the

8   fraudulent misrepresentation issues.  All of these go to

9   much of what the Court was just talking about and

10   exacerbates what we all understood yesterday morning -- or

11   at least had some in- -- understanding about what really

12   happened.  And as of last night we have more information,

13   which is that it's much worse than we thought.

14     So I submit that for everyone's consideration.  By the

15   way, it's fair to point out that this -- Mr. Moss is the man

16   who jumped in on behalf of C3 in March of 2021 when, in our

17   case against Vertical World, we went, spent all of the money

18   and time and effort that we had to, to get a Colorado

19   subpoena for C3's 30(b)(6) deposition.  We did all of that

20   knowing that there might be some protest.  We had the

21   subpoena properly executed and served and this guy Moss, the

22   C3 corporate counsel, said, "We're not going to produce

23   them."  And, of course, then we had to sue C3 to figure out

24   what was being withheld.

25     So I submit all of that for the Court's consideration

Pretrial Hearing - 6/14/2023

Page 23

1    because I think it certainly supports, enhances, and

2    furthers all of the findings and considerations that the

3    this Court has about the sanctions.

4      THE COURT:  All right.  And so, of course, you know, this

5    will go to what type of instruction we are giving to our

6    jurors, the negative adverse inference instruction.  And the

7    strength of that instruction can, of course -- of course,

8    incorporate any newly disclosed information.  You know, this

9    is the -- clearly, discovery -- the issues in this case

10   are -- are -- are continuing, regrettably, and so to the

11   extent that, you know, we -- we have got time to -- to look

12   at proposed instructions and anything that comes now or up

13   until the moment we start -- the moment we give out jury

14   instructions, if we have to change it, we will.

15     MR. COCHRAN:  Thank you.

16     THE COURT:  I want to address more specifically the

17   issues -- I talked about my remedies and -- but I want to

18   address with a bit more specificity the -- the misconduct

19   here because it matters.  It matters greatly.

20      So everyone here know, of course, the remedy discovery

21   misconduct, the Court's got to use its discretion to craft

22   an appropriate sanction.  Washington courts are going to

23   weigh two general factors in creating a sanction based on

24   discovery misconduct:  one, the potential importance or

25   relevance of the missing evidence and, two, the culpability

Pretrial Hearing - 6/14/2023

Page 24

1          or fault of the adverse party.

2              With respect to the first factor, the potential importance

3          or relevance of the missing evidence in this case, it is

4          very high.  With regard to Mr. Furman's access to Vertical

5          World's gym on 38 occasions, we will -- the -- the

6          Plaintiffs are deprived of understanding what C3's former

7          counsel did during these visits, which witnesses he may have

8          spoke, and whether or not he conducted additional research

9          or surveillance for C3.

10             I will point out here that, of course, I read his

11         declaration where we says he didn't do any of these things,

12         and I also read the entirety of his deposition where he

13         denied conducting additional research or talking or taking

14         any photos.  I want to state here that I -- I found his

15         testimony to be concerning.  I realize that transcripts can

16         often be what I can only describe as a flat mechanism by

17         which to form impressions.  They are just -- they're not --

18         they're not great.  But despite that, in -- in -- in my

19         reading of his deposition, he appeared to me to be cavalier

20         about the possibility of becoming a factual witness and

21         evasive.  He was a- -- he basically had to have every --

22         almost every single substantive question read back to him.

23         And he clearly -- he said he didn't understand the

24         questions.  These were very clear questions.  He asked for

25         them almost all to be repeated.  And he had little recall of

Pretrial Hearing - 6/14/2023

Page 25

1        the events that are very, very recent.

2          I, frankly, found that some of the cavalierness was

3        demonstrated by -- by counsel as well.  At one point in

4        response to her client not providing a response,

5        Ms. Reynolds says, "Counsel, let's move on, and let's get

6        Furman out of this situation."  And that struck me as a --

7        an odd thing to say, and it telegraphs this cavalier

8        attitude.  This situation is one that was specifically

9        brought about by C3 and Mr. Furman's misconduct, and to --

10       this idea that we should, you know, move on, let's get him

11       out of this situation -- it's a situation uniquely created

12       by these parties, and that was disturbing to me.

13         I do want to recognize that this is a young attorney.

14       Three years out of law school isn't very long.  But it's

15       long enough to have understood what was going on here.  This

16       was an effort -- an un- -- unbridled effort to invade --

17       engage in covert discovery without telling anyone and

18       particularly egregious, given that his client and Vertical

19       World have cross-claims against one another and

20       counterclaims and that Vertical World -- I'm sorry -- that

21       C3 has asserted that all of the fault here is specifically

22       on Vertical World.  The issues -- the things that he would

23       have had contact with in accessing this gym 38 times are

24       specifically identical to the things at issue in this case.

25       He testified in this deposition that he used the auto belay

Pretrial Hearing - 6/14/2023

Page 26

1        system.  This is exact words:  He used the -- the Perfect

2        Descent auto belay system nearly every time he went to the

3        gym.  Nearly every time.  He also had to have gone through

4        the on boarding process, release, waivers, et cetera.  And

5        these are things squarely at issue in this case.

6          This Court finds that he only reported his conduct to his

7        friend, Mr. Barry, for Vertical World -- an attorney for

8        Vertical World, after he was getting, as he put it, "side

9        eyes," quotation marks, from people at the gym.  That

10       suggests to me that he knew he was engaging in inappropriate

11       behavior and had essentially now been caught.  We will not

12       know what opinions and on which the Plaintiffs' claims and

13       Codefendant's counterclaims and cross-claims were impacted

14       by Mr. Furman's garnering information during this visits.

15       This is something that is unknowable, which in and of itself

16       is -- is troubling.

17         With respect to the second factor, the culpability or

18       fault of the adverse party, I have explained just above that

19       all the parties had conducted a CR 34 inspection of the

20       Vertical World gym with all counsel present and notice of

21       that, that C3's former counsel certainly would know about

22       the rules regarding having ex parte contact with represented

23       individual.  Vertical World's employees -- I'm sorry --

24       with -- with ex parte -- with -- with represented

25       individuals including Vertical World's employees.  Despite

Pretrial Hearing - 6/14/2023

Page 27

1    this, C3's counsel had extensive contact with these

2    employees with little ability for anyone to investigate this

3    further.

4      I'm particularly disturbed by the fact that just on the

5    same day as a CR 34 examination, which Mr. Furman himself

6    attended, which comes with it a lot of recognition of the

7    formality with which discovery rules require people to

8    access other parties' locations, their sites, in this case a

9    device, that formality being so clear from that proceeding

10   that he would just, right after, go and hit the gym is,

11   frank, mind-boggling to this Court.

12     I want to address the declarations of Mr. Fucile and

13   Mr. Strait and their focus on RPC 4.2 and 4.3.  My view,

14   that the conduct here in this case did violate RPC 4.2 and

15   4.3.  And I -- the next portion of -- of -- of this order, I

16   take with great seriousness.  I have never, in my ten years

17   on the bench, directed any person -- any party to refer a

18   matter to the Washington State Bar Association and to

19   indicate that I directed them to do this.  But I'm doing

20   that in this instance.  I would also point out that I have

21   never myself referred anyone to the State Bar Association,

22   but I'm doing it here because I think these facts are,

23   frankly, sufficient to do that.

24     Included in this direction to refer this matter is also

25   the attorneys that Mr. Furman testified he spoke to about

Pretrial Hearing - 6/14/2023

Page 28

1        his Vertical World membership, specifically Duncan Lemmon,

2        who he testified -- Mr. -- Mr. Furman testified that

3        Mr. Lemmon told him it was a nonevent.  And Mr. Hicks also

4        told him, at least according to Mr. Furman, that there was

5        no problem with it.  These are senior level attorneys way

6        more experienced than a third-year associate.  The Court

7        specifically finds that counsel for C3 were knowingly

8        engaging in covert discovery and that Mr. Furman was

9        purposefully enabling himself to become a fact witness,

10       which itself is a -- a problem.

11        I want to be clear that my -- that the focus of these

12       verly -- very respectable -- Mr. Fucile, I know, is

13       well-known, highly respected, as is Mr. Strait, and I

14       respect both of them greatly.  I've -- I have experience

15       with both of them.  But the focus on his -- their sole focus

16       on the communication with staff and others at VW, it

17       doesn't -- it -- it -- it really doesn't address in any way

18       Mr. Furman's observation abilities and the information

19       gathering which had the potential to aid in the formulation

20       of claims and/or defenses to Plaintiffs' claims and/or the

21       claims by and against Vertical World.

22        As to the claim that Mr. Furman thought it was fine to

23       begin a relationship with Vertical World in February of 2023

24       because he knew that Mr. Wood was leaving the firm, this

25       doesn't change anything and, frankly, is inconsistent with

Pretrial Hearing - 6/14/2023

Page 29

1        other evidence that I have reviewed in this case,

2        specifically that -- the declaration of Mr. Hicks in which

3        he states that Mr. Wood confirmed he would be moving to a

4        new firm in late April 2023, two months after Mr. Furman

5        joined the gym.  So it's possible he would have known.  And

6        furthermore, it was clear -- it would have been clear to

7        this -- to anyone -- and to Mr. Wood specifically, as of

8        knowing about the rescission on January 26, 2023, that he

9        could have never taken this case with him because his new

10       firm represents the insurance company which rescinded the

11       excess insurance policy.  That is a clear conflict, which

12       certainly could not -- it was known by him, and I don't know

13       what Mr. Furman knew, but to say that -- you know, he

14       thought he was moving with his -- with the case, so it

15       didn't matter is -- is -- has absolutely zero credibility to

16       this Court.

17        All right.  I know that my ruling here may raise some

18       questions for folks.  I do want to give you a few minutes to

19       ask them, and then I want to go on to more housekeeping

20       matters because there are some things that will need to

21       happen in fairly short order to get this case ready for

22       trial.

23        Questions.  I'll start with -- Mr. Christie you've got

24       your hand up, so you get to go first.

25        MR. CHRISTIE:  Thank you, Your Honor.  I was trying to be

Pretrial Hearing - 6/14/2023

Page 30

1    polite.  I will, given your direction, refer to the Bar

2    Association.  I think it's appropriate, because it was my

3    client's facility, that we part of that referral.  I just

4    want to be clear that if that is your directive, which would

5    make sense to me, we'll work with Mr. Cochran's office so

6    that there's a single referral on behalf of us both.

7        THE COURT:  Yep.  One referral makes most sense, and I do

8    want it indicated in there, for a variety of reasons, that

9    you were directed to do that by this Court.

10        MR. CHRISTIE:  Thank you, Your Honor.

11        THE COURT:  Any other question, Mr. Christie?

12        MR. COCHRAN:  So we --

13        THE COURT:  No?  Okay.

14        Mr. Cochran.

15        MR. COCHRAN:  Thank you, Your Honor.  So we -- you know,

16    we got a number of documents or a tranche of documents last

17    night including, by the way, a completely redacted policy

18    letter from Great American, which is astonishing to us,

19    given, Mr. Moss's statement himself on behalf of C3 to Tokio

20    Marine that there is no privilege for policyholders and

21    insurance companies, and yet they're still claiming some

22    privilege for the policyholders in the insurance company.

23        So I'm processing these documents as quickly as I -- as I

24    can.  I am going to ask additional discovery depositions and

25    documents that -- that I believe now this -- this letter

Pretrial Hearing - 6/14/2023

Page 31

1    shows have been withheld, and -- and I'll make sure that I'm

2    apprising the Court of what we have been asking for.

3      THE COURT:  Fair enough.

4      Ms. Reynolds.

5      MR. COCHRAN:  Thank you.

6      THE COURT:  Ms. Reynolds anything you want to ask or

7    clarify?

8      MS. REYNOLDS:  Just with regard to that, I just want to be

9    clear that the privileged log indicated that there is a --

10   a -- a big redaction.  It's -- it looks very substantial

11   when you look at the document and its application materials.

12   And certainly we would be happy to submit for an in camera

13   review whether or not a privilege applies.  And we are

14   attempting to be transparent with this Court.  And we

15   certainly understand the Court's ruling, but just wanted to

16   make it -- you know, I mean, I have an obligation to protect

17   that privilege, which is held by my client but also want to

18   insure that the information that the parties need is there.

19     THE COURT:  All right.  You know, I -- I don't know how

20   much you are going to need to be reviewed in camera.  I'm

21   always happy to do in camera reviews, but I don't know how

22   much -- how many documents you're talking about here.  And

23   we certainly -- I -- I -- I think I've been very clear there

24   will be no continuances of case.  And so I will review

25   things as I can, but just know that we are proceeding.

Pretrial Hearing - 6/14/2023

Page 32

1        All right.  Mr. Keller any questions on -- or Ms. Pradhan

2    any questions that I can address?

3      MR. KELLER:  I blanked out at the point where you were

4    giving your schedule regarding payment --

5      THE COURT:  Sure.

6      MR. KELLER:  -- of any sanction award.  I got there

7    June 23rd for 50 percent.  I did not hear the second date.

8      THE COURT:  Yep.  No problem.  Let me go back to my notes

9    here and re- -- here we are.  And so I am going to -- here

10   we are.  So Mr. Cochran or Plaintiffs are going to give me

11   their declaration in support of a fee and -- and costs award

12   and any attachments thereto, I'm going to have that by COB

13   Monday the 19th.  I'm going to issue an order on the 20th.

14   And I do know, by the way, that the 19th is a holiday, and

15   so if you want to give it me on the next day the 20th,

16   that's fine.  I'll review it and have an order by the end of

17   the day on that amount of sanctions and costs.  And, again,

18   I am reserving, until I review that, about multipliers.  So

19   the first payment, 50 percent of this sanction, will be due

20   by close of business June 23rd that Friday.

21     MR. KELLER:  It was the second date that I didn't catch.

22     THE COURT:  Sure.  And the remaining 50 percent will be

23   due 12 days later.  I incorporated the holiday so it

24   wouldn't be over the 4th of July, it will be due on 7/5.

25   And I'm sure -- I -- I'm sure that this point -- because

Pretrial Hearing - 6/14/2023

Page  33

1          you're detail-oriented, I'm sure you did not miss that this

2          is a -- a joint and several liability between the Sinars

3          firm and C3.

4            All right.  I wanted to go back if I --

5            MR. KELLER:  There's just one point I'd like to make sure

6          that it's in --

7            THE COURT:  Sure.

8            MR. KELLER:  -- in -- in the record in the event that this

9          ends up not being the last proceeding about this.

10           What the -- what has not been addressed is the issue of

11         supplementation of discovery responses under Rule 26(e) and

12         the standards that are set forth under that rule.  Because

13         when it comes to this insurance disclosure issue, I -- I

14         believe the issue that has been advocated and that the Court

15         has then found is that at the time the interrog- -- or

16         initial discovery response was provided, there's not a

17         question about its accuracy then, but it's then what

18         occurred afterwards on January 26th of 2023.

19           So the point I'd like to make here, Your Honor, is that

20         we're dealing with the question of supplementation.  And

21         there are two things about the rule regarding

22         supplementation that are important.  One is that it provides

23         that -- it -- it starts with the presumption that there is

24         no duty to supplement and that supplementation is only

25         required in the specific circumstances enumerated in the

Pretrial Hearing - 6/14/2023

Page 34

1 rule.  And a --

2  THE COURT:  Well, when it's clear to a party that the

3 information, the response previously given is no longer

4 accurate, there's a duty to supplement.  And so I don't know

5 anything to the contrary of that.  And, clearly, a letter

6 saying, "We hereby rescind your coverage," is a -- a -- a --

7 a very firm understanding by any recipient that the

8 discovery response previously given is no longer accurate.

9  MR. KELLER:  I believe that the rule goes a little further

10 and says it's -- and it's if the failure to supplement would

11 be deemed to be a knowing concealment.

12  And the other point that I wanted to make about the rule

13 is that it talks about seasonable supplementation.  And I

14 know, Your Honor is triggering off January 26th, but -- and

15 I don't want to reargue; I know you've ruled -- but I

16 want -- I want to have my record --

17  THE COURT:  Of course.

18  MR. KELLER:  -- that this -- what happened here unfolded

19 on a continuum between January 26th and March 17th.  And

20 during that continuum -- and it was highly disputed that

21 there had been a rescission -- an -- an effective

22 rescission, and in fact it remains disputed to this day.  So

23 the question about supplementation and what is seasonable in

24 that context, our position is that it ought to take into

25 account the fact that this was disputed and evolving over

Pretrial Hearing - 6/14/2023

Page 35

1    time and that any issue of seasonable supplementation ought

2    to be viewed through the lens of more appropriate to

3    March 17th.

4        THE COURT:  All right.

5        MR. KELLER:  I'm not here to reargue -- I'm not here to

6    reargue with Your Honor.  I'm just wanting to make sure that

7    I've got something in our -- in our record here on -- on

8    this issue.

9        THE COURT:  Understood, Mr. Keller.

10       Mr. Cochran?

11       MR. COCHRAN:  Thank you, Your Honor.  The documents last

12   night that were produced undermine everything that

13   Mr. Keller just said because and real -- well, I'll make

14   sure that I supplement this and -- and summarize it that C3,

15   Ron Naranjo had received the initial inquiry and statement

16   by Tokio Marine that there were material misrepresentations

17   in the -- in the policy application June 25 of 2021.  And,

18   of course, that was well after the point at which the Sinars

19   firm's Scott Wood had appeared.

20       What's interesting, because I went back and I mapped all

21   this out, is that there was a mediation that transpired.

22   And, of course, Tokio Marine was not there.  Was not there.

23   And we -- when they heard this after the fact, it was like,

24   well, that's interesting why was Tokio Marine not there?

25   And, of course, it turns out that, as we now see from this

Pretrial Hearing - 6/14/2023

Page  36

1        James Moss letter that we shared a second ago on November 2

2        of 2022, that it was in full swing, both Tokio Marine's

3        report of concerns about fraud and the request for the

4        information including documentation about everything that

5        they knew.  And then we have the November 2022 letter from

6        C3's corporate counsel, courtesy copying Scott Wood and

7        Sinars, saying, "We protest.  We are not going to give

8        anyone any documentation because we don't want the

9        Plaintiffs to get this in the litigation."

10         So it is well before January that all of this is ripe.

11       It's not just the question of whether the policy exists.

12       It's also the material fraud that was underlying the

13       rescission.  All of that dates back into mid-2022.  And

14       I'll -- I'll -- I'll make the supplement (inaudible), which

15       I have to because we only got the document dump last night,

16       so -- but we'll make sure that it gets in for the Court

17       consideration.

18         THE COURT:  Thank you, Mr. Cochran.

19         Okay.  So a couple other new things that we have to look

20       at.  And so we're going to need -- to need -- I have spoken

21       to my bailiff.  We've backtracked everything we need to do

22       to get our questionnaire back out to a new panel of folks in

23       line with a June 26 trial, so I'm going to have to have in a

24       revised neutral statement by noon Monday the 19th to the

25       extent -- and I -- and I -- you know, I -- I don't know

Pretrial Hearing - 6/14/2023

Page 37

1       whether -- what that revised neutral statement will look

2       like, but I would like you folks to work on it.

3         And, you know, Mr. Christie, I'm not sure what, if any,

4       involvement your firm will have at trial.  And so I -- I'm

5       not -- I'm -- I'm just not sure what that statement will

6       look like.

7         MR. CHRISTIE:  Your Honor, to respond to that

8       specifically, we anticipate having no further involvement in

9       any proceedings in this matter beyond this point except with

10      respect to request for supplemental proceedings.  Our

11      supplemental briefing -- and assuming you agree with us, we

12      would then promptly -- and we could do it even on the same

13      day -- submit our request for fees and costs.  We appreciate

14      you want to expedite this, so we'll move as quickly as you

15      want us to move.

16        THE COURT:  All right.  So, you know, the -- and I'm

17      just -- I'm thinking out loud here and -- and which I never

18      like to do.  But that revised neutral statement could

19      certainly indicate in there, you know, you will not, you

20      know -- as to ex parte, you -- this matter has resolved.

21      You will -- or -- or -- as to ex parte, you do not need --

22      you -- you will not be asked to make any determinations.

23      Something -- it -- it -- you know, with -- that the jury is

24      going to understand that, okay -- because they're going to

25      ask -- you know, it's going to be the first thing that will

Pretrial Hearing - 6/14/2023

Page 38

1       come to mind, Well, gosh, why are we only here on one party?

2       They'll just be focused on that.  And so we need to make it

3       clear to them at some point, you know, that they're not

4       going to have to be looking into any issue about the -- the,

5       you know, the gym where this occurred.  So I just want you

6       to be thinking about that.

7        Mr. Keller?

8        MR. KELLER:  Yeah, back to the sanctions ruling.  Not

9       arguing.  You gave me a chance.  You said that Vertical

10      World was to make a supplemental submission by June 23rd

11      about on this issue of can the Court, in effect, give a

12      sanction to Vertical World when it's somebody -- a different

13      party who propounded the discovery in the response.  And I

14      had thought of that issue before, and I was going to cover

15      that in some argument, if we had had further argument.  But

16      will we be getting an opportunity to respond to whatever it

17      is that Vertical World provides?  And if so, by what date

18      would Your Honor like that?

19       THE COURT:  You know, of course, everyone gets an

20      opportunity to -- everyone gets an opportunity to respond.

21       And I know -- and I don't -- you know, so, Mr. Christie,

22      if -- you know, if you want to provide if before the 23rd,

23      that's great.  You don't have to.  I want to give you --

24       MR. CHRISTIE:  We'll do it.

25       THE COURT:  -- time.  I want to give you time.  And I

Pretrial Hearing - 6/14/2023

Page 39

1    don't see this as law review briefing.  But, you know, I --

2    I want you to be able to cover the issues and -- and get a

3    response that covers the issue because I know it's important

4    for both parties.

5     So, you know, as -- as I said before, I am not at all

6    wedded to one order on the fees and costs that covers both

7    parties because Mr. Cochran just has to get me his invoice,

8    as it were, and you have to give me briefing first and have

9    time for Mr. Keller.  So they may not line up.

10    MR. CHRISTIE:  Your Honor, we can have that to you by the

11    end of business on the 21st.  I think that's Tuesday we'll

12    have it to you.  And then that would Mr. Keller a couple

13    days if we wants to respond by the 23rd.  And as soon as you

14    make a decision on that, if you ask for our fee and cost

15    submission, we'll have that do you -- we could have it to

16    you two days later on the 25th, so --

17    THE COURT:  Great.

18    MR. CHRISTIE:  -- we want to keep it moving and --

19    THE COURT:  Yep.

20    MR. CHRISTIE:  -- we will.

21    THE COURT:  And I don't -- you know, I -- you know, we

22    don't -- I don't -- I don't need to have this matter wrapped

23    up before you are able to submit a notice of withdrawal.

24    You know -- you know, the -- the -- they're not related --

25    MR. CHRISTIE:  No --

Pretrial Hearing - 6/14/2023

Page 40

1     THE COURT:  -- so --

2     MR. CHRISTIE:  -- no problem.

3     THE COURT:  Okay.  So I need --

4     MR. CHRISTIE:  Thank you, Your Honor.

5     THE COURT:  -- a revised neutral statement by noon on

6     Monday the 19th and also a new list of proposed witnesses so

7     I can run those names through the jury, propo- -- our venire

8     so that if they have any conflicts, they will know.  I

9     assume that the slate of witnesses may be quite different

10    now.  And so I -- Mr. Christie and whoever -- everyone can

11    look at that list and get rid of the folks who aren't going

12    to be testifying.  And I'll need that the same thing, Monday

13    June 19th.  And I keep forgetting it's a holiday.  I will

14    probably be here, but close of the bi- -- business day is

15    fine on that day.  I just want to get our questionnaire

16    ready to go.

17     And just so you folks know, I am in -- in -- I'm going to

18    be indicating an the questionnaire that we expect this case

19    will last -- there will -- there will testimony that will

20    last eight days.  I -- I -- I -- that to me -- again, I was

21    just kind of going through what I knew.  That seems about

22    right given that Vertical World isn't a party.  If you think

23    I'm way off base on that, let me know.

24     MR. COCHRAN:  It depends, Your Honor, if we're -- if we're

25    talking about eight days basically from opening statement

Pretrial Hearing - 6/14/2023

Page 41

1    forward.  I think that's doable.

2      THE COURT:  Yes.  Not including voir dire.  I never

3    include voir dire.  And I have no --

4      MR. COCHRAN:  I'm you.

5      THE COURT:  Sorry.  I have no reason to believe that we

6    will need more than one day for voir dire.  I don't think we

7    will.  And I never do.  And so I don't think I will in this

8    case either.  And we're also going to be taking off a couple

9    days around the 4th of July holiday, which will prevent, I

10   believe, a lot of folks from saying, "Oh, I can't.  I'm

11   going here.  I'm going here."  I think that's going to cover

12   it.  So I'm going to tell them that, you know -- the words I

13   always use, "We expect eight days and, you know, not

14   necessarily in- -- not to include deliberations."  And, you

15   know, if -- if we have to move that around as we get through

16   trial, we will.  I -- I tend to run things really tightly,

17   and I am very rarely off on this.  But, of course, having a

18   party leave the case right before could certainly affect

19   that.  So but that's my plan right now.

20     The one thing I do need -- my bailiff needs very badly is

21   a -- a list of all -- you know, going forward for purposes

22   of trial only -- who will be -- who needs to be on the email

23   distribution list.  You know, who's going getting

24   correspondence.  Sounds like, Mr. Christie, you're done.

25   But if can get a list of who will be needing to receive

Pretrial Hearing - 6/14/2023

Page 42

1       communications from -- from the Court, that would be very

2       helpful.

3        In addition, start thinking -- you've got plenty of

4       time -- if there are folks that you want to be able to

5       participate at -- participate -- observe at trial, I don't

6       know who that might be, but I -- I -- I -- I want to let my

7       bailiff know in advance.  You know, I don't -- we don't like

8       to have -- to the extent that we can -- you know, we don't

9       tons of people, every summer associate.  We just -- we don't

10      do that.  It's distracting for the jurors.  Certainly, you

11      know, let me know of -- of the folks that you want to

12      provide this link to so that we can have an idea of how many

13      additional people will be on the call.  So if you could

14      think about that and think about who should receive emails,

15      that would be very helpful.

16       So --

17       MR. COCHRAN:  Thank you, Your Honor.

18       THE COURT:  -- you know, I've said a lot here, and I --

19      and I -- and I wish I -- if I had a chance to review the new

20      order, you know, maybe I could have saved some time here,

21      but I didn't.  I prepared by findings, everything I did,

22      based on what I knew and what I had before me in the old

23      order.  But so if I could get, you know, a revised order --

24      proposed revised order in the next couple of days, that

25      would be really helpful.  Don't worry.  I have copious

Pretrial Hearing - 6/14/2023

Page 43

1    notes.  I've got a whole pad of notes that I used to

2    formulate my opinion here today, and so I can go back and

3    check it off.  I am sure there are things that may have been

4    missed and I -- I understand that.  It's too bad we don't

5    have court reporters to get you a transcript right away, but

6    we don't.

7       All right.  Is there anything further that you folks think

8    needs to be addressed right now?

9       MR. COCHRAN:  No, Your Honor, not from Plaintiffs.

10      MR. CHRISTIE:  Not for Vertical World, Your Honor.

11      THE COURT:  Ms. Reynolds?

12      MS. REYNOLDS:  Not -- no.  Thank you, Your Honor.

13      THE COURT:  Thank you.

14      Mr. Keller?

15      MR. KELLER:  Nothing, Your Honor.  Thank you.

16      THE COURT:  All right.  Thank you, everyone, for your time

17   here today and your hard work and the briefing on this.  And

18   I will -- we will be in touch.

19      MR. COCHRAN:  Thank you.

20      MR. CHRISTIE:  Thank you.

21                (Conclusion of hearing)

22

23

24

25

Pretrial Hearing - 6/14/2023

Page 44

1                    C E R T I F I C A T E

2       STATE OF WASHINGTON        )

3                                  )

4       COUNTY OF KING             )

5              I, the undersigned, do hereby certify under penalty

6       of perjury that the foregoing court proceedings or legal

7       recordings were transcribed under my direction as a certified

8       transcriptionist; and that the transcript is true and accurate

9       to the best of my knowledge and ability, including changes, if

10      any, made by the trial judge reviewing the transcript; that I

11      received the electronic recording in the proprietary court

12      format; that I am not a relative or employee of any attorney or

13      counsel employed by the parties hereto, nor financially

14      interested in its outcome.

15             IN WITNESS WHEREOF, I have hereunto set my hand

16      this 22nd day of June, 2023.

17

18

19

20

21

22      _____

23      s/ Jennifer A.P. Albino, CET

24

25

# EXHIBIT 7



**RUGGERI**
**PARKS**
**WEINBERG** LLP

James P. Ruggeri
Phone: 202-469-7752
jruggeri@ruggerilaw.com

June 17, 2023

**VIA EMAIL**

Ms. Lauren Kasheta
Claims Director
LDG Reinsurance Corporation
401 Edgewater Place, Suite 400
Wakefield, MA  01880
lauren_kasheta@ldgre.com

   Re: **Named Insured:**  **C3 Manufacturing, LLC**
       **Policy No.:**   **H18PX50121-00**
       **Effective Dates:**  **10/11/2018 – 10/11/2019**
       **Your Claim No.:**  **XPL-18-00175**
       **Underwriting Company:** **Houston Casualty Company**

Dear Ms. Kasheta:

This firm represents Great American E & S Insurance Company ("Great American") in
connection with C3 Manufacturing, LLC's ("C3") claim for coverage for *Vandivere, et al. v.
Vertical World, Inc., et al.*, Case No. 19-2-2738502 (King Cnty., Wash. Super.) (the "*Vandivere*
Action") pending in Washington state court.  If you are represented by counsel in connection
with this matter, please forward this correspondence to their attention or provide contact
information so that I may.

Great American issued Policy No. PL17453470-01 to C3 for policy period 10/11/2018-
10/11/2019 (the "Great American Policy").  The Great American Policy provides C3 with
primary commercial general liability insurance subject to a $1,000,000 per occurrence limit.
Houston Casualty Company ("Houston Casualty") issued Policy No. H18PX50121-00 to C3 (the
"Houston Casualty Policy"), which is excess to the Great American Policy and provides
$4,000,000 of umbrella coverage to C3 over the Great American Policy.  I understand that
Houston Casualty recently made the decision to refuse to participate in the potential settlement of
the *Vandivere* Action based on a purported rescission or cancellation of the Houston Casualty
Policy for alleged misrepresentations in C3's application for insurance.  Houston Casualty's
attempt to rescind or cancel the Houston Casualty Policy after a covered accident has taken place
is a violation of applicable law, and Houston Casualty's refusal to participate in settlement is a
clear violation of its duty to participate in settlement decisions in good faith.  We ask Houston
Casualty to reconsider its position and to confirm that it will participate in good faith in efforts to
settle the *Vandivere* Action.

GAESIC000149

Ms. Lauren Kasheta
June 17, 2023
Page 2 of 2

Here is a summary of my understanding of the relevant facts.  On January 26, 2023, you sent a letter to Ron Naranjo of C3 purporting to rescind the Houston Casualty Policy based on alleged material misrepresentations that you claimed C3 made in the application for the policy.  Also on that date, the broker that placed the Houston Casualty policy, Veracity Insurance Solutions, sent a Policy Change Notification to Mr. Naranjo at C3.  The covering e-mail forwarding the cancellation notice described it as a "FLAT CANCELLATION of the 18/19 policy per the carrier's request," and the Policy Change Notification indicated that the Houston Casualty Policy was "cancelled effective inception."  The January 26 letter enclosed a refund check for the premium associated with the Houston Casualty policy, and the Policy Change Notification was accompanied by an invoice that also reflected the return of the premium amount to C3 as a result of the cancellation.  C3 contested the rescission attempt and did not cash the check.  Houston Casualty did not notify Great American of Houston Casualty's purported rescission or cancellation, and the Superior Court has ruled the plaintiff's counsel may depose Houston Casualty in regard to the above events in the *Vandivere* Action.

We are aware of no law under either potentially applicable state's law (Colorado or Washington) that would allow Houston Casualty to cancel its policy retroactively for accidents that occurred prior to the attempted cancellation.  And, of course, even if Houston Casualty cleared that obstacle, it is far from clear that it would prevail on the merits based on the documents I have seen.  These are issues we understand Houston Casualty will be forced to address at deposition if the *Vandivere* Action does not settle.  Rather than confront that distraction, Houston Casualty should reconsider its coverage position and join us in trying to resolve the matter.  Time is of the essence; trial is scheduled to start June 23, 2023, in Seattle.  Should Houston Casualty refuse to reconsider its position and that decision cause Great American to have to pay amounts that it would not otherwise have to pay, Great American reserves all rights against Houston Casualty.


Should you or counsel have any questions, please let me know.


Sincerely yours,

James P. Ruggeri

GAESIC000150

# EXHIBIT 8

# Deposition of Jeffrey Scott Wood

# Vandivere, et al. v. Vertical World, Inc.

# June 22, 2023



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



GAESIC000151

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

---

**Page 1**

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

_____

MICHAEL VANDIVERE and KATHRYN )
SNOW VANDIVERE, husband and )
wife, and their marital )
community, and KATHRYN SNOW )
VANDIVERE, as the legal )
guardian of W.V., a minor, )

      Plaintiffs, )

   vs.                   ) No. 19-2-27385-2
                         )
VERTICAL WORLD, INC., a )
Washington State Corporation; )
C3 Manufacturing, LLC, a )
Colorado Company, )

      Defendants.

