1

1            UNITED STATES DISTRICT COURT
             DISTRICT OF COLORADO
2

3    HOUSTON CASUALTY COMPANY,      .  Case No. 23-cv-01705-RMR-NRN
                                    .
4              Plaintiff,           .
                                    .
5    vs.                            .
                                    .
6    C3 MANUFACTURING, LLC, and     .  Byron Rogers US Courthouse
     GREAT AMERICAN E & S           .  1929 Stout Street
7    INSURANCE COMPANY, as          .  Denver, CO   80294
     assignee of C3 MANUFACTURING   .
8    LLC,                           .
                                    .
9              Defendants.          .
                                    .  March 6, 2024
10   . . . . . . . . . . . . . . .  .  3:03 p.m.

11

12       **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
           **N. REID NEUREITER, UNITED STATES MAGISTRATE JUDGE**

13

14   APPEARANCES:

15   For the Plaintiff:            Arnett Litigation, LLC
                                   By:  Jennifer Arnett
16                                 1630 30th Street
                                   Boulder, CO   80301
17                                 (720) 726-5852

18   For the Defendant C3          Levin Sitcoff Waneka, PC
     Manufacturing, LLC:           By:  Kerri J. Anderson*
19                                 455 Sherman Street
                                   Suite 400
20                                 Denver, CO   80203
                                   (303) 575-9390

21   For the Defendant Great       Ruggeri Parks Weinberg, LLP
     American E & S Insurance      By:  James P. Ruggeri
22   Company:                      By:  Edward B. Parks, II
                                   1875 K Street
23                                 Suite 600
                                   Washington, DC   20006
24                                 (202) 984-1400

25   *By phone.

```
 1   Appearances continued:

 2   For the Defendant Great        Wheeler Trigg O'Donnell, LLP
     American E & S Insurance       By:  Thomas A. Olsen
 3   Company:                       370 17th Street
                                    Suite 4500
 4                                  Denver, CO  80202
                                    (303) 244-1800
 5
     Court Recorder:                Clerk's Office
 6                                  U.S. District Court
                                    1929 Stout Street
 7                                  Denver, CO  80294

 8   Transcription Service:         AB Litigation Services
                                    216 16th Street, Suite 600
 9                                  Denver, CO  80202
                                    (303) 296-0017

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

1                    (Time noted:  3:03 p.m.)

2                THE COURT CLERK:  All rise.  Court is in session.

3                THE COURT:  Good afternoon.  You may be seated.

4           I'm calling the case of Houston Casualty Company

5  versus C3 Manufacturing and Great American E & S Insurance

6  Company.

7                Appearances for the Plaintiff, please?

8           MS. ARNETT:  Good afternoon, Your Honor.  Jennifer

9  Arnett on behalf of Houston Casualty Company.

10               THE COURT:  All right.  And for the Defendants?

11          MR. OLSEN:  Good afternoon, Your Honor.  Thomas

12  Olsen on behalf of Defendant Great American.  I'm here with

13  my co-counsel, James Ruggeri and Ed Parks.

14          MR. RUGGERI:  Good afternoon, Your Honor.

15               THE COURT:  Thank you.  And do we have someone on

16  the phone?

17          MS. ANDERSON:  Yes, Your Honor.  Good afternoon.

18  This is Kerri Anderson on behalf of C3 Manufacturing.

19               THE COURT:  All right.  Thank you, Ms. Anderson.

20  If you could go ahead and -- I don't know if you have the

21  ability to mute your phone, but sometimes when folks are just

22  listening, you get distracted and we hear some sounds.

23          MS. ANDERSON:  I do.  I will do that.

24               THE COURT:  So if you do want to talk, please feel

25  free to take yourself off mute, and I'll try and remember to

4

1   ask if you have any comments or contributions.

2             MS. ANDERSON:  Thank you, Your Honor.

3             THE COURT:  Okay.  So we're here on the

4   Defendants' -- looks like it's the third time I've dealt with

5   a motion to dismiss.  Different Defendant, but that's what

6   we're here on.

7             There is also an unopposed motion for leave to

8   restrict docket number 86.  Am I correct that that mostly

9   just deals with the attachments rather than the substantive

10  motion itself?

11            MR. RUGGERI:  Yes, Your Honor.  That's correct.

12            THE COURT:  Okay.  All right.  I'll go ahead and

13  grant that.  Number 86.

14            And then there's 77, which was a motion for leave

15  to restrict, and it was filed on February 2nd.  What was that

16  seeking to restrict?  I'm trying to look at that.

17            MR. OLSEN:  Your Honor, I believe that one was

18  mooted by the second one.

19            THE COURT:  Oh, mooted.  Okay.

20            MR. OLSEN:  It was the amended.

21            THE COURT:  So is it appropriate for me then to

22  deny that one as moot?

23            MR. OLSEN:  Yes.

24            THE COURT:  Okay.  The first one then is -- docket

25  number 77 is denied as moot.

1          All right.  I'll hear argument, then, on the

2   motion to dismiss.

3          MR. RUGGERI:  Your Honor, may I use the podium.

4          THE COURT:  Yes, you should use the podium.

5          MR. RUGGERI:  Good afternoon, Your Honor.  James

6   Ruggeri for the Defendant -- one of the Defendants, Great

7   American E & S Insurance Company.

8          I have the sense from the Court's initial comments

9   that maybe you feel it's a little bit like Groundhog Day that

10  we've done this twice before.  I do appreciate the Court's

11  indulgence in letting us appear today, because from my

12  client's perspective, this is a new day.  This is the first

13  day.  This is the first time that we've had an opportunity to

14  address the Court on why my client believes that the Court

15  should dismiss or stay this action in favor of the pending

16  State Court action that my client filed.

17         THE COURT:  Yeah, but you're stepping into the

18  shoes of somebody who did have a couple bites of the apple

19  already.  Right?

20         MR. RUGGERI:  Your Honor, I'm stepping into the

21  shoes of someone that had a couple of bites at the apple, but

22  I'm also someone stepping in my own shoes by virtue of the

23  counts that I pleaded in the Washington action.

24         Some of the counts, but not all of the counts, are

25  derivative.  We filed a derivative breach of contract claim,

 1  we filed claims for breach of the Washington Consumer

 2  Protection Act, we filed claims for breach of Washington's

 3  Insurance Fair Conduct Act.

 4        Those are tort claims that stand alone in

 5  Washington in the Washington action, Your Honor.  And we

 6  filed our own equitable indemnity claim, which is not

 7  derivative of any rights of C3's.  Those are filed in our own

 8  independent rights unrelated to C3.

 9        And I think that what I would like to address is

10  -- perhaps the Court touched on it during either or both of

11  the prior hearings.  And I did review the transcript, but

12  it's really important, I think, under the *Brilhart* and *Runyon*

13  standard.

14        I think what I would say the most important

15  argument here, or issue or factor is, that whatever the Court

16  does here is not going to resolve the dispute between my

17  client and Houston Casualty Company.

18        The tort claims that my client is bringing in

19  Washington, violation of the Washington Insurance Fair

20  Conduct Act and the Washington Consumer Protection Act, are

21  not here.  And they shouldn't be here, because those involve

22  torts that -- alleged torts that we think were acted upon in

23  Washington, causing injury in Washington, in connection with

24  the --

25        THE COURT:  Even if the insurance contract is

1  deemed void?

2          MR. RUGGERI:  Even if the insurance contract, and

3  that's clear, Your Honor, under Washington law, because

4  Washington law recognizes both procedural and substantive bad

5  faith.

6          And those statutes, as well as the anti-annulment

7  statute, give rise to a cause of action under procedural and

8  substantive.

