IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01705-RMR-NRN

HOUSTON CASUALTY COMPANY,

Plaintiff,

v.

C3 MANUFACTURING LLC, and
GREAT AMERICAN E & S INSURANCE COMPANY, as assignee of C3
MANUFACTURING LLC,

Defendants.

---

**REPORT AND RECOMMENDATION
DENYING DEFENDANT GREAT AMERICAN E & S INSURANCE COMPANY'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT (Dkt. #67)**

---

**N. REID NEUREITER
United States Magistrate Judge**

It is sometimes said that "third time is the charm." But often, trying again for a third time after twice failing is just another wasted effort. So it is in this case, as new Defendant Great American E & S Insurance Company ("Great American") attempts to convince this Court for a third time that the question of the validity of an insurance policy issued in Colorado, to a Colorado company, and likely governed by Colorado law, is better adjudicated in Washington state court than by a court sitting in Colorado.

The matter comes before the Court on Great American's Motion to Dismiss Plaintiff Houston Casualty Company's ("HCC") Second Amended Complaint ("Motion to Dismiss"). Dkt. #67. The Motion to Dismiss was filed on January 18, 2024, and referred to this Court for recommendation by Judge Regina M. Rodriguez on January 19, 2024.

*See* Dkt. #69. HCC filed its opposition to Great American's Motion to Dismiss on February 2, 2024. Dkt. #78. Great American filed its reply on February 16, 2024. Dkt. #84. The Court heard argument on March 6, 2024. HCC filed a "status report" recounting developments in Washington state court on March 25, 2024. Dkt. #93. Great American filed its own responsive "status report" two days later. Dkt. #95.

Having considered the submissions and the arguments of the Parties, the Court will **RECOMMEND** that Great American's Motion to Dismiss (Dkt. #67) be **DENIED**.

## I.   FACTUAL BACKGROUND

C3 Manufacturing ("C3") is a Colorado-based corporation that makes automatic belay devices for rock and mountain climbers. A belay device automatically reels in slack from climbing ropes so the climber can remain supported without human assistance. A C3 device allegedly failed in Washington state and a climber was seriously injured. C3 looked to a $4 million excess insurance policy issued by HCC to C3.

HCC brought this lawsuit on July 5, 2023 seeking a declaratory judgment that the $4 million excess general and products liability insurance policy issued to the C3 is void or rescinded *ab initio* due to fraud, with the result that HCC has no duties or obligations to C3 (or any assignee) under the rescinded policy. *See* Dkt. #1 at 1; Dkt. #47 at 1.

C3 was insured by two policies of insurance covering commercial general liability, including products liability claims. The first and underlying policy was issued to C3 by Great American (the "Great American Policy"). The Great American Policy provided C3 with primary commercial general liability insurance, subject to a $1,000,000 per occurrence limit. The second policy, an excess-umbrella policy, was issued to C3 by

HCC (the "HCC Policy"). The HCC Policy is excess to the Great American Policy and provided $4,000,000 of umbrella coverage over the Great American Policy.

On August 1, 2019, Michael Vandivere was rock climbing at a gym in Seattle, Washington using a C3 belay device. Mr. Vandivere fell 45 feet to the floor and was seriously injured. Mr. Vandivere sued C3 and the climbing gym in Washington state court, alleging that C3's belay device was defective. At a deposition in the Vandivere personal injury lawsuit, C3's principal purportedly admitted that C3's automatic belay device had been the subject of a recall in 2018. HCC received a copy of C3's owner's deposition transcript.

In submitting C3's application for the liability insurance policy, C3 had answered "No" to the question, "Has the Applicant ever recalled or is it considering recalling a product?" If C3 had answered "Yes" to this recall question, HCC says it would not have issued the excess policy. After discovering the deposition testimony about the purported recall, on January 26, 2023, by letter, HCC rescinded the excess insurance policy, tendering back to C3 all policy premiums. C3 objected to the rescission and demanded that HCC pay the $4 million limit of the excess policy to help settle the Vandivere personal injury lawsuit. HCC responded to the policy limit demand by reiterating its rescission of the policy and declining to pay the $4 million.