_____

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF
JEFFREY SCOTT WOOD

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  JUNE 22, 2023
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

---

**Page 2**

```
              A P P E A R A N C E S
2
   FOR PLAINTIFFS:
3       DARRELL L. COCHRAN
        ANDREW S. ULMER
4       Pfau Cochran Vertetis Amala
        909 A Street
5       Suite 700
        Tacoma, WA 98402
6       253.777.0799
        darrell@pcvalaw.com
7       aulmer@pcvalaw.com
8
   FOR DEFENDANT C3 MANUFACTURING:
9
        GREGORY S. WORDEN
10      Lewis Brisbois Bisgaard & Smith LLP
        1111 Third Avenue
11      Suite 2700
        Seattle, WA 98101
12      206.436.2028
        Gregory.Worden@Lewisbrisbois.com
13
   FOR SINARS SLOWISKOWSKI TOMASKA and CHRISTOPHER FURMAN:
14
15      BRADLEY S. KELLER
        Byrnes Keller Cromwell LLP
16      1000 Second Avenue
        38th Floor
17      Seattle, WA 98104
        206.622.2000
18      bkeller@byrneskeller.com
19
   FOR THE WITNESS:
20
        JEFFREY T. KESTLE
21      Forsberg & Umlauf, P.S.
        901 Fifth Avenue
22      Suite 1400
        Seattle, WA 98164-2050
23      206.689.8500
        jkestle@foumlaw.com
24
25          * * * * *
```

---

**Page 3**

```
1         DEPOSITION OF JEFFREY SCOTT WOOD
2              EXAMINATION INDEX
3    EXAMINATION BY:                    PAGE
4    Mr. Cochran                        4
5    Mr. Keller                         48
6    Mr. Cochran                        61
7    Mr. Keller                         63
8    Mr. Cochran                        64
9
10             EXHIBIT INDEX
11   EXHIBITS FOR IDENTIFICATION        PAGE
12   Exhibit 1  Declaration of James D. Hicks in   19
              Support of the Sinars Firm and
13            Mr. Furman's Opposition to
              Plaintiffs' Motion for Sanctions
14
     Exhibit 2  5-page letter to Ron Naranjo from   28
15            Lauren Kasheta dated 10/4/2022;
              C3MFGLLC-VANDIVERE-004371 - 375
16
     Exhibit 3  3-page letter to Lauren Kasheta      39
17            from James Moss dated 11/2/2022;
              C3MFGLLC-VANDIVER-004411 - 413
18
     Exhibit 4  Declaration of James H. Moss in     44
19            Support of Defendant C3's
              Opposition to Plaintiffs' Motion
20            for Sanctions
21
22
23
24
25
```

---

**Page 4**

```
1         SEATTLE, WASHINGTON; JUNE 22, 2023
2              12:31 p.m.
3                 -o0o-
4    JEFFREY SCOTT WOOD,      witness herein, having been
5              first duly sworn on oath,
6              was examined and testified
7              as follows:
8         E X A M I N A T I O N
9    BY MR. COCHRAN:
10       Q.  We'll have you state your full name for the
11   record.
12       A.  Sure.  Jeffrey Scott Wood.
13       Q.  And your present place of business?
14       A.  I'm presently employed by the law firm of
15   Gordon Rees.
16       Q.  And how long have you been with Gordon Rees?
17       A.  Since the end of April.  April 28th, I believe.
18       Q.  Are you represented by counsel here for this
19   deposition?
20       A.  I am.
21       Q.  Who is that?
22       A.  Mr. Jeff Kestle.
23       Q.  What firm is Mr. Kestle with?
24       A.  Forsberg Umlauf.
25       Q.  In preparation for this deposition, have you
```

---

1 (Pages 1 to 4)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 5

1    met with lawyers other than Forsberg & Umlauf lawyers?
2        A.  No.
3        Q.  How about with Greg Worden?
4        A.  No.
5        Q.  No conversations or communications with Greg
6    Worden in the last week?
7        A.  No.
8        Q.  Have you submitted any declarations for
9    purposes of the Court's consideration in the Vandivere
10   case in the last 45 days?
11       A.  I -- no.  I don't believe I did a declaration
12   in connection with the motion to continue the trial
13   date.
14       Q.  Was it --
15       A.  Without specific -- yeah, I don't remember.  I
16   may have done a declaration as part of the motion to
17   continue the trial date, but otherwise no declarations
18   in the last 45 days.
19       Q.  With respect to the sanctions proceedings that
20   have been going on in the Vandivere case in the last 45
21   days, have you made a decision consciously not to submit
22   a declaration?
23       A.  No.
24       Q.  In other words, has there been a strategic
25   reason why you have not provided the Court with input

Page 6

1    from your knowledge base about the circumstances
2    underlying the sanctions motions?
3        A.  I -- well, one, I haven't seen all of the
4    briefing.  I got some stuff that I was served with early
5    on; some of which I've seen more recently, in the past
6    couple days.  But I don't -- I didn't make some
7    conscious decision not to submit a declaration.
8        Q.  Have you reviewed declarations that have been
9    submitted on behalf of C3 about knowledge that you had
10   of the Tokio Marine rescission of the excess policy?
11       A.  The only declaration I've reviewed was
12   Mr. Moss's.
13       Q.  Have you reviewed the declaration of Mr. Hicks?
14       A.  No.
15       Q.  Have you had a discussion or any communications
16   with Mr. Hicks about the declaration that he submitted
17   concerning the firm's knowledge -- Sinars firm knowledge
18   of the rescission of the Tokio Marine policy?
19       A.  No.
20       Q.  When did you begin representing C3
21   Manufacturing?
22       A.  I think maybe April of 2021, roughly around
23   then.
24       Q.  You were with Foley & Mansfield firm at that
25   time?

Page 7

1        A.  I was.
2        Q.  Do you remember submitting a notice of
3    appearance around May 21st of 2021?
4        A.  That sounds about right.
5        Q.  Nope.  Sorry.  June 23 of 2021.  Does that
6    sound right?
7        A.  That sounds about right.
8        Q.  Okay.  When you were first contacted about
9    representing C3, was that by a representative of Great
10   American Insurance Company?
11       A.  It was, I believe.
12       Q.  In other words, were you retained by Great
13   American Insurance Company to represent C3?
14       A.  Yes.
15       Q.  And at any point were you endorsed by Tokio
16   Marine to also represent C3?
17       A.  I don't know what "endorsed" means.
18       Q.  Approved, endorsed, an accord reached,
19   understanding?
20       A.  Not to my knowledge, no.
21       Q.  During the entire time that you represented C3
22   Manufacturing, was Great American always paying their
23   legal bills?
24       A.  Yes.
25       Q.  You left Foley & Mansfield when?

Page 8

1        A.  January of -- about a year and a half ago, so
2    what is that?  January of 2022, I believe.
3        Q.  And you took the C3 Manufacturing file with you
4    to the Sinars firm; is that right?
5        A.  Yes.
6        Q.  Did you take a number of Great American files
7    with you from Foley & Mansfield to Sinars?
8        A.  I don't think so.  I don't think so, no.  I
9    do --
10       Q.  In other words, how did it come to pass that
11   you took C3 Manufacturing file with you to Sinars, but
12   not other Great American work?
13           MR. KESTLE:  And object to the extent it
14   calls for attorney-client communications.
15   BY MR. COCHRAN:
16       Q.  Go ahead.
17       A.  I don't -- I mean, I do work for a variety of
18   clients.  I don't remember who was the payor on
19   various -- there are some clients that have multiple
20   insurance companies, for instance.
21           And so there may have been some files that --
22   or some clients that I continued to represent after I
23   transferred that perhaps Great American was a portion
24   of.  But I don't remember any other Great American
25   cases.

2 (Pages 5 to 8)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 9

1    Q.  And then you gave the date that you left the
2  Sinars firm for Gordon Rees, but I didn't get it.  It
3  was April 28th?
4    A.  Yeah.  It was the very last day of April.
5    Q.  And you did not take the C3 Manufacturing file
6  with you to the Gordon Rees firm; correct?
7    A.  Correct.
8    Q.  And you didn't take the C3 Manufacturing file
9  with you to Gordon Rees because there was a conflict
10  between Gordon Rees and their representation of Tokio
11  Marine that prohibited them from allowing you to
12  represent C3; is that correct?
13          MR. KESTLE:  Object to the extent it calls
14  for attorney-client communications.
15          MR. COCHRAN:  It won't.
16  BY MR. COCHRAN:
17    Q.  Go ahead.
18    A.  Yeah, well, I mean, there was a conflict.  I
19  don't know that I can get into the details of the
20  conflict without getting into attorney-client
21  communications.
22    Q.  I think it's been disclosed that Tokio Marine
23  is represented by Gordon Rees on actions, and that was
24  the reason why it could not take on the C3 file.
25          Are you aware of that?

Page 10

1    A.  I know there was a conflict that I wasn't able
2  to represent C3 at my -- continue to represent C3 at my
3  new firm.  And I don't know how to respond to the
4  question without getting into details of communications
5  with clients.
6    Q.  You officially joined the Gordon Rees firm
7  April 28, 2023, but was there a point at which you
8  advised your partners at the Sinars firm that you were
9  leaving to go to Gordon Rees prior to April 28th?
10    A.  Yes.
11    Q.  When was that?
12    A.  I think it was a day or two before.
13    Q.  April 27?
14    A.  Yeah, it was -- I can't remember the precise
15  day.  It was certainly between -- I left on a Friday,
16  and it was between that Monday and Thursday.
17    Q.  You've got -- you had some email correspondence
18  with your partners at Sinars, notifying them that you
19  were leaving, and that was on April 27th; right?
20    A.  I -- I don't think I told them by email.  I
21  remember I let them know.  I remember I had a meeting
22  about -- like maybe Wednesday about logistics.  So I
23  know at least by Wednesday they knew, and they knew
24  where I was going.
25    Q.  Am I correct in understanding, though, that,

Page 11

1  prior to that week of April 24, 2023, you had not
2  notified the Sinars law firm that you would be leaving
3  to Gordon Rees?  True?
4    A.  I think that's true.
5    Q.  All right.  And in fact, you hadn't been
6  talking to anyone at Sinars about leaving the Sinars
7  firm in January or February or March, other than perhaps
8  Virginia Leeper, who was leaving with you; right?
9    A.  I'm not sure how to answer that.  I'm not sure
10  that -- I think that is correct.
11    Q.  All right.  For example, you didn't tell Chris
12  Furman that he could start going to access the Vertical
13  World gym because you were leaving and taking the C3
14  file with you in January, did you?
15    A.  I -- I did not tell Chris Furman in January
16  that I was leaving, correct.
17    Q.  Nor did you tell him that in February or March?
18    A.  Correct.  I -- correct.
19    Q.  When did you notify Chris Furman that you were
20  leaving the Sinars firm?
21    A.  I don't think I talked to Chris or told him I
22  was leaving until after I left.
23    Q.  Until after April 28th --
24    A.  Correct.
25    Q.  -- of 2023?

Page 12

1    A.  Correct.
2    Q.  So to the extent that he has represented to our
3  Court in the Vandivere case that he was accessing
4  Vertical World's gym in the early part of 2023 because
5  he knew you were taking the case, that would not be
6  accurate.  Agreed?
7          MR. KESTLE:  Object to form.
8    A.  Let me make sure I understand the question.  If
9  he testified that in January of 2023 he knew I was
10  leaving the firm to go to Gordon Rees, correct, that
11  would not be accurate.
12  BY MR. COCHRAN:
13    Q.  And that wouldn't be true in February or March
14  or even up through April 28th; right?
15    A.  It would not be accurate if you say before the
16  last week of April, correct.
17    Q.  Did Chris Furman check with you about the fact
18  that he was accessing Vertical World's gym in February,
19  March, and April of 2023?
20    A.  No.
21    Q.  And just to be clear, did you approve Chris
22  Furman going to use the Vertical World gym at any point
23  in the litigation with Vandivere?
24    A.  I didn't know he was going to Vertical World
25  until after I left the Sinars firm.

3 (Pages 9 to 12)

Vandivere, et al. v. Vertical World, Inc.                                                Jeffrey Scott Wood

---

Page 13

1    Q. So let me ask this better.
2        At any point did you approve of Chris Furman
3    accessing Vertical World's gym?
4        MR. KESTLE: Object to form.
5        Go ahead.
6    A. Yeah, I guess I'm not sure what you mean,
7    "approve." You know, I didn't know he was going to
8    Vertical World gym before I left the Sinars firm.
9    BY MR. COCHRAN:
10       Q. You only found out that Chris Furman was
11   accessing the Vertical World gym as a member after the
12   point at which you left the Sinars firm in late April of
13   2023; is that true?
14       A. That's true.
15       Q. Did you become aware of other attorneys in your
16   firm purportedly approving of Chris Furman's membership
17   at the Vertical World gym?
18       A. I did.
19       Q. And how did you find out about that?
20       A. I called -- well, one, I've read Chris Furman's
21   deposition trans- -- or portions of Chris Furman's
22   deposition transcript. But I called Chris, and he told
23   me that.
24       Q. Did you call Chris after his deposition was
25   taken?

Page 14

1    A. No. I called him before, I think about within
2    a week of when I departed Sinars.
3        Q. And so why did you call him at that point?
4        A. Ann Trivett had called me and said that she was
5    going to list Chris Furman as a witness, and she told me
6    that Chris had told somebody, one of our partners, that
7    he had been climbing at the Vertical World gyms.
8        Q. And then you called Chris Furman?
9        A. Yes.
10       Q. Tell me about that conversation.
11       A. He told me that was correct. He told me he had
12   discussed it with Duncan Lemmon and Jim Hicks. And he
13   told me he had called Vertical World's counsel and told
14   them that. And he told me something about stopping
15   going there because it was, he felt, uncomfortable, or
16   people were staring at him or...
17       Q. And what was your -- and what were your
18   questions to Chris Furman?
19       A. I don't -- other than asking if it was true,
20   and he had gone, and who he had discussed it with, I
21   think that was it.
22       Q. Let me confirm. From February of 2023,
23   through, say, April 24 of 2023, you would have been the
24   lead attorney representing C3 Manufacturing; right?
25       A. I'm not sure, I guess, what you would call

Page 15

1    "lead," but I would say that Duncan Lemmon and I
2    together were sort of leads.
3        Q. If we look at the attorneys in the notice of
4    appearance or even on pleadings, you were the lead
5    attorney on it; right?
6        A. I was -- yeah, I probably was listed as the
7    first attorney.
8        Q. And did Jim Hicks represent C3, other than just
9    generically as a partner within the Sinars firm?
10       A. I'm trying to think how I can answer this
11   without getting into work product issues. I guess I --
12   well, Mr. Hicks would have had limited involvement. I
13   guess that's what I would say.
14       Q. Phrased differently, did Jim Hicks ever put a
15   notice of appearance in, representing C3 for purposes of
16   the Vandivere litigation?
17       A. I don't think so.
18       Q. And when you talked to Chris Furman about the
19   circumstances in which he had become a member of the
20   Vertical World gym, did you ask him why he hadn't
21   discussed it with you?
22       A. No.
23       Q. Did he explain why he hadn't discussed it with
24   you?
25       A. No.

Page 16

1    Q. Have you talked to Duncan Lemmon about whether
2    Chris Furman received his approval to become a Vertical
3    World gym member in the months leading up to our
4    Vandivere trial?
5        A. I think I talked to Duncan Lemmon that same
6    day.
7        Q. Tell us about that conversation.
8        A. Well, a lot of it was what I would consider
9    work product. But putting that aside, I talked to him
10   about a -- Chris Furman going to the gym.
11       Q. And did you ask Duncan Lemmon about whether he
12   had approved of that?
13       A. I didn't ask him that, no.
14       Q. Did he tell you about whether he had approved
15   of Chris Furman accessing the Vertical World gym?
16       A. I think what he -- well, I think he told me he
17   was aware of Chris Furman going to the gym, and that he
18   didn't see any issues with it.
19       Q. And have you talked to Jim Hicks about Chris
20   Furman accessing the Vertical World gym as well?
21       A. No.
22       Q. Have you talked to Jim Hicks at all about the
23   Chris Furman situation?
24       A. No. I had talked to -- Jim Hicks called me
25   about who the current lawyer was for C3, and I gave him

4 (Pages 13 to 16)

Vandivere, et al. v. Vertical World, Inc.                                                Jeffrey Scott Wood

---

Page 17

1  that information.
2       Q. Did Virginia Leeper appear as a substitute for
3  Chris Furman in late April of 2023, in terms of
4  representing C3?
5       A. I'm not sure. I'm not sure I understand what
6  you mean.
7       Q. So there was --
8       A. I think --
9       Q. -- at least some discussion about the fact that
10  Chris Furman did these notices of withdrawal because you
11  were taking C3 Manufacturing with you when you were
12  leaving the Sinars firm.
13       That's not why Chris Furman did a withdrawal as
14  an attorney for C3, is it?
15       MR. KELLER: Objection. Lack of foundation.
16  BY MR. COCHRAN:
17       Q. Go ahead.
18       MR. KESTLE: Yeah, and objection to the
19  extent it calls for discussion of work product
20  privileged information.
21  BY MR. COCHRAN:
22       Q. Go ahead. You can answer this.
23       A. Yeah, I don't know.
24       Q. You didn't tell Chris Furman that you were
25  taking C3 Manufacturing as of April 27, 2023; true?

---

Page 18

1       A. That is true.
2       Q. In fact, you wouldn't have told anyone you were
3  taking C3 Manufacturing as a client because you already
4  knew that you couldn't do that because Gordon Rees had a
5  conflict; right?
6       A. I don't know how to get into that, to answer
7  that question without getting into conversations I've
8  had with -- with the client.
9       Q. Let me put it this way: You never told anyone
10  at the Sinars firm that you would be taking C3
11  Manufacturing with you to the Gordon Rees firm; true?
12       A. Yeah, I don't recall ever having a conversation
13  like that.
14       Q. At some point, as you're leaving the Sinars
15  firm and transitioning to Gordon Rees, everyone knows
16  what cases you're going to take and what cases you're
17  leaving; true?
18       A. At some point, yeah. It -- you know, it --
19  it's an evolving process, but yes.
20       Q. And you made it clear that you would not be
21  taking the C3 Manufacturing file with you to the Gordon
22  Rees firm; true?
23       A. I guess I'm not -- made clear to who? I'm not
24  sure I'm following your question. Sorry.
25       Q. Anybody at Sinars.

---

Page 19

1       A. I -- I would have -- at some point I -- we -- I
2  would have communicated to Sinars that Lewis Brisbois
3  was taking over the representation of C3. I don't
4  recall exactly when that was or how that was
5  communicated.
6       Q. That's something that could be figured out
7  today; right?
8       A. Figured out what? When it occurred or --
9       Q. Right.
10       A. Yeah, I suppose I could try to think about --
11  well, I'm not sure how I communicated it to Sinars,
12  other than that phone call that I had with Mr. Hicks,
13  where he asked, and I told him Lewis Brisbois was
14  appearing for C3.
15       Q. And when did that happen?
16       A. I -- midway, mid-May, roughly.
17       MR. COCHRAN: Let me mark as Exhibit 1 a
18  declaration that Jim Hicks filed with the Court on
19  June 6, 2023, in Cabo San Lucas. Exhibit 1, I'll share
20  that.
21       Scott, I'll make sure you can scroll that in
22  case you haven't seen it before.
23       (Exhibit No. 1 marked.)
24       MR. ULMER: Scott, I gave you the ability to
25  scroll through it.

---

Page 20

1       THE WITNESS: All right. That may be beyond
2  my technical skills, but let me try.
3       MR. COCHRAN: It's just a mouse. All you
4  need is a mouse for this one.
5       THE WITNESS: Well, that's still the upper
6  limits of my -- okay. Okay. I've looked at it.
7  BY MR. COCHRAN:
8       Q. So I want to start with Paragraph 4 of
9  Mr. Hicks' declaration, where it says, "Scott Wood began
10  taking steps to remove himself and his clients to a new
11  law firm in early 2023."
12       When was that?
13       A. I don't know what he's referring to.
14       Q. Did that happen?
15       A. I don't remember when I first started
16  interviewing with my current firm, but it was probably
17  sometime -- well, clearly it was before April.
18       Q. Would it have been as early as January or
19  February?
20       A. Probably.
21       Q. And when did you -- strike that.
22       In looking at this first sentence of
23  Paragraph 4 where it says, "Scott Wood began taking
24  steps to move himself and his clients to a new law firm
25  in early 2023," let me ask this follow-up: Did you run

---

5 (Pages 17 to 20)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

<table>
<tr><td>

Page 21

1  clients through the conflict check at Gordon Rees to
2  have an understanding about what you could and could not
3  take?
4       A. I don't know -- well, let -- trying to figure
5  out how best to answer this. I'm not -- I don't know
6  how Gordon Rees actually does conflicts. All firms do
7  them differently. And I'm still kind of trying to
8  figure some of that stuff out.
9       So how it was checked and when, I just don't
10  know, I guess is what I'm trying to say.
11      Q. In the process, though, of transitioning to a
12  new firm -- and I did this with Gordon Thomas back in
13  the day -- there is a process by which you want to,
14  yourself, understand about what clients you're going to
15  be taking and what clients you're going to leave.
16      And I'm assuming that you ran your cases and
17  your clients through Gordon Rees's conflict check to
18  understand what you could take and what you could not
19  take.
20      Did that happen?
21      MR. KELLER: Are you asking before he left
22  Sinars, or after?
23  BY MR. COCHRAN:
24      Q. I'm asking, did that happen, and when?
25      A. At some point all of the clients that I had

</td><td>

Page 23

1  going to go to the Gordon Rees firm?
2       A. I think maybe the week before. I think around
3  the first week of May.
4       Q. I want to transition now into talking about the
5  Tokio Marine rescission of its excess policy. When did
6  you first understand that there might be an issue with
7  whether Tokio Marine was going to rescind its policy for
8  C3 Manufacturing?
9       MR. KESTLE: Object to the extent it calls
10  for attorney-client work product information.
11      A. Yeah, I don't -- I don't know how to answer
12  that question without getting into attorney-client
13  communications.
14      MR. KESTLE: Okay. And the objection is
15  also attorney-client privilege.
16      MR. COCHRAN: I don't think that exists
17  because it doesn't exist between policyholders and
18  anyone else. So what would be the basis of an
19  attorney-client privilege instruction not to answer?
20      MR. KESTLE: I'll withdraw that. It's a
21  work product privilege objection.
22  BY MR. COCHRAN:
23      Q. I'm not asking about attorney work product at
24  all. I'm talking about, when did you first know there
25  was an issue with the Tokio Marine policy?

</td></tr>
<tr><td>

Page 22

1  been asked to continue representation of at my new firm
2  were run through conflicts at my new firm.
3       Q. When did that happen?
4       A. Well, it's -- it's not a set date, I guess.
5  It's the -- what I'm trying to explain. So each client
6  would be -- first of all, there's always an issue about,
7  A, does this client wish you to continue representation
8  of them at your new firm?
9       And that communications -- or that -- it's just
10  a -- you know, it's a rolling process. I can't say,
11  hey, on March 3rd every one of my clients that had
12  communicated to coming with me to my new firm had gone
13  through conflicts internally.
14      Q. Fair enough.
15      A. Does that make sense?
16      Q. It does. I understand.
17      When did you know that you would not be taking
18  C3 Manufacturing with you to Gordon Rees?
19      A. I think at or around the time I sent an email
20  to the Court, letting them know that we'd be
21  withdrawing.
22      Q. What's your best estimate of when that
23  happened?
24      A. Like the second week of May.
25      Q. And when did you know that Virginia Leeper was

</td><td>

Page 24

1       A. Yeah, I don't know how to answer that question
2  without revealing the substance of an attorney-client
3  communication.
4       Q. It's not an attorney-client communication.
5  It's the point at which you stopped. So the point at which there
6  was a concern about Tokio Marine rescinding its policy.
7       MR. KESTLE: And if you can answer that
8  without revealing client communications, then you can
9  answer it. But if you can't, I'll instruct you not to
10  answer.
11      A. Yeah, I don't know how to answer your question
12  without getting into the substance of the conversation I
13  had with -- with a client, or former client.
14  BY MR. COCHRAN:
15      Q. When did you first have communication with
16  Tokio Marine about its policy?
17      A. When did I communicate with Tokio Marine about
18  its policies? I've never communicated with Tokio
19  Marine.
20      Q. Just so we're clear on the record, am I to
21  understand that from the point at which you began
22  representing C3 until the point at which you stopped
23  representing C3, which would be between April of 2021
24  and April 2023, that you never had any communications
25  with Tokio Marine/Houston Casualty Company?

</td></tr>
</table>

6 (Pages 21 to 24)

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

GAESIC000157

Vandivere, et al. v. Vertical World, Inc.                                        Jeffrey Scott Wood

Page 25

1    A. Not that I remember.
2    Q. Did you ever copy them courtesy copies of
3    pleadings or any materials from the litigation?
4    A. Not that I remember, no.
5    Q. In answering questions about what insurance
6    policies existed, did you or your law firm make contact
7    with Tokio Marine/Houston Casualty to understand whether
8    it provided coverage to C3 Manufacturing?
9    A. I don't believe so, no.
10   Q. And your testimony is that you had no
11   communications with Tokio Marine/Houston Casualty
12   Company about its inquiries into representations made in
13   its application by C3 or its decision to rescind the
14   policy; is that right?
15       MR. KESTLE: Object to form.
16       Go ahead.
17   A. Me personally, no, I never have.
18   BY MR. COCHRAN:
19   Q. Did anybody at the Sinars law firm or any other
20   law firm that you were part of receive those
21   communications?
22       MR. KESTLE: Object to form. Vague.
23   A. Yeah, I don't -- not that I know of.
24   BY MR. COCHRAN:
25   Q. Well, you've opaquely discussed Jim Hicks'

Page 26

1    role. Was Jim Hicks the insurance coverage person in
2    your firm at Sinars communicating with the Tokio Marine/
3    Houston Casualty folks?
4    A. I don't know if Mr. Hicks communicated with
5    Tokio Marine, if that's what the question is, or that's
6    how -- that's what I understand the question to be.
7    Q. Was that his limited role, was insurance
8    coverage issues?
9    A. You mean within the firm generally? No.
10   Q. No, I mean specifically as to C3. You
11   testified earlier he had a limited role. Was it about
12   insurance coverage?
13   A. I mean, I don't -- I don't know how to answer
14   that question without getting into work product
15   discussions.
16   Q. So what work product am I asking for?
17   A. How responsibilities are divvied up in
18   defending a client.
19   Q. That's pure fact. I don't know what work
20   product you're talking about. If you're not going to
21   answer, you're not going to answer.
22   A. Well --
23       MR. KESTLE: Hold on sec. I instruct you
24   not to answer to the extent that's going to reveal
25   attorney-client work product information.

Page 27

1        MR. COCHRAN: Maybe you can articulate for
2    Court what work product that that would reveal in
3    identifying Jim Hicks as the primary contact person
4    about coverage issues.
5        MR. KESTLE: I believe that the witness has
6    explained his position on the work product privilege.
7        MR. COCHRAN: What you haven't explained in
8    invoking a privilege and instructing the witness not to
9    answer is how that reveals a work product.
10       MR. KESTLE: I'll leave it at that. I've
11   got my instruction to my client, to my witness, not to
12   answer.
13   BY MR. COCHRAN:
14   Q. Mr. Wood, you received a copy of the October 4,
15   2022, letter from Tokio Marine/Houston Casualty Company,
16   discussing its concerns that there were material
17   misrepresentations made by C3 in its application; true?
18   A. Can you show me the document or --
19   Q. Yes.
20   A. Thank you.
21       MR. COCHRAN: I'll make it Exhibit 2. I
22   suspect that you looked at it last week, but I'm happy
23   to show it to you again.
24       MR. ULMER: This is the October 4, 2022,
25   letter, Darrell? Is that --

Page 28

1        MR. COCHRAN: Yes.
2        MR. ULMER: Okay.
3        MR. COCHRAN: That will be Exhibit 2.
4        (Exhibit No. 2 marked.)
5        MR. ULMER: And, Scott, I've given you the
6    ability to scroll.
7    A. Okay. I've looked at it quickly. I don't
8    believe I've seen that document before.
9    BY MR. COCHRAN:
10   Q. Your testimony under oath is that you've never
11   seen this document before?
12   A. Yeah. That's -- I don't remember seeing this
13   document before. I did look at some documents in the
14   last week or so, and I don't recall even this being in
15   those documents I looked at in the last week or so.
16   Q. What documents have you looked at in the last
17   week or so?
18   A. I looked at some of the briefing related to
19   this discovery motion, and I looked at Mr. Moss's
20   declaration and the attachments to that.
21   Q. Mr. Furman's deposition, it sounds like?
22   A. Well, I looked at the excerpts to Mr. Furman's
23   deposition, that I think your office included in your
24   reply, or surreply on the discovery motion, and I think
25   it's like a rough maybe of Mr. Furman's transcript, and

7  (Pages 25 to 28)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

---

Page 29

1    I think it's just pages, right, just excerpts?
2        Q. I don't know what you looked at, so I can't
3    make any representation.
4        A. Oh, sorry. I believe it was just excerpts. I
5    don't believe it was the whole rough of Mr. Furman's
6    transcript.
7        Q. I'm going to turn our attention back to this
8    Exhibit 2, the October 4, 2022, letter from Tokio Marine
9    to Mr. Naranjo.
10       You were representing Mr. Naranjo and C3
11   Manufacturing at this point, October 4, 2022; correct?
12       A. Correct.
13       Q. You're not denying that you understood the
14   substance of Tokio Marine's concerns expressed in this
15   October 4, 2022, letter, are you?
16       MR. KESTLE: Object to form, and object to
17   the extent it calls for your communications with your
18   client or your clients.
19   BY MR. COCHRAN:
20       Q. Go ahead. You can answer.
21       A. I don't -- yeah, I don't know how to answer the
22   question without getting into details of conversations I
23   had with -- with my client, C3 Manufacturing.
24       Q. It doesn't have to. I'm not asking about any
25   particular conversation. I'm asking about whether you

Page 30

1    deny or acknowledge that you knew about the substance of
2    what Tokio Marine included as concerns expressed in its
3    October 4, 2022, letter.
4        MR. KESTLE: And the objection to the extent
5    it calls for attorney-client privileged communications,
6    or revealing those communications through the answer,
7    and instruct you not to answer to the extent that it
8    does.
9        MR. COCHRAN: I think it's improper to
10   instruct him not to answer on the subject.
11   BY MR. COCHRAN:
12       Q. And I'd ask you to answer the question.
13       A. So I'm going to follow my lawyer's advice and
14   decline to answer the question.
15       Q. It's been disclosed earlier this morning in
16   Mr. Moss's deposition that you had a conversation with
17   him about the subject matter of this October 4, 2022,
18   letter, in a telephone conversation you had with him on
19   October 14, 2022.
20       Do you acknowledge that conversation?
21       MR. KESTLE: Objection. Work product
22   privilege.
23       MR. COCHRAN: Go ahead and articulate for
24   the Court how it's a work product privilege that hasn't
25   been waived, to the extent that it was.

Page 31

1        MR. KESTLE: Well, I don't know that it was
2    waived.
3        MR. COCHRAN: Okay. Go ahead and explain
4    then the basis for your work product discussion,
5    privilege -- strike that.
6        Go ahead and explain your work product
7    privilege instruction.
8        MR. KESTLE: It's two attorneys for a client
9    discussing something. The only way to answer the
10   question is to reveal what was discussed in those
11   conversations. Attorney work product privilege applies.
12       MR. COCHRAN: Counsel, I don't know if you
13   have appeared in the action and you understand the basis
14   for the sanctions hearings that have been ongoing, and
15   led to the ability that we have to depose Mr. Wood, but
16   this is the precise subject matter that we're exploring.
17       So I'd ask you to reconsider the objection and
18   the instruction not to answer, given the Court's
19   interest in when Mr. Wood knew and when the Sinars firm
20   knew of these particular events.
21       MR. KESTLE: No, and I appreciate that. If
22   my client's former client would authorize him testifying
23   along those lines, we would reconsider.
24       MR. COCHRAN: You're asking Mr. Keller for
25   permission?

Page 32

1        MR. KESTLE: I don't have authorization from
2    my client's former client to allow him to testify along
3    those lines.
4        MR. KELLER: I don't think that ask was --
5    or that inquiry was to Keller. I think that was to C3's
6    counsel.
7        MR. WORDEN: What's the precise -- what
8    precisely do you want?
9        MR. COCHRAN: Other than the question that
10   I've articulated twice? I can have it read back for you
11   if you need it.
12       MR. WORDEN: Read it back, please.
13       THE COURT REPORTER: "Question: It's been
14   disclosed earlier this morning in Mr. Moss's deposition
15   that you had a conversation with him about the subject
16   matter of this October 4, 2022, letter, in a telephone
17   conversation you had with him on October 14, 2022.
18       "Do you acknowledge that conversation?"
19       MR. WORDEN: And I would not object to him
20   answering whether he had that conversation or not.
21       MR. KESTLE: So I'll allow my client to
22   answer that question then.
23       A. I don't remember a specific conversation with
24   Jim about this letter, but I remember having several
25   conversations with Jim.