9          And Washington law is clear, including Washington

10  cases cited by the Washington Supreme Court, the *Onvia* case,

11  for example, from 2008; 165 Wash. 2d 122, and the *Coventry*

12  *Associates* case, 136 Wash. 2d, Washington Supreme Court 1998,

13  are clear that, yes, you can have procedural bad faith for

14  bad faith claims handling conduct, even if you rule against

15  the policyholder on a coverage issue.

16          In the *Onvia* case, that's exactly what happened.

17  It involved underlying facts blast cases.  St. Paul won, that

18  there was no coverage.  The Washington Supreme Court said in

19  Washington there's still a bad faith -- viable bad faith

20  cause of action for procedural bad faith.

21          And we are asserting bad faith, both procedural

22  and substantive, against HCC for the manner in which it went

23  about the rescission.

24          We submit, Your Honor, that's a predicate issue

25  that needs to be decided.  Because if I'm right on that

1    issue, it moots the issue that HCC has asked this Court to

2    rule on.

3            If I win in Washington that HCC had no procedural

4    right to do what it did in the manner that it did, then it

5    will not have a right to rescind the contract.

6            And here, what HCC is asking the Court to do is

7    rule on the substantive ground of whether it has substantive

8    merit to rescind.

9            We don't get to that issue, Your Honor, until you

10    get to the threshold issues, which, again, I submit are

11    properly before the Washington Court.  They implicate issues

12    of Washington Statutes and Washington interests and

13    Washington's paramount interest as we see from the statutory

14    scheme there, that Washington's paramount interest is

15    protecting the interests of Washington citizens to make sure

16    insurance contracts aren't rescinded after the injury takes

17    place, because otherwise, unless you have a carrier that's

18    willing to step in or obligated to step in, the Washington

19    citizen could be left without resources to pay their claim.

20            Those are unique interests of Washington law, Your

21    Honor.  And those are the issues that are being teed up in

22    the Washington Court.

23            THE COURT:  Help me understand, though.  So let's

24    accept as true the allegation that this contract of insurance

25    was fraudulently obtained, that C3 knew that it had recalls,

1  C3 didn't disclose that to the insurance company, and

2  procured multi-million dollar insurance policy on the basis

3  of false statements.

4          You're saying that under Washington -- and, of

5  course, the insurance company doesn't have a basis to

6  investigate that until there's a claim.  Right?

7          MR. RUGGERI:  Well, I think that's an issue for

8  the Court that's going to hear that.  It's a question --

9          THE COURT:  Maybe.  But help me understand how it

10 is that somebody can make false statements and then lo and

11 behold, you know, I represent when I get my car insurance

12 that I've never had an accident.  Well, I've got an accident

13 record a mile long.  The insurance company only finds out

14 after I've had the crash and injured somebody.

15         You're saying that can't be rescinded after

16 somebody has been injured?

17         MR. RUGGERI:  What I'm saying, Your Honor, is that

18 you have to do it the proper way in accord with the

19 Washington Statutes.

20         The proper way is if you believe that you have

21 grounds to rescind for a claim for which the injury already

22 has taken place, you must go to the Court and ask the Court

23 to rule on whether you have grounds to do so.

24         The reason for that is the paramount interests,

25 and the interest vests at the time of the injury, is to

1   protect the underlying claimant.

2           And it goes one step further.  It's not like the

3   insurer is without recourse, okay?  If it goes and it seeks

4   rescission, it has actions it can take, it can go in and try

5   to stay the underlying action.  It can go on to try to get a

6   quick ruling, or worst case, if it can't do that, what

7   Washington says is what the carrier has to do is perform your

8   contract, and if you win your rescission claim, then seek

9   reimbursement from the policyholder.

10          What you can't do, and what HCC did here by the

11  manner in which it did this, is it left the underlying

12  claimant, who had vested policy interest rights at the time

13  of the injury under Washington law, vulnerable to self-help

14  by an insurance company that says "I'm going to rescind the

15  policy.  This policy is rescinded, and I don't need to ask

16  anyone anything."

17          It's very clear, Your Honor, in Washington, that

18  --

19          THE COURT:  But did they ask this Court to

20  validate the rescission?

21          MR. RUGGERI:  Well, what they did, Your Honor, is

22  they didn't perform, as they're required to do.  They're

23  required to perform.  They should have funded the settlement.

24          That's the proper procedure under Washington law.

25  You're supposed to fund the settlement until you get a ruling

1  that your policy is rescinded, because until you get that

2  ruling, again, after you have a situation where you're

3  dealing with injury before the rescission, until you get that

4  ruling, the policy is not rescinded.  It remains in effect to

5  pay claims subject to your right to seek reimbursement from

6  your insured if you prove to a Court that you have grounds to

7  rescind.

8              What you can't do is what happened here, which is

9  engage in self-help.  The law is clear on that.  That's why

10  there's a statutory scheme.  That's why the statutory scheme

11  is so protective of the underlying claimant, otherwise you

12  can have situations, which is exactly what happened here,

13  which is the Plaintiff, after pursuing their cause of action,

14  thinking they have these millions of dollars in coverage and

15  acting accordingly, finds out literally on the eve of trial,

16  "no, you don't have coverage at all."

17              And it sets everything into a tailspin.  That's

18  what you can't have happen here.  That's what Washington says

19  you can't have happen, but that's exactly what HCC did here,

20  and they had a remedy.

21              They should have filed -- you have to act

22  reasonably.  Fast.

23              THE COURT:  So doesn't somebody have to decide

24  what law of rescission applies?  Whether Washington --

25              MR. RUGGERI:  No.

1            THE COURT:  Why not?

2            MR. RUGGERI:  I'm sorry, Your Honor.  Not just --

3    well, --

4            THE COURT:  Because you do have a Colorado

5    insured, right?

6            MR. RUGGERI:  Yes, of course.

7            THE COURT:  Okay.

8            MR. RUGGERI:  But here's where it separates.

9    There could be a debate under which state's law applies to

10   the interpretation, the substantive issue of whether there

11   are grounds for rescission.

12           THE COURT:  Or the propriety of the rescission.  I

13   mean, in Colorado, presumably, if you think you've been

14   defrauded, you tell them "hey, we rescind the contract

15   because we're defrauded, and we're going to ask a Court to

16   validate our decision."  That's what they did here.

17           MR. RUGGERI:  That's what --

18           THE COURT:  And you're saying in Washington it

19   can't be that way?

20           MR. RUGGERI:  Washington it can't be that way.

21   And the other issue is we know Washington law obviously

22   applies to the interpretation application of the Washington

23   Statutes.

24           THE COURT:  Right.

25           MR. RUGGERI:  Which we've placed at issue in

1  Washington, which are the predicate issues that need to be

2  dealt with before one gets to the grounds for rescission.

3          I think the law is clear, Your Honor, that this is

4  a case of procedural bad faith even setting aside the

5  substantive issue where we'll debate over whether Mr. Naranjo

6  said or didn't say whatever they say he said.  We'll get to

7  that issue if we need to.

8          But you don't get that issue until we get through

9  the predicate issues of whether there's been procedural bad

10  faith, because Washington law also is clear that if there has

11  been a violation of the statutory scheme, then there are

12  waiver and estoppel issues.  Then the carrier can't raise a

13  rescission if it didn't go about it the right way.

14          Again, where I think Colorado and Washington parts

15  ways is the degree to which they say "no, under Washington

16  law, when a person has been injured and the injury is covered

17  by an insurance policy, that person is a third party

18  beneficiary with vested rights in the policy, and you can't

19  take those away from the policyholder on your own."

20          The anti-annulment statute in Washington, Judge,

21  says the policyholder and the carrier can't even do it

22  between themselves after the injury occurs.  That's black

23  letter statute.  You can't even do it in that case.  Why?