Faced with C3's challenge to the rescission and corresponding demand for a payment of the $4 million policy limit, on July 5, 2023, HCC brought this lawsuit in Colorado federal court seeking a declaration that the excess policy has been rescinded (or was rescinded *ab initio*) and that HCC therefore had and has no duties and no obligations with respect to the rescinded excess policy. Dkt. #47 at 9.

The Court's understanding is that C3 has settled the underlying Vandivere personal injury lawsuit, with the settlement payment coming from Great American. It is also the Court's understanding that Great American not only paid its own policy limits, but stepped in and contributed the additional $4 million that otherwise would have come from HCC's excess policy. *See* Dkt. #49 (filing by C3 explaining that "Great American paid the entire amount that was required to settle the underlying lawsuit on behalf of C3, including the $4 million excess policy limit that C3 and Great American contend was HCC's to bear").

In connection with that settlement, on August 4, 2023, C3 executed final documentation that assigned certain (but not all) rights under the allegedly rescinded HCC excess policy to Great American. C3 retained rights against HCC for future potential claims, but assigned to Great American all claims against HCC arising out of the Vandivere personal injury action up to $4 million and certain sanctions awarded to the Vandivere plaintiffs. C3 retained the rights to any extra-contractual damages in excess of the $4 million and sanctions. *See* Dkt. #80 (Assignment).

On September 5, 2023, Great American, as assignee/subrogee of the claims from C3, filed a lawsuit in Washington state court (the "Washington Malpractice/Insurance Lawsuit"). The named defendants in the Washington Malpractice/Insurance Lawsuit are HCC and the lawyers involved in defending the personal injury action on behalf of C3: the law firms of Gordon Rees Scully Manusukhai LLP and Sinars Slowikowski Tomaska LLC, and individual lawyers J. Scott Wood and Christopher Furman.

The Washington Malpractice/Insurance Lawsuit alleges that, because of alleged legal missteps, violations of discovery rules, and conflicts of interest by C3's legal counsel in the Vandivere personal injury lawsuit, the trial court in that case issued a scathing ruling to the severe legal detriment of C3. Great American asserts that those legal missteps, combined with HCC's allegedly unlawful rescission (and the method of HCC's allegedly unlawful recission—not giving appropriate notice and rescinding after an injury had occurred), put Great American in the position of having to settle the personal injury case for an amount far in excess of Great American's own policy limits:

> Faced with negligence and breaches of fiduciary duty by two law firms, and a breach of contract by a co-insurer [HCC] on the eve of trial, all of which declined to participate in discussions regarding an appropriate settlement of the [personal injury] action, C3 and Great American were forced to resolve the [personal injury] action for an amount that was significantly higher than it otherwise would have been and involved sums greatly in excess of Great American's policy limits; sums that should have been paid by [HCC] (or one or more of the other defendants).

Dkt. #28-1 at 11. Great American not only paid in excess of policy limits to settle the Vandivere personal injury lawsuit, it is also paying additional monetary sanctions awarded by the trial judge as a result of the C3's counsel's misconduct in that case.

In the Washington Malpractice/Insurance Lawsuit, Great American brings claims against HCC of (1) breach of contract, (2) statutory unfair insurance conduct, (3) violation of Washington's Consumer Protection Act, and equitable indemnity/subrogation. In the same suit, Great American also brings claims of legal malpractice and breach of fiduciary duty against the two law firms and the two individual lawyers who represented C3 in the Vendivere personal injury case. *See* Dkt. #28-1.

5

II.    **DEFENDANT C3'S TWO PRIOR MOTIONS TO DISMISS**

In July 2023, C3 first moved to dismiss or stay this case based on the *Colorado River* abstention doctrine. *See* Dkt. #17 (filed July 27, 2023). I recommended denying that motion (*see* Dkt. #26) and on November 8, 2023, Judge Rodriguez overruled C3's objection to that recommendation. *See* Dkt. #42. The *Colorado River* motion was denied for two reasons. First, no parallel litigation had actually been filed at that time. But second, and more important, this fairly discrete declaratory judgment action between an insurer and its insured as to the validity of the excess policy was filed in Colorado, the home state of C3. Colorado law will likely apply to the policy. And it would be more convenient for C3 witnesses to appear to testify here. As I wrote in my recommendation denying the motion to dismiss on *Colorado River* abstention grounds, "there is nothing about the hypothetical state court lawsuit that would create the exceptional circumstances that would justify this federal court abstaining from its 'unflagging' obligation to adjudicate a controversy properly before it." Dkt. #26 at 6.