8 (Pages 29 to 32)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 33

1  BY MR. COCHRAN:
2      Q.  Do you remember several conversations or any
3  conversation with him about the substance of Tokio
4  Marine's concerns about material misrepresentation in
5  the insurance application?
6          MR. KESTLE:  Same objections I expressed
7  with respect to the last question.
8  BY MR. COCHRAN:
9      Q.  But you can go ahead and answer.
10     A.  I don't know how to answer that without getting
11 into substance of conversations I had with -- with C3's
12 counsel about -- about the defense of C3.
13     Q.  I don't think that that's a material concern,
14 given the nature of the sanctions proceedings that we're
15 in, is my point.  That's exactly what we've been
16 exploring.
17         MR. KESTLE:  Right.  So we have the same
18 issue here as with the last question, so that depends on
19 what my client's former client would like you to do with
20 respect to this question.
21         MR. WORDEN:  And again, what's the
22 particular question you want answered?  And I would not
23 waive any attorney-client privileged communications with
24 representatives of C3.
25         MR. COCHRAN:  Do you want me to have it read

Page 34

1  back?
2          MR. WORDEN:  Yeah.  Do that again, please.
3          MR. COCHRAN:  Okay.
4          THE COURT REPORTER:  "Question:  Do you
5  remember several conversations or any conversation with
6  him about the substance of Tokio Marine's concerns about
7  material misrepresentation in the insurance
8  application?"
9          MR. WORDEN:  Yeah, I would not object to the
10 answer to that unless it goes to work product about how
11 the lawsuit itself was being defended.
12 BY MR. COCHRAN:
13     Q.  Go ahead.  You can answer.
14     A.  I can't separate the -- my conversations with
15 Mr. Moss were generally about how the lawsuit was
16 proceeding, strategy issues, defense issues.  I can't
17 parcel, I guess, portions of it out.
18     Q.  The most significant line of inquiry in the
19 entire sanctions proceeding, or at least one of the most
20 important, is why the information about the rescission
21 of the insurance coverage Tokio Marine had once provided
22 was not communicated to the plaintiffs.
23         Do you understand that?
24     A.  I'm not -- I -- well, I understand some of the
25 issues.  I don't -- I haven't read all the briefing, and

Page 35

1  I haven't -- I wasn't at the hearing.  I haven't
2  listened to the hearing tapes.  I'm not 100 percent sure
3  I understand what all of the issues are.
4      Q.  Was it a strategic decision by either C3 or you
5  or Great American or a combination of all of the above
6  to withhold the information about Tokio Marine's
7  rescission of the insurance policy?
8          MR. KESTLE:  Objection.  Work product
9  privilege.
10 BY MR. COCHRAN:
11     Q.  Go ahead.  You can answer.
12     A.  I don't know how to respond to the question
13 without getting into the substance of conversations I
14 had with the client.
15     Q.  Did Great American either instruct you or ask
16 you not to transmit information about the policy
17 decision, so that it could protect its $1 million
18 underlying policy from a policy limit demand?
19     A.  I guess I consider communications with Great
20 American the same as communications with my client,
21 given what I understand to be the tripartite
22 relationship.
23     Q.  Not according to Mr. Moss.  His letter of
24 November 2, 2022, confirmed that there is no privilege
25 with its policyholders, and that information that the

Page 36

1  insurance company would have would be susceptible to
2  discovery by the plaintiffs.
3          So I'd ask you to answer the question.
4      A.  Yeah, I don't -- again, I just don't know how
5  to answer the question without getting into
6  conversations I would have had with -- with the clients,
7  with my clients' counsel, and with the claims
8  representative that was handling the matter.
9      Q.  But a privilege, whether you're asserting the
10 attorney-client privilege or a work product privilege or
11 any other privilege, for that matter, wouldn't withstand
12 scrutiny if what was being discussed was an unlawful
13 withholding of discoverable information.
14         You understand that; right?
15         MR. KESTLE:  Object to form.
16 BY MR. COCHRAN:
17     Q.  Go ahead.
18     A.  I am confident that I have never participated
19 in the unlawful withholding of information.
20     Q.  Then explain for the Court why you did not
21 transmit information in a supplemental discovery
22 response to the plaintiffs in the Vandivere action,
23 which would have notified them that the excess policy
24 offered by Tokio Marine had been rescinded due to
25 material misrepresentations in the application?

9  (Pages 33 to 36)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

GAESIC000160

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 37

1    MR. KESTLE: Objection. Attorney-client
2    privilege, work product privilege.
3    BY MR. COCHRAN:
4        Q. Please answer, particularly given your claim
5    and testimony a moment ago that you've never unlawfully
6    withheld discovery.
7        A. Yeah, I don't know how to answer that question
8    without getting into conversations that I've had with --
9    with my client, or my former client.
10       Q. Did Great American urge you not to provide
11   information about Tokio Marine's rescission for a
12   strategic advantage in trying to preserve its $1 million
13   policy without paying?
14       MR. KESTLE: Objection. Work product
15   privilege.
16   BY MR. COCHRAN:
17       Q. Please answer.
18       A. I don't understand your question. I'm sorry.
19       MR. COCHRAN: I'll have it read back.
20       THE COURT REPORTER: "Question: Did Great
21   American urge you not to provide information about Tokio
22   Marine's rescission for a strategic advantage in trying
23   to preserve its $1 million policy without paying?"
24       A. Yeah, I don't know how to answer the question
25   without getting into conversations I've had with the --

Page 38

1    with the clients.
2    BY MR. COCHRAN:
3        Q. You're not talking about C3 Manufacturing.
4    You're talking about not disclosing what Great American
5    instructed you to do; right? How's that -- how's that
6    privileged?
7        A. Well, my understanding is that
8    communications -- I think, as I said before. Right?
9    Communications with both the client and the client's
10   insurer are privileged.
11       Q. Right. Now the question is, why didn't you
12   supplement discovery to notify the plaintiffs that Tokio
13   Marine had rescinded its excess policy due to material
14   misrepresentations by C3? That's the subject of our
15   sanctions proceeding. Can you answer that question for
16   the Court, please?
17       MR. KESTLE: Objection. Attorney-client
18   privilege, work product privilege.
19       A. Yeah, I -- I don't know --
20   BY MR. COCHRAN:
21       Q. You can answer the question.
22       A. I don't know how to answer the question without
23   getting into work product and attorney-client privilege.
24       MR. COCHRAN: I want to make sure that we
25   have whatever CR 26 discussion everyone wants to have

Page 39

1    because I need to bring this before the Court for its
2    consideration since this is the very subject matter of
3    our proceeding.
4        Is everyone good with the fact that we've had
5    this CR 26(i) discussion? Anyone want to have any
6    further discussion about it?
7        MR. KESTLE: We don't need to have further
8    discussion from our end.
9        MR. COCHRAN: Thank you.
10       Andrew, would you make the next exhibit, which
11   I think will be Exhibit 3, the November 2, 2022, letter
12   from Jim Moss to Tokio Marine. And give Mr. Wood the
13   ability to scroll, if you would, in the event he tells
14   us he's never seen it before.
15       MR. ULMER: All right. So, Cindy, these are
16   in the chat and I'll publish now.
17       (Exhibit No. 3 marked.)
18       MR. ULMER: All right. Scott, you can
19   scroll through.
20       A. All right. I'm ready to answer questions.
21   BY MR. COCHRAN:
22       Q. Would you have received a copy of this letter
23   from James Moss, November 2, 2022, to Tokio Marine?
24       A. I don't remember receiving a copy of it, but I
25   see that I'm shown as a CC, so I would assume I did

Page 40

1    receive a copy of it.
2        Q. Would someone else on your legal team, whether
3    it was Mr. Lemmon or Mr. Hicks or Mr. Furman, have been
4    the primary person interacting with the insurance
5    companies, or processing the information about the
6    insurance coverage, to explain why you wouldn't remember
7    whether you'd received this letter?
8        MR. KESTLE: Object to form.
9        A. Do you mean -- I guess is the question, do I
10   think this letter would have gone to somebody else
11   rather than me or -- I'm not sure I understand your
12   question.
13   BY MR. COCHRAN:
14       Q. I'm not understanding why you wouldn't know if
15   you'd received this letter, particularly given the
16   importance of the sanctions hearing and the pending
17   trial.
18       So I'm wondering whether somebody else was the
19   primary person on your legal team who would have dealt
20   with this type of situation that Tokio Marine presented
21   to your client, C3.
22       MR. KESTLE: Object to form.
23       A. I don't -- I don't know how to answer that
24   question.
25   ////

10 (Pages 37 to 40)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 41

1  BY MR. COCHRAN:
2      Q. You acknowledge that you're a courtesy copy
3  recipient who at least is identified on this Jim Moss
4  letter of November 2, 2022; right?
5          MR. KESTLE: Object to form.
6      A. Correct.
7  BY MR. COCHRAN:
8      Q. Would the file have stayed with the Sinars
9  firm, or did you take a copy of this C3 Manufacturing
10  file to Gordon Rees when you left late April 2023?
11      A. Did the physical file go with me to Gordon &
12  Rees? Is that your question?
13      Q. The digital file -- I don't know how you keep
14  your files, but whether it was digital or hard copies,
15  did it -- did you have a copy when you went to Gordon
16  Rees because, at least according to your testimony
17  today, you didn't make a decision not to represent them
18  until the second week of May or so?
19      A. Yes. The physical file came from Sinars to
20  Gordon & Rees --
21      Q. So that's something that you could even confirm
22  right now, whether this letter is in the correspondence
23  file; right?
24      A. I could. I'm not sure what parts of the file
25  we still have, but I could certainly search what files

Page 42

1  we have to see if this letter shows up there, if that's
2  what you're asking.
3      Q. Yeah. Let's take five minutes and do that.
4      A. No, I -- I'm not going to be able to do that
5  now because I can't access my Gordon & Rees physical
6  files right now.
7      Q. Why not?
8      A. I can't -- I attempted earlier to get on email
9  and wasn't successful.
10      Q. Are you off-site from the firm?
11      A. I am.
12      Q. Where are you physically located now?
13      A. I'm at Mr. Kestle's office.
14      Q. Is this a client, C3 Manufacturing, who
15  received from you basically just -- strike that. Let me
16  ask it differently.
17          Was your representation of C3 Manufacturing
18  primarily just that of the originating lawyer who had
19  then delegated most of the responsibility to other
20  attorneys in your law firms?
21      A. I don't -- I don't think that's true. But was
22  a lot of the responsibility for the defense of C3
23  delegated to others? Yes, it was.
24      Q. Scott Wood -- or Scott -- strike that.
25          Duncan Lemmon, for example?

Page 43

1      A. Yes. Mr. Lemmon had a lot of responsibilities
2  for -- for the defense of C3.
3      Q. On the bottom of the second page of this letter
4  of November 2, 2022, you see the two paragraphs at the
5  bottom that start with a sentence, "Because this case is
6  in litigation, C3 and Mr. Naranjo will not be supplying
7  any documents to you or anyone else," and then goes on
8  to say, "An insurance company under Colorado law has no
9  privilege with its policyholders. As such, any
10  documentation provided would be available to the
11  plaintiff in this case."
12          Do you see that section?
13      A. I do.
14      Q. By the way, this is a letter that you've seen
15  in the last week in preparation for this deposition;
16  right?
17      A. Yes.
18      Q. The very last sentence, paragraph, Page 2,
19  says, "If you wish to access documents, please contact
20  defense counsel Scott Wood of the Sinars Slowikowski
21  Tomaska."
22          Did anyone from Tokio Marine or Houston
23  Casualty contact you about accessing documents?
24      A. Not that I recall.
25      Q. When you reviewed the pages of Chris Furman's

Page 44

1  deposition that you did, did you see -- strike that.
2          MR. COCHRAN: I'm going to take a
3  five-minute break, decide what I need to ask further,
4  and then we'll try to wrap it up really soon.
5          (Recess from 1:29 p.m. to 1:38 p.m.)
6          MR. COCHRAN: Andy, let's make the next
7  exhibit Jim Moss's declaration.
8          (Exhibit No. 4 marked.)
9          E X A M I N A T I O N (Continuing)
10  BY MR. COCHRAN:
11      Q. And, Mr. Wood, I think you mentioned that you
12  have seen the Moss declaration; right?
13      A. Correct.
14          MR. ULMER: All right. Scott, I gave you
15  the ability to scroll.
16          THE WITNESS: Thank you.
17  BY MR. COCHRAN:
18      Q. I'm not doing much with this, but what I want
19  to confirm is that you did receive the policy change
20  notifications and the two documents that Mr. Moss lists
21  as Exhibits A and B to his declaration, and you received
22  those in January of 2023?
23      A. I don't remember.
24      Q. Any reason to disbelieve Mr. Moss's sworn
25  testimony in this declaration?

11 (Pages 41 to 44)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 45

1      A.  No.
2      Q.  Did you transmit that information to the
3   plaintiffs in January of 2023, or February or March or
4   April of 2023?
5      A.  Was Exhibit A or B ever provided to the
6   plaintiffs?
7      Q.  Correct.
8      A.  Yeah, not to my understanding.
9      Q.  Did you provide any supplementation to
10  discovery to the effect of what is communicated by the
11  policy changes, which is the policy from Tokio Marine,
12  had been rescinded?
13     MR. KELLER:  I'm going to object to the form
14  of the question, and this is to the insurance -- this is
15  the insurance geek part of me.  There's a difference
16  between rescission and cancellation.
17     MR. COCHRAN:  They described it as a
18  rescission, though; right?
19     MR. KELLER:  I thought it was referred to as
20  a cancellation in Exhibits A and B.  Am I wrong?
21     MR. COCHRAN:  I don't know.  I never --
22  it's -- described it as a rescission.
23  BY MR. COCHRAN:
24     Q.  But whether it's cancellation or rescission,
25  Mr. Wood, did you provide that information in

Page 46

1   supplemental discovery to the plaintiffs at any point
2   prior to you leaving the Sinars firm?
3      A.  No.
4      Q.  And did you withhold that information for
5   strategic reasons to put the plaintiffs at a
6   disadvantage?
7      MR. KESTLE:  Objection.  Work product
8   privilege.
9   BY MR. COCHRAN:
10     Q.  I'd ask you to answer.
11     A.  I'm not sure I understand your question.
12     MR. COCHRAN:  I'll have it read back.
13     THE COURT REPORTER:  "Question:  And did you
14  withhold that information for strategic reasons to put
15  the plaintiffs at a disadvantage?"
16     MR. KESTLE:  Same objection.
17     A.  Yeah, I -- I don't know how to answer questions
18  like that.  I'm, you know, trying to be helpful here and
19  answer the questions, but I don't -- feel like I have an
20  obligation not to talk about strategy that I had when I
21  represented C3 or conversations I had with my clients
22  about issues in the defense of the matter in C3.
23     So I guess what I'm saying is, I can't answer
24  that question without getting into either of those.
25  ////

Page 47

1   BY MR. COCHRAN:
2      Q.  So you're declining to answer the question of
3   whether material information was misrepresent- -- or
4   strike that.
5      Am I understanding correctly that you are
6   declining to answer about whether insurance information
7   was purposefully withheld from the plaintiffs to secure
8   a strategic advantage for the insurance companies
9   because of a work product privilege?  Is that correct?
10     MR. KESTLE:  Same objections.
11     A.  I don't -- I guess what I'm saying is, I don't
12  know how to parcel out conversations; right?  I had many
13  conversations with my client during the time I was
14  defending the Vandivere claim, and many of those
15  conversations were about a variety of issues, including
16  strategies.
17     I don't -- and I just don't know how to answer
18  that question without getting into the details of those
19  conversations.
20  BY MR. COCHRAN:
21     Q.  But you would agree that the information was
22  not provided in supplemental discovery at any point;
23  correct?
24     MR. KESTLE:  Object to form.
25     A.  I think --

Page 48

1   BY MR. COCHRAN:
2      Q.  During the time that you represented them.
3      A.  Yeah, I'm not 100 percent sure I'm following
4   your question, but I would agree that those two
5   documents were not produced in discovery, yes.
6      Q.  Nor the information about Tokio Marine either
7   canceling or rescinding the excess policy, at least
8   while you represented them; true?
9      MR. KESTLE:  Object to form.
10     Go ahead.
11     A.  There were not discovery responses that said
12  that.  True.
13     MR. COCHRAN:  That's all the questions I've
14  got today.
15     MR. KELLER:  I've got a few follow-up
16  questions, if I could.
17           E X A M I N A T I O N
18  BY MR. KELLER:
19     Q.  Mr. Wood, my name is Brad Keller.  I represent
20  the Sinars firm, and I also represent Chris Furman
21  individually.
22     Did I understand correctly that you testified
23  that you first learned that you would not be taking the
24  C3 file in mid -- the second week of May?
25     A.  It was early May.  Whether it was the first

12  (Pages 45 to 48)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

---

Page 49

1    week or second week, I don't recall.
2        Q. And so -- and that -- obviously first or second
3    week of May is after the last week of April; right?
4        A. Yeah.
5        Q. And you left the firm, I think you said, on --
6    was it April 27th?
7        A. My last day at Sinars was the Thursday of that
8    final week of April, and my first day at Gordon & Rees
9    was that Friday.
10       Q. Can I, by logic -- it sounds like, when you
11   left, you thought you were taking the file with you. Is
12   that fair?
13           MR. KESTLE:  Objection to the extent it
14   calls for attorney-client communications.
15       A. Yeah, I guess I don't know how to answer that
16   question, except to talk about what I said earlier.
17   Right?
18           I had a number of different clients, and, you
19   know, when you leave a firm, you communicate with
20   clients and find out, for instance, whether the clients
21   want you to continue representation of them at the new
22   firm.  And that was just a rolling process.
23   BY MR. KELLER:
24       Q. But you -- if you didn't learn that you weren't
25   going to be keeping that file until the first or second

---

Page 50

1    week of May, is it fair to say that, prior to that time,
2    you thought it was a file that you would probably be
3    taking with you?
4           MR. KESTLE:  Same objections.
5        A. I don't -- I don't know how to answer that
6    without getting into conversations I had with the
7    client.
8    BY MR. KELLER:
9        Q. You were asked a number of questions about
10   whether you had told anyone in January, February,
11   March of 2023 that you were leaving to go to Gordon
12   Rees, and I think your answer was no.  Is that right?
13       A. Correct.
14       Q. I want to ask a broader question, though, not
15   limited to Gordon Rees.  Were you having discussions
16   with the firm about your leaving the firm going back as
17   early as January of 2023?
18       A. I was having conversations about -- was just --
19   it was not a good fit, let me just put it that way, and
20   leave it at that.
21       Q. Well, I really apologize --
22           MR. COCHRAN:  I couldn't hear it.
23           THE WITNESS:  Sure.  I said it was not a
24   good fit.
25           MR. COCHRAN:  Okay.

---

Page 51

1        A. I was having some conversations about what the
2    firm was like and things like that.
3    BY MR. KELLER:
4        Q. I'm sorry to have to probe a little further,
5    but apparently some of the folks involved in this
6    dispute feel like it's important to know what -- who
7    knew what when about your leaving the firm.  So I'm
8    broadening it up.  I'm not interested about who knew
9    what when about your going to Gordon Rees.
10           I want to ask you more about in January,
11   February, March, were you having discussions with the
12   firm leadership about the fact that you would be
13   leaving?
14       A. I had conversations with the firm about leaving
15   before I left, yes.
16       Q. I appreciate that, but were those
17   conversations -- look, I'll be blunt, Mr. Wood.  Hadn't
18   those conversations begun at the end of December of
19   2022?
20       A. I don't think that's accurate, but
21   conversations about separating occurred in late
22   December and on, yeah.
23       Q. Okay.  That -- let's use your phrase.  So is it
24   fair to say that you having conversations with the firm
25   about you separating from the firm and a parting of ways

---

Page 52

1    going back as far as December of 2022?
2        A. That's fair.
3        Q. Okay.  And as --
4           MR. COCHRAN:  Brad, did you -- did you say
5    September of 2022?
6           MR. KELLER:  I meant to say December.  I
7    hope -- I think that's what the witness thought I said,
8    but you tell us, Mr. Wood.
9           THE WITNESS:  It's what I understood the
10   question to be.
11           MR. COCHRAN:  Okay.
12   BY MR. KELLER:
13       Q. When you say you thought the question to be,
14   you're saying you thought it was December; right?
15       A. Correct.
16       Q. Okay.  During January, February, and March, did
17   the conversations about the need to implement that
18   separation, did they continue during that time, your
19   conversations with firm leadership?
20       A. Conversations about the separation
21   considered -- continued over a couple months, yeah.
22       Q. Okay.  And they were ongoing and, fair to say,
23   people were asking you, how -- how is it going?  Have
24   you found a place to go?  When are you leaving?
25       A. There were -- there were conversations about

---

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

GAESIC000164

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 53

1  the separation, yeah. I mean, it wasn't -- I think I
2  had different ideas and visions than others did, but
3  yeah, there were conversations.
4      Q. And did those conversations include firm
5  leadership asking you, how is it going? Are you getting
6  situated? When will you be leaving?
7      A. Yeah, I think that's fair.
8      Q. All right. I apologize to have to go into
9  this, but for reasons totally unrelated to you and the
10  dynam- -- whatever the dynamic was between the firm, I
11  have to go into it.
12         So were those conversations occurring during
13  January, February, and March of 2023?
14      MR. KESTLE: Object to form.
15         Go ahead.
16      A. Yeah, I mean, this is -- I mean, this is
17  personal information for me, so I'm not comfortable
18  talking about it.
19  BY MR. KELLER:
20      Q. I'll explain to you why I'm asking it, if you
21  want, Mr. Wood. Folks at the firm were quite sure you
22  were going to be leaving, and Mr. Furman has testified
23  that he was aware that you were going to be leaving.
24  Not where you were going, but that you were going to be
25  leaving. And some folks are questioning the credibility

Page 54

1  and truthfulness of that.
2         So I need to develop and ask you a few more
3  questions about what the status of things were between
4  you, on the one hand, and the firm, on the other, during
5  this time period of January, February, March. That's --
6  that's why I'm asking.
7      A. Sure. We -- I was with conversations about how
8  the divorce might look like and who might go with me,
9  and what type of relationship we might have afterwards.
10  Yeah, that was going back for a couple months.
11         I can't speak to what Mr. Furman knew, or I
12  didn't have any conversations with Mr. Furman about
13  that.
14      Q. And that's fine. But the Seattle office is a
15  fairly small office, isn't it?
16      A. It is.
17      Q. About how many people is it? Oh, excuse me.
18  About how many people was it during the early spring of
19  2023?
20      A. Ten lawyers maybe, nine or ten lawyers.
21      Q. Okay. And the conversations that you were
22  having with firm leadership, I think you said it was,
23  like, what the divorce might look like, who might be
24  going with you, and those sorts of things; right?
25      A. Yes.

Page 55

1      Q. And in those conversations in January,
2  February, March, at some point did it become clear in
3  the discussions, that you were informing the firm that
4  Duncan Lemmon would be leaving with you, or leaving
5  around the same time?
6      A. Yes, I think so.
7      Q. At any point during that time period, did you
8  and Duncan Lemmon speak with each other about the
9  possibility of him actually going with you to wherever
10  it was you were going to land next?
11      A. I'm sure I had conversations with Duncan about
12  things like that, yes.
13      Q. Okay. And Mr. Cochran used the phrase
14  "originating attorney." Were you the originating
15  attorney for the C3 file?
16      A. Yes.
17      Q. And was Mr. Lemmon, for lack of a better
18  phrase, the lieutenant running the day-to-day aspects of
19  the file?
20      A. I would give him a higher ranking than
21  lieutenant, but yeah, he was the individual that ran --
22  ran the defense day to day.
23      Q. And if you're leaving, and he's leaving,
24  doesn't that suggest that there's a very high
25  probability that the C3 file would be leaving the Sinars

Page 56

1  firm?
2      MR. KESTLE: Object to form.
3         Go ahead.
4      A. I don't know how to answer that. I don't know.
5  BY MR. KELLER:
6      Q. Well, you -- was the C3 file one of the firm --
7  one of the files that you were, in fact, hoping to be
8  able to take with you, wherever it was you landed?
9      A. I was hoping that all of my clients that I was
10  representing at my old firm would continue to be
11  represented by me at my new firm.
12      Q. And when you were talking with firm leadership
13  during February and March about what the divorce might
14  look like, was there discussions with firm leadership
15  about which of the matters that you were involved in,
16  and how you thought they might -- you or the firm
17  thought they might shake out in terms of which stayed
18  and which went?
19      A. No.
20      Q. Do associates -- are associates at the firm
21  asked -- are they assigned mentors?
22      MR. KESTLE: I'm sorry. Object to form.
23  The first firm, Brad?
24      MR. KELLER: Sinars.
25      MR. KESTLE: Yeah.

14 (Pages 53 to 56)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 57

1    A. No, not to my knowledge.
2  BY MR. KELLER:
3    Q. Did you have any responsibility for keeping
4  track of the workload of any of the associates in the
5  Seattle office in terms of, you know, making sure their
6  plate's full, making sure it's not overloaded, that kind
7  of stuff?
8    A. Yeah, to some degree.
9    Q. Okay.
10   A. I think we all did to some degree.
11   Q. Did -- who else was working on the C3 file in
12 the January, February, March of 2023 time period for
13 Sinars, other than you, Mr. Lemmon, and Mr. Furman?
14   A. So others would have helped here or there, but
15 that was it.
16   Q. Was there -- in addition to discussing with
17 firm leadership about the possibility -- strike that.
18      In addition to discussing with Mr. Lemmon about
19 the possibility of him going with you wherever it was
20 you landed, was there another individual, Zach something
21 or other, that was included in those discussions?
22   A. There were a lot of conversations about who --
23 who -- I'm trying to think how best to answer this --
24 who might leave and what -- what the relationship might
25 look like and things like that, yeah.

Page 58

1    Q. And was there anybody that was not included as
2  the potential leaving group --
3    A. No.
4    Q. -- that was involved in the C3 case, other than
5  Mr. Furman?
6    A. I'm not sure I understand the question.
7    Q. At one point did you ever ask Mr. Furman if he
8  wanted to actually leave with you?
9    A. I did not -- I talked to Mr. Furman -- I did
10 not talk to Mr. Furman, until after I left the Sinars
11 firm, about my departure.
12   Q. Was there any time before you left where you
13 gently felt him out as to whether he might be receptive
14 to going to another firm? I'm trying to ask it broadly
15 and neutrally.
16   A. Sure. I'm sure I asked Chris that. I think
17 Mr. Furman's an excellent lawyer.
18   Q. And you say you're sure you asked him that.
19 Rec-- you know, as best you can, what likely would you
20 have discussed with him during this January, February,
21 March 2023 time frame?
22   A. Right. I think what I said to him at some
23 point, it was pretty close to when I was departing to
24 Gordon Rees, "Hey, stay tuned. I don't know what our
25 new team looks like, but we'll be in touch." Something

Page 59

1  like that.
2    Q. Was it before or after you had walked -- left
3  to Gordon Rees that you had the conversation you just
4  described?
5    A. I think it was before, maybe -- maybe that
6  week, maybe around the Wednesday or Thursday of that
7  week.
8    Q. All right. In that first or second week of
9  May 2023, when you realized that you couldn't -- I guess
10 there's a -- is there a short period of time where you
11 actually took the C3 file with you from Sinars over to
12 Gordon & Rees?
13   A. The physical file was transferred, correct.
14   Q. Okay. And for that two weeks or so that you
15 continued to have responsibility for the file, it was at
16 Gordon & Rees; is that right?
17   A. I'm sorry; what was the question again?
18   Q. You were at Gordon & Rees for a week or two
19 where you actually had responsibility for the file;
20 right?
21   A. The physical file? Correct.
22   Q. What about the case?
23   A. Yeah.
24   Q. Okay.
25   A. I don't remember exactly when the notice of

Page 60

1  change of attorneys was filed, but yeah, there was
2  probably a week or two.
3    Q. I think you said you sent an email or a
4  notification to the Court around the second week of May,
5  is your best recollection. Is that right?
6    A. About the potential conflict issue and the
7  notice of withdrawal, yes.
8    Q. That was my question. Was it the -- around the
9  second week of May that you became aware -- first became
10 aware that there was a conflict issue for Gordon & Rees?
11   A. I don't know how -- let me see if I can answer
12 this in a way that doesn't get into attorney-client
13 communications and work product issues. There was an
14 ongoing analysis of the issue when I came to Gordon &
15 Rees, and it was at or around the time that I sent my
16 email to the Court that I realized it wasn't going to be
17 possible for me to rep- -- continue to represent C3.
18      MR. KELLER: All right. Thank you for your
19 time.
20      MR. COCHRAN: Greg, you got anything?
21      MR. WORDEN: I do not.
22      MR. COCHRAN: So, Mr. Wood, I'm going to
23 follow up.
24 ////
25 ////

15 (Pages 57 to 60)

Vandivere, et al. v. Vertical World, Inc.                                    Jeffrey Scott Wood

Page 61

1        F U R T H E R   E X A M I N A T I O N
2   BY MR. COCHRAN:
3        Q. Did the Sinars firm ask you to leave?
4        A. I had discussions with the Sinars firm about my
5   departure. I'm not comfortable getting into it more
6   than that.
7        Q. Was there some misconduct that led Sinars to
8   asking you to leave the firm?
9        A. No. And that's not what occurred.
10       Q. What did occur?
11       A. I'm not going to get into details about my
12  transfer of firms. I'm just not going to.
13       Q. Where's Duncan Lemmon practicing now?
14       A. He is a California-licensed lawyer.
15       Q. My question, though, is, where is he working
16  now, if you know?
17       A. He's not working -- he's not working anywhere.
18       Q. Was he asked by the Sinars firm to leave?
19       A. I don't know the details of Mr. Lemmon's
20  employment. You'd have to ask him.
21       Q. Well, what do you know about the reason why he
22  departed and was not with you and Virginia Leeper in
23  going to Gordon Rees?
24       A. You'd have to ask Mr. Lemmon that.
25       Q. Well, what do you know about it, is what I'm

Page 62

1   asking.
2        A. I don't know what Mr. Lemmon has decided to do,
3   if that's the question. He's not practicing currently.
4        Q. I understand that. My question is, what do you
5   know about why he did not go with you to Gordon Rees?
6   Did you not ask him to come to Gordon Rees, decline to
7   have him come? What happened?
8        A. I think you'll have to ask him that question.
9   I don't know what his -- what his --
10       Q. I'm asking what you know about it.
11       A. Yeah, I -- the answer is, I don't know. I
12  don't know what his career plans are, and he's not
13  practicing right now.
14       Q. I'm not asking about his career plans. I'm
15  asking why he didn't come to Gordon Rees.
16       A. Yeah, I don't -- I don't feel comfortable
17  talking about somebody else's employment. I just don't.
18            (Interruption in proceedings.)
19  BY MR. COCHRAN:
20       Q. Mr. Wood, my question is, why didn't you bring
21  Duncan Lemmon with you to Gordon Rees?
22       A. Well, the short answer is, I don't think
23  Mr. Lemmon's decided what he wants to do. I think
24  Mr. Lemmon is a fine lawyer, and I'd be fine to hire him
25  anywhere.