24  Protecting the claimants.

25          The procedure under Washington law and Washington

1    statutory scheme is that HCC should have performed until it

2    got a ruling that it was entitled to rescind.  And if it got

3    that ruling, and if it had paid the settlement portion, then

4    it should have sought the money from C3.

5            You may say "well, what if C3 doesn't have money?"

6    But here's where the public policy interest comes in.  As

7    between an insurance company that takes premium, or an

8    underlying claimant who is injured, by, in this case, C3's

9    product, where does that public policy fall?  Washington is

10   very clear that it falls in favor of the underlying

11   claimants.

12           That's the problem with going forward in this

13   case, Your Honor.  I think it's a clear case where depending

14   on -- we have success in Washington.  What this Court does

15   here will be mooted by that Court's ruling if I'm right on

16   the procedural bad faith.

17           I will also say, Judge, that we do have a

18   situation where there's at least a remote possibility of

19   conflicting rulings by this Court and the Washington Court.

20   Imagine a situation where this Court says "yeah, I think C3

21   lied on the application, and HCC had grounds too rescind."

22           And then my Court in Washington says "yeah, but

23   they didn't have the right to rescind because they violated

24   the protocol, the procedural step that they have to take."

25           THE COURT:  But that wouldn't be a conflict.  That

1  would be a factual finding by this Court that there was fraud

2  in the procurement of the policy.  And so you take that, and

3  it is what it is.

4          But what you've just articulated to me is that it

5  doesn't matter if there was fraud in the procurement of the

6  policy because under Washington law, they have to jump

7  through certain hoops before they can rescind.  They didn't

8  do that property, and, therefore, regardless of whether there

9  was fraud in the procurement, the dominos will fall under

10  Colorado -- under Washington law in the Washington Court, and

11  you'll take whatever finding by this Court on the preliminary

12  motion for summary judgment that they want to file for what

13  it is.

14          MR. RUGGERI:  The problem I have is I think it's

15  -- that's a cold comfort to my client, which could have a

16  situation where HCC would prevail here, and the Washington

17  lawyers were to prevail there in arguing that "yeah, HCC,

18  they violated the protocol and they had no rights to rescind,

19  and they were the proximate cause of your damages."

20          So we don't dispute you were damages, but it

21  wasn't we.  It was HCC.  So I have a situation where I have

22  no pocket in that circumstance.  And that's can't possibly be

23  the case, because if it's all in one action, the Courts are

24  going to rule, I think, in order of the issues in which they

25  arise.

1          And we have placed the issue that I'm articulating

2     to the Court today.

3          THE COURT:  But this is a problem if your clients

4     make it.  I mean, they're the ones who at the end of the day

5     decided "hey, we're going to pay it all, and then try and

6     recoup it from" whether it's the lawyers or HCC, or

7     presumably C3 if C3 -- if it was invalidated and C3 should

8     have paid it.

9          MR. RUGGERI:  I respectfully disagree, Your Honor,

10    because this is why one of the factors, as well, that there's

11    an alternative forum that can provide a remedy that doesn't

12    encroach on any of these issues.  And the answer is yes.

13    That can be done in Washington where all of the issues are

14    there and could be there.

15         And with regard to C3, C3 is not a party there,

16    but there's personal jurisdiction over C3 as we know from the

17    Vandevere action, the underlying action.  It can be brought

18    in there, and indeed it said it would consent to jurisdiction

19    there if anyone thought it needed to be there.

20         THE COURT:  Let me tell you one other thing that

21    sort of concerns me, is that I feel like my chain is being

22    yanked a little bit.  I've had, as you mentioned at the

23    beginning, and I mentioned, this is the third time somebody

24    has come in and said "oh, this lawsuit should be here."

25         And the first time, it was based on "oh, well

1   we're going to file -- we, C3, are going to file a lawsuit in

2   Washington."

3           And then the second time, "oh, the lawsuit hasn't

4   been filed.  We're not even a party.  Another person has

5   filed it."

6           And now the person who funded the settlement is

7   now here in front of me.  And if somebody had said "hey, stay

8   everything, don't decide anything, there are proceedings

9   going up there," that would have been different.

10           But I've already decided twice -- Judge Rodriguez

11   decided, based on my recommendation twice before, and it just

12   seems like, you know, the people who you bought the claim

13   from have not been entirely forthright about what was going

14   on, and maybe they didn't know.

15           But it almost seems like it's law of the case now.

16   And I know you've haven't gotten to make your argument

17   before, but you bought the rights from somebody who did make

18   the argument.  And that troubles me.

19           MR. RUGGERI:  Your Honor, I think we don't know

20   each other well enough.

21           THE COURT:  Yeah.

22           MR. RUGGERI:  Maybe we'll become to know each

23   other well.  I would never jerk your chain.  I wouldn't do

24   that to any judge, and haven't in 34 years of practice.

25           But you said something really important.  Today is

1  the first that I've been able to articulate our position.

2  And the answer is why I believe from my client's perspective

3  that the case should be stayed -- dismissed or stayed in

4  favor of Washington.

5        And I don't think that the prior arguments on the

6  issue detract or are binding in any way on my client, because

7  I'm here and explaining to the Court, hopefully maybe a

8  little bit better, on why, for example, what happens here

9  does not extinguish the dispute between HCC and Great

10 American.  That is undeniable.  That can't be denied.

11       There are claims that are going to go forward in

12 Washington.

13       THE COURT:  Does it extinguish the claim between

14 HCC and C3?

15       MR. RUGGERI:  Your Honor, it extinguishes the only

16 claim that is alive between those two parties because C3 is

17 not a part of the Washington action, right?  So I guess in

18 the technical sense, the answer is yes.

19       THE COURT:  Because I heard last time that there's

20 still technically a -- you know, to the extent there are

21 other potential claims or other, you know, other belay

22 devices that could fail, and other gyms around the country

23 that those might be covered if it's still a valid insurance

24 policy.

25       MR. RUGGERI:  That is true, Your Honor.  And the

1    other point that I make, which I think was not entirely spot

2    on, is if you'll look at the agreement between C3 and Great

3    American, C3 actually has a continuing financial interest in

4    our successful pursuit of the bad faith claims against HCC.

5    I didn't want to mislead the Court.

6              There is, I believe, a 10 percent interest above

7    the first $4 million dollars, plus costs and sanctions, that

8    could go to C3 in the event of a successful recovery.

9              So I just didn't want to mislead the Court on

10   that.  So there are a couple of places where C3 does maintain

11   an interest, both in the claims that we're pursuing in

12   Washington, as well as, yes, it does maintain an interest in

13   the policies.  And I probably should have said that earlier.

14   I didn't understand the Court's question.

15             But yes, to the extent there were other claims

16   that would otherwise be covered by the policy, then it would

17   retain an interest in seeking the ability to pursue those

18   claims.

19             You know, Judge, you know, the reason why I kicked

20   off the argument the way I did is I did look, and I looked

21   hard, at the prior transcripts.  And in particular, the

22   November 7th transcript.  And I thought that we got a little

23   too ahead of ourselves when the Court suggested that the case

24   is a simple case where HCC says C3 lied on the application,

25   and that it wouldn't have issued the policy if it knew the

1    truth.

2          I think it's not that simple, because of the

3    issues that I said, which it ignores the procedural issue,

4    the procedural bad faith issues that need to be addressed

5    that could moot the simple issue articulated by the Court.

6          And, of course, I would disagree or dispute that

7    that factual issue is all that simple either.  I don't know

8    if it's simple or not.  I know what I understand C3's

9    position to be.  I know what HCC's position is on the papers.