Then, Great American filed the Washington Malpractice/Insurance Lawsuit against HCC and the lawyers involved in the personal injury case. C3 did not file that lawsuit and, as far as this Court knows, C3 is not even a party to that suit.

Nevertheless, on September 5, 2023, C3 again moved to dismiss or stay this action based on the legal developments in Washington state court. *See* Dkt. #28. The second C3 dismissal motion was based on the *Brillhart* abstention doctrine. *See* Dkt. #28 at 2 (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942), *as re-affirmed in Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)). Per C3's argument, under the *Brillhart* abstention doctrine, a district court has the discretion to dismiss a declaratory

6

judgment action when a competing state court action is pending. In its second motion to dismiss, C3 argued that the only question to be decided was whether the issues "can better be settled in the proceeding pending in the state court." *Id.* at 3 (citing *Brillhart*, 316 U.S. at 495 (quoted in *Wilton*, 515 U.S. at 283)).

On November 21, 2023, I recommended that C3's second motion to dismiss be denied as well. *See* Dkt. #46. I found that HCC had not engaged in "procedural fencing." Instead, I found it proper that HCC had sued its insured, C3, in C3's home state of Colorado. I further found that Colorado law is likely to apply to the terms of the insurance agreement. I noted again that it will be more convenient for the C3 witnesses to testify in a Colorado-based case. I further found that C3 still has an interest in the HCC excess policy in the event there are other incidents that might trigger coverage. (I did not realize then that the assignment was just for the $4 million plus sanctions, and that C3 retained the right to any extra-contractual damages available against HCC.) Thus, notwithstanding the partial assignment to Great American, there remains an ongoing dispute between HCC and its Colorado insured that should properly be resolved here in Colorado.

In terms of the effectiveness of the litigation in Washington providing a quick and efficient resolution, as compared to the District of Colorado, I concluded that the Colorado litigation is likely to be more efficient, noting that the Washington action involves other parties (lawyers defending against claims of malpractice) who have little-to-nothing to do with the validity of the rescission of the policy, and who will have to answer for their alleged legal malpractice and breaches of duty which allegedly led (in part) to Great American settling the underlying personal injury case on an unfavorable

basis and paying multiples of its own policy limits. I also found that moving forward to a decision on the claims currently in this Court would not increase the friction between the state and federal courts. *See generally id.* C3 objected to my report and recommendation. *See* Dkt. #49. That recommendation and the associated objection are currently pending before Judge Rodriguez.

I also allowed the filing of HCC's Second Amended Complaint. *See* Dkt. #47 (filed November 21, 2023). In that Second Amended Complaint, in light of C3's partial assignment of claims, HCC added Great American as a defendant in this rescission/declaratory judgment action. Now that Great American is in the case, having partly stepped into the shoes of C3 (at least to the tune of $4 million), and hoping "the Court will be open to a new perspective" (Dkt. #67 at 1), Great American moves again to dismiss this matter. Great American does recognize that it is in "something of an awkward position" in asking the Court to revisit for a third time whether the issue of the validity of the HCC excess policy is better decided in Washington rather than here in Colorado. (*Id.* at 3).

## III.   ANALYSIS

Great American makes two arguments for dismissal. First, Great American insists that there is no specific personal jurisdiction over it in Colorado. *See* Dkt. 67 at 12–17. Second, Great American makes many of the same arguments previously asserted by C3, insisting that entire dispute (including both the rescission question regarding the HCC policy and the legal malpractice/misconduct resulting in the unfavorable settlement of the Vandivere personal injury action) is an "indivisible whole"

and only a Washington court can resolve all the issues in one legal proceeding. *See id.* at 4–11. The Court will address each of these arguments in turn.