Page 63

1        Q. And what do you know about why the Sinars firm
2   did not wish to retain his services?
3        A. I don't know anything about that. You'd have
4   to ask Mr. Lemmon. I don't even know if that's true, so
5   you'd have to ask Mr. Lemmon.
6            MR. COCHRAN: That's all the questions I've
7   got today. I'll order the transcript expedited.
8            MR. KELLER: Hang on. I got one follow-up
9   because I'm interested in trying to avoid disputes down
10  the road. And maybe Mr. Wood will answer this one,
11  maybe it isn't.
12       F U R T H E R   E X A M I N A T I O N
13  BY MR. KELLER:
14       Q. But in terms of your divorce with the Sinars
15  firm, from your perspective and what you were told or
16  whatever, did it have anything to do with anything about
17  performance or anything having to do with the C3 case?
18       A. Did --
19       Q. Whatever the reasons were for your divorce from
20  the firm, did it have anything to do with the C3 case?
21  That's what I'm asking you.
22       A. Nothing to do with the C3 case specifically,
23  no.
24            MR. KELLER: I'm just trying to give all of
25  us the benefit of that information, so that I -- maybe

Page 64

1   the appetite for an answer there is decreased, maybe it
2   isn't. Thank you.
3            MR. COCHRAN: Well, let me broaden it.
4       F U R T H E R   E X A M I N A T I O N
5   BY MR. COCHRAN:
6        Q. Did the divorce decision with Sinars have its
7   roots in poor performance generally, at least from
8   Sinars' perspective?
9        A. A lot of complicated issues that would take me
10  days upon days, and I'm sure I have a different
11  perspective than others, and a lot of issues, but
12  nothing related to C3 specifically, if that forestalls
13  future questioning. There were no conversations about
14  C3, let me put it that way.
15           MR. COCHRAN: That's all the questions I've
16  got.
17           MR. KELLER: Thank you, sir.
18           (Deposition concluded at 2:08 p.m.)
19           (By agreement between counsel and witness,
20            signature was reserved.)
21                 -o0o-
22
23
24
25

16  (Pages 61 to 64)

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

GAESIC000167

Vandivere, et al. v. Vertical World, Inc.                                      Jeffrey Scott Wood