10         THE COURT:  I mean, I saw that there's a question

11   of whether there's a formal recall issued, or whether they

12   contemplated it, and they're relying on the statement by C3's

13   representative at the deposition that yeah they thought about

14   it, and did informal recalls.

15         MR. RUGGERI:  Yeah, we'll get into issues such as

16   what authority was delegated to Veracity, which is the

17   representative you're talking about, the broker.  The

18   applications on Veracity paper, C3's owner said it relied, it

19   consulted with Veracity, Mr. Allen, in the preparation of the

20   answer to those applications.  If Veracity was acting as an

21   agent or representative of HCC, then HCC really can't then

22   complain about the manner in which the application was filled

23   out if its agent instructed C3 to fill it out that way.

24         But those are the factual issues that are going to

25   have to be sorted out, again, if we get to the substantive

1    issue of whether there are grounds to rescind once we get

2    past the procedural issues, which, again, do need to be

3    sorted out, in my view.

4              THE COURT:  This might not be necessary for this

5    decision, but help me understand the conflict of laws issue.

6    I mean, C3 is a Colorado company.  The policy was issued to a

7    Colorado company.  And clearly Colorado's law -- well, not

8    clearly.  It appears that Colorado's law on rescinding

9    insurance contracts is different from Washington law.

10             It would seem that it would be difficult for an

11   insurer -- let me put it a different way.

12             Somebody is going to have to decide whether

13   Colorado law of rescission applies to this case, or

14   Washington State law applies, and it's just going to be a

15   conflict of laws determination, right?

16             MR. RUGGERI:  If the Court gets to that once it

17   gets beyond the Washington Statutes, which are uniquely

18   Washington law.  Those are going to be --

19             THE COURT:  But even that.  I mean, if --

20             MR. RUGGERI:  No.

21             THE COURT:  If I'm sitting here in Colorado,

22   assuming I don't dismiss, but you presumably are going to

23   bring counter-claims, which will include many of these

24   Washington State issues.

25             So play that out for me a little bit.

 1          MR. RUGGERI:  I think that's an assumption I don't

 2    share.  I will not be impleading the Washington Statutes in

 3    this action.  I think those are unique creatures, and should

 4    be decided where those torts took place.

 5          And I will ask -- I have asked, and will continue

 6    to ask, the Washington Court to decide those issues,

 7    regardless of what the Court does with respect to the pending

 8    motion to dismiss or stay.

 9          THE COURT:  And so there may be decisions by the

10    Washington Court that would -- because the Plaintiff here,

11    Houston Casualty, is a Defendant now in Washington State.

12          MR. RUGGERI:  Yes.

13          THE COURT:  So there may be determinations,

14    interlocutory or final, on the application of Washington

15    State law that you would then, if this case is stayed here,

16    and when I say "stayed," it remains here, that you would then

17    be bringing to this Court's attention, whether it's me or

18    Judge Rodriguez, to say "hey, this now happened in

19    Washington, the Washington State Court ruled against HCC on

20    this point, you need to take that into account going

21    forward."

22          MR. RUGGERI:  No question.  And I would probably

23    ask the Court to stay its hand until those issues are

24    decided.

25          We do have a summary judgment date for my motion

1   of April 19th in Washington, where I'm presenting this legal

2   issue of whether HCC had the right to rescind unilaterally

3   after Mr. Vandevere's injuries occurred.

4          And I think the law is pretty clear from the

5   Washington Supreme Court, beginning with the main case I

6   think 70 years ago, to the current, and it's woven into the

7   anti-annulment statute.  The answer is no, that it didn't

8   have that right.

9          And so it violated my client's right, or C3's

10  rights, you know, I would say in bad faith.  And that's going

11  to be adjudicated there before that Court were to address the

12  issue of if there were no violation of the procedure, then

13  does HCC have substantive grounds to rescind.  I think that's

14  the order in which the issues.

15         But we clearly would keep the Court apprised of

16  the developments in Washington.  As I said, we have an

17  argument date of April 19th.  Yesterday HCC did move to

18  vacate that argument date because I came in here and said

19  "well, their summary judgment motion is premature, so it

20  means that mine is."

21         But I think the Court gets from my reply I sort of

22  preview and outline what my summary judgment motion is in

23  Washington for the Court in our reply.  And I've also got the

24  footnote that says unless HCC's motion, which raises that

25  issue, he-said-he-said with regard to who said what in

1    connection with the insurance policy application.

2              My motion is just presenting the straight up legal

3    issue, which is can an insurer do what HCC did under the

4    circumstances where it announced a rescission of a policy

5    after an underlying claimant's injuries that otherwise would

6    be covered by the policy.  There is no dispute there.

7              And I think the answer under clear Washington law,

8    we will argue, is no, Your Honor.

9              THE COURT:  Okay.  So give me in three quick

10   points, because we're going to -- you've about exhausted your

11   time.  I allocated an hour to this argument.

12             MR. RUGGERI:  Oh, thank you.

13             THE COURT:  Give me in three quick points what

14   relief you're seeking, and the basis for it.

15             MR. RUGGERI:  I'm seeking for the Court to grant

16   my motion to dismiss or stay this action in its entirety.

17             Alternatively, to dismiss my client from this

18   action.  And I'm seeking that because there are predicate

19   issues that need to be decided under Washington Statutes and

20   Washington law interpreting those Statutes, that are

21   predicate to the issue placed before this Court, which is

22   whether HCC had substantive grounds to rescind.

23             I'm also seeing the Court to dismiss my client.

24   And I say this with some trepidation.

25             THE COURT:  On personal jurisdiction grounds,

1    yeah.  That one is not going to fly.

2            I saw your case where you say just because

3    somebody steps into the shoes of somebody else, you don't

4    look to the personal jurisdiction of the party who assigned

5    the claim.

6            But, you know, you guys, you're intentionally --

7            MR. RUGGERI:  Can I have one college try?

8            THE COURT:  You're not intentionally availing

9    yourself, but you're certainly -- you knew what you were

10   getting into when you got the claim assigned.  So that one is

11   not going to be a winner, at least from me.  Maybe from Judge

12   Rodriguez.

13           MR. RUGGERI:  And for the record in two seconds.

14           THE COURT:  Yes.

15           MR. RUGGERI:  I would just say that the case law

16   is clear that the assignee isn't imputed with the assignor's

17   contacts -- I don't need to get into it.

18           There is an exemption, Rule 25(c), but we submit

19   it doesn't apply here.  And whether that applies comes down

20   to whether the Court concludes the assignment from C3 to my

21   client took place with the email agreement on June 26, 2023,

22   or whether it was effected through the formal settlement

23   agreement, which was executed two months later.

24           THE COURT:  So why does that timing matter?

25           MR. RUGGERI:  Because of the July 5th filing of

1  this action by HCC.  Rule 25(c) is clear that the interests

2  are imputed only if the assignment takes place after the

3  filing of a lawsuit.  And that's why the Rule -- the language

4  of the Rule actually says the action may be continued, which

5  means it already was filed.

6            And there are cases in the Tenth Circuit and

7  Eleventh Circuit that make that point, too.  But I do

8  acknowledge that whether I'm right on that comes down to

9  whether you give legal effect to the email agreement, which

10  was the agreement that facilitated the announcement of the

11  settlement of the underlying action on June 26th, or the

12  final definitive settlement agreement that was entered two

13  months later.  That's what that issue comes down to, Your

14  Honor.

15            THE COURT:  Okay.  Yeah, you're not going to win

16  on that.  Okay.