### a. The Court has personal jurisdiction over Great American.

The Court agrees that there is no general personal jurisdiction over Great American because it is not based in Colorado, is not incorporated in Colorado, and is not "at home" here. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014). So, this case can only go forward against Great American if there is specific personal jurisdiction over Great American.

Specific jurisdiction exists when (1) a defendant "purposefully avails itself of the privilege of conducting activities within the forum state," and (2) "the plaintiff's claims . . . arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 592 U.S. 351, 362 (2021).

Great American asserts that its actions in Colorado lack any connection with HCC's claims and C3's alleged misrepresentations about a product recall in C3's application for insurance have "nothing to do with Great American." Dkt. #67 at 17.

But Great American's protestations that it had nothing to do with Colorado, and there is no basis for it appearing as a defendant in Colorado, misses the point. First, Great American did issue a contract of insurance to C3, a Colorado company—the underlying $1 million general liability policy. And then C3 itself procured the excess policy from HCC in Colorado. Subsequently, in connection with the settlement of the Vandivere personal injury lawsuit, Great American accepted the partial assignment of C3's claims against HCC, all arising out of a Colorado excess insurance policy, issued in Colorado to a Colorado company. It did so by executing the final formal settlement

agreement and assignment of claims with C3, a Colorado company, on August 4, 2023—*after* HCC has already sued C3 in Colorado on July 5, 2023. *See* Dkt. #79 (Confidential Settlement Agreement and Release). This settlement agreement specifies that it is governed by Colorado law and C3 executed the document in Littleton, Colorado. It is true that there had been an email term sheet laying out the terms of the agreement between C3 and Great American dated June 26, 2023, but later, in August, it was specified that the formal executed agreement superseded and replaced the email terms. *See id.* at 5 ¶ 2. In addition, the settlement agreement between C3 and Great American did not become effective until the Assignment and Joint Prosecution Agreement were executed in August. *Id.* ¶ 3. Moreover, the June 26, 2023 term sheet itself specifies that "the agreement outlined in this term sheet must be reduced to a formal document signed by Great American and C3. The formal agreement shall be the controlling document." Dkt. #68 at 193.

Thus, with knowledge that there was a pending dispute in a Colorado federal court about the validity of a Colorado insurance policy issued to C3 (a Colorado insured), Great American acquired the substantial portion of C3's rights under that policy. When it did this, Great American knew or should have known that, having acquired an interest in the Colorado insurance policy issued to C3, it would necessarily become a defendant in this Colorado lawsuit. For Great American to claim, under these facts, that there is no basis for it to defend in Colorado the validity of the HCC policy, borders on the definition of chutzpah.

Great American cites a number of cases for the proposition that a court's jurisdiction over an assignor does not necessarily imply jurisdiction over the assignee.

*See* Dkt. #67 at 14. For example, Great American points to *Libertsat v. Sundance Energy, Inc.*, 978 F.3d 315 (5th Cir. 2020), where the court wrote, "Courts that have looked at assignor/assignee relationships have 'determined that an assignee does not step automatically into the shoes of the assignor for purposes of personal jurisdiction.'" 978 F.3d at 319 ((quoting *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003)); *see also Russellville Steel Co., Inc. v. Sears, Roebuck & Co.,* No. 99 C 485, 2000 WL 91680, at *3 (N.D. Ill. Jan.19, 2000) ("The fact that the assignor can be sued in the forum state does not necessarily mean that the assignee can be sued there."). Looking to the suggestion found in the Seventh Circuit's *Purdue Research Foundation* case, one must look to the "contractual situation" and ask whether at the time of the assignment of rights, the assignee so "structured its business affairs that it reasonably could have predicted that it would be answerable in a court situated [in Colorado] for its actions with respect to these transactions." 338 F.3d at 785.

Here, especially in light of the timing of the final execution of the settlement agreement and associated assignment, which came after HCC had already sued C3 in this Court for a declaratory judgment, Great American obviously knew it likely was buying into Colorado-based litigation about the validity of an insurance policy issued to a Colorado insured. The Court finds that Great American purposefully directed its activities toward Colorado and the present lawsuit, and Great American's involvement as a defendant herein relates to Great American's contacts with Colorado. *See Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985). Under these circumstances, there is nothing inconsistent with "traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), in making Great American respond

in Colorado to HCC's effort to invalidate that same policy. The Court therefore finds that it has personal jurisdiction over Great American.