Page 65

```
 1              C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON
 4   COUNTY OF PIERCE
 5
 6        I, Cindy M. Koch, a Certified Court Reporter in
 7   and for the State of Washington, do hereby certify that
 8   the foregoing transcript of the deposition of Jeffrey
 9   Scott Wood, having been duly sworn, on June 22, 2023, is
10   true and accurate to the best of my knowledge, skill and
11   ability.
12        IN WITNESS WHEREOF, I have hereunto set my hand
13   and seal this 23rd day of June, 2023.
14
15
16        _____
17             CINDY M. KOCH, CCR, RPR, CRR #2357
18
19   My commission expires:
20   JUNE 9, 2024
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

GAESIC000168

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 66

**A**

**ability** 19:24 28:6
 31:15 39:13 44:15
 65:11
**able** 10:1 42:4 56:8
**access** 11:12 42:5
 43:19
**accessing** 12:3,18
 13:3,11 16:15,20
 43:23
**accord** 7:18
**accurate** 12:6,11
 12:15 51:20 65:10
**acknowledge** 30:1
 30:20 32:18 41:2
**action** 31:13 36:22
**actions** 9:23
**addition** 57:16,18
**advantage** 37:12
 37:22 47:8
**advice** 30:13
**advised** 10:8
**ago** 8:1 37:5
**agree** 47:21 48:4
**Agreed** 12:6
**agreement** 64:19
**ahead** 8:16 9:17
 13:5 17:17,22
 25:16 29:20 30:23
 31:3,6 33:9 34:13
 35:11 36:17 48:10
 53:15 56:3
**allow** 32:2,21
**allowing** 9:11
**Amala** 2:4
**American** 7:10,13
 7:22 8:6,12,23,24
 35:5,15,20 37:10
 37:21 38:4
**analysis** 60:14
**Andrew** 2:3 39:10
**Andy** 44:6
**Ann** 14:4
**answer** 11:9 15:10
 17:22 18:6 21:5

23:11,19 24:1,7,9
 24:10,11 26:3,12,11
 26:21,24 27:9,12
 29:20,21 30:6,7
 30:10,12,14 31:9
 31:18 32:22 33:9
 33:10 34:10,13
 35:11 36:3,5 37:4
 37:7,17,24 38:15
 38:21,22 39:20
 40:23 46:10,17,19
 46:23 47:2,6,17
 49:15 50:5,12
 56:4 57:23 60:11
 62:11,22 63:10
 64:1
**answered** 33:22
**answering** 25:5
 32:20
**anybody** 18:25
 25:19 58:1
**apologize** 50:21
 53:8
**apparently** 51:5
**appear** 17:2
**appearance** 7:3
 15:4,15
**appeared** 1:20
 31:13
**appearing** 19:14
**appetite** 64:1
**application** 25:13
 27:17 33:5 34:8
 36:25
**applies** 31:11
**appreciate** 31:21
 51:16
**approval** 16:2
**approve** 12:21 13:2
 13:7
**approved** 7:18
 16:12,14
**approving** 13:16
**April** 4:17,17 6:22
 9:3,4 10:7,9,13,19

11:1,23 12:14,16
 12:19 13:12 14:23
 17:3,25 20:17
 24:23,24 41:10
 45:4 49:3,6,8
**articulate** 27:1
 30:23
**articulated** 32:10
**aside** 16:9
**asked** 19:13 22:1
 50:9 56:21 58:16
 58:18 61:18
**asking** 14:19 21:21
 21:24 23:23 26:16
 29:24,25 31:24
 42:2 52:23 53:5
 53:20 54:6 61:8
 62:1,10,14,15
 63:21
**aspects** 55:18
**asserting** 36:9
**assigned** 56:21
**associates** 56:20,20
 57:4
**assume** 39:25
**assuming** 21:16
**attachments** 28:20
**attempted** 42:8
**attention** 29:7
**attorney** 14:24
 15:5,7 17:14
 23:23 31:11 55:14
 55:15
**attorney-client**
 8:14 9:14,20
 23:10,12,15,19
 24:2,4 26:25 30:5
 33:23 36:10 37:1
 38:17,23 49:14
 60:12
**attorneys** 13:15
 15:3 31:8 42:20
 60:1
**aulmer@pcvala...**
 2:7

**authorization** 32:1
**authorize** 31:22
**available** 43:10
**Avenue** 2:10,16,21
**avoid** 63:9
**aware** 9:25 13:15
 16:17 53:23 60:9
 60:10

**B**

**B** 44:21 45:5,20
**back** 21:12 29:7
 32:10,12 34:1
 37:19 46:12 50:16
 52:1 54:10
**base** 6:1
**basically** 42:15
**basis** 23:18 31:4,13
**began** 20:9,23
 24:21
**begun** 51:18
**behalf** 6:9
**believe** 4:17 5:11
 7:11 8:2 25:9
 27:5 28:8 29:4,5
**benefit** 63:25
**best** 21:5 22:22
 57:23 58:19 60:5
 65:10
**better** 13:1 55:17
**beyond** 20:1
**bills** 7:23
**Bisgaard** 2:10
**bkeller@byrnes...**
 2:18
**blunt** 51:17
**bottom** 43:3,5
**Brad** 48:19 52:4
 56:23
**BRADLEY** 2:15
**break** 44:3
**briefing** 6:4 28:18
 34:25
**bring** 39:1 62:20
**Brisbois** 2:10 19:2
 19:13

**broaden** 64:3
**broadening** 51:8
**broader** 50:14
**broadly** 58:14
**business** 4:13
**Byrnes** 2:15

**C**

**C** 2:1 65:1,1
**C.3** 64:14
**C3** 1:10 2:8 6:9,20
 7:9,13,16,21 8:3
 8:11 9:5,8,12,24
 10:2,2 11:13
 14:24 15:8,15
 17:25 18:3,10,21
 19:3,14 22:18
 23:8 24:22,23
 25:8,13 26:10
 27:17 29:10,23
 33:12,24 35:4
 38:3,14 40:21
 41:9 42:14,17,22
 43:2,6 46:21,22
 48:24 55:15,25
 56:6 57:11 58:4
 59:11 60:17 63:17
 63:20,22 64:12
**C3's** 3:19 32:5
 33:11
**C3MFGLLC-V...**
 3:17
**C3MFGLLC-V...**
 3:15
**Cabo** 19:19
**California-licens...**
 61:14
**call** 13:24 14:3,25
 19:12
**called** 13:20,22
 14:1,4,8,13 16:24
**calls** 8:14 9:13
 17:19 23:9 29:17
 30:5 49:14
**canceling** 48:7

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 67

**cancellation** 45:16
45:20,24
**career** 62:12,14
**case** 5:10,20 12:3,5
19:22 43:5,11
58:4 59:22 63:17
63:20,22
**cases** 8:25 18:16,16
21:16
**Casualty** 24:25
25:7,11 26:3
27:15 43:23
**CC** 39:25
**CCR** 1:25 65:17
**certainly** 10:15
41:25
**Certified** 65:6
**certify** 65:7
**change** 44:19 60:1
**changes** 45:11
**chat** 39:16
**check** 12:17 21:1
21:17
**checked** 21:9
**Chris** 11:11,15,19
11:21 12:17,21
13:2,10,16,20,21
13:22,24 14:5,6,8
14:18 15:18 16:2
16:10,15,17,19,23
17:3,10,13,24
43:25 48:20 58:16
**CHRISTOPHER**
2:14
**Cindy** 1:25 39:15
65:6,17
**circumstances** 6:1
15:19
**claim** 37:4 47:14
**claims** 36:7
**clear** 12:21 18:20
18:23 24:20 55:2
**clearly** 20:17
**client** 18:3,8 22:5,7
24:8,13,13 26:18

27:11 29:18,23
31:8,22 32:2,21
33:19 35:14,20
37:9,9 38:9 40:21
42:14 47:13 50:7
**client's** 31:22 32:2
33:19 38:9
**clients** 8:18,19,22
10:5 20:10,24
21:1,14,15,17,25
22:11 29:18 36:6
38:1 46:21 49:18
49:20,20 56:9
**clients'** 36:7
**climbing** 14:7
**close** 58:23
**Cochran** 2:3,4 3:4
3:6,8 4:9 8:15
9:15,16 12:12
13:9 17:16,21
19:17 20:3,7
21:23 23:16,22
24:14 25:18,24
27:1,7,13,21 28:1
28:3,9 29:19 30:9
30:11,23 31:3,12
31:24 32:9 33:1,8
33:25 34:3,12
35:10 36:16 37:3
37:16,19 38:2,20
38:24 39:9,21
40:13 41:1,7 44:2
44:6,10,17 45:17
45:21,23 46:9,12
47:1,20 48:1,13
50:22,25 52:4,11
55:13 60:20,22
61:2 62:19 63:6
64:3,5,15
**Colorado** 1:10 43:8
**combination** 35:5
**come** 8:10 62:6,7
62:15
**comfortable** 53:17
61:5 62:16

**coming** 22:12
**commission** 65:19
**communicate**
24:17 49:19
**communicated**
19:2,5,11 22:12
24:18 26:4 34:22
45:10
**communicating**
26:2
**communication**
24:3,4,15
**communications**
5:5 6:15 8:14
9:14,21 10:4 22:9
23:13 24:8,24
25:11,21 29:17
30:5,6 33:23
35:19,20 38:8,9
49:14 60:13
**community** 1:5
**companies** 8:20
40:5 47:8
**company** 1:10 7:10
7:13 24:25 25:12
27:15 36:1 43:8
**complicated** 64:9
**concern** 24:6 33:13
**concerning** 6:17
**concerns** 27:16
29:14 30:2 33:4
34:6
**concluded** 64:18
**confident** 36:18
**confirm** 14:22
41:21 44:19
**confirmed** 35:24
**conflict** 9:9,18,20
10:1 18:5 21:1,17
60:6,10
**conflicts** 21:6 22:2
22:13
**connection** 5:12
**conscious** 6:7
**consciously** 5:21

**consider** 16:8
35:19
**consideration** 5:9
39:2
**considered** 52:21
**contact** 25:6 27:3
43:19,23
**contacted** 7:8
**continue** 5:12,17
10:2 22:1,7 49:21
52:18 56:10 60:17
**continued** 8:22
52:21 59:15
**Continuing** 44:9
**conversation** 14:10
16:7 18:12 24:12
29:25 30:16,18,20
32:15,17,18,20,23
33:3 34:5 59:3
**conversations** 5:5
18:7 29:22 31:11
32:25 33:2,11
34:5,14 35:13
36:6 37:8,25
46:21 47:12,13,15
47:19 50:6,18
51:1,14,17,18,21
51:24 52:17,19,20
52:25 53:3,4,12
54:7,12,21 55:1
55:11 57:22 64:13
**copies** 25:2 41:14
**copy** 25:2 27:14
39:22,24 40:1
41:2,9,15
**Corporation** 1:9
**correct** 9:6,7,12
10:25 11:10,16,18
11:18,24 12:1,10
12:16 14:11 29:11
29:12 41:6 44:13
45:7 47:9,23
50:13 52:15 59:13
59:21
**correctly** 47:5

48:22
**correspondence**
10:17 41:22
**counsel** 4:18 14:13
31:12 32:6 33:12
36:7 43:20 64:19
**COUNTY** 1:2 65:4
**couple** 6:6 52:21
54:10
**Court** 1:1 5:25 12:3
19:18 22:20 27:2
30:24 32:13 34:4
36:20 37:20 38:16
39:1 46:13 60:4
60:16 65:6
**Court's** 5:9 31:18
**courtesy** 25:2 41:2
**coverage** 25:8 26:1
26:8,12 27:4
34:21 40:6
**CR** 38:25 39:5
**credibility** 53:25
**Cromwell** 2:15
**CRR** 1:25 65:17
**current** 16:25
20:16
**currently** 62:3

**D**

**D** 3:12
**Darrell** 2:3 27:25
**darrell@pcvala...**
2:6
**date** 1:24 5:13,17
9:1 22:4
**dated** 3:15,17
**day** 9:4 10:12,15
16:6 21:13 49:7,8
55:22,22 65:13
**day-to-day** 55:18
**days** 5:10,18,21 6:6
64:10,10
**dealt** 40:19
**December** 51:18,22
52:1,6,14
**decide** 44:3

**decided** 62:2,23
**decision** 5:21 6:7
    25:13 35:4,17
    41:17 64:6
**declaration** 3:12,18
    5:11,16,22 6:7,11
    6:13,16 19:18
    20:9 28:20 44:7
    44:12,21,25
**declarations** 5:8,17
    6:8
**decline** 30:14 62:6
**declining** 47:2,6
**decreased** 64:1
**Defendant** 2:8 3:19
**Defendants** 1:11
**defended** 34:11
**defending** 26:18
    47:14
**defense** 33:12
    34:16 42:22 43:2
    43:20 46:22 55:22
**degree** 57:8,10
**delegated** 42:19,23
**demand** 35:18
**deny** 30:1
**denying** 29:13
**departed** 14:2
    61:22
**departing** 58:23
**departure** 58:11
    61:5
**depends** 33:18
**depose** 31:15
**deposition** 1:13 3:1
    4:19,25 13:21,22
    13:24 28:21,23
    30:16 32:14 43:15
    44:1 64:18 65:8
**described** 45:17,22
    59:4
**details** 9:19 10:4
    29:22 47:18 61:11
    61:19
**develop** 54:2

**difference** 45:15
**different** 49:18
    53:2 64:10
**differently** 15:14
    21:7 42:16
**digital** 41:13,14
**disadvantage** 46:6
    46:15
**disbelieve** 44:24
**disclosed** 9:22
    30:15 32:14
**disclosing** 38:4
**discoverable** 36:13
**discovery** 28:19,24
    36:2,21 37:6
    38:12 45:10 46:1
    47:22 48:5,11
**discussed** 14:12,20
    15:21,23 25:25
    31:10 36:12 58:20
**discussing** 27:16
    31:9 57:16,18
**discussion** 6:15
    17:9,19 31:4
    38:25 39:5,6,8
**discussions** 26:15
    50:15 51:11 55:3
    56:14 57:21 61:4
**dispute** 51:6
**disputes** 63:9
**divorce** 54:8,23
    56:13 63:14,19
    64:6
**divvied** 26:17
**document** 27:18
    28:8,11,13
**documentation**
    43:10
**documents** 28:13
    28:15,16 43:7,19
    43:23 44:20 48:5
**doing** 44:18
**due** 36:24 38:13
**duly** 4:5 65:9
**Duncan** 14:12 15:1

    16:1,5,11 42:25
    55:4,8,11 61:13
    62:21
**dynam-** 53:10
**dynamic** 53:10

─────────────
        **E**
─────────────
**E** 2:1,1 4:8 44:9
    48:17 61:1,1
    63:12,12 64:4,4
    65:1,1
**earlier** 26:11 30:15
    32:14 42:8 49:16
**early** 6:4 12:4
    20:11,18,25 48:25
    50:17 54:18
**effect** 45:10
**either** 35:4,15
    46:24 48:6
**else's** 62:17
**email** 10:17,20
    22:19 42:8 60:3
    60:16
**employed** 4:14
**employment** 61:20
    62:17
**endorsed** 7:15,17
    7:18
**entire** 7:21 34:19
**estimate** 22:22
**event** 39:13
**events** 31:20
**evolving** 18:19
**exactly** 19:4 33:15
    59:25
**EXAMINATION**
    1:13 3:2,3
**examined** 4:6
**example** 11:11
    42:25
**excellent** 58:17
**excerpts** 28:22 29:1
    29:4
**excess** 6:10 23:5
    36:23 38:13 48:7
**excuse** 54:17

**exhibit** 3:10,12,14
    3:16,18 19:17,19
    19:23 27:21 28:3
    28:4 29:8 39:10
    39:11,17 44:7,8
    45:5
**Exhibits** 3:11 44:21
    45:20
**exist** 23:17
**existed** 25:6
**exists** 23:16
**expedited** 63:7
**expires** 65:19
**explain** 15:23 22:5
    31:3,6 36:20 40:6
    53:20
**explained** 27:6,7
**exploring** 31:16
    33:16
**expressed** 29:14
    30:2 33:6
**extent** 8:13 9:13
    12:2 17:19 23:9
    26:24 29:17 30:4
    30:7,25 49:13

─────────────
        **F**
─────────────
**F** 61:1 63:12 64:4
    65:1
**fact** 11:5 12:17
    17:9 18:2 26:19
    39:4 51:12 56:7
**factually** 24:5
**fair** 22:14 49:12
    50:1 51:24 52:2
    52:22 53:7
**fairly** 54:15
**far** 52:1
**February** 11:7,17
    12:13,18 14:22
    20:19 45:3 50:10
    51:11 52:16 53:13
    54:5 55:2 56:13
    57:12 58:20
**feel** 46:19 51:6
    62:16

**felt** 14:15 58:13
**Fifth** 2:21
**figure** 21:4,8
**figured** 19:6,8
**file** 8:3,11 9:5,8,24
    11:14 18:21 41:8
    41:10,11,13,19,23
    41:24 48:24 49:11
    49:25 50:2 55:15
    55:19,25 56:6
    57:11 59:11,13,15
    59:19,21
**filed** 19:18 60:1
**files** 8:6,21 41:14
    41:25 42:6 56:7
**final** 49:8
**find** 13:19 49:20
**fine** 54:14 62:24,24
**firm** 3:12 4:14,23
    6:17,24 8:4 9:2,6
    10:3,6,8 11:2,7,20
    12:10,25 13:8,12
    13:16 15:9 17:12
    18:10,11,15,22
    20:11,16,24 21:12
    22:1,2,8,12 23:1
    25:6,19,20 26:2,9
    31:19 41:9 42:10
    46:2 48:20 49:5
    49:19,22 50:16,15
    51:2,7,12,14,24
    51:25 52:19 53:4
    53:10,21 54:4,22
    55:3 56:1,6,10,11
    56:12,14,16,20,23
    57:17 58:11,14
    61:3,4,8,18 63:1
    63:15,20
**firm's** 6:17
**firms** 21:6 42:20
    61:12
**first** 4:5 7:8 15:7
    20:15,22 22:6
    23:3,6,24 24:15
    48:23,25 49:2,8

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 69

49:25 56:23 59:8
60:9
**fit** 50:19,24
**five** 42:3
**five-minute** 44:3
**Floor** 2:16
**Foley** 6:24 7:25 8:7
**folks** 26:3 51:5
53:21,25
**follow** 30:13 60:23
**follow-up** 20:25
48:15 63:8
**following** 18:24
48:3
**follows** 4:7
**foregoing** 65:8
**forestalls** 64:12
**form** 12:7 13:4
25:15,22 29:16
36:15 40:8,22
41:5 45:13 47:24
48:9 53:14 56:2
56:22
**former** 24:13 31:22
32:2 33:19 37:9
**Forsberg** 2:21 4:24
5:1
**found** 13:10 52:24
**foundation** 17:15
**frame** 58:21
**Friday** 10:15 49:9
**full** 4:10 57:6
**Furman** 2:14 11:12
11:15,19 12:17,22
13:2,10 14:5,8,18
15:18 16:2,10,15
16:17,20,23 17:3
17:10,13,24 40:3
48:20 53:22 54:11
54:12 57:13 58:5
58:7,9,10
**Furman's** 3:13
13:16,20,21 28:21
28:22,25 29:5
43:25 58:17

**further** 39:6,7 44:3
51:4
**future** 64:13

——————
**G**
**geek** 45:15
**generally** 26:9
34:15 64:7
**generically** 15:9
**gently** 58:13
**getting** 9:20 10:4
15:11 18:7 23:12
24:12 26:14 29:22
33:10 35:13 36:5
37:8,25 38:23
46:24 47:18 50:6
53:5 61:5
**give** 39:12 55:20
63:24
**given** 28:5 31:18
33:14 35:21 37:4
40:15
**go** 8:16 9:17 10:9
12:10 13:5 17:17
17:22 23:1 25:16
29:20 30:23 31:3
31:6 33:9 34:13
35:11 36:17 41:11
48:10 50:11 52:24
53:8,11,15 54:8
56:3 62:5
**goes** 34:10 43:7
**going** 5:20 10:24
11:12 12:22,24
13:7 14:5,15
16:10,17 18:16
21:14,15 23:1,7
26:20,21,24 29:7
30:13 42:4 44:2
45:13 49:25 50:16
51:9 52:1,23 53:5
53:22,23,24,24
54:10,24 55:9,10
57:19 58:14 60:16
60:22 61:11,12,23
**good** 39:4 50:19,24

**Gordon** 4:15,16 9:2
9:6,9,10,23 10:6,9
11:3 12:10 18:4
18:11,15,21 21:1
21:6,12,17 22:18
23:1 41:10,11,15
41:20 42:5 49:8
50:11,15 51:9
58:24 59:3,12,16
59:18 60:10,14
61:23 62:5,6,15
62:21
**Great** 7:9,12,22 8:6
8:12,23,24 35:5
35:15,19 37:10,20
38:4
**Greg** 5:3,5 60:20
**GREGORY** 2:9
**Gregory.Worde...**
2:12
**group** 58:2
**guardian** 1:6
**guess** 13:6 14:25
15:11,13 18:23
21:10 22:4 34:17
35:19 40:9 46:23
47:11 49:15 59:9
**gym** 11:13 12:4,18
12:22 13:3,8,11
13:17 15:20 16:3
16:10,15,17,20
**gyms** 14:7

——————
**H**
**H** 3:18 61:1 63:12
64:4
**half** 8:1
**hand** 54:4 65:12
**handling** 36:8
**Hang** 63:8
**happen** 19:15
20:14 21:20,24
22:3
**happened** 22:23
62:7
**happy** 27:22

**hard** 41:14
**hear** 50:22
**hearing** 35:1,2
40:16
**hearings** 31:14
**helped** 57:14
**helpful** 46:18
**hereunto** 65:12
**hey** 22:11 58:24
**Hicks** 3:12 6:13,16
14:12 15:8,12,14
16:19,22,24 19:12
19:18 26:1,4 27:3
40:3
**Hicks'** 20:9 25:25
**high** 55:24
**higher** 55:20
**hire** 62:24
**Hold** 26:23
**hope** 52:7
**hoping** 56:7,9
**Houston** 26:3
43:22
**how's** 38:5,5
**husband** 1:4

——————
**I**
**ideas** 53:2
**IDENTIFICATI...**
3:11
**identified** 41:3
**identifying** 27:3
**implement** 52:17
**importance** 40:16
**important** 34:20
51:6
**improper** 30:9
**include** 53:4
**included** 28:23
30:2 57:21 58:1
**including** 47:15
**INDEX** 3:2,10
**individual** 55:21
57:20
**individually** 48:21
**information** 17:1

17:20 23:10 26:25
34:20 35:6,16,25
36:13,19,21 37:11
37:21 40:5 45:2
45:25 46:4,14
47:3,6,21 48:6
53:17 63:25
**informing** 55:3
**input** 5:25
**inquiries** 25:12
**inquiry** 32:5 34:18
**instance** 8:20 49:20
**instruct** 24:9 26:23
30:7,10 35:15
**instructed** 38:5
**instructing** 27:8
**instruction** 23:19
27:11 31:7,18
**insurance** 7:10,13
8:20 25:5 26:1,7
26:12 33:5 34:7
34:21 35:7 36:1
40:4,6 43:8 45:14
45:15 47:6,8
**insurer** 38:10
**interacting** 40:4
**interest** 31:19
**interested** 51:8
63:9
**internally** 22:13
**Interruption** 62:18
**interviewing** 20:16
**invoking** 27:8
**involved** 51:5
56:15 58:4
**involvement** 15:12
**issue** 22:6 23:6,25
33:18 60:6,10,14
**issues** 15:11 16:18
26:8 27:4 34:16
34:16,25 35:3
46:22 47:15 60:13
64:9,11

——————
**J**
**James** 3:12,17,18

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 70

39:23
**January** 8:1,2 11:7
　11:14,15 12:9
　20:18 44:22 45:3
　50:10,17 51:10
　52:16 53:13 54:5
　55:1 57:12 58:20
**Jeff** 4:22
**Jeffrey** 1:14 2:20
　3:1 4:4,12 65:8
**Jim** 14:12 15:8,14
　16:19,22,24 19:18
　25:25 26:17 27:3
　32:24,25 39:12
　41:3 44:7
**jkestle@foumla...**
　2:23
**joined** 10:6
**June** 1:24 4:1 7:5
　19:19 65:9,13,20

———————
**K**
**Kasheta** 3:15,16
**KATHRYN** 1:3,5
**keep** 41:13
**keeping** 49:25 57:3
**Keller** 2:15,15 3:5
　3:7 17:15 21:21
　31:24 32:4,5
　45:13,19 48:15,18
　48:19 49:23 50:8
　51:3 52:6,12
　53:19 56:5,24
　57:2 60:18 63:8
　63:13,24 64:17
**Kestle** 2:20 4:22,23
　8:13 9:13 12:7
　13:4 17:18 23:9
　23:14,20 24:7
　25:15,22 26:23
　27:5,10 29:16
　30:4,21 31:1,8,21
　32:1,21 33:6,17
　35:8 36:15 37:1
　37:14 38:17 39:7
　40:8,22 41:5 46:7

46:16 47:10,24
　48:9 49:13 50:4
　53:14 56:2,22,25
**Kestle's** 42:13
**kind** 21:7 57:6
**KING** 1:2
**knew** 10:23,23 12:5
　12:9 18:4 24:5
　30:1 31:19,20
　51:7,8 54:11
**know** 7:17 9:19
　10:1,3,21,23
　12:24 13:7,7
　17:23 18:6,18
　20:13 21:4,5,10
　22:10,17,20,25
　23:11,24 24:1,11
　25:23 26:4,13,19
　29:2,21 31:1,12
　33:10 35:12 36:4
　37:7,24 38:19,22
　40:14,23 41:13
　45:21 46:17,18
　47:12,17 49:15,19
　50:5 51:6 56:4,4
　57:5 58:19,24
　60:11 61:16,19,21
　61:25 62:2,5,9,10
　62:11,12 63:1,3,4
**knowledge** 6:1,9,17
　6:17 7:20 57:1
　65:10
**knows** 18:15
**Koch** 1:25 65:6,17

———————
**L**
**L** 2:3
**lack** 17:15 55:17
**land** 55:10
**landed** 56:8 57:20
**late** 13:12 17:3
　41:10 51:21
**Lauren** 3:15,16
**law** 4:14 11:2 20:11
　20:24 25:6,19,20
　42:20 43:8

**lawsuit** 34:11,15
**lawyer** 16:25 42:18
　58:17 61:14 62:24
**lawyer's** 30:13
**lawyers** 5:1,1 54:20
　54:20
**lead** 14:24 15:1,4
**leadership** 51:12
　52:19 53:5 54:22
　56:12,14 57:17
**leading** 16:3
**leads** 15:2
**learn** 49:24
**learned** 48:23
**leave** 21:15 27:10
　49:19 50:20 57:24
　58:8 61:3,8,18
**leaving** 10:9,19
　11:2,6,8,13,16,20
　11:22 12:10 17:12
　18:14,17 46:2
　50:11,16 51:7,13
　51:14 52:24 53:6
　53:22,23,25 55:4
　55:4,23,23,25
　58:2
**led** 31:15 61:7
**Leeper** 11:8 17:2
　22:25 61:22
**left** 7:25 9:1 10:15
　11:22 12:25 13:8
　13:12 21:21 41:10
　49:5,11 51:15
　58:10,12 59:2
**legal** 1:5 7:23 40:2
　40:19
**Lemmon** 14:12
　15:1 16:1,5,11
　40:3 42:25 43:1
　55:4,8,17 57:13
　57:18 61:13,24
　62:2,21,24 63:4,5
**Lemmon's** 61:19
　62:23
**let's** 42:3 44:6

51:23
**letter** 3:14,16 27:15
　27:25 29:8,15
　30:3,18 32:16,24
　35:23 39:11,22
　40:7,10,15 41:4
　41:22 42:1 43:3
　43:14
**letting** 22:20
**Lewis** 2:10 19:2,13
**lieutenant** 55:18,21
**limit** 35:18
**limited** 15:12 26:7
　26:11 50:15
**limits** 20:6
**line** 34:18
**lines** 31:23 32:3
**list** 14:5
**listed** 15:6
**listened** 35:2
**lists** 44:20
**litigation** 12:23
　15:16 25:3 43:6
**little** 51:4
**LLC** 1:10
**LLP** 2:10,15
**located** 42:12
**logic** 49:10
**logistics** 10:22
**long** 4:16
**look** 15:3 28:13
　51:17 54:8,23
　56:14 57:25
**looked** 20:6 27:22
　28:7,15,16,18,19
　28:22 29:2
**looking** 20:22
**looks** 58:25
**lot** 16:8 42:22 43:1
　57:22 64:9,11
**Lucas** 19:19

———————
**M**
**M** 1:25 4:8 44:9
　48:17 61:1 63:12
　64:4 65:6,17

**making** 57:5,6
**Mansfield** 6:24
　7:25 8:7
**Manufacturing**
　1:10 2:8 6:21
　7:22 8:3,11 9:5,8
　14:24 17:11,25
　18:3,11,21 22:18
　23:8 25:8 29:11
　29:23 38:3 41:9
　42:14,17
**March** 11:7,7,17
　12:13,19 22:11
　45:3 50:11 51:11
　52:16 53:13 54:5
　55:2 56:13 57:12
　58:21
**Marine** 6:10,18
　7:16 9:11,22 23:5
　23:7,25 24:6,16
　24:17,19 26:5
　29:8 30:2 34:21
　36:24 38:13 39:12
　39:23 40:20 43:22
　45:11 48:6
**Marine's** 29:14
　33:4 34:6 35:6
　37:11,22
**Marine/** 26:2
**Marine/Houston**
　24:25 25:7,11
　27:15
**marital** 1:4
**mark** 19:17
**marked** 19:23 28:4
　39:17 44:8
**material** 27:16
　33:4,13 34:7
　36:25 38:13 47:3
**materials** 25:3
**matter** 30:17 31:16
　32:16 36:8,11
　39:2 46:22
**matters** 56:15
**mean** 8:17 9:18

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 71

13:6 17:6 26:9,10
26:13 40:9 53:1
53:16,16
**means** 7:17
**meant** 52:6
**meeting** 10:21
**member** 13:11
15:19 16:3
**membership** 13:16
**mentioned** 44:11
**mentors** 56:21
**met** 5:1
**MICHAEL** 1:3
**mid** 48:24
**mid-May** 19:16
**midway** 19:16
**million** 35:17 37:12
37:23
**minor** 1:6
**minutes** 42:3
**misconduct** 61:7
**misrepresent-** 47:3
**misrepresentation**
33:4 34:7
**misrepresentatio...**
27:17 36:25 38:14
**moment** 37:5
**Monday** 10:16
**months** 16:3 52:21
54:10
**morning** 30:15
32:14
**Moss** 3:17,18 34:15
35:23 39:12,23
41:3 44:12,20
**Moss's** 6:12 28:19
30:16 32:14 44:7
44:24
**motion** 3:13,19
5:12,16 28:19,24
**motions** 6:2
**mouse** 20:3,4
**move** 20:24
**multiple** 8:19

— **N** —

**N** 2:1 4:8,8 44:9,9
48:17,17 61:1,1
63:12,12 64:4,4
**name** 4:10 48:19
**Naranjo** 3:14 29:9
29:10 43:6
**nature** 33:14
**need** 20:4 32:11
39:1,7 44:3 52:17
54:2
**neutrally** 58:15
**never** 18:9 24:18
24:24 25:17 28:10
36:18 37:5 39:14
45:21
**new** 10:3 20:10,24
21:12 22:1,2,8,12
49:21 56:11 58:25
**nine** 54:20
**Nope** 7:5
**notice** 7:2 15:3,15
59:25 60:7
**notices** 17:10
**notification** 60:4
**notifications** 44:20
**notified** 11:2 36:23
**notify** 11:19 38:12
**notifying** 10:18
**November** 35:24
39:11,23 41:4
43:4
**number** 8:6 49:18
50:9

— **O** —

**O** 4:8 44:9 48:17
61:1 63:12 64:4
**o0o-** 4:3 64:21
**oath** 4:5 28:10
**object** 8:13 9:13
12:7 13:4 23:9
25:15,22 29:16,16
32:19 34:9 36:15
40:8,22 41:5
45:13 47:24 48:9
53:14 56:2,22
**objection** 17:15,18
23:14,21 30:4,21
31:17 35:8 37:1
37:14 38:17 46:7
46:16 49:13
**objections** 33:6
47:10 50:4
**obligation** 46:20
**obviously** 49:2
**occur** 61:10
**occurred** 19:8
51:21 61:9
**occurring** 53:12
**October** 27:14,24
29:8,11,15 30:3
30:17,19 32:16,17
**off-site** 42:10
**offered** 36:24
**office** 28:23 42:13
54:14,15 57:5
**officially** 10:6
**Oh** 29:4 54:17
**okay** 7:8 20:6,6
23:14 28:2,7 31:3
34:3 50:25 51:23
52:3,11,16,22
54:21 55:13 57:9
59:14,24
**old** 56:10
**once** 34:21
**ongoing** 31:14
52:22 60:14
**opaquely** 25:25
**Opposition** 3:13,19
**ORAL** 1:13
**order** 63:7
**originating** 42:18
55:14,14
**overloaded** 57:6

— **P** —

**P** 2:1,1
**p.m** 4:2 44:5,5
64:18
**P.S** 2:21
**page** 3:3,11 43:3,18

**pages** 29:1 43:25
**paragraph** 20:8,23
43:18
**paragraphs** 43:4
**parcel** 34:17 47:12
**part** 5:16 12:4
25:20 45:15
**participants** 1:20
**participated** 36:18
**particular** 29:25
31:20 33:22
**particularly** 37:4
40:15
**parting** 51:25
**partner** 15:9
**partners** 10:8,18
14:6
**parts** 41:24
**pass** 8:10
**payer** 8:18
**paying** 7:22 37:13
37:23
**pending** 40:16
**people** 14:16 52:23
54:17,18
**percent** 35:2 48:3
**performance** 63:17
64:7
**period** 54:5 55:7
57:12 59:10
**permission** 31:25
**person** 26:1 27:3
40:4,19
**personal** 53:17
**personally** 25:17
**perspective** 63:15
64:8,11
**Pfau** 2:4
**phone** 19:12
**phrase** 51:23 55:13
55:18
**Phrased** 15:14
**physical** 41:11,19
42:5 59:13,21
**physically** 42:12

**PIERCE** 65:4
**place** 4:13 52:24
**plaintiff** 43:11
**plaintiffs** 1:7 2:2
34:22 36:2,22
38:12 45:3,6 46:1
46:5,15 47:7
**Plaintiffs'** 3:13,19
**plans** 62:12,14
**plate's** 57:6
**pleadings** 15:4 25:3
**please** 32:12 34:2
37:4,17 38:16
43:19
**point** 7:15 10:7
12:22 13:2,12
14:3 18:14,18
19:1 21:25 24:5
24:21,22 29:11
33:15 46:1 47:22
55:2,7 58:7,23
**policies** 24:18 25:6
**policy** 6:10,18 23:5
23:7,25 24:6,16
25:14 35:7,16,18
35:18 36:23 37:17
37:23 38:13 44:19
45:11,11 48:7
**policyholders**
23:17 35:25 43:9
**poor** 64:7
**portion** 8:23
**portions** 13:21
34:17
**position** 27:6
**possibility** 55:9
57:17,19
**possible** 60:17
**potential** 58:2 60:6
**practicing** 61:13
62:3,13
**precise** 10:14 31:16
32:7
**precisely** 32:8
**preparation** 4:25

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 72

43:15
present 4:13
presented 40:20
presently 4:14
preserve 37:12,23
pretty 58:23
primarily 42:18
primary 27:3 40:4
  40:19
prior 10:9 11:1
  46:2 50:1
privilege 23:15,19
  23:21 27:6,8
  30:22,24 31:5,7
  31:11 35:9,24
  36:9,10,10,11
  37:2,2,15 38:18
  38:18,23 43:9
  46:8 47:9
privileged 17:20
  30:5 33:23 38:6
  38:10
probability 55:25
probably 15:6
  20:16,20 50:2
  60:2
probe 51:4
proceeding 34:16
  34:19 38:15 39:3
proceedings 5:19
  33:14 62:18
process 18:19
  21:11,13 22:10
  49:22
processing 40:5
produced 48:5
product 15:11 16:9
  17:19 23:10,21,23
  26:14,16,20,25
  27:2,6,9 30:21,24
  31:4,6,11 34:10
  35:8 36:10 37:2
  37:14 38:18,23
  46:7 47:9 60:13
prohibited 9:11

protect 35:17
provide 37:10,21
  45:9,25
provided 5:25 25:8
  34:21 43:10 45:5
  47:22
publish 39:16
pure 26:19
purportedly 13:16
purposefully 47:7
purposes 5:9 15:15
put 15:14 18:9 46:5
  46:14 50:19 64:14
putting 16:9

_____

Q

question 10:4 12:8
  18:7,24 23:12
  24:1,11 26:5,6,14
  29:22 30:12,14
  31:10 32:9,13,22
  33:7,18,20,22
  34:4 35:12 36:3,5
  37:7,18,20,24
  38:11,15,21,22
  40:9,12,24 41:12
  45:14 46:11,13,24
  47:2,18 48:4
  49:16 50:14 52:10
  52:13 58:6 59:17
  60:8 61:15 62:3,4
  62:8,20
questioning 53:25
  64:13
questions 14:18
  25:5 39:20 46:17
  46:19 48:13,16
  50:9 54:3 63:6
  64:15
quickly 28:7
quite 53:21

_____

R

R 2:1 61:1,1 63:12
  63:12 64:4,4 65:1
ran 21:16 55:21,22

ranking 55:20
reached 7:18
read 13:20 32:10
  32:12 33:25 34:25
  37:19 46:12
ready 39:20
realized 59:9 60:16
really 44:4 50:21
reason 5:25 9:24
  44:24 61:21
reasons 46:5,14
  53:9 63:19
Rec- 58:19
recall 18:12 19:4
  28:14 43:24 49:1
receive 25:20 40:1
  44:19
received 16:2 27:14
  39:22 40:7,15
  42:15 44:21
receiving 39:24
receptive 58:13
Recess 44:5
recipient 41:3
recollection 60:5
reconsider 31:17
  31:23
record 4:11 24:20
Rees 4:15,16 9:2,6
  9:9,10,23 10:6,9
  11:3 12:10 18:4
  18:11,15,22 21:1
  21:6 22:18 23:1
  41:10,12,16,20
  42:5 49:8 50:12
  50:15 51:9 58:24
  59:3,12,16,18
  60:10,15 61:23
  62:5,6,15,21
Rees's 21:17
referred 45:19
referring 20:13
related 28:18 64:12
relationship 35:22
  54:9 57:24

remember 5:15 7:2
  8:18,24 10:14,21
  10:21 20:15 25:1
  25:4 28:12 32:23
  32:24 33:2 34:5
  39:24 40:6 44:23
  59:25
remove 20:10
rep- 60:17
reply 28:24
REPORTED 1:25
Reporter 32:13
  34:4 37:20 46:13
  65:6
represent 7:13,16
  8:22 9:12 10:2,2
  15:8 41:17 48:19
  48:20 60:17
representation
  9:10 19:3 22:1,7
  29:3 42:17 49:21
representations
  25:12
representative 7:9
  36:8
representatives
  33:24
represented 4:18
  7:21 9:23 12:2
  46:21 48:2,8
  56:11
representing 6:20
  7:9 14:24 15:15
  17:4 24:22,23
  29:10 56:10
rescind 23:7 25:13
rescinded 36:24
  38:13 45:12
rescinding 24:6
  48:7
rescission 6:10,18
  23:5 34:20 35:7
  37:11,22 45:16,18
  45:22,24
reserved 64:20

respect 5:19 33:7
  33:20
respond 10:3 35:12
response 36:22
responses 48:11
responsibilities
  26:17 43:1
responsibility
  42:19,22 57:3
  59:15,19
retain 63:2
retained 7:12
reveal 26:24 27:2
  31:10
revealing 24:2,8
  30:6
reveals 27:9
reviewed 6:8,11,13
  43:25
right 7:4,6,7 8:4
  10:19 11:5,8,11
  12:14 14:24 15:5
  18:5 19:7,9 20:1
  25:14 29:1 33:17
  36:14 38:5,8,11
  39:15,18,20 41:4
  41:22,23 42:6
  43:16 44:12,14
  45:18 47:12 49:3
  49:17 50:12 52:14
  53:8 54:24 58:22
  59:8,16,20 60:5
  62:8 63:13
road 63:10
role 26:1,7,11
rolling 22:10 49:22
Ron 3:14
roots 64:7
rough 28:25 29:5
roughly 6:22 19:16
RPR 1:25 65:17
run 20:25 22:2
running 55:18

_____

S

S 2:1,3,9,15

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 73

**San** 19:19
**sanctions** 3:13,20
5:19 6:2 31:14
33:14 34:19 38:15
40:16
**saying** 46:23 47:11
52:14
**says** 20:9,23 43:19
**Scott** 1:14 3:1 4:4
4:12 19:21,24
20:9,23 28:5
39:18 42:24,24
43:20 44:14 65:9
**scroll** 19:21,25 28:6
39:13,19 44:15
**scrutiny** 36:12
**seal** 65:13
**search** 41:25
**Seattle** 1:17 2:11
2:17,22 4:1 54:14
57:5
**sec** 26:23
**second** 2:16 22:24
41:18 43:3 48:24
49:1,2,25 59:8
60:4,9
**section** 43:12
**secure** 47:7
**see** 16:18 39:25
42:1 43:4,12 44:1
60:11
**seeing** 28:12
**seen** 6:3,5 19:22
28:8,11 39:14
43:14 44:12
**sense** 22:15
**sent** 22:19 60:3,15
**sentence** 20:22
43:5,18
**separate** 34:14
**separating** 51:21
51:25
**separation** 52:18
52:20 53:1
**September** 52:5

**served** 6:4
**services** 63:2
**set** 22:4 65:12
**shake** 56:17
**share** 19:19
**short** 59:10 62:22
**show** 27:18,23
**shown** 39:25
**shows** 42:1
**signature** 64:20
**significant** 34:18
**Sinars** 2:14 3:12
6:17 8:4,7,11 9:2
10:8,18 11:2,6,6
11:20 12:25 13:8
13:12 14:2 15:9
17:12 18:10,14,25
19:2,11 21:22
25:19 26:2 31:19
41:8,19 43:20
46:2 48:20 49:7
55:25 56:24 57:13
58:10 59:11 61:3
61:4,7,18 63:1,14
64:6
**Sinars'** 64:8
**sir** 64:17
**situated** 53:6
**situation** 16:23
40:20
**skill** 65:10
**skills** 20:2
**Slowiskowski** 43:20
**SLOWISKOWS...**
2:14
**small** 54:15
**Smith** 2:10
**SNOW** 1:4,5
**somebody** 14:6
40:10,18 62:17
**soon** 44:4
**sorry** 7:5 18:24
29:4 37:18 51:4
56:22 59:17
**sort** 15:2

**sorts** 54:24
**sound** 7:6
**sounds** 7:4,7 28:21
49:10
**speak** 54:11 55:8
**specific** 5:15 32:23
**specifically** 26:10
63:22 64:12
**spring** 54:18
**staring** 14:16
**start** 11:12 20:8
43:5
**started** 20:15
**state** 1:1,9 4:10
65:3,7
**status** 54:3
**stay** 58:24
**stayed** 41:8 56:17
**steps** 20:10,24
**stopped** 24:22
**stopping** 14:14
**strategic** 5:24 35:4
37:12,22 46:5,14
47:8
**strategies** 47:16
**strategy** 34:16
46:20
**Street** 2:4
**strike** 20:21 31:5
42:15,24 44:1
47:4 57:17
**stuff** 6:4 21:8 57:7
**subject** 30:10,17
31:16 32:15 38:14
39:2
**submit** 5:21 6:7
**submitted** 5:8 6:9
6:16
**submitting** 7:2
**substance** 24:2,12
29:14 30:1 33:3
33:11 34:6 35:13
**substitute** 17:2
**successful** 42:9
**suggest** 55:24

**Suite** 2:5,11,22
**SUPERIOR** 1:1
**supplement** 38:12
**supplemental**
36:21 46:1 47:22
**supplementation**
45:9
**supplying** 43:6
**Support** 3:12,19
**suppose** 19:10
**sure** 4:12 11:9,9
12:8 13:6 14:25
17:5,5 18:24
19:11,21 35:2
38:24 40:11 41:24
46:11 48:3 50:23
53:21 54:7 55:11
57:5,6 58:6,16,16
58:18 64:10
**surreply** 28:24
**susceptible** 36:1
**suspect** 27:22
**sworn** 4:5 44:24
65:9

_____

**T**

**T** 2:20 4:8 44:9
48:17 61:1,1
63:12,12 64:4,4
65:1,1
**Tacoma** 2:5
**take** 8:6 9:5,8,24
18:16 21:3,18,19
41:9 42:3 44:2
56:8 64:9
**taken** 1:24 13:25
**talk** 46:20 49:16
58:10
**talked** 11:21 15:18
16:1,5,9,19,22,24
58:9
**talking** 11:6 23:4
23:24 26:20 38:3
38:4 53:18 56:12
62:17
**tapes** 35:2

**team** 40:2,19 58:25
**technical** 20:2
**telephone** 30:18
32:16
**tell** 11:11,15,17
14:10 16:7,14
17:24 52:8
**tells** 39:13
**ten** 54:20,20
**terms** 17:3 56:17
57:5 63:14
**testified** 4:6 12:9
26:11 48:22 53:22
**testify** 32:2
**testifying** 31:22
**testimony** 25:10
28:10 37:5 41:16
44:25
**Thank** 27:20 39:9
44:16 60:18 64:2
64:17
**things** 51:2 54:3,24
55:12 57:25
**think** 6:22 8:8,8
9:22 10:12,20
11:4,10,21 14:1
14:21 15:10,17
16:5,16,16 17:8
19:10 22:19 23:2
23:2,16 28:23,24
29:1 30:9 32:4,5
33:13 38:8 39:11
40:10 42:21 44:11
47:25 49:5 50:12
51:20 52:7 53:1,7
54:22 55:6 57:10
57:23 58:16,22
59:5 60:3 62:8,22
62:23
**Third** 2:10
**Thomas** 21:12
**thought** 45:19
49:11 50:2 52:7
52:13,14 56:16,17
**Thursday** 10:16

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 74

49:7 59:6
**time** 6:25 7:21
22:19 47:13 48:2
50:1 52:18 54:5
55:5,7 57:12
58:12,21 59:10
60:15,19
**today** 19:7 41:17
48:14 63:7
**Tokio** 6:10,18 7:15
9:10,22 23:5,7,25
24:6,16,17,18,25
25:7,11 26:2,5
27:15 29:8,14
30:2 33:3 34:6,21
35:6 36:24 37:11
37:21 38:12 39:12
39:23 40:20 43:22
45:11 48:6
**told** 10:20 11:21
13:22 14:5,6,11
14:11,13,13,14
16:16 18:2,9
19:13 50:10 63:15
**Tomaska** 2:14
43:21
**totally** 53:9
**touch** 58:25
**track** 57:4
**trans-** 13:21
**transcript** 13:22
28:25 29:6 63:7
65:8
**transfer** 61:12
**transferred** 8:23
59:13
**transition** 23:4
**transitioning** 18:15
21:11
**transmit** 35:16
36:21 45:2
**trial** 5:12,17 16:4
40:17
**tripartite** 35:21
**Trivett** 14:4

**true** 11:3,4 12:13
13:13,14 14:19
17:25 18:1,11,17
18:22 27:17 42:21
48:8,12 63:4
65:10
**truthfulness** 54:1
**try** 19:10 20:2 44:4
**trying** 15:10 21:4,7
21:10 22:5 37:12
37:22 46:18 57:23
58:14 63:9,24
**tuned** 58:24
**turn** 29:7
**twice** 32:10
**two** 10:12 31:8 43:4
44:20 48:4 59:14
59:18 60:2
**type** 40:20 54:9

---

**U**
**U** 61:1 63:12 64:4
**ULMER** 2:3 19:24
27:24 28:2,5
39:15,18 44:14
**Umlauf** 2:21 4:24
5:1
**uncomfortable**
14:15
**underlying** 6:2
35:18
**understand** 12:8
17:5 21:14,18
22:16 23:6 24:21
25:7 26:6 31:13
34:23,24 35:3,21
36:14 37:18 40:11
46:11 48:22 58:6
62:4
**understanding**
7:19 10:25 21:2
38:7 40:14 45:8
47:5
**understood** 29:13
52:9
**unlawful** 36:12,19

**unlawfully** 37:5
**unrelated** 53:9
**upper** 20:5
**urge** 37:10,21
**use** 12:22 51:23

---

**V**
**Vague** 25:22
**Vandivere** 1:3,4,5
5:9,20 12:3,23
15:16 16:4 36:22
47:14
**variety** 8:17 47:15
**various** 8:19
**Vertetis** 2:4
**Vertical** 1:9 11:12
12:4,18,22,24
13:3,8,11,17 14:7
14:13 15:20 16:2
16:15,20
**videoconference**
1:13,20
**Virginia** 11:8 17:2
22:25 61:22
**visions** 53:2
**vs** 1:8

---

**W**
**W.V** 1:6
**WA** 2:5,11,17,22
**waive** 33:23
**waived** 30:25 31:2
**walked** 59:2
**want** 20:8 21:13
23:4 32:8 33:22
33:25 38:24 39:5
44:18 49:21 50:14
51:10 53:21
**wanted** 58:8
**wants** 38:25 62:23
**Washington** 1:1,9
1:17 4:1 65:3,7
**wasn't** 10:1 35:1
42:9 53:1 60:16
**way** 18:9 31:9
43:14 50:19 60:12

64:14
**ways** 51:25
**we'll** 4:10 44:4
58:25
**we're** 24:20 31:16
33:14
**we've** 33:15 39:4
**Wednesday** 10:22
10:23 59:6
**week** 5:6 11:1
12:16 14:2 22:24
23:2,3 27:22
28:14,15,17 41:18
43:15 48:24 49:1
49:1,3,3,8 50:1
59:6,7,8,18 60:2,4
60:9
**weeks** 59:14
**went** 41:15 56:18
**weren't** 49:24
**WHEREOF** 65:12
**wife** 1:4
**wish** 22:7 43:19
63:2
**withdraw** 23:20
**withdrawal** 17:10
17:13 60:7
**withdrawing** 22:21
**withheld** 37:6 47:7
**withhold** 35:6 46:4
46:14
**withholding** 36:13
36:19
**withstand** 36:11
**witness** 2:19 4:4
14:5 20:1,5 27:5,8
27:11 44:16 50:23
52:7,9 64:19
65:12
**wondering** 40:18
**Wood** 1:14 3:1 4:4
4:12 20:9,23
27:14 31:15,19
39:12 42:24 43:20
44:11 45:25 48:19

51:17 52:8 53:21
60:22 62:20 63:10
65:9
**Worden** 2:9 5:3,6
32:7,12,19 33:21
34:2,9 60:21
**words** 5:24 7:12
8:10
**work** 8:12,17 15:11
16:9 17:19 23:10
23:21,23 26:14,16
26:19,25 27:2,6,9
30:21,24 31:4,6
31:11 34:10 35:8
36:10 37:2,14
38:18,23 46:7
47:9 60:13
**working** 57:11
61:15,17,17
**workload** 57:4
**World** 1:9 11:13
12:22,24 13:8,11
13:17 14:7 15:20
16:3,15,20
**World's** 12:4,18
13:3 14:13
**wouldn't** 12:13
18:2 36:11 40:6
40:14
**wrap** 44:4
**wrong** 45:20

---

**X**
**X** 4:8 44:9 48:17
61:1 63:12 64:4

---

**Y**
**yeah** 5:15 9:4,18
10:14 13:6 15:6
17:18,23 18:12,18
19:10 23:11 24:1
24:11 25:23 28:12
29:21 34:2,9 36:4
37:7,24 38:19
42:3 45:8 46:17
48:3 49:4,15

Vandivere, et al. v. Vertical World, Inc.

Jeffrey Scott Wood

Page 75

51:22 52:21 53:1
53:3,7,16 54:10
55:21 56:25 57:8
57:25 59:23 60:1
62:11,16
**year** 8:1

**Z**

**Zach** 57:20

**0**

**1**

**1** 3:12 19:17,19,23
35:17 37:12,23
**1:29** 44:5
**1:38** 44:5
**10/4/2022** 3:15
**100** 35:2 48:3
**1000** 2:16
**11/2/2022** 3:17
**1111** 2:10
**12:31** 4:2
**14** 30:19 32:17
**1400** 2:22
**19** 3:12
**19-2-27385-2** 1:8

**2**

**2** 3:14 27:21 28:3,4
29:8 35:24 39:11
39:23 41:4 43:4
43:18
**2:08** 64:18
**2021** 6:22 7:3,5
24:23
**2022** 8:2 27:15,24
29:8,11,15 30:3
30:17,19 32:16,17
35:24 39:11,23
41:4 43:4 51:19
52:1,5
**2023** 1:24 4:1 10:7
11:1,25 12:4,9,19
13:13 14:22,23
17:3,25 19:19

20:11,25 24:24
41:10 44:22 45:3
45:4 50:11,17
53:13 54:19 57:12
58:21 59:9 65:9
65:13
**2024** 65:20
**206.436.2028** 2:12
**206.622.2000** 2:17
**206.689.8500** 2:23
**21st** 7:3
**22** 1:24 4:1 65:9
**23** 7:5
**2357** 1:25 65:17
**23rd** 65:13
**24** 11:1 14:23
**253.777.0799** 2:6
**26** 38:25
**26(i)** 39:5
**27** 10:13 17:25
**2700** 2:11
**27th** 10:19 49:6
**28** 3:14 10:7
**28th** 4:17 9:3 10:9
11:23 12:14

**3**

**3** 3:16 39:11,17
**3-page** 3:16
**375** 3:15
**38th** 2:16
**39** 3:16
**3rd** 22:11

**4**

**4** 3:4,18 20:8,23
27:14,24 29:8,11
29:15 30:3,17
32:16 44:8
**413** 3:17
**44** 3:18
**45** 5:10,18,20
**48** 3:5

**5**

**5-page** 3:14

**6**

**6** 19:19
**61** 3:6
**63** 3:7
**64** 3:8

**7**

**700** 2:5

**8**

**9**

**9** 65:20
**901** 2:21
**909** 2:4
**98101** 2:11
**98104** 2:17
**98164-2050** 2:22
**98402** 2:5

# EXHIBIT 9

**Latto, Aaron**

| | |
|---|---|
| **From:** | Celebrezze, Bruce <Bruce.Celebrezze@clydeco.us> |
| **Sent:** | Monday, June 26, 2023 4:27 PM |
| **To:** | Kerri@lsw-legal.com |
| **Cc:** | Potente, Alex |
| **Subject:** | Vandivere v. C3 CONFIDENTIAL COMMUNICATION [CC-US2.00768.10270559.FID898587] |

Kerri,

Please see below and then call me at 415.365.9870. If I am away from my desk, it will just be for a moment.

As you are aware, Great American E & S Insurance Company ("Great American") issued policy no. PL1745347-01 to C3 Manufacturing LLC and others ("C3") for the policy period of October 11, 2018 to October 11, 2019 with policy limits of $1,000,000. Great American has repeatedly offered this sum to plaintiffs' counsel to extricate C3 from the *Vandivere* case, but he will not accept it, rather insisting on a settlement of $5,000,000 (plus payment of court-ordered sanctions) in order to fully release and dismiss C3.

As you have acknowledged, Great American has worked extremely hard trying to convince Tokio Marine/Houston Casualty Company ("HCC"), the carrier which provided a $4,000,000 excess policy to C3 but claims to have rescinded (and then also canceled the policy), to fund the difference between Great American's $1,000,000 and the demand of $5,000,000. Great American has also been working diligently trying to persuade the Sinars law firm, QBE (the E&O insurer for the Sinars law firm), and the Gordon Rees law firm to contribute to a settlement. Despite a tremendous push, these efforts have not been successful.

Therefore, in order to protect C3 and obtain a full dismissal and release for C3 in the *Vandivere* suit, Great American is prepared to advance the difference between its policy limit of $1,000,000 and the $5,000,000 settlement demand (Great American is not being asked to pay the sanctions given what we understand from Mr. Cochran's most recent motion that the Sinars firm pay them), if C3 will agree to the following:

1. Provide Great American with a full release of all claims of any nature whatsoever, including bad faith claims.
2. Assign all of its rights against HCC to Great American.
3. C3 will join with Great American, via a law firm of Great American's choice, in pursuing claims and, if necessary, filing a lawsuit against HCC. Great American is entitled to recover the sum of the first $4,000,000 plus any unreimbursed court-ordered sanctions paid by Great American of any judgment or settlement against HCC, and C3 is entitled to recover 90% of any judgment or settlement in excess of the sum of $4,000,000 plus any unreimbursed court-ordered sanctions paid by Great American. Except as set forth in the last sentence of this paragraph, Great American shall bear the costs and legal fees incurred in pursuing HCC and retains all rights to make all decisions regarding the prosecution of such claims. C3 agrees to cooperate fully – including but not limited to the production of documents, witnesses, and any other assistance Great American might require – in order for Great American to pursue its assigned rights and any other rights Great American or C3 might have against HCC, including in litigation against HCC. Great American shall have the sole and exclusive right to decide whether or not to settle with HCC on behalf of itself and C3, including when and for what amount. In the event the court orders attorneys' fees and costs in favor of plaintiffs, Great American shall recover such fees and costs.