17            But let's hear from Plaintiff's counsel.

18            MR. RUGGERI:  Thank you, Your Honor.

19            THE COURT:  Thank you for coming.  I mean, it's a

20  -- you know, I try and minimize costs and disruption for

21  lawyers who I know are appearing from long distances.  But it

22  really does make a difference to look somebody in the eye.

23            MR. RUGGERI:  I appreciate it.

24            THE COURT:  And we can do stuff by video

25  teleconference, but it makes a huge difference to have people

1    here.  So thank you for coming.

2            Counsel?

3            MS. ARNETT:  Thank you, Your Honor.  I have a lot

4    to respond to what Mr. Ruggeri just said.  There was a lot in

5    there.

6            But I do want to highlight two phrases that came

7    out in Mr. Ruggeri's presentation.

8            Groundhog Day, and yanking your chain.  And both

9    are apt here.

10           We are in Groundhog Day.  You've heard all of

11   these arguments before.  He's putting a different spin on it.

12   There's a lot of grandstanding.  There's a lot of fancy

13   footwork.

14           There is also a lot with that of yanking your

15   chain and HCC's chain, both with the facts that are presented

16   in the briefing by Great American, and also in the law.

17           Mr. Ruggeri makes it seem very clear that

18   Washington law applies in a certain way with respect to

19   rescission.  That is not accurate.

20           This anti-annulment statute that he keeps pointing

21   to does not apply in this situation.  Washington Courts do

22   not require that a Court approve of a rescission post-

23   accident.

24           You are absolutely right.  How is an insurer

25   supposed to know that an insured lied on an application until

1  a claim arises?  Absolutely.

2          He makes it seem that it's very clear.  He speaks

3  of great authority and great conviction.  But that's not what

4  the law in Washington states, just as many of the facts, and

5  I could go -- I have a list of facts.

6          THE COURT:  So let's accept that what he's saying

7  is presented as an advocate.  But he's going to make that

8  pitch to the Court in Washington about what should or

9  shouldn't have been done, and whether the rescission was

10 appropriate or not as a matter of procedure, not as a matter

11 of whether there was lying on the policy itself.

12         MS. ARNETT:  And I would just state that that

13 distinction between procedure and substance of rescission is

14 a false one.

15         THE COURT:  Okay.

16         MS. ARNETT:  That he has created.

17         THE COURT:  All right.  So what's the pitch of

18 your client in opposition to his motion for summary judgment?

19         MS. ARNETT:  Well, first, Houston Casualty, as

20 Your Honor has already recognized in one of your

21 recommendations, Houston Casualty Company cannot obtain

22 complete relief in the Washington action.  C3 is not a party.

23 It is not upon HCC to bring C3 in to that action.

24         This is HCC's chosen forum.  It is a forum that

25 makes sense.  Colorado law will apply.

1            And I think that we do need to have a serious

2   discussion about choice of law principles here.

3            They assume that Washington law applies.  I read

4   the summary judgment brief that they filed in Washington

5   yesterday.  They just assume that Washington law applies to

6   the whole thing.  Right?

7            They first state the Restatement and the factors

8   in the Restatement on choice of law, and then they ignore it,

9   and simply say that Washington law applies because the

10  accident happened in Washington and we have to protect

11  Washington citizens.

12           So Colorado law applies.  It was a Colorado

13  insured.  Policy issued in Colorado.  Premium was paid from

14  Colorado.  The main witness is in Colorado.  Colorado makes

15  sense.  This is HCC's preferred forum.

16           So it is not on us to bring C3 into the action in

17  Washington.  In the Washington case, we cannot get complete

18  relief.  That's already been recognized.  We've been over

19  that.

20           I also want to discuss the practical consequences

21  if Great American's motion were granted.

22           So it's already been decided that this case is

23  staying here, at least with respect to C3.  If Great

24  American's motion is granted, let's say that the action is

25  dismissed with respect to Great American, then HCC on the

1  rescission portion of the action will not be able to obtain

2  complete relief because of the assignment.

3           So what does that mean?  That means that a

4  separate action would have to be initiated in some other

5  forum.  I think that Great American resides in Ohio, if I'm

6  correct, so perhaps an action in Ohio.  So that would be a

7  third action, and that would be extremely inefficient.

8           THE COURT:  Or a counter-claim in Washington.

9           MS. ARNETT:  Or a counter-claim in Washington,

10  although we are not inclined to do that.  I think that the

11  preferred course of action is to stay where the first case

12  was filed in July, only a few days after a demand was made of

13  Houston Casualty to fund this settlement in the Washington

14  action.  HCC did not know of the settlement between C3 and

15  Great American until this action was filed.  We only found

16  out through this action.

17           So I think that there are some serious procedural

18  and practical consequences if Great American is dismissed

19  from this action.

20           And, again, all of their arguments are pretty much

21  the same as what C3 already argued.  Again, with some more

22  fancy footwork, some culling together of law in creative and

23  unique ways that I think will not play out in the Washington

24  action.

25           I am glad that Mr. Ruggeri did bring up that they

1  have filed a motion for summary judgment in the Washington

2  action just yesterday after Houston Casualty moved to stay

3  the hearing on that motion for summary judgment.

4             I think this goes to procedural fencing.  It is

5  the ultimate example of procedural fencing, because here, we

6  moved to -- due to Judge Rodriguez's somewhat unique

7  standards with summary judgment practice, we moved the Court

8  to file a motion for summary judgment.  Great American

9  opposed that.  And our motion would be only with respect to

10 C3, although it could be with both parties.

11            Great American opposed it, saying it's premature.

12 Yet they turn about and file a motion for summary judgment in

13 Washington State.

14            He tries to distinguish the two.  They are not

15 distinguishable.  It's on rescission.  It is on the

16 rescission of the policy, and Colorado law is going to apply

17 to the rescission of the policy, not Washington law.

18 Colorado law.

19            THE COURT:  You say that with great authority and

20 confidence.

21            MS. ARNETT:  I do.  I'm applying the factors of

22 the Restatement.

23            THE COURT:  Almost equal amount of authority and

24 confidence that Mr. Ruggeri used.  I mean, how am I supposed

25 to --

1          MS. ARNETT:  But I have case law to -- I have case

2    law that I can refer to.  He doesn't refer to case law very

3    much in his brief.  He makes a lot of grand statements

4    without referring to facts, to evidence, and without

5    referring to case law.

6          I can cite a couple of cases if you'd like, and we

7    can look at the Restatement.

8          THE COURT:  So if you're -- so your major -- so

9    number one, I do want to hear your thoughts on the -- I was

10   kind of flippant when I said that they were going to lose

11   that.

12         But I'd like to hear your thoughts on the motion

13   to dismiss for lack of personal jurisdiction.  That's one

14   thing I'd like you to respond to.

15         But number two, I'd like -- when you started with

16   Groundhog Day and jerking my chain, but what benefit is it?

17   I mean, it would be really easy for us to just say "okay,

18   we'll stay it.  I'm not going to dismiss it."  Just recommend

19   to Judge Rodriguez to stay this, let's see what happens in

20   Washington.

21         So tell me why that is a bad idea.  That's number

22   one.

23         And number two, I'd like you to address the

24   personal jurisdiction question.

25         MS. ARNETT:  Okay.  So number one, personal

1    jurisdiction.  They've already admitted that they purposely

2    availed themselves of Colorado law.  They issued the policy

3    in Colorado to a Colorado insured.  They admit that in their

4    briefing.

5            With respect to the connection between Great

6    American's activities in Colorado and HCC's claim, the entire

7    reason that Great American is in this case here is because of

8    the assignment from C3 to HCC.