There is another reason for finding personal jurisdiction over Great American proper. Under Rule 25(c) of the Federal Rules of Civil Procedure, "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Here, by allowing the filing of the Second Amended Complaint naming Great American as a Defendant, the Court has effectively allowed Great American as assignee joined with C3, the original party. *See, e.g., Kilbourn v. W. Sur. Co.*, 187 F.2d 567, 572 (10th Cir. 1951) ("Rule 25(c) of The Federal Rules of Civil Procedure also authorizes a substitution of an assignee of the cause of action, who takes his assignment while the action is pending."). Great American insists that the assignment actually occurred on the date of the term sheet, before the filing of HCC's lawsuit. *See* Dkt. #67 at 15. But, as explained above, the final agreement itself and the assignment were not formally executed until August 4, 2023—after this suit was already pending.

For all of the reasons cited above, the Court finds it has personal jurisdiction over Great American.

> ### b. Great American raises no new grounds to justify dismissal of this Colorado case based on the pending Washington Malpractice/Insurance action.

On the issue of dismissing this Colorado case based on legal developments in Washington, the Court is concerned about revisiting a question that has been twice decided before (at least by this Magistrate Judge). Great American has stepped into the shoes of C3 in connection with the assignment of rights to the excess policy, *see* Fed.

R. Civ. P. 25(c), and, to some extent, has to live with legal decisions already issued in this case. The law of the case doctrine provides that once a rule of law is decided in a case, it should stay decided. "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) (same). This doctrine is designed to promote finality and prevent re-litigation of previously decided issues, but does not serve to limit a court's power. *Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir. 1996). When law of the case doctrine applies, three circumstances generally warrant departure from the prior ruling: (1) new and different evidence; (2) intervening controlling authority; or (3) a clearly erroneous prior decision which would work a manifest injustice. *Rimbert v. Eli Lilly and Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011).

Of course, the law of the case does not technically prevent a trial court from revisiting, before entry of final judgment, a prior ruling. *Id.*; *see also Been v. O.K. Indus.*, 495 F.3d 1217, 1225 (10th Cir. 2007) (concluding that "district courts generally remain free to reconsider their earlier interlocutory orders"); *Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge." (quotation omitted)). But the law of the case doctrine nevertheless "directs a court's discretion." *Arizona v. California*, 460 U.S. at 618.

In this District, the discretion to revisit a prior decision is exercised with restraint. The issue usually comes up in the context of a motion for reconsideration. Such motions fall within the Court's plenary power to revisit and amend interlocutory orders as justice

requires. *See Paramount Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1090 (10th Cir. 1980) (citing Fed. R. Civ. P. 54(b)); *Houston Fearless Corp. v. Teter*, 313 F.2d 91, 92 (10th Cir. 1962). To avoid the inefficiency which would attend the repeated re-adjudication of interlocutory orders, judges in this district have imposed limits on their broad discretion to revisit interlocutory orders. *See, e.g., Montano v. Chao*, No. 07-cv-00735-EWN-KMT, 2008 WL 4427087, at \*5–6 (D. Colo. Sept. 28, 2008) (applying Rule 60(b) analysis to the reconsideration of interlocutory order); *United Fire & Cas. Co. v. McCrerey & Roberts Constr. Co.*, No. 06-cv-00037-WYD-CBS, 2007 WL 1306484, at \*1–2 (D. Colo. May 3, 2007) (applying Rule 59(e) standard to the reconsideration of the duty-to-defend order). "Regardless of the analysis applied, the basic assessment tends to be the same: courts consider whether new evidence or legal authority has emerged or whether the prior ruling was clearly in error." *Rivera v. Exeter Fin. Corp.*, No. 15-cv-01057-PAB-MEH, 2019 WL 6173666, at \*1 (D. Colo. Nov. 19, 2019). A motion to reconsider is generally an inappropriate vehicle to advance "new arguments, or supporting facts which were available at the time of the original motion." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

Here, Great American presents no persuasive argument that the Court should revisit its prior decision(s) denying dismissal or a stay based on the existence (or potential existence) of the Washington state litigation.