4. To the extent, under applicable law, legal malpractice claims or other claims of acts, errors or omissions are assignable or permissible under a subrogation doctrine, C3 will assign to Great American all of its rights against the Sinars law firm and the Gordon Rees law firm and cooperate fully – including but not limited to

1

GAESIC000179

the production of documents, witnesses, and any other assistance Great American might require – with Great American in the prosecution of those claims.

5.  If such legal malpractice claims are not assignable or subject to subrogation, C3 will pursue legal malpractice claims and other claims of acts, errors, or omissions, including filing suit if necessary, against the Sinars law firm and the Gordon Rees law firm.  C3 would need to retain counsel of its own choice and completely control the litigation.  However, C3 must agree that it will pay Great American 90% of the net proceeds of any such litigation.  In other words, the fees and costs of prosecution would first be reimbursed to C3, and then C3 would keep 10% of the remaining net with 90% of the remaining net going to Great American.

6.  This agreement and the settlement with the underlying plaintiffs must be confidential.

This term sheet must be signed by Great American and C3, and then the agreement outlined in this term sheet must be reduced to a formal document signed by Great American and C3.  The formal agreement shall be the controlling document.

Having read the foregoing, each signator covenants that he or she is authorized to sign this email – to be replaced later with a formal document – on behalf of the entity on whose behalf his or her signature is affixed.

C3 MANUFACTURING LLC

By_____

_____
Its _____

GREAT AMERICAN E&S INSURANCE COMPANY

By_____ Aaron B. Latto
_____June 26, 2023_____
Its Senior Vice Presidnet_____

**Bruce Celebrezze**
Clyde & Co US LLP
**Direct Dial:** +1 415 365 9870 | **Mobile:** +1 415 867 1943

**CLYDE&CO** | 150 California Street | 15th Floor | San Francisco | CA 94111 | USA
**Main** +1 415 365 9800 | **Fax** +1 415 365 9801 | www.clydeco.us

GAESIC000180

# EXHIBIT 10

## McGrath, Haylee

**From:** Reynolds, Rachel <Rachel.Reynolds@lewisbrisbois.com>
**Sent:** Thursday, June 29, 2023 4:39 PM
**To:** McGrath, Haylee; Wood, Porche
**Subject:** [External] FW: [EXT] Vandivere [CC-US2.00768.10270559.FID898587]

---

**This Message Is From an External Sender**
This message came from outside your organization.

Report Suspicious

---

Here is confirmation of settlement.



**Rachel Reynolds** (She/Her/Hers)
**Partner | Seattle Administrative Partner**
**Rachel.Reynolds@lewisbrisbois.com**

**T: 206.455.7442 F: 206.436.2030**

1111 Third Avenue, Suite 2700, Seattle, WA 98101 | LewisBrisbois.com

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Darrell L. Cochran <darrell@pcvalaw.com>
**Sent:** Monday, June 26, 2023 6:30 PM
**To:** Reynolds, Rachel <Rachel.Reynolds@lewisbrisbois.com>; Celebrezze, Bruce <Bruce.Celebrezze@clydeco.us>; Sarah Awes <sawes@pcvalaw.com>; Andrew S. Ulmer <aulmer@pcvalaw.com>; Kerri J. Anderson <Kerri@lsw-legal.com>
**Subject:** RE: [EXT] Vandivere [CC-US2.00768.10270559.FID898587]

Thank you and I will do that now.

**Darrell L. Cochran**
Partner



**p:** (253) 777-0798
**e:** darrell@pcvalaw.com

GAESIC000181

**Pfau Cochran Vertetis Amala PLLC**
909 A Street, Suite 700, Tacoma, WA 98402
**www.pcva.law**

This message and the documents attached to it, if any, contains confidential information from PFAU COCHRAN
VERTETIS AMALA PLLC and is intended only for the use of the addressee and may contain information that is
PRIVILEGED and CONFIDENTIAL under applicable law, and/or may contain ATTORNEY WORK PRODUCT. If you
are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly
prohibited. If you have received this communication in error, please delete all electronic copies of this message
and its attachments, destroy any hard copies you may have created and notify me immediately at (253) 777-
0798.

**From:** Reynolds, Rachel <Rachel.Reynolds@lewisbrisbois.com>
**Sent:** Monday, June 26, 2023 6:29 PM
**To:** Celebrezze, Bruce <Bruce.Celebrezze@clydeco.us>; Darrell L. Cochran <darrell@pcvalaw.com>; Sarah Awes
<sawes@pcvalaw.com>; Andrew S. Ulmer <aulmer@pcvalaw.com>; Kerri J. Anderson <Kerri@lsw-legal.com>
**Subject:** Re: [EXT] Vandivere [CC-US2.00768.10270559.FID898587]

Darrell,

We are confirmed.  Will you notify the court?



Rachel Reynolds (She/Her/Hers)
**Partner | Seattle Administrative Partner**
Rachel.Reynolds@lewisbrisbois.com

**T: 206.455.7442 F: 206.436.2030**

1111 Third Avenue, Suite 2700, Seattle, WA 98101 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are no
intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then
delete this email and any attachment from your computer and any of your electronic devices where the message is stored.
**From:** Darrell L. Cochran <darrell@pcvalaw.com>
**Sent:** Monday, June 26, 2023 6:00 PM
**To:** Celebrezze, Bruce <Bruce.Celebrezze@clydeco.us>; Sarah Awes <sawes@pcvalaw.com>
**Cc:** Kerri@lsw-legal.com; rachel.reynolds@lewisbrisbois.co; Andrew S. Ulmer <aulmer@pcvalaw.com>
**Subject:** Re: Vandivere [CC-US2.00768.10270559.FID898587]

We have a deal at $5m to settle the claims against C3 Manufacturing, with the only
confidentiality as to the source of the funds.  We had previously settled with Vertical World for
its $1m policy and the court had previously ordered payment of sanctions for roughly $287,000
and those funds are separate and apart from this evening's settlement with C3.  Confirm and we
will notify the court.

2

GAESIC000182

Darrell Cochran
(253) 777-0799

---

**From:** Celebrezze, Bruce <Bruce.Celebrezze@clydeco.us>
**Sent:** Monday, June 26, 2023 5:54:28 PM
**To:** Darrell L. Cochran <darrell@pcvalaw.com>; Sarah Awes <sawes@pcvalaw.com>
**Cc:** Kerri@lsw-legal.com <Kerri@lsw-legal.com>; rachel.reynolds@lewisbrisbois.co
<rachel.reynolds@lewisbrisbois.co>
**Subject:** RE: Vandivere [CC-US2.00768.10270559.FID898587]

Darrell, I misspoke a small bit. There will be a confidentiality provision as to the source of the
settlement funds, which you indicated in our call would not be an issue.

Thanks, Bruce

**Bruce Celebrezze**
Clyde & Co US LLP
**Direct Dial:** +1 415 365 9870 | **Mobile:** +1 415 867 1943

 | 150 California Street | 15th Floor | San Francisco | CA 94111 | USA
**Main** +1 415 365 9800 | **Fax** +1 415 365 9801 | www.clydeco.us

---

**From:** Celebrezze, Bruce
**Sent:** Monday, June 26, 2023 5:48 PM
**To:** Darrell L. Cochran <darrell@pcvalaw.com>; Sarah Awes <sawes@pcvalaw.com>
**Cc:** Kerri@lsw-legal.com; Reynolds, Rachel (rachel.reynolds@sedgwicklaw.com)
<rachel.reynolds@sedgwicklaw.com>
**Subject:** Vandivere [CC-US2.00768.10270559.FID898587]

Darrell,

Everyone who needed to confer has done do and there will not be a need for a confidentiality
clause. Rachel will draft a settlement agreement and release.

Thanks, Bruce

**Bruce Celebrezze**
Clyde & Co US LLP
**Direct Dial:** +1 415 365 9870 | **Mobile:** +1 415 867 1943

 | 150 California Street | 15th Floor | San Francisco | CA 94111 | USA
**Main** +1 415 365 9800 | **Fax** +1 415 365 9801 | www.clydeco.us

**If our account details change, we will notify these to you by letter, telephone or face-to-face
and never by email.**

This email message and any attachments may contain legally privileged and/or confidential
information intended solely for the use of the individual or entity to whom it is addressed. If the

3

GAESIC000183

# EXHIBIT 11

FILED
2023 SEP 05 10:53 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 23-2-16817-8 SEA

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF WASHINGTON STATE
FOR KING COUNTY

8   GREAT AMERICAN E & S INSURANCE        NO.
    COMPANY, INDIVIDUALLY, AND AS
9   ASSIGNEE OF CLAIMS FROM ITS          **COMPLAINT FOR BREACH OF**
    INSURED C3 MANUFACTURING LLC, A      **CONTRACT, INSURANCE BAD FAITH,**
10  COLORADO COMPANY,                    **VIOLATIONS OF THE WASHINGTON**
                                         **CONSUMER PROTECTION ACT,**
11                      Plaintiff,       **EQUITABLE SUBROGATION, LEGAL**
                                         **MALPRACTICE AND BREACH OF**
12          vs.                          **FIDUCIARY DUTY**

13  HOUSTON CASUALTY COMPANY,
    GORDON REES SCULLY MANSUKHANI,
14  LLP, SINARS SLOWIKOWSKI
    TOMASAKA LLC, J. SCOTT WOOD and
    CHRISTOPHER FURMAN,

15
                        Defendants.
16

17

18          COMES NOW THE PLAINTIFF, Great American E & S Insurance Company ("Great

19  American"), individually, and as Assignee of Claims From its Insured C3 Manufacturing LLC,

20  a Colorado Company, and for its causes of action against the defendants allege as follows:

21                          **I.      PLAINTIFF**

22          1.1     Great American is a corporation organized and existing under the laws of the

23  State of Ohio with its principal place of business in Cincinnati, Ohio.

24

25  COMPLAINT FOR BREACH OF CONTRACT,              **JOHNSON FLORA SPRANGERS PLLC**
    INSURANCE BAD FAITH, VIOLATIONS OF THE         2001 Western Avenue, Suite 205
    WASHINGTON CONSUMER PROTECTION ACT,            Seattle, WA   98121-2174
    EQUITABLE SUBROGATION, LEGAL                       (t) 206.386.5566
    MALPRACTICE AND BREACH OF FIDUCIARY
    DUTY- 1

GAESIC000184

1  1.2  Great American brings this action as the assignee of claims against the

2 defendants which were assigned to Great American by C3 Manufacturing LLC ("C3"), a

3 Colorado LLC, as a result of a written assignment of claims executed between Great American

4 and C3 on August 4, 2023.

5  1.3  Great American also brings this action in its individual capacity owing to its

6 right to equitable subrogation from Houston Casualty Company ("Houston Casualty"),

7 described herein below.

8        **II.**  **DEFENDANTS**

9  2.1  Houston Casualty is a corporation organized under the laws of the State of

10 Texas with its principal place of business in Texas. At all times material times, Houston

11 Casualty was engaged in the business of issuing policies of insurance and providing insurance

12 coverage to its policy holders, including in Washington State.

13  2.2  J. Scott Wood is an attorney at law licensed to practice law in Washington State.

14 Mr. Wood resides in Seattle, King County, Washington. Mr. Wood was employed at the

15 Seattle office of defendant Sinars Slowikowski Tomaska LLC ("Sinars") from January 2022 to

16 April 28, 2023 and then at the Seattle office of defendant Gordon Rees Scully Mansukhani,

17 LLP ("Gordon Rees") from April 28, 2023 to the present.

18  2.3  Christopher Furman is an attorney at law licensed to practice law in Washington

19 State. Mr. Furman resides in Seattle, King County, Washington. At all times material hereto,

20 Mr. Furman was employed at the Seattle office of defendant Sinars.

21  2.4  Gordon Rees is a law firm doing business as a limited liability partnership

22 organized under the laws of the State of California, with its principal place of business in

23 California. Gordon Rees maintains an office in Seattle, King County, Washington where all

24 relevant acts and omissions took place.

25 COMPLAINT FOR BREACH OF CONTRACT,    **JOHNSON FLORA SPRANGERS PLLC**
 INSURANCE BAD FAITH, VIOLATIONS OF THE   2001 Western Avenue, Suite 205
 WASHINGTON CONSUMER PROTECTION ACT,    Seattle, WA  98121-2174
 EQUITABLE SUBROGATION, LEGAL       (t) 206.386.5566
 MALPRACTICE AND BREACH OF FIDUCIARY
 DUTY- 2

GAESIC000185

1    2.5    Sinars is a law firm doing business as a limited liability company organized

2  under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

3  Sinars maintains an office in Seattle, King County, Washington where all relevant acts and

4  omissions took place.

5                     **III.    JURISDICTION AND VENUE**

6    3.1    Jurisdiction is proper in the Superior Court pursuant to Wash. Const. Art. IV,

7  §6, RWC 4.28.185(1)(a), (b) and (d) and RCW 48.05.215.

8    3.2    Venue in King County is proper because the acts and/or omissions giving rise to

9  the claims set out in this Complaint took place in King County, Washington and, pursuant to

10  RCW 48.05.220, the cause of action against Houston Casualty arose in King County,

11  Washington.

12                     **IV.    VICARIOUS LIABILITY**

13    4.1    The acts and/or omissions by Mr. Wood described herein took place within the

14  scope and course of his employment with Sinars and Gordon Rees such that Sinars and/or

15  Gordon Rees are liable for his tortious conduct.

16    4.2    The acts and/or omissions by Mr. Furman described herein took place within the

17  scope and course of his employment with Sinars such that Sinars is liable for his tortious

18  conduct.

19                         **V.    FACTS**

20    5.1    On August 1, 2019, while climbing a vertical wall at the Vertical World rock

21  climbing gym in Seattle, Michael Vandivere fell and sustained significant injuries.

22    5.2    On October 16, 2019 Mr. Vandivere filed suit for personal injuries in King

23  County Superior Court against Vertical World.

24    5.3    At the time he fell, Mr. Vandivere was using an auto belay, a device intended to

25

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 3

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

1    assist vertical wall climbers to safely descend a climbing wall, that was manufactured by C3.

2       5.4     On May 21, 2021, in a second-amended complaint, Mr. Vandivere named C3 as

3    a defendant in the lawsuit, alleging that C3's auto belay device failed, owing to defects in

4    manufacturing and/or design.

5       5.5     On or about May 25, 2021, Mr. Vandivere's counsel served C3.

6       5.6     At the time Mr. Vandivere was injured, C3 was insured by two policies of

7    insurance covering commercial general liability, including products liability claims.

8       5.7     One policy was issued to C3 by Great American under Policy No. PL1745347-

9    01 (the "Great American Policy"). The Great American Policy provided C3 with primary

10   commercial general liability insurance, subject to a $1,000,000 per occurrence limit.

11      5.8     The second policy, an excess-umbrella policy, was issued to C3 by Houston

12   Casualty under Policy No. H18PX50121-00 to C3 (the "Houston Casualty Policy"). The

13   Houston Casualty Policy is excess to the Great American Policy and provided C3 $4,000,000

14   of umbrella coverage over the Great American Policy.

15      5.9     The Houston Casualty Policy generally follows form to the terms and conditions

16   of the Great American Policy but also contains its own terms, including terms that limit the

17   circumstances under which Houston Casualty may seek to cancel or attempt to void the policy.

18      5.10    Section IV (Conditions), Paragraph 8 of the Houston Casualty Policy is entitled

19   "Cancellation." It provides in relevant part that Houston Casualty may cancel the policy but

20   only by providing written notice to C3 "at least . . . 60 days before the effective date of the

21   cancellation."

22      5.11    The Cancellation provision does not permit Houston Casualty to retroactively

23   cancel the policy. Section IV (Conditions), Paragraph 13 of the Houston Casualty Policy is

24   entitled "Representations or Fraud." It provides that Houston Casualty may void a policy if it

25   COMPLAINT FOR BREACH OF CONTRACT,
     INSURANCE BAD FAITH, VIOLATIONS OF THE
     WASHINGTON CONSUMER PROTECTION ACT,
     EQUITABLE SUBROGATION, LEGAL
     MALPRACTICE AND BREACH OF FIDUCIARY
     DUTY- 4

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000187

1  determines that the "statements in the Declarations" are not accurate and complete because of

2  fraud. None of the statements in the Declarations is untrue, much less fraudulent. Moreover,

3  Houston Casualty's attempt to rescind or cancel the policy nearly three and a half years after

4  Mr. Vandivere's accident and six months before trial violated Washington law, including RCW

5  48.18.320.

6      5.12    Shortly after the second amended Vandivere complaint was filed, C3 was

7  served with a summons and complaint that it tendered to Great American, C3's primary insurer

8  for the period implicated by the claims in the lawsuit.

9      5.13    Great American retained Mr. Wood, then a lawyer at Foley & Mansfield, to

10  defend C3 against the lawsuit.

11      5.14    On or about January 2022, Mr. Wood left Foley & Mansfield and joined Sinars.

12  C3 subsequently retained Sinars and Mr. Wood.

13      5.15    Mr. Wood worked on the *Vandivere* action with other Sinars lawyers, including

14  Duncan Lemmon, a partner based in California, and Christopher Furman, an associate based in

15  Seattle.

16      5.16    While employed at Sinars, Mr. Wood prepared discovery responses on C3's

17  behalf, which disclosed the Great American and Houston Casualty policies as policies that

18  provided coverage to C3 at the time of the accident.

19      5.17    Mr. Wood, also while employed at Sinars, prepared a response to a discovery

20  request that asked C3 to identify all dates and locations in which employees, agents, attorneys,

21  directors, and officers of Vertical World met with employees, agents, attorneys and directors

22  and officers of C3. In that response, Mr. Wood identified two incidents involving Vertical

23  World's tour of C3's facility and a meeting in April 2022 with Vertical World, C3 and the

24  Plaintiffs and stated that C3 did not recall meeting on any other occasion.

25

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 5

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000188

1    5.18    Great American notified Houston Casualty of the action on July 22, 2022.

2    5.19    On January 26, 2023, Houston Casualty sent a letter to C3 purporting to rescind

3    the Houston Casualty Policy based on alleged material misrepresentations it claimed C3

4    knowingly made in the application for the policy.

5    5.20    Also on January 26, 2023, the broker that placed the Houston Casualty policy,

6    Veracity Insurance Solutions, sent a Policy Change Notification to C3. The cover e-mail

7    forwarding the cancellation notice described it as a "FLAT CANCELLATION of policy per

8    the carrier's request." In breach of the cancellation provision in the Houston Casualty Policy,

9    the Policy Change Notification indicated that the Houston Casualty Policy was "cancelled

10    effective inception."

11    5.21    Mr. Wood was contemporaneously notified of Houston Casualty's position that

12    the Houston Casualty Policy was rescinded and cancelled but he did not supplement C3's

13    discovery responses in the *Vandivere* action with respect to the insurance coverage available to

14    potentially pay Mr. Vandivere's and the other Plaintiffs' claims.

15    5.22    The January 26 letter enclosed a refund check for the premium associated with

16    the Houston Casualty Policy, and the Policy Change Notification was accompanied by an

17    invoice that also reflected the return of the premium amount to C3 as a result of the

18    cancellation.

19    5.23    C3 did not cash the check and contested the rescission/cancellation attempt

20    because it was based on a false premise that C3 intentionally misrepresented a material fact

21    with the intent to deceive Houston Casualty.

22    5.24    In fact, C3 answered the question Houston Casualty used to try to justify

23    rescission truthfully, based on its understanding of the meaning of the question in consultation

24    with its broker.

25    COMPLAINT FOR BREACH OF CONTRACT,                **JOHNSON FLORA SPRANGERS PLLC**
INSURANCE BAD FAITH, VIOLATIONS OF THE                 2001 Western Avenue, Suite 205
WASHINGTON CONSUMER PROTECTION ACT,                      Seattle, WA   98121-2174
EQUITABLE SUBROGATION, LEGAL                                    (t) 206.386.5566
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 6

GAESIC000189

1    5.25    On February 27, 2023, C3's coverage counsel responded to Houston Casualty's

2    purported termination/cancellation and explained why Houston Casualty's acts were

3    inappropriate and based on the false premise that C3 intentionally made false statements in its

4    insurance application with the intent to deceive Houston Casualty.

5    5.26    On March 13, 2023, Andrew Lavin and Melissa Wiese, lawyers at Gordon

6    Rees, wrote C3's coverage counsel on behalf of Houston Casualty and affirmed Houston

7    Casualty's coverage position, wrongly accusing C3 of making material misrepresentations in

8    its insurance application.

9    5.27    Upon information and belief, Mr. Lavin and Ms. Wiese and Gordon Rees had

10    been Houston Casualty's insurance coverage counsel with respect to C3's claim for coverage

11    from at least the fall of 2022.

12    5.28    Although C3 disagreed with, and continues to disagree with, Houston

13    Casualty's position, Washington Rule of Court 26(e) required Mr. Wood to seasonably

14    supplement C3's discovery responses to reflect Houston Casualty's purported recission, which

15    was communicated to Mr. Wood no later than January 26, 2023.

16    5.29    Mr. Wood did not supplement the discovery responses, nor did he notify Mr.

17    Vandivere's counsel of the material change in the amount of insurance coverage available for

18    the Vandiveres' damages.

19    5.30    On April 1, 2022, the same day C3, Vertical World, and Plaintiffs inspected

20    C3's allegedly defective product, Mr. Furman joined a Vertical World climbing facility in

21    Lynnwood, Washington without telling C3 or any party to the Vandivere case. Mr. Furman did

22    inform Mr. Lemmon.

23

24

25    COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 7

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000190

1    5.31    On March 5, 2023, Mr. Furman joined Vertical World's Seattle facility, the

2    same facility where Mr. Vandivere was injured.  Between April 1, 2022, and April 26, 2023,

3    Mr. Furman visited the Lynnwood and Seattle gyms dozens of times.

4    5.32    Neither Mr. Wood nor anyone at Sinars supplemented C3's discovery responses

5    to report Mr. Furman's contact with employees of Vertical World.

6    5.33    Mr. Furman testified in a deposition that he ultimately decided to notify Vertical

7    World that he had been using the gym because, in his words, certain Vertical World employees

8    were giving him "some side-eye" and he felt "kind of being observed by people in the gym,"

9    although he could not identify the employees to whom he was referring by gender, age, or any

10    other identifying characteristic.

11    5.34    On April 28, 2023, Mr. Wood, while representing C3, joined the firm of Gordon

12    Rees, the same firm where Mr. Lavin and Ms. Wiese worked while representing Houston

13    Casualty with respect to the rescission and cancellation of the Houston Casualty Policy.

14    5.35    Prior to the date he joined Gordon Rees and took C3's defense of the Vandivere

15    case with him, Mr. Wood and Gordon Rees knew or should have known that Gordon Rees

16    represented Houston Casualty in an insurance coverage dispute against Mr. Wood's client C3.

17    5.36    For a period of two weeks, Mr. Wood continued to represent C3 at Gordon Rees

18    even though he and Gordon Rees had an ethically impermissible conflict of interest between

19    representing both C3 and Houston Casualty. During this time period, Mr. Wood did not

20    disclose Houston Casualty's attempt to rescind and cancel the Houston Casualty Policy.

21    5.37    In May of 2023, Mr. Wood and Gordon Rees acknowledged that their dual

22    representation of C3 and Houston Casualty constituted an ethically improper and impermissible

23    conflict of interest, and they moved to withdraw as C3's counsel.

24

25    COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 8

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA   98121-2174
(t) 206.386.5566

GAESIC000191

5.38   Sinars refused to reengage in C3's defense, forcing Great American to bring in a new law firm to defend C3 only weeks before the scheduled trial.

5.39   The Court granted the motion for Mr. Wood to withdraw as C3's counsel in the *Vandivere* action, but in a scathing May 22, 2023 order, one month before trial, chastised C3 and Mr. Wood for what it described as a "dizzying array of attorney withdrawals/substitutions and law firm changes by counsel" and highlighted the problem Mr. Wood caused by joining a firm with a known conflict:

> The Court notes that this matter has been continued no fewer than 6 times. The parties have waited four and half years for their day in court. The Court is troubled by what can only be described as C3's dizzying array of attorney withdrawals/substitutions and law firm changes by counsel. With an Order signed by Judge Shaffer on October 12, 2022 indicating there would be no further continuances **for any reason** and an **agreed** trial date of June 5, 2023 entered on October 18, 2022, requesting a continuance two weeks away from trial is unacceptable and **prejudices all parties and counsel**. Counsel for C3 was fully aware of the October 12th and 18th Orders and yet chose to change firms within a month of a hard set trial **without first ascertaining that there was no conflict with the new firm.**

(emphasis supplied).

5.40   On May 5, 2023, Vertical World disclosed to the Plaintiffs that, notwithstanding C3's discovery responses, Mr. Furman had accessed the Vertical World gyms without notice more than two dozen times.

5.41   On May 22, 2023, after Mr. Wood's withdrawal, C3's new counsel promptly disclosed to the parties to the *Vandivere* action that Houston Casualty had attempted to cancel and/or rescind its policy and was taking the position that there was no coverage available under its policy for the Plaintiffs' claims.

COMPLAINT FOR BREACH OF CONTRACT, INSURANCE BAD FAITH, VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT, EQUITABLE SUBROGATION, LEGAL MALPRACTICE AND BREACH OF FIDUCIARY DUTY- 9

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000192

5.42    On May 24, 2023, Plaintiffs moved for sanctions against C3 based on Mr. Furman's undisclosed visits and the failure to disclose, before May 22, 2023, Houston Casualty's coverage position.

5.43    On June 14, 2023, shortly before trial was scheduled to begin, the Court granted Plaintiffs' motion, ordered monetary sanctions, and indicated that it would provide a jury instruction that would allow the jury to make a negative inference from what it found to be C3's discovery misconduct.

5.44    The Court also made a number of factual and legal findings, including that: (i) Mr. Wood's misconduct was egregious and a "massive breach of the rules of discovery by C3 and its attorneys"; (ii) Mr. Furman's visits to Vertical World were an "unbridled effort" to engage in "covert discovery"; (iii) Mr. Furman's unauthorized contact with Vertical World's employees was a violation of Washington Rules of Professional Conduct 4.2 and 4.3; and (iv) Mr. Wood knew about the Houston Casualty conflict and that "he never could have taken [the *Vandivere* Action] with him because [Gordon Rees] represent[ed] the insurance company which rescind[ed] the excess insurance policy."

5.45    The Court also, for the first time in ten years on the bench, referred an attorney to the Washington State Bar Association, Mr. Wood.

5.46    The Plaintiffs in the *Vandivere* action also alleged that, as a result of the above-referenced misconduct, Great American was obligated to fund the entirety of any judgment, irrespective of its limit.

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 10

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000193

5.47    Faced with negligence and breaches of fiduciary duty by two law firms, and a breach of contract by a co-insurer on the eve of trial, all of which declined to participate in discussions regarding an appropriate settlement of the *Vandivere* action, C3 and Great American were forced to resolve the *Vandivere* action for an amount that was significantly higher than it otherwise would have been and involved sums greatly in excess of Great American's policy limits; sums that should have been paid by Houston Casualty (or one or more of the other defendants).

5.48    Houston Casualty's breach of its contract, its bad faith claims handling, and the negligence and breaches of fiduciary duty by Mr. Wood, Mr. Furman, Sinars, and Gordon Rees forced C3 and Great American to resolve the *Vandivere* action for a confidential amount that was significantly higher than it otherwise would have been and involved sums greatly in excess of Great American's policy limits; sums that should have been paid by Houston Casualty.

5.49    On August 9, 2023, the Court awarded additional monetary sanctions to Vertical World as a result of Mr. Wood's, Mr. Furman's and Sinar's misconduct. Great American is paying on C3's behalf a portion of those sanctions concurrently with the filing of this action and anticipates paying an additional amount on or before September 29, 2023.

## VI.    **FIRST CAUSE OF ACTION**

### ***Breach of Contract by Houston Casualty***

6.1    Plaintiff incorporates by reference Sections I-V as if set forth fully herein.

6.2    By refusing to provide coverage, by refusing to participate in the settlement of the *Vandivere* action, and by refusing to fund its share of the *Vandivere* Settlement,

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 11

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000194

1  Houston Casualty breached the Houston Casualty Policy by unilaterally and wrongfully

2  purporting to rescind and/or cancel its policy with C3 after an injury-causing event, without a

3  reasonable basis to do so, in violation of terms of the contract, the doctrine of equitable

4  estoppel and Washington State's insurance bad faith law including, but not limited to,

5  Washington's public policy to preserve insurance compensation sources for injured persons

6  after an injury-causing event.

7      6.3    As a direct and proximate result of Houston Casualty's breach of contract, Great

8  American, as C3's contractual and equitable subrogee and assignee, has suffered damages

9  including that: (i) Great American paid the portion of the settlement of the *Vandivere* action

10  that was rightfully and legally owed by Houston Casualty and; (ii) the amount paid to resolve

11  the *Vandivere* action was higher than it would have been but for Houston Casualty's breach(es)

12  of contract.

13                    **VII.    SECOND CAUSE OF ACTION**

14          ***Violation of Washington's Insurance Fair Conduct Act By Houston Casualty***

15      7.1    Plaintiff incorporates by reference Sections I-VI as if set forth fully herein.

16      7.2    Houston Casualty's wrongful purported rescission and/or cancellation of C3's

17  policy violated Washington State's Insurance Fair Conduct Act (IFCA), including RCW

18  48.30.010, 48.30.015 and Washington Administrative Code Regulations, including WAC 284-

19  30-330 and Washington's public policy to preserve insurance compensation sources for injured

20  persons after an injury-causing event.

21      7.3    C3 did not make material misrepresentations in connection with its application

22  for insurance and, as a result, Houston Casualty had no good faith basis to attempt to rescind or

23  cancel the Houston Casualty Policy. Houston Casualty also had no good faith basis to attempt

24  to rescind or cancel the Houston Casualty Policy after the occurrence of Mr. Vandivere's injury

25  COMPLAINT FOR BREACH OF CONTRACT,
   INSURANCE BAD FAITH, VIOLATIONS OF THE
   WASHINGTON CONSUMER PROTECTION ACT,
   EQUITABLE SUBROGATION, LEGAL
   MALPRACTICE AND BREACH OF FIDUCIARY
   DUTY- 12

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000195

1    for which C3 was alleged to be liable.

2        7.4    Houston Casualty had a duty not to attempt to rescind or cancel the Houston

3    Casualty Policy, a duty to participate in settlement discussions, a duty to pay its share of the

4    settlement of the *Vandivere* action and also a duty not to make false allegations of fraud and

5    dishonesty against its policyholder, knowing that the Plaintiffs in the *Vandivere* action would

6    learn about the allegations, thereby allowing them to be unfairly used against C3.

7        7.5    As a direct and proximate result of one or more of the aforesaid breaches of

8    duty by Houston Casualty, Great American, as C3's contractual and equitable subrogee and, to

9    the extent permitted, assignee, has suffered economic and noneconomic damages, including

10   that: (i) Great American funded the portion of the settlement of the *Vandivere* action owed by

11   Houston Casualty and; (ii) the amount paid to resolve the *Vandivere* action was higher than it

12   would have been but for Houston Casualty's breaches of duty.

13       7.6    Plaintiff seeks all damages recoverable under the IFCA, including treble

14   damages and attorney's fees as authorized by the IFCA.

15                   **VIII.   THIRD CAUSE OF ACTION**

16              ***Violation of Washington's Consumer Protection Act By Houston Casualty***

17       8.1    Plaintiff incorporates by reference Sections I-VII as if set forth fully herein.

18       8.2    Houston Casualty's wrongful purported rescission/cancellation of the Houston

19   Casualty Policy, including its bad faith denial of coverage and other violations of

20   Washington's Insurance Fair Conduct Act and Washington Administrative code regulations

21   cited herein above, constitute per se violations of Washington's Consumer Protection Act,

22   Chapter 19.86 RCW ("CPA").

23       8.3    As a direct and proximate result of Houston Casualty's violations of

24   Washington's CPA, Great American, as C3's contractual and equitable subrogee and, to the

25

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY**- 13**

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000196

1    extent permitted, assignee, has suffered damages as a result of the violations, including that: (i)

2    Great American funded the portion of the settlement of the *Vandivere* action owed by Houston

3    Casualty and; (ii) the amount paid to resolve the *Vandivere* action was higher than it would

4    have been but for Houston Casualty's breach.

5        8.4    Plaintiff seeks all damages recoverable under the CPA, including treble

6    damages and attorney's fees as authorized by the CPA.

7                          **IX.    FOURTH CAUSE OF ACTION**

8                  **_Equitable Indemnity/Subrogation From Houston Casualty_**

9        9.1    Plaintiff incorporates by reference Sections I-VIII as if set forth fully herein.

10       9.2    In addition to claims based on Great American's status as C3's contractual and

11   equitable subrogee and assignee, Great American also has an independent claim for equitable

12   subrogation against Houston Casualty.

13       9.3    Houston Casualty's breach of its contract with C3 and its violation of

14   Washington's IFCA and CPA proximately caused damage to Great American by interfering

15   with Great American's ability to resolve the *Vandivere* action when it was prudent and

16   reasonable to do so, and by exposing Great American to litigation with the Plaintiffs and C3.

17       9.4    Great American reached a settlement resolving all claims in the *Vandivere*

18   action but was forced to fund the portion of the settlement that should have been paid by

19   Houston Casualty.

20       9.5    Great American's actions were necessitated by, and the proximate result of,

21   Houston's Casualty's wrongful acts and breaches of duty and were necessary to protect Great

22   American's and C3's interests because, had Great American not resolved the *Vandivere* action,

23   Great American would have been forced to continue paying defense costs in the action and was

24   exposed to potential claims from both the Plaintiffs in the *Vandivere* action and C3.

25   COMPLAINT FOR BREACH OF CONTRACT,              **JOHNSON FLORA SPRANGERS PLLC**
     INSURANCE BAD FAITH, VIOLATIONS OF THE           2001 Western Avenue, Suite 205
     WASHINGTON CONSUMER PROTECTION ACT,                  Seattle, WA  98121-2174
     EQUITABLE SUBROGATION, LEGAL
     MALPRACTICE AND BREACH OF FIDUCIARY                      (t) 206.386.5566
     DUTY- 14

GAESIC000197

1    9.6    Great American is entitled to equitable indemnity from Houston Casualty for

2    the damages Great American sustained, including that: (i) Great American funded the portion

3    of the settlement of the *Vandivere* action owed by Houston Casualty and; (ii) the amount paid

4    to resolve the *Vandivere* action was higher than it would have been but for Houston Casualty's

5    breach.

6    ## X.    FIFTH CAUSE OF ACTION

7    ### *Legal Malpractice By Mr. Wood, Mr. Furman, Sinars, and Gordon Rees*

8    10.1    Plaintiff incorporates by reference Sections I-IX as if set forth fully herein.

9    10.2    As C3's attorneys, Mr. Wood, Mr. Furman, Sinars, and Gordon Rees owed C3 a

10   duty to comply with the standard of care of reasonable, careful, and prudent attorneys in the

11   State of Washington acting in the same or similar circumstances.

12   10.3    Mr. Wood and Gordon Rees breached the duty of care by, among other things,

13   failing to timely supplement C3's discovery responses relating to the Houston Casualty

14   insurance coverage dispute.

15   10.4    Mr. Wood, Mr. Furman and Sinars also breached the duty of care by allowing

16   Mr. Furman to visit the Vertical World gym while participating in the defense of the Vandivere

17   action.

18   10.5    Prior, and subsequent to, Mr. Wood's becoming an employee of Gordon Rees,

19   Mr. Wood and Gordon Rees had an obligation to disclose to C3, Great American and the Court

20   in the *Vandivere* action that Mr. Wood intended to join the firm and, as such, he would have a

21   disqualifying conflict of interest created by his representation of C3 and Gordon Rees's

22   representation of Houston Casualty in the C3 coverage dispute.

23   10.6    Mr. Wood's, Mr. Furman's, Sinars's, and Gordon Rees's aforementioned

24   breaches of the duty, proximately caused damage to Great American, as C3's contractual and

25

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY- 15

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA   98121-2174
(t) 206.386.5566

GAESIC000198

1    equitable subrogee and, to the extent permitted, assignee by: (i) it was required to pay more in

2    settlement of the *Vandivere* action, and; (ii) it paid and expects to pay in the future court-

3    ordered sanctions on C3's behalf.

4    **XI.    SIXTH CAUSE OF ACTION**

5    ***Breach of Fiduciary Duty by Mr. Wood, Mr. Furman, Sinars and Gordon Rees***

6    11.1    Plaintiff incorporates by reference Sections I-X as if set forth fully herein.