9            THE COURT:  What about that principle under the

10   Rule that just an assignment doesn't necessarily --

11           MS. ARNETT:  I'm getting to that.

12           THE COURT:  Okay.  Go ahead.

13           MS. ARNETT:  Because the very document that brings

14   in -- is the basis, that is the *Raison d'être* of their being

15   here, states that Colorado law applies.  It's very clear.

16           They've submitted themselves to Colorado

17   jurisdiction by stating in their own documents that form a

18   basis for them being in this action, that Colorado law

19   applies.

20           THE COURT:  By "the document," you mean the

21   assignment document, Colorado law applies to this?

22           MS. ARNETT:  The settlement agreement.

23           THE COURT:  Okay.

24           MS. ARNETT:  So there are two agreements.  A

25   settlement agreement and the assignment agreement.

1         THE COURT:  And Colorado law applies to both?

2         MS. ARNETT:  The assignment agreement is wrapped

3    within the settlement agreement.  The settlement agreement

4    refers to the assignment agreement.

5         THE COURT:  Okay.  And those are, I presume, some

6    of the confidential -- point me to which docket entry those

7    are.  Which exhibit am I looking at?

8         MS. ARNETT:  I don't have the -- when I printed

9    out my documents, unfortunately the docket number did not

10   come out.

11        So I don't believe they are confidential anymore.

12   C3 had filed them as confidential and under level one

13   restriction.  I pushed back on that, and so they had -- I

14   think they had 14 days under the Local Rules to seek to

15   retain that confidentiality, and they have not so done.

16        THE COURT:  Okay.  But is it -- they were attached

17   to your response to the motion to dismiss for lack of

18   jurisdiction?

19        MS. ARNETT:  Yes, as level one.

20        THE COURT:  Okay.  But it's docket 78, and then

21   it's the attachments to docket 78, right?

22        MS. ARNETT:  Also, I believe that Great American

23   has served those documents in the Washington action, and we

24   have an agreement that documents exchanged in that case can

25   be used here, and vice-versa, and they did not label it as

1    confidential in the Washington action.

2              THE COURT:  Okay.  But I'm just trying to pin it

3    down so that I can find them.

4              MS. ARNETT:  So it's the settlement agreement,

5    paragraph 12 or 13.

6              THE COURT:  Okay.  But you don't know the docket

7    number?

8              MS. ARNETT:  I'm sorry, I don't have that.

9              THE COURT:  Defense counsel, do you know?

10             MR. RUGGERI:  I do not.  We can try to pull that

11   up, Your Honor.

12             THE COURT:  Okay.  If you could try and pin that

13   down.  I mean, we can find it.  Unfortunately, when they --

14             MS. ARNETT:  It's paragraph 12 of the settlement

15   agreement.

16             THE COURT:  Okay.  All right.  But you say it's

17   governed by Colorado law.  So by --

18             MS. ARNETT:  I can read it into the record.

19             THE COURT:  Sure, go ahead and read it.

20             MS. ARNETT:  It says:  "12.  Governing law.  This

21   agreement shall be construed and interpreted in accordance

22   with the laws of the State of Colorado without regard to the

23   principles of conflict of laws."

24             THE COURT:  And that's the assignment agreement?

25             MS. ARNETT:  That's the settlement agreement.

1                THE COURT:  Oh, the settlement.

2                MS. ARNETT:  The assignment agreement does not

3    have a choice of law provision.

4                THE COURT:  All right.  Okay.  Go ahead.

5                MS. ARNETT:  That's personal jurisdiction.  Are

6    you wanting additional --

7                THE COURT:  Well, what about this date thing?  It

8    doesn't matter whether --

9                MS. ARNETT:  I'm not following that.

10               THE COURT:  -- it was entered into before or after

11   this lawsuit was filed?

12               MS. ARNETT:  No.

13               THE COURT:  All right.

14               MS. ARNETT:  No.

15               THE COURT:  Okay.

16               MS. ARNETT:  And I'm really having a hard time

17   following it.

18               THE COURT:  Okay.

19               MS. ARNETT:  I can follow most things.  I'm not

20   following that argument.  It's a little too clever for me.

21               THE COURT:  All right.  Personal jurisdiction,

22   we've checked that box.

23               MS. ARNETT:  Okay.

24               THE COURT:  So go ahead.

25               MS. ARNETT:  Okay.  So why shouldn't you stay?

1            THE COURT:  Right.

2            MS. ARNETT:  Why would you reward their procedural

3    fencing?  Why?  We filed this case in good faith, seeking a

4    determination from the Court, a relatively simple

5    determination.

6            We have under oath testimony from the owner of C3,

7    Ron Naranjo, not that he issued a certain type of recall,

8    just that he issued recalls before he -- days before

9    submitting the application for insurance.

10           In my book, that's called a lie.  That's called a

11   misrepresentation.  That's fraudulent.  That is grounds --

12           THE COURT:  Did Mr. Naranjo sign the application?

13           MS. ARNETT:  He did.  Yes, he did.

14           THE COURT:  All right.

15           MS. ARNETT:  So we have an under oath statement,

16   we have a signed application say that "no, there were no

17   recalls," and that they were not considering issuing recalls.

18           And he also stated on the application they knew of

19   no circumstances that could give rise to a claim, which was

20   also false.  That's a little more difficult factually, but

21   the sworn statement compared with what's in the application

22   that he signed is pretty clear.

23           So we brought a very simple case seeking a

24   declaratory judgment, that the rescission was valid.  Period.

25           Great American is trying to make this into a much

1  bigger case.  They paid $4 million dollars. that they think

2  that they should not have $4 million above their policy

3  limits.  That was their decision.  They are now seeking to

4  recover it from lawyers, from law firms, and also from HCC,

5  arguing a bad faith claim.

6           Their procedural posturing and procedural fencing

7  is striking.  It's offensive.  And I think that this Court

8  should not reward such behavior.

9           Again, with respect to the motions for summary

10 judgment, we think we have sufficient evidence now to move

11 for summary judgment.  They have opposed that.

12          And so then they go around and file for summary

13 judgment in Washington State.  Tell me that's not procedural

14 fencing.

15          And trying to distinguish the type of -- well,

16 they're both about rescission, but it's different.  No.  No

17 they are not.  It's about rescission.  It's not rocket

18 science.  It's not as complex as what they are attempting to

19 make it out to be.

20          In addition, the case should stay here because

21 Colorado law applies.  We can look at the Restatement, we can

22 look at the case law.  I'll give you the case citations, if

23 you would like.  But I think it's pretty obvious, giving that

24 it's a Colorado insured, Colorado -- they're domiciled here

25 in Colorado, et cetera.

1    So it's better for a Court who is probably so used

2    to making insurance decisions in Colorado, you're probably up

3    to your ears in insurance decisions, but you're used to

4    applying Colorado insurance law.  A Washington Court is not.

5    And as we've heard Mr. Ruggeri stating, Washington

6    has a different take on the relationship between insureds and

7    insurers than Colorado does.  And so I think that while we'd

8    all like to think that we could put on a different hat and

9    apply a different jurisdiction's laws, that happens from time

10   to time.

11   I think that it would be particularly difficult in

12   this situation, where Washington is somewhat different in its

13   approach to insurance law than Colorado is.

14   THE COURT:  Okay.  Anything else?  I want to make

15   sure -- I sort of jumped in and asked you to tell me what I

16   was interested in.  But I want to make sure you have every

17   opportunity to make the points that you wanted to make.

18   You started by saying "there's a lot to respond

19   to," and I want to make sure you have every chance to do

20   that.

21   MS. ARNETT:  There is.  I think that I'll stop now

22   and not test your patience.  If you do have specific

23   questions, I'm open to them.