Great American says that in the Vandivere personal injury case, "C3 was squeezed from two sides: its excess insurer HCC unilaterally excused itself from its coverage obligations after the loss occurred, while its lawyers, abetted by HCC, committed a remarkable series of blunders that incensed the trial court and hopelessly

compromised C3's position." Dkt. #67 at 4–5. According to Great American, "[t]he double squeeze resulted in a largely unitary damages claim: Great American paid millions above its policy limits to settle the case and protect C3 from a potentially staggering judgment." *Id.* at 5. Great American maintains that it has "valid and intertwined claims" against both HCC and the lawyers, and those claims "should be heard together in one court, which can only be a Washington court because the lawyers are beyond this Court's reach." *Id.*

The allegation that HCC somehow "abetted" the lawyers' misconduct stems from the assertion that C3's original defense counsel, J. Scott Wood, had failed to update C3's disclosures to reflect that HCC had rescinded its $4 million excess policy. Thus, the Vandivere plaintiff and Great American purportedly did not know about the recission until near the eve of trial. Mr. Wood changed firms, joining the Gordon Rees firm, which inconveniently happened to represent HCC against C3 in the recission matter. Mr. Wood did this just six weeks before the scheduled start of the Vanidivere personal injury trial. Mr. Wood tried to take the defense of the Vandivere case with him to Gordon Rees. But, because of the conflict (fighting C3 on the insurance coverage question on the one hand, while defending C3 on the personal injury claim on the other), he ended up withdrawing. It is fair to say that the Washington state judge was not pleased. The judge was even less pleased when new counsel for C3 revealed for the first time to Great American and the Vandivere plaintiff that the HCC excess policy had been rescinded. Plaintiff's counsel moved for sanctions because of Mr. Wood's nondisclosure and other attorney misconduct. The trial judge granted the motion for sanctions, noting

that he would provide a jury instruction allowing the jury to draw a negative inference from the discovery misconduct. *See id.* at 7.

According to Great American, Vandivere's counsel adopted the position that, because of C3's lawyers' misconduct, Great American was obligated to fund the entirety of the any judgment, irrespective of any limit. Great American made repeated appeals to HCC to contribute to the settlement, but HCC rebuffed those requests. "With the case in shambles and HCC refusing to help, Great American [allegedly] had little choice but to accede to plaintiff's demands." *Id.* Great American says that HCC undermined the defense of the Vandivere personal injury case not just by cancelling its policy, "but by cancelling it without notice to the interested parties and leaving them in the lurch with the trial impending." *Id.* Thus, according to Great American, the validity or invalidity of the HCC excess policy is just one small piece of a much larger puzzle, which includes "a serious issue of Washington law not only as to whether HCC could cancel or rescind, but also whether it could cancel in the manner, and under the circumstances, that it did." *Id.* at 7–8. Therefore, per Great American, whether Great American was harmed by the lawyers' conduct and/or some combination of HCC's allegedly inappropriate recission is "an involved factual question" that can only be addressed in its entirety by one court— the one in Washington that has jurisdiction over the lawyers.

Great American also asserts that, in now seeking abstention or dismissal, it is differently situated from C3. If the Court exercises its discretion to hear this case, it will supposedly expose Great American to an unnecessary risk of inconsistent judgments, in part because complete relief as to Great American cannot be obtained in Colorado because the lawyers cannot be joined as defendants here, and because in the

Washington action, HCC has pleaded affirmative defenses based on the intervening causes or contributory fault of the lawyers. *Id.* at 9. Great American claims that HCC has engaged in "procedural fencing" by first seeking to rescind without informing Great American, then filing a preemptive suit here in Colorado with knowledge that Great American would be filing suit in Washington. *Id.* at 10. Great American also takes issue with HCC attempting unsuccessfully to remove to federal court the Washington Malpractice/Insurance Lawsuit, suggesting HCC's conduct was part of its pattern of "procedural fencing." *Id.* at 10-11.