7    11.2    As C3's attorneys, Mr. Wood, Mr. Furman, Sinars, and Gordon Rees owed C3,

8    as a matter of law, a fiduciary duty, including the obligations of utmost good faith, complete

9    honesty, full disclosure (the duty to inform) and loyalty.

10    11.3    Mr. Wood and Gordon Rees breached their fiduciary duty to C3 by failing to

11    identify and disclose, prior to Mr. Wood's accepting at Gordon Rees, that his employment

12    would create a direct conflict of interest between Gordon Rees's representation of C3 and

13    Gordon Rees's representation of Houston Casualty.

14    11.4    Mr. Furman and Sinars breached their fiduciary duty to C3 by failing to inform

15    C3, prior to Mr. Furman's visits that they intended to conduct intentional and unethical

16    contacts with a represented party, by failing to explain the potential adverse consequences to

17    C3 and by failing to inform C3 that they had done so.

18    11.5    Mr. Wood's, Mr. Furman's, Sinar's, and Gordon Rees's breaches of fiduciary

19    duty proximately caused damage to Great American, as C3's contractual and equitable

20    subrogee and, to the extent permitted assignee, including that: (i) it was required to pay more in

21    settlement of the *Vandivere* action than it otherwise would have had to pay, and; (ii) it paid and

22    expects to pay in the future court-ordered sanctions on C3's behalf.

23    **XII.    AD DAMNUM**

24

25

COMPLAINT FOR BREACH OF CONTRACT,
INSURANCE BAD FAITH, VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT,
EQUITABLE SUBROGATION, LEGAL
MALPRACTICE AND BREACH OF FIDUCIARY
DUTY - 16

**JOHNSON FLORA SPRANGERS PLLC**
2001 Western Avenue, Suite 205
Seattle, WA  98121-2174
(t) 206.386.5566

GAESIC000199

1    WHEREFORE, Plaintiff seeks judgment in its favor for all damages recoverable under

2   Washington law against Defendants Houston Casualty, Gordon Rees, Mr. Wood, Mr. Furman

3   and Sinars as follows:

4    The portion of the settlement of the *Vandivere* action that should have been paid by

5   Houston Casualty;

6    The excess amount required to resolve the *Vandivere* action;

7    The court ordered sanctions Great American paid on C3's behalf;

8    Treble and punitive damages, to the extent permissible; and

9    Awarding Great American such attorney's fees and litigation costs, and such other

10   relief that the Court deems just and proper.

11

12    Dated this 5th day of September, 2023

13

14

15                          JOHNSON FLORA SPRANGERS PLLC

16
                            By: */s/Mark Johnson*
17                          Mark Johnson, WSBA No. 8463
                            Michael Sprangers, WSBA No. 45501
18                          2001 Western Ave, Ste 205
                            Seattle, WA 98121
19                          206-386-5566
20                          mark@johnsonflora.com
                            michael@johnsonflora.com
21
                            Attorneys for Plaintiff Great American
22

23

24

25   COMPLAINT FOR BREACH OF CONTRACT,          **JOHNSON FLORA SPRANGERS PLLC**
     INSURANCE BAD FAITH, VIOLATIONS OF THE      2001 Western Avenue, Suite 205
     WASHINGTON CONSUMER PROTECTION ACT,           Seattle, WA   98121-2174
     EQUITABLE SUBROGATION, LEGAL                     (t) 206.386.5566
     MALPRACTICE AND BREACH OF FIDUCIARY
     DUTY- 17

GAESIC000200

# EXHIBIT 12

1        The Honorable Thomas S. Zilly

2

3

4

5

6            UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
7                    AT SEATTLE

8   GREAT AMERICAN E & S INSURANCE
    COMPANY, individually, and as Assignee of
9   Claims from Its Insured C3            No. 2:23-cv-01695-TSZ
    MANUFACTURING LLC, a Colorado
10  Company,                             **DEFENDANT HOUSTON CASUALTY
                                         COMPANY'S AMENDED ANSWER TO
11              Plaintiff,               COMPLAINT FOR BREACH OF
                                         CONTRACT, INSURANCE BAD FAITH,
12        v.                             VIOLATIONS OF THE WASHINGTON
                                         CONSUMER PROTECTION ACT,
13  HOUSTON CASUALTY COMPANY,            EQUITABLE SUBROGATION, LEGAL
    GORDON REES SCULLY MANSUKHANI,       MALPRACTICE AND BREACH OF
14  LLP, SINARS SLOWIKOWSKI TOMASAKA     FIDUCIARY DUTY**
    LLC, J. SCOTT WOOD and CHRISTOPHER
15  FURMAN,

16              Defendants.

17

18        Defendant HOUSTON CASUALTY COMPANY ("Defendant" or "HCC") files this

19  amended answer to Plaintiff GREAT AMERICAN E & S INSURANCE COMPANY's

20  complaint. To the extent that any allegation in the complaint is not specifically admitted, the

21  allegation is denied.  Defendant answers the corresponding numbered paragraphs of the

22  complaint as follows:

23                   **I.    PLAINTIFF**

24        1.1    Great American is a corporation organized and existing under the laws of the State

HOUSTON CASUALTY'S AMENDED ANSWER                    Davis Wright Tremaine LLP
TO COMPLAINT (2:23-CV-01695-TSZ) - 1                 LAW OFFICES
4884-7124-9561v.1 0122352-000001                     920 Fifth Avenue, Suite 3300
                                                     Seattle, WA 98104-1610
                                                     206.622.3150 main · 206.757.7700 fax

GAESIC000201

1   of Ohio with its principal place of business in Cincinnati, Ohio.

2       **ANSWER:**

3       HCC lacks sufficient knowledge and information to admit or deny the allegations

4   contained in Paragraph 1.1 of the Complaint, and therefore, denies same.

5

6       1.2     Great American brings this action as the assignee of claims against the defendants

7   which were assigned to Great American by C3 Manufacturing LLC ("C3"), a Colorado LLC, as

8   a result of a written assignment of claims executed between Great American and C3 on August 4,

9   2023.

10      **ANSWER:**

11      HCC denies the allegations in Paragraph 1.2 of the Complaint to the extent they allege

12  there is a valid assignment of claims. HCC otherwise lacks sufficient knowledge and information

13  to admit or deny the allegations contained in Paragraph 1.2 of the Complaint, and therefore,

14  denies same.

15

16      1.3     Great American also brings this action in its individual capacity owing to its right

17  to equitable subrogation from Houston Casualty Company ("Houston Casualty"), described

18  herein below.

19      **ANSWER:**

20      HCC lacks sufficient knowledge and information to admit or deny the allegations

21  contained in Paragraph 1.3 of the Complaint, and therefore, denies same.

22

23      **II.     DEFENDANTS**

24      2.1     Houston Casualty is a corporation organized under the laws of the State of Texas

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 2
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000202

1  with its principal place of business in Texas. At all times material times, Houston Casualty was

2  engaged in the business of issuing policies of insurance and providing insurance coverage to its

3  policy holders, including in Washington State.

4      **ANSWER:**

5      HCC admits the allegations in Paragraph 2.1 of the Complaint.

6

7      2.2    J. Scott Wood is an attorney at law licensed to practice law in Washington State.

8  Mr. Wood resides in Seattle, King County, Washington. Mr. Wood was employed at the Seattle

9  office of defendant Sinars Slowikowski Tomaska LLC ("Sinars") from January 2022 to April 28,

10  2023 and then at the Seattle office of defendant Gordon Rees Scully Mansukhani, LLP ("Gordon

11  Rees") from April 28, 2023 to the present.

12      **ANSWER:**

13      HCC lacks sufficient knowledge and information to admit or deny the allegations

14  contained in Paragraph 2.2 of the Complaint, and therefore, denies same.

15

16      2.3    Christopher Furman is an attorney at law licensed to practice law in Washington

17  State. Mr. Furman resides in Seattle, King County, Washington. At all times material hereto, Mr.

18  Furman was employed at the Seattle office of defendant Sinars.

19      **ANSWER:**

20      HCC lacks sufficient knowledge and information to admit or deny the allegations

21  contained in Paragraph 2.3 of the Complaint, and therefore, denies same.

22

23      2.4    Gordon Rees is a law firm doing business as a limited liability partnership

24  organized under the laws of the State of California, with its principal place of business in

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 3
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000203

1  California. Gordon Rees maintains an office in Seattle, King County, Washington where all

2  relevant acts and omissions took place.

3  **ANSWER:**

4  HCC lacks sufficient knowledge and information to admit or deny the allegations

5  contained in Paragraph 2.4 of the Complaint, and therefore, denies same.

6

7  2.5    Sinars is a law firm doing business as a limited liability company organized under

8  the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. Sinars

9  maintains an office in Seattle, King County, Washington where all relevant acts and omissions

10  took place.

11  **ANSWER:**

12  HCC lacks sufficient knowledge and information to admit or deny the allegations

13  contained in Paragraph 2.5 of the Complaint, and therefore, denies same.

14

15  **III.    JURISDICTION AND VENUE**

16  3.1    Jurisdiction is proper in the Superior Court pursuant to Wash. Const. Art. IV, §6,

17  RWC 4.28.185(1)(a), (b) and (d) and RCW 48.05.215.

18  **ANSWER:**

19  The allegations in Paragraph 3.1 call for a legal conclusion to which no response is

20  required. To the extent an answer is required, HCC lacks sufficient knowledge and information to

21  admit or deny the allegations contained in Paragraph 3.1 of the Complaint, and therefore, denies

22  same.

23

24  3.2    Venue in King County is proper because the acts and/or omissions giving rise to

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 4
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000204

1   the claims set out in this Complaint took place in King County, Washington and, pursuant to

2   RCW 48.05.220, the cause of action against Houston Casualty arose in King County,

3   Washington.

4        **ANSWER:**

5        The allegations in Paragraph 3.2 call for a legal conclusion to which no response is

6   required. To the extent an answer is required, HCC lacks sufficient knowledge and information to

7   admit or deny the allegations contained in Paragraph 3.2 of the Complaint, and therefore, denies

8   same.

9

10           **IV.    VICARIOUS LIABILITY**

11        4.1    The acts and/or omissions by Mr. Wood described herein took place within the

12   scope and course of his employment with Sinars and Gordon Rees such that Sinars and/or

13   Gordon Rees are liable for his tortious conduct.

14        **ANSWER:**

15        HCC lacks sufficient knowledge and information to admit or deny the allegations

16   contained in Paragraph 4.1 of the Complaint, and therefore, denies same.

17

18        4.2    The acts and/or omissions by Mr. Furman described herein took place within the

19   scope and course of his employment with Sinars such that Sinars is liable for his tortious

20   conduct.

21        **ANSWER:**

22        HCC lacks sufficient knowledge and information to admit or deny the allegations

23   contained in Paragraph 4.2 of the Complaint, and therefore, denies same.

24

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 5
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000205

**V.      FACTS**

1

2      5.1      On August 1, 2019, while climbing a vertical wall at the Vertical World rock

3 climbing gym in Seattle, Michael Vandivere fell and sustained significant injuries.

4      **ANSWER:**

5      HCC lacks sufficient knowledge and information to admit or deny the allegations

6 contained in Paragraph 5.1 of the Complaint, and therefore, denies same.

7

8      5.2      On October 16, 2019 Mr. Vandivere filed suit for personal injuries in King County

9 Superior Court against Vertical World.

10      **ANSWER:**

11      HCC admits paragraph 5.2.

12

13      5.3      At the time he fell, Mr. Vandivere was using an auto belay, a device intended to

14 assist vertical wall climbers to safely descend a climbing wall, that was manufactured by C3.

15      **ANSWER:**

16      HCC lacks sufficient knowledge and information to admit or deny the allegations

17 contained in Paragraph 5.3 of the Complaint, and therefore, denies same.

18

19      5.4      On May 21, 2021, in a second-amended complaint, Mr. Vandivere named C3 as a

20 defendant in the lawsuit, alleging that C3's auto belay device failed, owing to defects in

21 manufacturing and/or design.

22      **ANSWER:**

23      HCC admits that a second-amended complaint was filed on May 21, 2021, the contents of

24 the Second Amended Complaint speak for themselves.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 6
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000206

1

2      5.5      On or about May 25, 2021, Mr. Vandivere's counsel served C3.

3      **ANSWER:**

4      HCC lacks sufficient knowledge and information to admit or deny the allegations

5  contained in Paragraph 5.5 of the Complaint, and therefore, denies same.

6

7      5.6      At the time Mr. Vandivere was injured, C3 was insured by two policies of

8  insurance covering commercial general liability, including products liability claims.

9      **ANSWER:**

10      HCC lacks sufficient knowledge and information to admit or deny the allegations

11  contained in Paragraph 5.6 of the Complaint, and therefore, denies same.

12

13      5.7      One policy was issued to C3 by Great American under Policy No. PL1745347-01

14  (the "Great American Policy"). The Great American Policy provided C3 with primary

15  commercial general liability insurance, subject to a $1,000,000 per occurrence limit.

16      **ANSWER:**

17      HCC lacks sufficient knowledge and information to admit or deny the allegations

18  contained in Paragraph 5.7 of the Complaint, and therefore, denies same.

19

20      5.8      The second policy, an excess-umbrella policy, was issued to C3 by Houston

21  Casualty under Policy No. H18PX50121-00 to C3 (the "Houston Casualty Policy"). The Houston

22  Casualty Policy is excess to the Great American Policy and provided C3 $4,000,000 of umbrella

23  coverage over the Great American Policy.

24      **ANSWER:**

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 7
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000207

1       HCC admits of paragraph 5.8 that it issued a Commercial Excess Liability Policy to C3,

2  with the policy number H18PX50121-00 ("HCC Policy"), the terms and conditions of which

3  speak for themselves.

4       5.9    The Houston Casualty Policy generally follows form to the terms and conditions

5  of the Great American Policy but also contains its own terms, including terms that limit the

6  circumstances under which Houston Casualty may seek to cancel or attempt to void the policy.

7     **ANSWER:**

8       HCC admits of paragraph 5.9 that the terms and conditions of the HCC Policy speak for

9  themselves.

10

11       5.10    Section IV (Conditions), Paragraph 8 of the Houston Casualty Policy is entitled

12  "Cancellation." It provides in relevant part that Houston Casualty may cancel the policy but only

13  by providing written notice to C3 "at least . . . 60 days before the effective date of the

14  cancellation."

15     **ANSWER:**

16       HCC admits only of paragraph 5.10 that the language quoted is an incomplete recitation

17  of a provision of the HCC Policy.

18       5.11    The Cancellation provision does not permit Houston Casualty to retroactively

19  cancel the policy. Section IV (Conditions), Paragraph 13 of the Houston Casualty Policy is

20  entitled "Representations or Fraud." It provides that Houston Casualty may void a policy if it

21  determines that the "statements in the Declarations" are not accurate and complete because of

22  fraud. None of the statements in the Declarations is untrue, much less fraudulent. Moreover,

23  Houston Casualty's attempt to rescind or cancel the policy nearly three and a half years after

24  Mr. Vandivere's accident and six months before trial violated Washington law, including RCW

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 8
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000208

1    48.18.320.

2        **ANSWER:**

3        HCC admits that paragraph 5.11 references a term of the HCC Policy, which term speaks

4    for itself.  Except as expressly admitted, HCC denies the allegations of paragraph 5.11.

5        5.12    Shortly after the second amended Vandivere complaint was filed, C3 was served

6    with a summons and complaint that it tendered to Great American, C3's primary insurer for the

7    period implicated by the claims in the lawsuit.

8        **ANSWER:**

9        HCC lacks sufficient knowledge and information to admit or deny the allegations

10   contained in Paragraph 5.12 of the Complaint, and therefore, denies same.

11

12       5.13    Great American retained Mr. Wood, then a lawyer at Foley & Mansfield, to

13   defend C3 against the lawsuit.

14       **ANSWER:**

15       HCC lacks sufficient knowledge and information to admit or deny the allegations

16   contained in Paragraph 5.13 of the Complaint, and therefore, denies same.

17

18       5.14    On or about January 2022, Mr. Wood left Foley & Mansfield and joined Sinars.

19   C3 subsequently retained Sinars and Mr. Wood.

20       **ANSWER:**

21       HCC lacks sufficient knowledge and information to admit or deny the allegations

22   contained in Paragraph 5.14 of the Complaint, and therefore, denies same.

23

24       5.15    Mr. Wood worked on the *Vandivere* action with other Sinars lawyers, including

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 9
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000209

1 Duncan Lemmon, a partner based in California, and Christopher Furman, an associate based in

2 Seattle.

3        **ANSWER:**

4        HCC lacks sufficient knowledge and information to admit or deny the allegations

5 contained in Paragraph 5.15 of the Complaint, and therefore, denies same.

6

7        5.16    While employed at Sinars, Mr. Wood prepared discovery responses on C3's

8 behalf, which disclosed the Great American and Houston Casualty policies as policies that

9 provided coverage to C3 at the time of the accident.

10        **ANSWER:**

11        HCC lacks sufficient knowledge and information to admit or deny the allegations

12 contained in Paragraph 5.16 of the Complaint, and therefore, denies same.

13

14        5.17    Mr. Wood, also while employed at Sinars, prepared a response to a discovery

15 request that asked C3 to identify all dates and locations in which employees, agents, attorneys,

16 directors, and officers of Vertical World met with employees, agents, attorneys and directors and

17 officers of C3. In that response, Mr. Wood identified two incidents involving Vertical World's

18 tour of C3's facility and a meeting in April 2022 with Vertical World, C3 and the Plaintiffs and

19 stated that C3 did not recall meeting on any other occasion.

20        **ANSWER:**

21        HCC lacks sufficient knowledge and information to admit or deny the allegations

22 contained in Paragraph 5.17 of the Complaint, and therefore, denies same.

23

24        5.18    Great American notified Houston Casualty of the action on July 22, 2022.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 10
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000210

1    **ANSWER:**

2    Denied

3        5.19    On January 26, 2023, Houston Casualty sent a letter to C3 purporting to rescind

4    the Houston Casualty Policy based on alleged material misrepresentations it claimed C3

5    knowingly made in the application for the policy.

6    **ANSWER:**

7        HCC admits that by letter dated January 26, 2023 the contents of which speak for

8    themself.

9

10        5.20    Also on January 26, 2023, the broker that placed the Houston Casualty policy,

11    Veracity Insurance Solutions, sent a Policy Change Notification to C3. The cover e-mail

12    forwarding the cancellation notice described it as a "FLAT CANCELLATION of policy per the

13    carrier's request." In breach of the cancellation provision in the Houston Casualty Policy, the

14    Policy Change Notification indicated that the Houston Casualty Policy was "cancelled effective

15    inception."

16    **ANSWER:**

17        HCC lacks sufficient knowledge and information to admit or deny the allegations

18    contained in Paragraph 5.20 of the Complaint, and therefore, denies same.

19

20        5.21    Mr. Wood was contemporaneously notified of Houston Casualty's position that

21    the Houston Casualty Policy was rescinded and cancelled but he did not supplement C3' s

22    discovery responses in the *Vandivere* action with respect to the insurance coverage available to

23    potentially pay Mr. Vandivere's and the other Plaintiffs' claims.

24    **ANSWER:**

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 11
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000211

1    HCC lacks sufficient knowledge and information to admit or deny the allegations

2    contained in Paragraph 5.21 of the Complaint, and therefore, denies same.

3

4    5.22    The January 26 letter enclosed a refund check for the premium associated with the

5    Houston Casualty Policy, and the Policy Change Notification was accompanied by an invoice

6    that also reflected the return of the premium amount to C3 as a result of the cancellation.

7    **ANSWER:**

8    HCC admits of paragraph 5.22 that it sent a refund check to  C3 along with its notice

9    rescinding the policy.

10

11    5.23    C3 did not cash the check and contested the rescission/cancellation attempt

12    because it was based on a false premise that C3 intentionally misrepresented a material fact with

13    the intent to deceive Houston Casualty.

14    **ANSWER:**

15    HCC admits only of paragraph 5.23 that C3 has not negotiated the premium refund check

16    sent by HCC.

17

18    5.24    In fact, C3 answered the question Houston Casualty used to try to justify

19    rescission truthfully, based on its understanding of the meaning of the question in consultation

20    with its broker.

21    **ANSWER:**

22    HCC denies the allegations in Paragraph 5.24.

23

24    5.25    On February 27, 2023, C3's coverage counsel responded to Houston Casualty's

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 12
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000212

1    purported termination/cancellation and explained why Houston Casualty's acts were

2    inappropriate and based on the false premise that C3 intentionally made false statements in its

3    insurance application with the intent to deceive Houston Casualty.

4        **ANSWER:**

5        HCC admits that it received certain correspondence from C3 and its counsel, the contents

6    of which speak for themselves.

7

8        5.26    On March 13, 2023, Andrew Lavin and Melissa Wiese, lawyers at Gordon Rees,

9    wrote C3's coverage counsel on behalf of Houston Casualty and affirmed Houston Casualty's

10   coverage position, wrongly accusing C3 of making material misrepresentations in its insurance

11   application.

12       **ANSWER:**

13       HCC admits of paragraph 5.26 that correspondence was exchanged between C3 and HCC

14   and their respective counsel, the substance of those exchanges speak for themselves.

15

16       5.27    Upon information and belief, Mr. Lavin and Ms. Wiese and Gordon Rees had

17   been Houston Casualty's insurance coverage counsel with respect to C3's claim for coverage

18   from at least the fall of 2022.

19       **ANSWER:**

20       HCC admits of paragraph 5.27 that for a period of time Gordon Rees was its coverage

21   counsel with regard to C3's claim for coverage.

22

23       5.28    Although C3 disagreed with, and continues to disagree with, Houston Casualty's

24   position, Washington Rule of Court 26(e) required Mr. Wood to seasonably supplement C3's

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 13
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000213

1  discovery responses to reflect Houston Casualty's purported recission, which was communicated

2  to Mr. Wood no later than January 26, 2023.

3      **ANSWER:**

4      HCC lacks sufficient knowledge and information to admit or deny the allegations

5  contained in Paragraph 5.28 of the Complaint, and therefore, denies same.

6

7      5.29    Mr. Wood did not supplement the discovery responses, nor did he notify

8  Mr. Vandivere's counsel of the material change in the amount of insurance coverage available for

9  the Vandiveres' damages.

10     **ANSWER:**

11     HCC lacks sufficient knowledge and information to admit or deny the allegations

12  contained in Paragraph 5.29 of the Complaint, and therefore, denies same.

13

14     5.30    On April 1, 2022, the same day C3, Vertical World, and Plaintiffs inspected C3's

15  allegedly defective product, Mr. Furman joined a Vertical World climbing facility in Lynnwood,

16  Washington without telling C3 or any party to the Vandivere case. Mr. Furman did inform Mr.

17  Lemmon.

18     **ANSWER:**

19     HCC lacks sufficient knowledge and information to admit or deny the allegations

20  contained in Paragraph 5.30 of the Complaint, and therefore, denies same.

21

22     5.31    On March 5, 2023, Mr. Furman joined Vertical World's Seattle facility, the same

23  facility where Mr. Vandivere was injured. Between April 1, 2022, and April 26, 2023, Mr.

24  Furman visited the Lynnwood and Seattle gyms dozens of times.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 14
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
Law Offices
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000214

1    **ANSWER:**

2    HCC lacks sufficient knowledge and information to admit or deny the allegations

3    contained in Paragraph 5.31 of the Complaint, and therefore, denies same.

4

5    5.32    Neither Mr. Wood nor anyone at Sinars supplemented C3's discovery responses to

6    report Mr. Furman's contact with employees of Vertical World.

7    **ANSWER:**

8    HCC lacks sufficient knowledge and information to admit or deny the allegations

9    contained in Paragraph 5.32 of the Complaint, and therefore, denies same.

10

11    5.33    Mr. Furman testified in a deposition that he ultimately decided to notify Vertical

12    World that he had been using the gym because, in his words, certain Vertical World employees

13    were giving him "some side-eye" and he felt "kind of being observed by people in the gym,"

14    although he could not identify the employees to whom he was referring by gender, age, or any

15    other identifying characteristic.

16    **ANSWER:**

17    HCC lacks sufficient knowledge and information to admit or deny the allegations

18    contained in Paragraph 5.33 of the Complaint, and therefore, denies same.

19

20    5.34    On April 28, 2023, Mr. Wood, while representing C3, joined the firm of Gordon

21    Rees, the same firm where Mr. Lavin and Ms. Wiese worked while representing Houston

22    Casualty with respect to the rescission and cancellation of the Houston Casualty Policy.

23    **ANSWER:**

24    HCC lacks sufficient knowledge and information to admit or deny the allegations

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 15
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000215

1    contained in Paragraph 5.34 of the Complaint, and therefore, denies same.

2

3         5.35    Prior to the date he joined Gordon Rees and took C3's defense of the Vandivere

4    case with him, Mr. Wood and Gordon Rees knew or should have known that Gordon Rees

5    represented Houston Casualty in an insurance coverage dispute against Mr. Wood's client C3.

6        **ANSWER:**

7        HCC lacks sufficient knowledge and information to admit or deny the allegations

8    contained in Paragraph 5.35 of the Complaint, and therefore, denies same.

9

10        5.36    For a period of two weeks, Mr. Wood continued to represent C3 at Gordon Rees

11   even though he and Gordon Rees had an ethically impermissible conflict of interest between

12   representing both C3 and Houston Casualty. During this time period, Mr. Wood did not disclose

13   Houston Casualty's attempt to rescind and cancel the Houston Casualty Policy.

14       **ANSWER:**

15       HCC lacks sufficient knowledge and information to admit or deny the allegations

16   contained in Paragraph 5.36 of the Complaint, and therefore, denies same.

17

18        5.37    In May of 2023, Mr. Wood and Gordon Rees acknowledged that their dual

19   representation of C3 and Houston Casualty constituted an ethically improper and impermissible

20   conflict of interest, and they moved to withdraw as C3's counsel.

21       **ANSWER:**

22       HCC lacks sufficient knowledge and information to admit or deny the allegations

23   contained in Paragraph 5.37 of the Complaint, and therefore, denies same.

24

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 16
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000216

5.38    Sinars refused to reengage in C3's defense, forcing Great American to bring in a new law firm to defend C3 only weeks before the scheduled trial.

**ANSWER:**

HCC lacks sufficient knowledge and information to admit or deny the allegations contained in Paragraph 5.38 of the Complaint, and therefore, denies same.

5.39    The Court granted the motion for Mr. Wood to withdraw as C3's counsel in the *Vandivere* action, but in a scathing May 22, 2023 order, one month before trial, chastised C3 and Mr. Wood for what it described as a "dizzying array of attorney withdrawals/substitutions and law firm changes by counsel" and highlighted the problem Mr. Wood caused by joining a firm with a known conflict:

> The Court notes that this matter has been continued no fewer than 6 times. The parties have waited four and half years for their day in court. The Court is troubled by what can only be described as C3's dizzying array of attorney withdrawals/substitutions and law firm changes by counsel. With an Order signed by Judge Shaffer on October 12, 2022 indicating there would be no further continuances **for any reason** and an **agreed** trial date of June 5, 2023 entered on October 18, 2022, requesting a continuance two weeks away from trial is unacceptable and **prejudices all parties and counsel**. Counsel for C3 was fully aware of the October 12th and 18th Orders and yet chose to change firms within a month of a hard set trial **without first ascertaining that there was no conflict with the new firm**.

(emphasis supplied).

**ANSWER:**

HCC admits of paragraph 5.39 that the Court issued orders in the *Vandivere* lawsuit which speak for themselves.

5.40    On May 5, 2023, Vertical World disclosed to the Plaintiffs that, notwithstanding

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 17
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000217

1  C3's discovery responses, Mr. Furman had accessed the Vertical World gyms without notice

2  more than two dozen times.

3      **ANSWER:**

4      HCC lacks sufficient knowledge and information to admit or deny the allegations

5  contained in Paragraph 5.40 of the Complaint, and therefore, denies same.

6

7      5.41    On May 22, 2023, after Mr. Wood's withdrawal, C3's new counsel promptly

8  disclosed to the parties to the *Vandivere* action that Houston Casualty had attempted to cancel

9  and/or rescind its policy and was taking the position that there was no coverage available under

10  its policy for the Plaintiffs' claims.

11      **ANSWER:**

12      HCC lacks sufficient knowledge and information to admit or deny the allegations

13  contained in Paragraph 5.41 of the Complaint, and therefore, denies same.

14

15      5.42    On May 24, 2023, Plaintiffs moved for sanctions against C3 based on Mr.

16  Furman's undisclosed visits and the failure to disclose, before May 22, 2023, Houston Casualty's

17  coverage position.

18      **ANSWER:**

19      HCC lacks sufficient knowledge and information to admit or deny the allegations

20  contained in Paragraph 5.42 of the Complaint, and therefore, denies same.

21

22      5.43    On June 14, 2023, shortly before trial was scheduled to begin, the Court granted

23  Plaintiffs' motion, ordered monetary sanctions, and indicated that it would provide a jury

24  instruction that would allow the jury to make a negative inference from what it found to be C3's

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 18
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000218

1  discovery misconduct.

2          **ANSWER:**

3          To the extent the allegations in Paragraph 5.43 of the Complaint refer to a court order,

4  that order speaks for itself. HCC otherwise lacks sufficient knowledge and information to admit

5  or deny the allegations contained in Paragraph 5.43 of the Complaint, and therefore, denies same.

6

7          5.44    The Court also made a number of factual and legal findings, including that: (i) Mr.

8  Wood's misconduct was egregious and a "massive breach of the rules of discovery by C3 and its

9  attorneys"; (ii) Mr. Furman's visits to Vertical World were an "unbridled effort" to engage in

10 "covert discovery"; (iii) Mr. Furman's unauthorized contact with Vertical World's employees was

11 a violation of Washington Rules of Professional Conduct 4.2 and 4.3; and (iv) Mr. Wood knew

12 about the Houston Casualty conflict and that "he never could have taken [the *Vandivere* Action]

13 with him because [Gordon Rees] represent[ed] the insurance company which rescind[ed] the

14 excess insurance policy."

15         **ANSWER:**

16         HCC admits of paragraph 5.44 that the Court issued orders in the *Vandivere* lawsuit

17 which speak for themselves.

18

19         5.45    The Court also, for the first time in ten years on the bench, referred an attorney to

20 the Washington State Bar Association, Mr. Wood.

21         **ANSWER:**

22         HCC lacks sufficient knowledge and information to admit or deny the allegations

23 contained in Paragraph 5.45 of the Complaint, and therefore, denies same.

24

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 19
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000219

5.46    The Plaintiffs in the *Vandivere* action also alleged that, as a result of the above-referenced misconduct, Great American was obligated to fund the entirety of any judgment, irrespective of its limit.

**ANSWER:**

HCC lacks sufficient knowledge and information to admit or deny the allegations contained in Paragraph 5.46 of the Complaint, and therefore, denies same.

5.47    Faced with negligence and breaches of fiduciary duty by two law firms, and a breach of contract by a co-insurer on the eve of trial, all of which declined to participate in discussions regarding an appropriate settlement of the *Vandivere* action, C3 and Great American were forced to resolve the *Vandivere* action for an amount that was significantly higher than it otherwise would have been and involved sums greatly in excess of Great American's policy limits; sums that should have been paid by Houston Casualty (or one or more of the other defendants).

**ANSWER:**

HCC lacks sufficient knowledge and information to admit or deny the allegations contained in Paragraph 5.47 of the Complaint, and therefore, denies same.

5.48    Houston Casualty's breach of its contract, its bad faith claims handling, and the negligence and breaches of fiduciary duty by Mr. Wood, Mr. Furman, Sinars, and Gordon Rees forced C3 and Great American to resolve the *Vandivere* action for a confidential amount that was significantly higher than it otherwise would have been and involved sums greatly in excess of Great American's policy limits; sums that should have been paid by Houston Casualty.

**ANSWER:**

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-cv-01695-TSZ) - 20
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000220

HCC denies the allegations in Paragraph 5.48 of the Complaint.

5.49    On August 9, 2023, the Court awarded additional monetary sanctions to Vertical World as a result of Mr. Wood's, Mr. Furman's and Sinar's misconduct. Great American is paying on C3' s behalf a portion of those sanctions concurrently with the filing of this action and anticipates paying an additional amount on or before September 29, 2023.

**ANSWER:**

HCC lacks sufficient knowledge and information to admit or deny the allegations contained in Paragraph 5.49 of the Complaint, and therefore, denies same

## VI.    FIRST CAUSE OF ACTION

### *Breach of Contract by Houston Casualty*

6.1    Plaintiff incorporates by reference Sections I-V as if set forth fully herein.

**ANSWER:**

HCC incorporates its responses to the allegations in all of the preceding Paragraphs as through fully restated herein.

6.2    By refusing to provide coverage, by refusing to participate in the settlement of the *Vandivere* action, and by refusing to fund its share of the Vandivere Settlement, Houston Casualty breached the Houston Casualty Policy by unilaterally and wrongfully purporting to rescind and/or cancel its policy with C3 after an injury-causing event, without a reasonable basis to do so, in violation of terms of the contract, the doctrine of equitable estoppel and Washington State's insurance bad faith law including, but not limited to, Washington's public policy to preserve insurance compensation sources for injured persons after an injury-causing event.

**ANSWER:**

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 21
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000221

1       The allegations in Paragraph 6.2 require a legal conclusion to which no response is

2  required. To the extent an answer is required, HCC denies the allegations in Paragraph 6.2 of the

3  Complaint.

4

5       6.3    As a direct and proximate result of Houston Casualty's breach of contract, Great

6  American, as C3's contractual and equitable subrogee and assignee, has suffered damages

7  including that: (i) Great American paid the portion of the settlement of the *Vandivere* action that

8  was rightfully and legally owed by Houston Casualty and; (ii) the amount paid to resolve the

9  *Vandivere* action was higher than it would have been but for Houston Casualty's breach(es) of

10  contract.

11     **ANSWER:**

12       The allegations in Paragraph 6.3 require a legal conclusion to which no response is

13  required. To the extent an answer is required, HCC denies the allegations in Paragraph 7.2 of the

14  Complaint.

15

16        **VII.   SECOND CAUSE OF ACTION**

17     ***Violation of Washington's Insurance Fair Conduct Act By Houston Casualty***

18     7.1    Plaintiff incorporates by reference Sections I-VI as if set forth fully herein.

19     **ANSWER:**

20       HCC incorporates its responses to the allegations in all of the preceding Paragraphs as

21  through fully restated herein.