24   THE COURT:  No.  I think you've answered them.

25   MS. ARNETT:  Okay.

1              THE COURT:  Thank you.

2              MS. ARNETT:  Thank you.

3              THE COURT:  It's their motion, though, so Mr.

4  Ruggeri gets the last word.

5              MR. RUGGERI:  May I, Your Honor?

6              THE COURT:  Yes.

7              MR. RUGGERI:  Judge, I'm new to the Court, and I'm

8  not going to engage in a lot of the adjective hurling and all

9  that stuff.  I just don't think that accomplishes anything,

10  in my view.

11             But there were a couple of things that are

12  noteworthy.

13             Ms. Arnett never disputed that regardless of what

14  this Court does, my Washington claims go forward.  So we are

15  definitely in an undisputed situation where what this Court

16  does could be mooted by what happens in Washington, and I

17  think that's the classic situation where the Court should

18  exercise its discretion under *Brilhart* and *Runyon* and stay

19  its hand, if not dismiss this case, and allow the Washington

20  action to proceed.  That's unrebutted.

21             Ms. Arnett said that in the Washington case she

22  can't get complete relief.  Well, sure she can.  The Court

23  said she could file -- she could add C3 as a party.  It's

24  consented to jurisdiction.  There's no dispute over personal

25  jurisdiction over there.

1          Also, I would be remiss if I didn't say that HCC

2    has joined the issues in the Washington action through its

3    affirmative defenses, including 11, saying that it's -- the

4    claims are barred because of Defendants' alleged conduct was

5    justified, HHC's, saying under the common law HCC was

6    permitted to rescind the HCC policy.  So it's putting the

7    rescission, the substantive rescission issue, in play in

8    Washington, and then also raising the issue of fraud and

9    misrepresentations by C3.

10          Again, that's affirmative defense 14, placing that

11   directly at issue in Washington.  So Washington has --

12          THE COURT:  But don't they have to?  Right?  I

13   mean, aren't these compulsory counter-claims?

14          MR. RUGGERI:  Well, I think they're affirmative

15   defenses.  But the point is that all of the issues are only

16   in one place, and I dare say they can only -- can be

17   compelled to be in one place.  And that's Washington.

18          The issues, all of the issues, are not going to be

19   in this Court.  This case, if it goes forward, will change in

20   one regard.  I do believe that a compulsory counter-claim

21   that I would have to file is a breach claim which would be

22   for money damages, and would give rise to a jury trial right.

23          So in that circumstance, this case would change

24   dramatically from potentially a bench trial situation to a

25   jury trial, which we presumably would insist on.

 1           THE COURT:  Unless summary judgment is granted on

 2  the rescission issue.

 3           MR. RUGGERI:  Unless summary judgment were granted

 4  on a rescission.

 5           THE COURT:  Right.

 6           MR. RUGGERI:  I will say, Judge, that, you know, I

 7  kind of think that my briefs are amply supported by cases,

 8  but counsel says not.

 9           I do want to read what the Washington Supreme

10  Court said in the *Maine* case, because it is spot on:  "The

11  appellant says," and that's the insurance company, "that it

12  was not necessary to bring," or the party pleading

13  rescission, I should say, which was the property purchaser

14  was trying to rescind the land deal.

15           "Appellant says that it was not necessary to bring

16  an action to rescind the contract because he had already

17  rescinded it by notice and moving out on a count of fraud,

18  which he claimed had been practiced upon him.  But one party

19  to a contract, while he may give notice of his election to

20  rescind, cannot rescind the contract over the objection of

21  the other party."

22           It goes on to say:  "And having been given notice

23  of election to rescind, it is necessary that an action be

24  brought for that purpose within a reasonable time, or the

25  right to rescind, if one exists, will be lost.  There is a

1   disputed factual issue over whether, even if HCC had the

2   right to rescind, that whether it acted with appropriate

3   dispatch to preserve its right to rescind, which it now

4   asserts here, we submit it waited too long and waited until

5   the eve of trial to do so."

6           THE COURT:  Let me ask you.  The case that you've

7   just cited, what year was that?  That was pretty flowerly

8   language.

9           MR. RUGGERI:  That was flowerly language, and

10  there are others.  It was from 1932.

11          THE COURT:  Okay.

12          MR. RUGGERI:  The *Maine v. W. Loan.*  But if that

13  weren't enough, that spirit is embodied in the anti-annulment

14  statute, RCW section 4818.320, which says no insurance

15  contract insuring a loss or damage through legal liability

16  for the bodily injury or death by accident of any individual,

17  or for damage to the property of any person, shall be

18  retroactively annulled by any agreement between the insurer

19  and the insured after the occurrence of such injury, death,

20  or damage, for which the insured may be liable, and any such

21  attempted, or annulment attempted, shall be void.

22          That says that --

23          THE COURT:  But that gets to the choice of law

24  question.  Right?  If Washington law applies, then you win.

25          MR. RUGGERI:  Well, it goes to the procedural bad

 1    faith issue.  They can't do what they did.  They can't do it

 2    on their own.  They couldn't even do what they wanted to do

 3    with the agreement of C3 when they did it.  They can't do it.

 4            THE COURT:  But you could under Colorado law,

 5    right?

 6            MR. RUGGERI:  Well, --

 7            THE COURT:  I mean, assuming that there was fraud,

 8    and I'm not accepting that for all purposes, but assuming

 9    there was fraud they could have done it under Colorado law.

10    That's the choice of law question.

11            MR. RUGGERI:  I don't believe you can do it in the

12    context of a Washington tort action, which is where the

13    effects of that decision were felt, and why the tort claims

14    pursuant to Washington Statutes are going to be covered by

15    Washington law.  The procedural bad faith issues that I'm

16    raising are going to be governed by Washington law, because

17    the tort took place in Washington and the effects of that

18    were felt in Washington.

19            THE COURT:  So let's play this out.  So let's say

20    the case isn't stayed in Colorado.  It's determined that the

21    insurance contract and the rescission is governed by Colorado

22    law, and there's a finding here in Colorado Federal Court

23    that HCC acted appropriately because there was fraud.

24            That, you say, doesn't end it in Washington

25    because in Washington, even if the contract, because they'd

 1   have to give full -- assuming our decision comes up to give

 2   full faith and credit to the decision of the Colorado Court,

 3   they might say it doesn't matter whether it was a valid

 4   contract or not because there was a tortious act here in

 5   Washington, and having not committed that tortious act under

 6   Washington law, then they would have been on the hook for the

 7   $4 million anyway.

 8           MR. RUGGERI:  And the tortious act was effected

 9   upon Mr. Vandevere.  That's the problem.  He had a right in

10   the policy and had the rescission claim sprung on him without

11   a court announcing whether there was a right to rescind.

12           THE COURT:  Well, did you get the injured party's

13   assignment of his claims, too?

14           MR. RUGGERI:  We don't need the injured party's

15   assignment of the claim.

16           THE COURT:  Oh.

17           MR. RUGGERI:  Because the whole point -- again, it

18   has to do with the purpose of the statute and how this all

19   fits together, and it just shows that the tort took place in

20   Washington.

21           This was the genesis, part of the reason, why the

22   sanctions were levied.  The case was thrown upside down on

23   the eve of trial.  The Plaintiff's lawyer went and said

24   "you've got to be kidding me.  You've told me all along we're

25   at $5 million dollars, and Vertical World, the co-Defendant,

1  now there's one?"

2          This affected everything that we did here.  So had

3  HCC done the right thing, gone in, sought Court relief, they

4  would have known the position that they asserted in January,

5  and people didn't have to wait until the end of May.

6          THE COURT:  But that's the claim against the

7  lawyers, that the lawyer didn't tell the Court.