Notwithstanding these arguments, there is nothing earth-shaking in Great American's presentation that would justify changing a decision already made by this Court. Yes, Great American is a defendant now. But it is only so because it has stepped into the shoes of C3. C3 twice argued that Washington would be a better forum for the resolution of all these claims. Twice before those arguments were rejected. Looking to the standard for a motion for reconsideration, I do not find that there is new evidence or legal authority that has emerged, and do not find that my prior decisions were "clearly in error." In addition, despite Great American's presence in this case, there remains a continuing dispute between HCC and C3, its Colorado insured, with respect to whether the excess insurance remains valid in connection with other belay devices products that are out in the marketplace.

### c. New Developments in the Washington case militate against Abstention.

Great American accuses HCC of "procedural fencing" for filing a preemptive lawsuit in Colorado with supposed knowledge that a suit would be filing Washington state. But Great American has done some procedural fencing of its own.

Consistent with Judge Rodriguez' practice standards, on January 4, 2024, HCC moved for permission to file an early motion for summary judgment in this case. *See* Dkt. #62. On January 25, 2024, Great American filed an opposition to HCC's motion. *See* Dkt. #73. Great American argued against any early motion for summary judgment, asserting that there are fact questions about whether C3 made misrepresentations in denying there was a product recall, and that C3's principal had sought advice from his insurance broker on how to answer the question on the insurance application about recalls. *Id.* at 2. Great American also says that any summary judgment motion in this case would be met by a Rule 56(d) affidavit seeking more discovery, in part because Great American was recently added and has not had any opportunity to take discovery. Great American says it would seek discovery from the broker who allegedly advised C3's principal on how to answer the "recall" question, and from HCC on how the alleged misstatement may have materially affected HCC's acceptance of the risk and whether HCC relied on the misstatement to its detriment. *Id.* at 3. Great American concluded its opposition to HCC's request to file an early motion for summary judgment with the statement, "Great American is content to adhere to the usual procedures of federal courts—establishing jurisdiction, allowing reasonable discovery, and reserving factual questions for trial." *Id.* at 4–5.

But while Great American opposed HCC's effort to file for early summary judgment in Colorado, Great American concurrently attempted to file its own motion for partial summary judgment in the Washington Malpractice/Insurance Lawsuit and scheduled oral argument there. *See* Dkt. #93-1 (notice of setting for C3's Motion for

Partial Summary Judgment). One could say this constitutes a form of "procedural fencing": taking inconsistent positions in two different courts.

On March 24, 2024, the Washington state court vacated the hearing set on Great American's partial summary judgment motion on the issue of recission and further ordered that "[n]o party shall file a dispositive motion on the issue of recission in this matter." Dkt. #93-2 (Order of the Superior Court of State of Washington, King County, issued March 24, 2024). Great American has sought reconsideration of this order. A briefing schedule has been set on Great American's motion for reconsideration, and the hearing (without argument) is scheduled for April 9, 2024. Dkt. #95-1 at 3–4.

Notwithstanding potential future developments in the Washington Malpractice/Insurance Lawsuit, as it presently stands, no one in that case is permitted to move for summary judgment on issues of recission. HCC has pending before this Court a motion for permission to file an early motion for summary judgment on the recission question. Discovery in this case continues.

## IV. RECOMMENDATION

Based on all of the above, including my prior decisions denying a stay or dismissal of this case in favor of the Washington Malpractice/Insurance Lawsuit, the fact that the heart of this case involves a Colorado insurance policy issued to a Colorado insured, with the validity of the HCC excess policy (or HCC's decision to rescind) likely to be determined under Colorado law, I see no basis to reconsider my prior decisions that this case should proceed.

Therefore, because there is personal jurisdiction over Great American and there is no basis to abstain from deciding the question of the validity of HCC rescission of its

excess policy, the Court **RECOMMENDS** that Defendant Great American's Motion to Dismiss (Dkt. #67) be **DENIED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives** *de novo* **review of the recommendation by the District Judge,** *Thomas v. Arn*, **474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.** *Makin v. Colo. Dep't of Corr.*, **183 F.3d 1205, 1210 (10th Cir. 1999);** *Talley v. Hesse*, **91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:   April 2, 2024
         Denver, Colorado

N. Reid. Neureiter
United States Magistrate Judge