22

23     7.2    Houston Casualty's wrongful purported rescission and/or cancellation of C3's

24  policy violated Washington State's Insurance Fair Conduct Act (IFCA), including RCW

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 22
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000222

1    48.30.010, 48.30.015 and Washington Administrative Code Regulations, including WAC

2    284¬30-330 and Washington's public policy to preserve insurance compensation sources for

3    injured persons after an injury-causing event.

4    **ANSWER:**

5    The allegations in Paragraph 7.2 require a legal conclusion to which no response is

6    required. To the extent an answer is required, HCC denies the allegations in Paragraph 7.2 of the

7    Complaint.

8

9    7.3    C3 did not make material misrepresentations in connection with its application for

10    insurance and, as a result, Houston Casualty had no good faith basis to attempt to rescind or

11    cancel the Houston Casualty Policy. Houston Casualty also had no good faith basis to attempt to

12    rescind or cancel the Houston Casualty Policy after the occurrence of Mr. Vandivere's injury for

13    which C3 was alleged to be liable.

14    **ANSWER:**

15    The allegations in Paragraph 7.3 require a legal conclusion to which no response is

16    required. To the extent an answer is required, HCC denies the allegations in Paragraph 7.3 of the

17    Complaint.

18

19    7.4    Houston Casualty had a duty not to attempt to rescind or cancel the Houston

20    Casualty Policy, a duty to participate in settlement discussions, a duty to pay its share of the

21    settlement of the *Vandivere* action and also a duty not to make false allegations of fraud and

22    dishonesty against its policyholder, knowing that the Plaintiffs in the *Vandivere* action would

23    learn about the allegations, thereby allowing them to be unfairly used against C3.

24    **ANSWER:**

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 23
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000223

1    The allegations in Paragraph 7.4 require a legal conclusion to which no response is

2   required. To the extent an answer is required, HCC denies the allegations in Paragraph 7.4 of the

3   Complaint.

4

5    7.5    As a direct and proximate result of one or more of the aforesaid breaches of duty

6   by Houston Casualty, Great American, as C3's contractual and equitable subrogee and, to the

7   extent permitted, assignee, has suffered economic and noneconomic damages, including that:

8   (i) Great American funded the portion of the settlement of the *Vandivere* action owed by Houston

9   Casualty and; (ii) the amount paid to resolve the *Vandivere* action was higher than it would have

10  been but for Houston Casualty's breaches of duty.

11    **ANSWER:**

12    The allegations in Paragraph 7.5 require a legal conclusion to which no response is

13  required. To the extent an answer is required, HCC denies the allegations in Paragraph 7.5 of the

14  Complaint.

15

16    7.6    Plaintiff seeks all damages recoverable under the IFCA, including treble damages

17  and attorney's fees as authorized by the IFCA.

18    **ANSWER:**

19    No response is required to Paragraph 7.6 of the Complaint. To the extent an answer is

20  required, HCC denies the allegations in Paragraph 7.6 of the Complaint.

21    **VIII.   THIRD CAUSE OF ACTION**

22    ***Violation of Washington's Consumer Protection Act By Houston Casualty***

23    8.1    Plaintiff incorporates by reference Sections I-VII as if set forth fully herein.

24    **ANSWER:**

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 24
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000224

1    HCC incorporates its responses to the allegations in all of the preceding Paragraphs as

2    through fully restated herein.

3

4    8.2    Houston Casualty's wrongful purported rescission/cancellation of the Houston

5    Casualty Policy, including its bad faith denial of coverage and other violations of Washington's

6    Insurance Fair Conduct Act and Washington Administrative code regulations cited herein above,

7    constitute per se violations of Washington's Consumer Protection Act, Chapter 19.86 RCW

8    ("CPA").

9    **ANSWER:**

10    The allegations in Paragraph 8.2 require a legal conclusion to which no response is

11    required. To the extent an answer is required, HCC denies the allegations in Paragraph 8.2 of the

12    Complaint.

13

14    8.3    As a direct and proximate result of Houston Casualty's violations of Washington's

15    CPA, Great American, as C3's contractual and equitable subrogee and, to the extent permitted,

16    assignee, has suffered damages as a result of the violations, including that: (i) Great American

17    funded the portion of the settlement of the *Vandivere* action owed by Houston Casualty and;

18    (ii) the amount paid to resolve the *Vandivere* action was higher than it would have been but for

19    Houston Casualty's breach.

20    **ANSWER:**

21    The allegations in Paragraph 8.3 require a legal conclusion to which no response is

22    required. To the extent an answer is required, HCC denies the allegations in Paragraph 8.3 of the

23    Complaint.

24

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 25
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000225

1    8.4    Plaintiff seeks all damages recoverable under the CPA, including treble damages

2   and attorney's fees as authorized by the CPA.

3    **ANSWER:**

4    No answer is required to Paragraph 8.4 of the Complaint. To the extent an answer is

5   required, HCC denies the allegations in Paragraph 8.4 of the Complaint.

6    **IX.    FOURTH CAUSE OF ACTION**

7    ***Equitable Indemnity/Subrogation From Houston Casualty***

8    9.1    Plaintiff incorporates by reference Sections I-VIII as if set forth fully herein.

9    **ANSWER:**

10    HCC incorporates its responses to the allegations in all of the preceding Paragraphs as

11   through fully restated herein.

12

13    9.2    In addition to claims based on Great American's status as C3's contractual and

14   equitable subrogee and assignee, Great American also has an independent claim for equitable

15   subrogation against Houston Casualty.

16    **ANSWER:**

17    The allegations in Paragraph 9.2 require a legal conclusion to which no response is

18   required. To the extent and answer is required, HCC denies the allegations in Paragraph 9.2 of

19   the Complaint.

20

21    9.3    Houston Casualty's breach of its contract with C3 and its violation of

22   Washington's IFCA and CPA proximately caused damage to Great American by interfering with

23   Great American's ability to resolve the *Vandivere* action when it was prudent and reasonable to

24   do so, and by exposing Great American to litigation with the Plaintiffs and C3.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 26
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000226

1    **ANSWER:**

2        The allegations in Paragraph 9.3 require a legal conclusion to which no response is

3    required. To the extent an answer is required, HCC lacks sufficient information to admit or deny

4    the allegations in Paragraph 9.3 of the Complaint, and therefore, denies same.

5

6        9.4    Great American reached a settlement resolving all claims in the *Vandivere* action

7    but was forced to fund the portion of the settlement that should have been paid by Houston

8    Casualty.

9    **ANSWER:**

10        HCC lacks sufficient information to admit or deny the allegations contained in Paragraph

11    9.4 of the Complaint, and therefore, denies same.

12

13        9.5    Great American's actions were necessitated by, and the proximate result of,

14    Houston's Casualty's wrongful acts and breaches of duty and were necessary to protect Great

15    American's and C3's interests because, had Great American not resolved the *Vandivere* action,

16    Great American would have been forced to continue paying defense costs in the action and was

17    exposed to potential claims from both the Plaintiffs in the *Vandivere* action and C3.

18    **ANSWER:**

19        Denied.

20

21        9.6    Great American is entitled to equitable indemnity from Houston Casualty for the

22    damages Great American sustained, including that: (i) Great American funded the portion of the

23    settlement of the *Vandivere* action owed by Houston Casualty and; (ii) the amount paid to resolve

24    the *Vandivere* action was higher than it would have been but for Houston Casualty's breach.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 27
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000227

1     **ANSWER:**

2     The allegations in Paragraph 9.6 require a legal conclusion to which no response is

3 required. To the extent an answer is required, To the extent an answer is required, HCC denies

4 the allegations in Paragraph 7.5 of the Complaint.

5

6         **X.     FIFTH CAUSE OF ACTION**

7     ***Legal Malpractice By Mr. Wood, Mr. Furman, Sinars, and Gordon Rees***

8     10.1    Plaintiff incorporates by reference Sections I-IX as if set forth fully herein.

9     **ANSWER:**

10     The allegations of paragraph 10.1 are directed to other parties and for that reason no

11 response is required from HCC.  To the extent any response is required, HCC  incorporates its

12 responses to the allegations in all of the preceding Paragraphs as through fully restated herein.

13

14     10.2    As C3's attorneys, Mr. Wood, Mr. Furman, Sinars, and Gordon Rees owed C3 a

15 duty to comply with the standard of care of reasonable, careful, and prudent attorneys in the State

16 of Washington acting in the same or similar circumstances.

17     **ANSWER:**

18     The allegations of paragraph 10.2 are directed to other parties and for that reason no

19 response is required from HCC.  To the extent any response is required, HCC lacks sufficient

20 knowledge and information to admit or deny the allegations contained in Paragraph 10.2 of the

21 Complaint, and therefore, denies same.

22

23     10.3    Mr. Wood and Gordon Rees breached the duty of care by, among other things,

24 failing to timely supplement C3's discovery responses relating to the Houston Casualty insurance

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 28
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000228

1  coverage dispute.

2      **ANSWER:**

3      The allegations of paragraph 10.3 are directed to other parties and for that reason no

4  response is required from HCC.  To the extent any response is required, HCC lacks sufficient

5  knowledge and information to admit or deny the allegations contained in Paragraph 10.3 of the

6  Complaint, and therefore, denies same.

7

8      10.4    Mr. Wood, Mr. Furman and Sinars also breached the duty of care by allowing Mr.

9  Furman to visit the Vertical World gym while participating in the defense of the *Vandivere* action.

10     **ANSWER:**

11     The allegations of paragraph 10.4 are directed to other parties and for that reason no

12 response is required from HCC.  To the extent any response is required, HCC lacks sufficient

13 knowledge and information to admit or deny the allegations contained in Paragraph 10.4 of the

14 Complaint, and therefore, denies same.

15

16     10.5    Prior, and subsequent to, Mr. Wood's becoming an employee of Gordon Rees, Mr.

17 Wood and Gordon Rees had an obligation to disclose to C3, Great American and the Court in the

18 *Vandivere* action that Mr. Wood intended to join the firm and, as such, he would have a

19 disqualifying conflict of interest created by his representation of C3 and Gordon Rees's

20 representation of Houston Casualty in the C3 coverage dispute.

21     **ANSWER:**

22     The allegations of paragraph 10.5 are directed to other parties and for that reason no

23 response is required from HCC.  To the extent any response is required, HCC lacks sufficient

24 knowledge and information to admit or deny the allegations contained in Paragraph 10.5 of the

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 29
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000229

1  Complaint, and therefore, denies same.

2

3      10.6    Mr. Wood's, Mr. Furman's, Sinars's, and Gordon Rees's aforementioned breaches

4  of the duty, proximately caused damage to Great American, as C3's contractual and equitable

5  subrogee and, to the extent permitted, assignee by: (i) it was required to pay more in settlement

6  of the *Vandivere* action, and; (ii) it paid and expects to pay in the future court-ordered sanctions

7  on C3's behalf.

8      **ANSWER:**

9      The allegations of paragraph 10.6 are directed to other parties and for that reason no

10  response is required from HCC.  To the extent any response is required, HCC lacks sufficient

11  knowledge and information to admit or deny the allegations contained in Paragraph 10.6 of the

12  Complaint, and therefore, denies same.

13

14              **XI.    SIXTH CAUSE OF ACTION**

15  ***Breach of Fiduciary Duty by Mr. Wood, Mr. Furman, Sinars and Gordon Rees***

16      11.1    Plaintiff incorporates by reference Sections I-X as if set forth fully herein.

17      **ANSWER:**

18      The allegations of paragraph 11.1 are directed to other parties and for that reason no

19  response is required from HCC.  To the extent any response is required, HCC incorporates its

20  responses to the allegations in all of the preceding Paragraphs as through fully restated herein.

21

22      11.2    As C3's attorneys, Mr. Wood, Mr. Furman, Sinars, and Gordon Rees owed C3, as

23  a matter of law, a fiduciary duty, including the obligations of utmost good faith, complete

24  honesty, full disclosure (the duty to inform) and loyally.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 30
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000230

1    **ANSWER:**

2         The allegations of paragraph 11.2 are directed to other parties and for that reason no

3    response is required from HCC.  To the extent any response is required, HCC lacks sufficient

4    knowledge and information to admit or deny the allegations contained in Paragraph 11.2 of the

5    Complaint, and therefore, denies same.

6

7         11.3    Mr. Wood and Gordon Rees breached their fiduciary duty to C3 by failing to

8    identify and disclose, prior to Mr. Wood's accepting at Gordon Rees, that his employment would

9    create a direct conflict of interest between Gordon Rees's representation of C3 and Gordon

10   Rees's representation of Houston Casualty.

11   **ANSWER:**

12        The allegations of paragraph 11.3 are directed to other parties and for that reason no

13   response is required from HCC.  To the extent any response is required, HCC lacks sufficient

14   knowledge and information to admit or deny the allegations contained in Paragraph 11.3 of the

15   Complaint, and therefore, denies same.

16

17        11.4    Mr. Furman and Sinars breached their fiduciary duty to C3 by failing to inform

18   C3, prior to Mr. Furman's visits that they intended to conduct intentional and unethical contacts

19   with a represented party, by failing to explain the potential adverse consequences to C3 and by

20   failing to inform C3 that they had done so.

21   **ANSWER:**

22        The allegations of paragraph 11.4 are directed to other parties and for that reason no

23   response is required from HCC.  To the extent any response is required, HCC lacks sufficient

24   knowledge and information to admit or deny the allegations contained in Paragraph 11.4 of the

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 31
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000231

1  Complaint, and therefore, denies same.

2

3      11.5    Mr. Wood's, Mr. Furman's, Sinar's, and Gordon Rees's breaches of fiduciary duty

4  proximately caused damage to Great American, as C3's contractual and equitable subrogee and,

5  to the extent permitted assignee, including that: (i) it was required to pay more in settlement of

6  the *Vandivere* action than it otherwise would have had to pay, and; (ii) it paid and expects to pay

7  in the future court-ordered sanctions on C3's behalf.

8      **ANSWER:**

9      The allegations of paragraph 10.2 are directed to other parties and for that reason no

10  response is required from HCC.  To the extent any response is required, HCC lacks sufficient

11  knowledge and information to admit or deny the allegations contained in Paragraph 11.5 of the

12  Complaint, and therefore, denies same.

13

14              **XII.    AD DAMNUM**

15      WHEREFORE, Plaintiff seeks judgment in its favor for all damages recoverable under

16  Washington law against Defendants Houston Casualty, Gordon Rees, Mr. Wood, Mr. Furman and

17  Sinars as follows:

18      The portion of the settlement of the *Vandivere* action that should have been paid by

19  Houston Casualty;

20      The excess amount required to resolve the *Vandivere* action;

21      The court ordered sanctions Great American paid on C3's behalf;

22      Treble and punitive damages, to the extent permissible; and

23      Awarding Great American such attorney's fees and litigation costs, and such other relief

24  that the Court deems just and proper.

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 32
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000232

1    **ANSWER:**

2        HCC denies the allegations in the AD DAMNUM portion of the Complaint to the extent

3    those allegations are made against HCC. Defendant lacks sufficient knowledge and information

4    to admit or deny the reaming allegations in the AD DAMNUM portion of the Complaint, and

5    therefore, denies same.

6        Except to the extent expressly admitted in response to paragraphs 1.1 through XII. Ad

7    Damnum above, HCC denies the allegations of plaintiffs' Complaint and the whole thereof.

8                        **AFFIRMATIVE DEFENSES**

9        By setting forth these affirmative defenses, HCC does not assume any burden of proof as

10    to any fact issue or other element of any cause of action that properly belongs to Plaintiff.  HCC

11    reserves the right to amend or supplement its affirmative defenses.

12        1.        The Complaint fails to state a claim for which relief can be granted against HCC.

13        2.        The Complaint is based upon, and alleges claims that are void as a matter of

14    public policy in Washington, Colorado, and/or Ohio.

15        3.        The Complaint alleges causes of action which Plaintiff lacks standing to assert.

16        4.        The Complaint seeks damages that are the result of Plaintiff's own negligence and

17    contributory fault.

18        5.        The Complaint seeks damages that are the result of Plaintiff's beach of a contract

    to provide indemnification to its insured.

19        6.        The Complaint alleges claims that Plaintiff waived before filing its Complaint.

20        7.        The Complaint alleges claims that are barred by the doctrine of estoppel.

21        8.        The Complaint fails to include a necessary party.

22        9.        The Complaint alleges claims that are subject to the affirmative defenses of

23    accord and satisfaction.

24        10.        The Complaint alleges claims that are barred by the doctrines of unclean hands

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 33
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000233

1  and unjust enrichment.

2     11.    The Complaint alleges claims that are barred, in whole or in part, because

3  Defendant's alleged conduct was justified.

4     12.    The law of Colorado applies to preclude the claims asserted in plaintiffs'

5  Complaint.

6     13.    Under the common law, HCC was permitted to rescind the HCC Policy based on

   the misrepresentations of C3 and properly did so, and as a result plaintiffs' claims fail.

7     14.    Under the terms of the HCC Policy, HCC was entitled to void the HCC Policy as

8  a result of the fraud and misrepresentations by C3 and did so, and as a result plaintiffs' claims

9  fail.

10    15.    Coverage under the HCC policy, if any, is limited to the limits of liability of the

11 HCC Policy.

12    16.    Plaintiff's loss or damages, if any, were caused in whole or in part by the

   contributory fault of others, including Plaintiff's own negligence, with the result that Plaintiff's

13 claims are barred, in whole or in part, by the doctrine of comparative fault and each party or

14 entity or individual determined to be at fault should only be liable for its percentage degree of

15 fault.

16    17.    If Plaintiff sustained loss or damage, these were the result of intervening or

17 superseding causes, and not as a result of the acts or omissions of HCC.

18    18.    Plaintiff's alleged damages should be barred or reduced due to the failure to

19 mitigate.

20

21

22

23

24

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 34
4884-7124-9561v.1 0122352-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

GAESIC000234

1     DATED this 28th day of December, 2023.

2
                                    Davis Wright Tremaine LLP
3                                   Attorneys for Defendant
                                    Houston Casualty Company
4

5                                   By *s/ Everett W. Jack*_____
                                        Everett W. Jack, WSBA No. 47076
6                                       1300 SW Fifth Ave., Suite 2400
                                        Portland, OR 97201
7                                       Telephone: (503) 241-2300
                                        Facsimile: (503) 778-5299
                                        everettjack@dwt.com
8

9                                   By *s/ Steven P. Caplow*_____
                                        Steven P. Caplow, WSBA No. 19843
10                                      stevencaplow@dwt.com
                                        920 Fifth Avenue, Suite Seattle, WA 98104-
11                                      1610
                                        P: (206) 622-3150
12                                      F: (206) 757-7700

13

14

15

16

17

18

19

20

21

22

23

24

HOUSTON CASUALTY'S AMENDED ANSWER
TO COMPLAINT (2:23-CV-01695-TSZ) - 35                    Davis Wright Tremaine LLP
4884-7124-9561v.1 0122352-000001                              LAW OFFICES
                                                        920 Fifth Avenue, Suite 3300
                                                          Seattle, WA  98104-1610
                                                    206.622.3150 main · 206.757.7700 fax

GAESIC000235

# EXHIBIT 13

1

2

3                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
4                                    AT SEATTLE

5
GREAT AMERICAN E & S INSURANCE
6    COMPANY, individually and as assignee of
     C3 MANUFACTURING LLC,
7
                              Plaintiff,
8
             v.                                          C23-1695 TSZ
9
     HOUSTON CASUALTY COMPANY;                           MINUTE ORDER
10   GORDON REES SCULLY MANSUKHANI,
     LLP; SINARS SLOWIKOWSKI
11   TOMASAKA LLC; J. SCOTT WOOD; and
     CHRISTOPHER FURMAN,
12
                              Defendants.
13
             The following Minute Order is made by direction of the Court, the Honorable
14   Thomas S. Zilly, United States District Judge:

15           (1)     By Minute Order entered November 8, 2023, docket no. 5, the Court
     directed defendants to show cause why this case should not be remanded back to King
16   County Superior Court as unremovable because two defendants, J. Scott Wood and
     Christopher Furman, are citizens of Washington. *See* 28 U.S.C. § 1441(b)(2); *see also*
17   Compl. at ¶¶ 2.2 & 2.3 (docket no. 1-1).  Defendant Houston Casualty Company
     ("Houston") filed a timely response, docket no. 10, and defendants Wood and Gordon
18   Rees Scully Mansukhani, LLP ("Gordon Rees") filed a late response, docket no. 14.
     Plaintiff filed replies, docket nos. 11, 18, and 20, which the Court treats collectively as a
19   timely motion to remand. *See* 28 U.S.C. § 1447(c).  For the following reasons, plaintiff's
     motion to remand is GRANTED.

20           (a)     Resident Defendants:  Contrary to Houston's contention, citizens of
21   Washington (namely Wood and Gordon Rees) were served as defendants before
     Houston removed this matter from state court, and thus, if such defendants were
     properly joined, the action was not removable. *See* Johnson Decl. at ¶ 1 & Ex. 1
22   (docket nos. 12 & 12-1); *see also* 28 U.S.C. 1441(b)(2).

23

MINUTE ORDER - 1

GAESIC000236

(b)  <u>Lack of Diversity</u>:  Neither the Complaint, docket no. 1-1, nor the Notice of Removal, docket no. 1, indicate the citizenship of Gordon Rees.  In its briefing, however, plaintiff represents that Gordon Rees, which is a limited liability partnership and a citizen of every state in which one of its partners is a citizen, is a citizen of at least Ohio, in which it has three offices housing at least nine partners, and Washington, in which it has two offices and thirteen partners.  <u>See</u> Pl.'s Reply at 3–4 & n.1 (docket no. 11); <u>see also</u> <u>Carden v. Arkoma Assocs.</u>, 494 U.S. 185 (1990).  Plaintiff is also domiciled in Ohio, being incorporated and having its principal place of business there.  <u>See</u> Compl. at ¶ 1.1 (docket no. 1-1).  Thus, if Gordon Rees is a proper defendant, complete diversity does not exist and the Court lacks subject matter jurisdiction.  <u>See</u> 28 U.S.C. § 1332(a).

(c)  <u>No Allegation of Fraudulent Joinder</u>:  Although Houston contends that the defendant lawyers (Wood and Furman) and law firms (Gordon Rees and Sinar Slowikowski Tomasaka LLC ("Sinar")) are fraudulently joined, Houston did not, as required, include such allegation in its Notice of Removal, docket no. 1.  <u>See</u> 28 U.S.C. § 1446(a) (a notice of removal shall contain "a short and plain statement of the grounds for removal"); <u>see also</u> <u>Fetters v. Ewatt, Inc.</u>, No. CV 17-1916, 2017 WL 7066378 (C.D. Cal. Apr. 26, 2017) (rejecting a fraudulent joinder contention because it "was not pleaded in the notice of removal" and the notice of removal was not amended within the 30-day period after removal (citing <u>ARCO Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Montana</u>, 213 F.3d 1108, 1117 (9th Cir. 2000))).

(d)  <u>Failure to Rebut Presumption Against Fraudulent Joinder</u>:  To invoke diversity jurisdiction in this matter, Houston must carry a "heavy burden" of rebutting the "general presumption against [finding] fraudulent joinder."  <u>See</u> <u>GranCare, LLC v. Thrower ex rel. Mills</u>, 889 F.3d 543, 548 (9th Cir. 2018).  Fraudulent joinder may take one of two forms:  (i) actual fraud in the pleading of jurisdictional facts; or (ii) joinder of a defendant that "cannot be liable on any theory."  <u>See id.</u>  Houston does not allege the first category of fraudulent joinder.  With regard to the second type, Houston must show that, based on a "summary inquiry," the Court can "identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state [or non-diverse] defendant[s]."  <u>See Hunter v. Philip Morris USA</u>, 582 F.3d 1039, 1044 (9th Cir. 2009) (quoting <u>Smallwood v. Ill. Cent. R.R. Co.</u>, 385 F.3d 568, 573–74 (5th Cir. 2004) (en banc)).  Houston contends that, under Colorado law, plaintiff could not take an assignment of or subrogate to the legal malpractice claims belonging to its insured and therefore cannot assert those claims against the resident and/or non-diverse defendants in this action.  Plaintiff argues that Washington law governs and allows the assignment or subrogation at issue.  The Court cannot in "a summary manner," <u>see id.</u>, decide the conflict of law issue raised by the parties.  And, given the "possibility" that "a state court would find that the complaint states

GAESIC000237

1   a cause of action against" the attorneys and/or law firms named as defendants, the
    Court "must find that the joinder was proper and remand the case to the state
2   court." *Id.* at 1046 (quoting *Tillman v. R.J. Reynolds Tobacco*, 340 F.3d 1277,
    1279 (11th Cir. 2003)).

3
            (2)     The Clerk is DIRECTED to send a copy of this Minute Order to all counsel
4   of record and to REMAND this case to King County Superior Court.

5           Dated this 4th day of January, 2024.

6
                                                Ravi Subramanian_____
7                                               Clerk

8                                               s/Laurie Cuaresma_____
                                                Deputy Clerk
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MINUTE ORDER - 3

GAESIC000238

# EXHIBIT 14

# King County Superior Court Clerk's Office

Welcome to the Records Access Portal

# Records Request

Submission Title*

eRequest_26

**You may leave the default name or rename your request for future reference (such as "Mom and Dad's Probate").**

## Records Request (New)

∨ Information

- If you know your case number, use the case search to add documents and recordings to your order.
- If you don't know your case number, you can add a research request to your order and we'll find the records for you.

**PLEASE NOTE:** Some documents may be immediately available after purchase. Other records such as recordings, archive documents, subpoenas, writs, research requests, and others might take up to 5 business days to be completed. You will be notified via email and through your account once your request is processed. Once submitted, your order status will be available through My Orders.

GAESIC000239

| DOCUMENTS AND HEARINGS | ISSUANCE OF SUBPOENA, WRIT, OR CITATION | CAN'T FIND WHAT YOU'RE LOOKING FOR? |
|---|---|---|

Case Number

`19-2-27385-2`    **Search**    Don't know the case number?

Orders for exempt records must be submitted separately from all other orders. When you choose an exempt reason, it will apply to all items in this order.

Is this order for exempt records? Learn who is exempt for records based on Washington law.

`No ▾` *

[ Go to Order ]    Your Order: 0 items

An order cannot exceed 200 items. You may submit multiple orders with up to 200 items each. From My Cart multiple orders can be paid within one transaction.

## 19-2-27385-2: VANDIVERE ET AL VS C3 MANUFACTURING

## DOCUMENTS

Select the subs you want to order. If you want to order sealed documents, please use the **Request Access to Sealed Documents** button to request access first.

**Previous Documents**

| ☐ | Sub | Date | Document Name | Additional Information | Seal | Pages |
|---|---|---|---|---|---|---|
| ☐ | 502 | 06/21/23 | Affidavit / Declaration / Certificate of eService | | | 2 |
| ☐ | 506 | 06/22/23 | Reply | IN SUPPORT OF PLAINTIFFS AMENDED MOTIONS IN LIMINE | | 9 |
| ☐ | 509 | 06/22/23 | Designation | DEPOSITION | | 4 |
| ☐ | 510 | 06/22/23 | Memorandum | RE ADVERSE INFERENCE INSTRUCTIONS | | 5 |
| ☐ | 512 | 06/22/23 | Order Setting Court Costs | | | 4 |
| ☐ | 513 | 06/22/23 | Order | GRANTING IN PART/PLAINTIFF MOTION FOR SANCTIONS | | 38 |
| ☐ | 507 | 06/22/23 | Affidavit / Declaration / Certificate of eService | | | 2 |
| ☐ | 511 | 06/22/23 | Affidavit / Declaration / Certificate of eService | | | 2 |
| ☐ | 536 | 06/23/23 | Minutes | | | 7 |
| ☐ | 517 | 06/26/23 | Motion | REGARDING COURT'S JUNE 21,2023 SANCTIONS ORDER | | 9 |
| ☐ | 520 | 06/26/23 | Witness and Exhibit List | | | 48 |

GAESIC000240

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 521 | 06/26/23 | Plaintiff 's Proposed Instructions | | 49 |
| ☐ | 525 | 06/26/23 | Objection / Opposition | OF SINARS FIRMS | 3 |
| ☐ | 516 | 06/26/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 519 | 06/26/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 522 | 06/26/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 526 | 06/26/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 527 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 528 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 529 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 530 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 531 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 532 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 533 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 534 | 06/27/23 | Faulty Document Notice | | 1 |
| ☐ | 535 | 06/28/23 | Declaration | FEES AND COSTS /ROBERT CHRISTIE | 32 |
| ☐ | 537 | 06/29/23 | Motion for Reconsideration | | 11 |
| ☐ | 538 | 06/29/23 | Declaration | RACHEL TALLON REYNOLDS | 52 |
| ☐ | 541 | 06/30/23 | Notice of Withdrawal of Attorney | | 4 |
| ☐ | 545 | 06/30/23 | Declaration | ROBERT CHRISTIE | 6 |
| ☐ | 546 | 06/30/23 | Objection / Opposition | OF SINARS FIRM | 5 |
| ☐ | 547 | 06/30/23 | Declaration | BRADLEY KELLER | 7 |
| ☐ | 539 | 06/30/23 | Faulty Document Notice | | 1 |
| ☐ | 540 | 06/30/23 | Faulty Document Notice | | 1 |
| ☐ | 548 | 06/30/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 550 | 07/03/23 | Notice | STRIKING MOTION | 2 |
| ☐ | 552 | 07/03/23 | Response | TO VERTICIAL WORLD'S MOTION TO RECOVER ATTORNEY'S FEES | 6 |
| ☐ | 555 | 07/03/23 | Motion for Reconsideration | FOR PARTIES CHRISTOPHER FURMAN AND SINARS SLOWIKOWSKI TOMASKA | 11 |
| ☐ | 556 | 07/03/23 | Declaration | BRADLEY KELLER | 16 |
| ☐ | 557 | 07/03/23 | Declaration | MEGAN SLOWIKOWSKI | 3 |
| ☐ | 551 | 07/03/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 554 | 07/03/23 | Notice of Hearing | | 2 |
| ☐ | 558 | 07/03/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 559 | 07/05/23 | Objection / Opposition | IN OPPOSITION TO AMENDED MOTIONS IN LIMINE | 8 |
| ☐ | 560 | 07/05/23 | Declaration | OF RACHEL TALLON REYNOLDS | 42 |
| ☐ | 561 | 07/05/23 | Objection / Opposition | | 10 |

GAESIC000241

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 562 | 07/05/23 | Declaration | OF RACHEL TALLON REYNOLDS | 42 |
| ☐ | 563 | 07/05/23 | Response | TO VERTICAL WORLD INC MOTION TO RECOVER ATTORNEYS' FEES AND COSTS | 6 |
| ☐ | 564 | 07/05/23 | Joinder | IN OPPOSITION RE THE AMOUNT OF ATTORNEYS' FEES AND COSTS | 3 |
| ☐ | 565 | 07/05/23 | Notice of Hearing | | 3 |
| ☐ | 566 | 07/05/23 | Motion for Reconsideration | | 11 |
| ☐ | 567 | 07/05/23 | Declaration | OF RACHEL TALLON REYNOLDS | 52 |
| ☐ | 568 | 07/05/23 | Reply | IN SUPPORT OF SUBMISSION RE AMOUNT OF ATTORNEYS' FEES AND COSTS | 8 |
| ☐ | 569 | 07/05/23 | Declaration | OF ROBERT CHRISTIE | 26 |
| ☐ | 570 | 07/10/23 | Faulty Document Notice | | 1 |
| ☐ | 571 | 07/10/23 | Faulty Document Notice | | 1 |
| ☐ | 572 | 07/10/23 | Faulty Document Notice | | 1 |
| ☐ | 573 | 07/21/23 | Notice of Discretionary Review to Court of Appeals | | 52 |
| ☐ | 574 | 07/21/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 575 | 07/21/23 | Notice of Appeal to Court Of Appeals | | 53 |
| ☐ | 576 | 08/07/23 | Report of Guardian Ad Litem | RE STATUS | 2 |
| ☐ | 577 | 08/07/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 578 | 08/09/23 | Order on Motion for Reconsideration | SINARS MOTION | 2 |
| ☐ | 579 | 08/10/23 | Order Granting Motion / Petition | DEF VERTICAL MOTION FOR ATTORNEYS FEES & COSTS | 3 |
| ☐ | 581 | 08/14/23 | Petition for Approval of Settlement | STIPULATED | 5 |
| ☐ | 582 | 08/14/23 | Report of Guardian Ad Litem | | 13 |
| ☐ | 584 | 08/14/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 585 | 08/15/23 | Order Approving Minor Settlement (if funds in court registry) | | 4 |
| ☐ | 587 | 08/18/23 | Notice of Hearing | MOTION FOR RECONSIDERATION | 3 |
| ☐ | 588 | 08/18/23 | Motion for Reconsideration | | 6 |
| ☐ | 586 | 08/18/23 | Faulty Document Notice | | 1 |
| ☐ | 589 | 08/22/23 | Faulty Document Notice | | 1 |
| ☐ | 590 | 09/08/23 | Notice of Discretionary Review to Court of Appeals | | 9 |
| ☐ | 591 | 09/08/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 592 | 09/18/23 | Order on Motion for Reconsideration | DENIED/DEFENDANT MOTION | 1 |

GAESIC000242

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 593 | 09/19/23 | Order of Dismissal With Prejudice | | 4 |
| ☐ | 594 | 10/05/23 | Designation of Clerk's Papers | 85568-9 COA | 7 |
| ☐ | 595 | 10/05/23 | Clerk's Papers Set | | 500 |
| ☐ | 596 | 10/05/23 | Clerk's Papers Set | | 500 |
| ☐ | 597 | 10/05/23 | Clerk's Papers Set | | 500 |
| ☐ | 598 | 10/05/23 | Clerk's Papers Set | | 102 |
| ☐ | 599 | 10/05/23 | Clerk's Papers Index | | 4 |
| ☐ | 600 | 10/13/23 | Notice of Appeal to Court Of Appeals | SUPPLEMENTAL | 10 |
| ☐ | 601 | 10/13/23 | Notice of Appeal to Court Of Appeals | SUPPLEMENTAL | 7 |
| ☐ | 602 | 10/17/23 | Notice of Withdrawal of Attorney | | 3 |
| ☐ | 603 | 10/19/23 | Notice of Withdrawal of Attorney | | 3 |
| ☐ | 604 | 11/20/23 | Designation of Clerk's Papers | | 3 |
| ☐ | 605 | 11/20/23 | Affidavit / Declaration / Certificate of eService | | 2 |
| ☐ | 606 | 11/22/23 | Clerk's Papers Set | | 66 |
| ☐ | 607 | 11/22/23 | Clerk's Papers Index | | 2 |
| ☐ | 608 | 12/15/23 | Designation of Clerk's Papers | 85568-9 | 4 |
| ☐ | 609 | 12/28/23 | Clerk's Papers Set | | 55 |
| ☐ | 610 | 12/28/23 | Clerk's Papers Index | | 1 |
| ☐ | 611 | 01/02/24 | Notice of Withdrawal of Attorney | | 2 |
| ☐ | 612 | 01/02/24 | Affidavit / Declaration / Certificate of eService | | 2 |

**Add Selected Documents to Order**        **Previous Documents**

## HEARINGS

Select the hearings you want to order. If you do not see the hearing you are looking for, please use the **Not Seeing Hearing** button to request.

| ☐ | Date | Type | Location | Official | Hearing | Start Time | End Time |
|---|---|---|---|---|---|---|---|
| ☐ | 05/22/20 | Motion Hearing | KCCH W921 | Melinda Young | Trial continued | 8:31:05 AM | 8:38:45 AM |
| ☐ | 03/26/21 | Motion Hearing | Kevin Moll | Catherine Shaffer | Summary judgment | 3:11 | 4:20 |
| ☐ | 06/17/22 | Motion Hearing | KCCH W829 | Catherine Shaffer | Summary judgment | 10:06:59 | 10:28:25 |
| ☐ | 03/24/23 | Motion Hearing | Miranda Seitz | Catherine Shaffer | Motion hearing | 9:58 | 10:25 |
| ☐ | 05/11/23 | Pre-Trial Conference | KCCH W355 | Suzanne Parisien | Motion hearing | 9:31:38 | 9:50:41 |
| ☐ | 05/15/23 | Motion Hearing | KCCH W355 | Suzanne Parisien | Motion hearing | 4:01:00 PM | 4:31:00 PM |
| ☐ | 05/31/23 | Motion Hearing | KCCH W355 | Suzanne Parisien | Motion hearing | 01:04:15 | 01:44:07 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | 06/02/23 | Motion Hearing | KCCH W355 | Suzanne Parisien | Motion hearing | 02:59:49 | 03:21:09 |
| ☐ | 06/07/23 | Motion Hearing | KCCH W355 | Suzanne Parisien | Motion hearing | 11:02:48 AM | 2:17:25 PM |
| ☐ | 06/14/23 | Motion Hearing | KCCH W355 | Suzanne Parisien | Motion hearing | 3:01:44 | 3:59:52 |
| ☐ | 06/23/23 | Trial Date | KCCH W355 | Suzanne Parisien | 12 person jury | 1:06:49 | 2:38:18 |
| ☐ | 06/26/2023 | Trial Date | KCCH W355 | Suzanne Parisien | 12 person jury | 8:33:22 AM | 3:57:35 PM |
| ☐ | 06/27/2023 | Trial Date | KCCH W355 | Suzanne Parisien | 12 person jury | start | stop |

**Add Selected Hearings to Order**        **Not Seeing Hearing?**

Add another Case

Your Order: items

Your Cost: $0.00

Submit Order

Copyright © Journal Technologies, USA. All rights reserved.

GAESIC000244