8          MR. RUGGERI:  It's a claim against HCC, too, if

9  HCC wanted to preserve its right to rescind.

10          THE COURT:  I know.  But that is one of the

11  reasons why the lawyers are being sued, is that the Court --

12  the whole case went south when the Judge got really angry

13  because they weren't told that the $4 million dollars in

14  insurance had disappeared.

15          MR. RUGGERI:  The Judge did -- yes, that was that

16  the lawyers had a duty of disclosure that they didn't meet.

17          But our position is that Washington law put a duty

18  on HCC if it wanted to rescind, to do something to seek to

19  preserve those rights, which would have put, for example, my

20  client on notice, which didn't learn until the end of May,

21  that there was this purported rescission.

22          So again, it seems to me that really where the

23  rubber hits the road for me, and I'm not going to tell you

24  it's in my book, I don't make the book by which we have to

25  play ball here.

1          But it's just -- I mean, this case could be over

2   after the argument on April 19th if I'm successful.  It would

3   remove the issue from this Court's docket.

4          If the Court allows me to go forward with my

5   motion, and I think it will, because I think most courts

6   understand the difference between summary judgment motions

7   that raise legal issues and summary judgment motions that

8   raised disputed factual issues.

9          Assuming my case goes forward, if I win that

10  argument, then this case is mooted.  There is nothing for

11  this Court to do.

12          THE COURT:  How does Washington -- are they like

13  California where they issue an argument date and then a

14  preliminary decision on that date?

15          MR. RUGGERI:  No.  I don't know if they come out

16  with a tentative ruling, which is what you're suggesting.

17          THE COURT:  Yeah.

18          MR. RUGGERI:  I don't -- I mean, I haven't argued

19  that much in Washington.  I had a couple of cases there in 34

20  years.  We do have an argument date.  There are going to be

21  three summary judgment motions, as I understand it, that are

22  going to be argued on that date.  Two by the law firms and

23  one by me.

24          And, again, it's April 19th.  So I don't know what

25  the protocol is if the Court is going to issue a tentative.

1          I was involved in one case where the Court did

2    that, but I don't know if it's mandatory or whether it's

3    routine on the Judges out there.

4          THE COURT:  Okay.  And, Ms. Arnett, you're not

5    counsel for HCC in Washington?

6          MS. ARNETT:  I am not.  No.

7          THE COURT:  Okay.

8          MR. RUGGERI:  And, Judge, I don't think we need to

9    get into the inability to follow my argument concerning Rule

10   25(c) of the Federal Rules of Civil Procedure.  It comes

11   right out of the Statute, the Rule itself, and the cases

12   interpreting it in terms of it's an exception to the rule

13   that you can't -- the case we cited from the Fifth Circuit

14   that had to do with a mineral lease, the lessor argued that

15   the lessee's contacts should be imputed to the assignees, and

16   the Fifth Cicuit said no.  You can impute liability contacts,

17   but you've still go to get through the personal jurisdiction

18   contacts first.

19          You know, you  stand in the shoes for purposes of

20   liability.  You don't stand in the shoes for purposes of

21   personal jurisdiction.  That has to be separately established

22   as to the defendant, and we submit they can't do that here.

23          THE COURT:  But what about the fact that when you

24   sent the settlement agreement you agreed to be governed by

25   Colorado law?

1        MR. RUGGERI:  I think that's a different issue
2   because whether that really is the -- I mean, their claim has
3   nothing to do with my settlement agreement.  It has to do
4   with their rescission claim.

5        All they did -- there's nothing about me in the
6   complaint.  It's all -- they just added me as a party to the
7   action in the caption.  All of the operative allegations run
8   against C3 and its alleged lie.  I'm named right on the face.
9   It says as the assignee of that.  There's no choice of law
10  provision in the assignment agreement.

11        THE COURT:  When you say "I," you mean Great
12  American?

13        MR. RUGGERI:  Great American, yes.

14        THE COURT:  It's always a problem.  When I was a
15  lawyer I would do that.  I'd say "we're this," "we're that,"
16  and like "you" or "your client."

17        MR. RUGGERI:  Solidarity, Your Honor.  Solidarity.

18        THE COURT:  Yeah.  Be careful.  That gets people
19  in trouble sometimes.

20        MR. RUGGERI:  I appreciate it, Your Honor.

21        THE COURT:  All right.  The hour is up.

22        MR. RUGGERI:  Thank you, Your Honor.

23        MS. ARNETT:  Your Honor, he raised some new issues
24  that I'd like to respond to very briefly.

25        THE COURT:  You've got one minute.  Sure.

1          MS. ARNETT:  Okay.  First, with respect to

2    procedural bad faith, his entire basis for his "procedural

3    bad faith argument" is this 1932 case.  There is no

4    Washington --

5          THE COURT:  But then he's got the annulment

6    statute.

7          MS. ARNETT:  I'll read it to you.  He read it to

8    you.  It doesn't apply.  That applies to an agreement between

9    the insurer and the insured after the occurrence.  There is

10   no agreement here.  That's so that there's no collusion,

11   right, after an accident.  That's not the situation here.

12         That anti-annulment statute doesn't apply.  The

13   1932 case doesn't apply.  No Washington Court has cited to

14   that provision that he hangs his hat on.  He's creating --

15   trying to create new law.

16         So that's procedural bad faith.  I think it's

17   bologna.  I think it's not going to go anywhere.

18         THE COURT:  Well, we'll find out on April 19th,

19   right?

20         MS. ARNETT:  Maybe, because we've moved to stay

21   that summary judgment motion, because it is gamesmanship,

22   because we have sought to file here first.

23         THE COURT:  Okay.  You have 30 seconds.

24         MS. ARNETT:  With respect to the duty to --

25   supposed duty to file a declaratory judgment action sooner,

1  which he faults HCC for doing, in Colorado there is no

2  requirement that an insurer after rescission seek affirmation

3  of that through declaratory judgment.  There's no requirement

4  of that.  We did it only because they were asking for $4

5  million dollars on a rescinded policy.  But there is no

6  requirement in Colorado that that be done.

7          With respect to the Rule 25 argument, we haven't

8  argued for anything under Rule 25.  So he's arguing against

9  himself with respect to Rule 25 and the date of the

10 assignment agreement.

11         And then with respect to the affirmative defenses,

12 he makes a lot out of the affirmative defenses that HCC pled

13 in the Washington action, and I think you're right, don't you

14 have to make those?  Right.  We have to make our defenses.

15         THE COURT:  But in response to his point that

16 everything could be resolved in Washington and get complete

17 relief as between all parties, it is true that that would

18 happen in -- could happen in Washington.

19         MS. ARNETT:  Only if you reward the bad actor

20 here, which is Great American, for the gamesmanship and

21 procedural fencing that it has been engaging in.  Only if you

22 do that, and then only if you force HCC to bring in C3 as a

23 third party defendant in that Washington action.

24         THE COURT:  Okay.  All right.  I want to thank you

25 all again for your arguments today.

1           MS. ARNETT:  Thank you.

2           THE COURT:  And I will take it under advisement,

3    but whatever I do it will just be a recommendation.  You get

4    to take it up with Judge Rodriguez after that.

5           We'll be in recess.

6           MR. RUGGERI:  Thank you, Your Honor.

7           THE COURT CLERK:  All rise.

8                 (Time noted:  4:04 p.m.)

9                     *  *  *  *  *

10                     CERTIFICATE

11       I, RANDEL RAISON, certify that the foregoing is a

12   correct transcript from the official electronic sound

13   recording of the proceedings in the above-entitled matter, to

14   the best of my ability.

15

16

17   _____          March 26, 2024

18   Randel Raison

19

20

21

22

23

24

25